# 22-0972-cv

## United States Court of Appeals

*for the*

## Second Circuit

CHASE WILLIAMS, individually and on behalf
of all others similarly situated,

*Plaintiff-Appellant,*

JD ANDERSON, COREY HARDIN, ERIC LEE, individually
and on behalf of all others similarly situated, BRETT MESSIEH, DAVID
MUHAMMAD, RANJITH THIAGARAJAN, TOKEN FUND I LLC,

*Lead-Plaintiffs-Appellants,*

– v. –

BINANCE, CHANGPENG ZHAO,

*Defendants-Appellees,*

YI HE, ROGER WANG,

*Defendants.*

———————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 3 of 3 (Pages A-413 to A-663)

CAITLIN J. HALLIGAN
JORDAN GOLDSTEIN
DAVID COON
SELENDY GAY ELSBERG PLLC
*Attorneys for Plaintiffs-Appellants*
1290 Avenue of the Americas
New York, New York 10104
(212) 390-9000

JAMES P. ROUHANDEH
DANIEL J. SCHWARTZ
MARIE KILLMOND
DAVIS POLK & WARDWELL LLP
*Attorneys for Defendants-Appellees*
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

i

# TABLE OF CONTENTS

Page

Docket Entries.................................................. A-1

Amended Complaint, filed September 11, 2020
(Omitted herein)

Exhibit A to Amended Complaint -
JD Anderson Certification, dated
September 9, 2020 ................................... A-15

Exhibit B to Amended Complaint -
Corey Harden Certification, dated
September 10, 2020 ................................. A-40

Exhibit C to Amended Complaint -
Eric Lee Certification, dated
September 10, 2020 ................................. A-67

Exhibit D to Amended Complaint -
Brett Messieh Certification, dated
September 10, 2020 ................................. A-70

Exhibit E to Amended Complaint -
David Muhammad Certification, dated
September 10, 2020 ................................. A-84

Exhibit F to Amended Complaint -
Ranjith Thiagarajan Certification, dated
September 10, 2020 ................................. A-123

Exhibit G to Amended Complaint -
Chase Williams Certification, dated
September 10, 2020 ................................. A-126

Exhibit H to Amended Complaint -
Token Funds Certification, dated
September 10, 2020 ................................. A-132

ii

                                                                    **Page**

Second Amended Complaint, dated
    December 15, 2020.................................................. A-150

Declaration of James P. Rouhandeh, for Defendants,
    in Support of Motion to Dismiss the Second
    Amended Complaint, dated February 16, 2021
    (Omitted herein)

    Exhibit 1 to Rouhandeh Declaration -
    Binance Terms of Use, revised
    February 20, 2019.................................................. A-489

    Exhibit 2 to Rouhandeh Declaration -
    Webpage entitled "FAQ," on Binance's Website... A-512

    Exhibit 3 to Rouhandeh Declaration -
    Table reflecting the Earliest and Latest Alleged
    Purchases of each Token........................................ A-522

    Exhibit 4 to Rouhandeh Declaration -
    Webpage entitled "National Securities Exchanges,"
    available on the Website of the U.S. Securities and
    Exchange Commission .......................................... A-525

    Exhibit 5 to Rouhandeh Declaration -
    Webpage entitled " Company Information About
    Active Broker-Dealers," available on the Website of
    the U.S. Securities and Exchange Commission ....... A-529

    Exhibit 6 to Rouhandeh Declaration -
    "Framework for 'Investment Contract' Analysis
    of Digital Assets Guidance," dated April 3, 2019.. A-537

    Exhibit 7 to Rouhandeh Declaration -
    U.S. Securities and Exchange Commission's
    Exchange Act Release No. 81207......................... A-547

iii

**Page**

Exhibit 8 to Rouhandeh Declaration -
"Statement on Potentially Unlawful Online
Platforms for Trading Digital Assets" by the U.S.
Securities and Exchange Commission's Exchange
Act Divisions of Enforcement and Trading
Markets, dated March 7, 2018 .................................. A-566

Exhibit 9 to Rouhandeh Declaration -
Article by Kate Rooney entitled "SEC chief says
agency won't change securities laws to cater to
cryptocurrencies," published by CNBC on
June 6, 2018 ............................................................. A-571

Exhibit 10 to Rouhandeh Declaration -
Remarks made by William Hinman, Director of
the SEC's Division of Corporation Finance, at the
Yahoo Finance All Markets Summit on
June 14, 2018 ............................................................ A-576

Exhibit 11 to Rouhandeh Declaration -
Binance Terms of Use, revised July 6, 2017 .......... A-583

Exhibit 12 to Rouhandeh Declaration -
Binance Terms of Use, revised January 13, 2021 .. A-596

Exhibit 13 to Rouhandeh Declaration -
Table setting forth the Statutory Nexus
Requirement in the Blue Sky Law for each
Jurisdiction ............................................................. A-620

Stipulation and Order re: Voluntary Dismissal of He
and Wang, dated April 5, 2021 ............................... A-633

Declaration of Kyle W. Roche, for Plaintiffs, in
Opposition to Motion to Dismiss the Second
Amended Complaint, dated April 19, 2021
(Omitted herein)

iv

**Page**

Exhibit 1 to Roche Declaration -
Screenshot of Binance's Registration Page from
Binance's Website .................................................. A-636

Exhibit 2 to Roche Declaration -
February 28, 2018 *Forbes* article entitled "From
Zero To Crypto Billionaire In Under A Year:
Meet The Founder Of Binance".............................. A-638

Exhibit 3 to Roche Declaration -
March 7, 2019 Tweet showing Zhao
(@cz_binance), on his Personal Twitter Account,
stating that "it is my duty to promote $BNB" ....... A-645

Exhibit 4 to Roche Declaration -
Screenshot of January 29, 2021 Tweet showing
Zhao (@cz_binance), on his Personal Twitter
Account, stating that "[w]ithdrawals suspended
again" .................................................................... A-647

Exhibit 5 to Roche Declaration -
Screenshot of January 29, 2021 Tweet showing
Zhao (@cz_binance) replying to his Tweet
referenced in Ex. 4 ................................................ A-649

Exhibit 6 to Roche Declaration -
May 27, 2019 Tweet showing Zhao
(@cz_binance), on his Personal Twitter Account,
informing his Followers that Binance "[h]ad
some system performance bottlenecks, trading
saw some delays, fixed now"................................. A-651

Declaration of James P. Rouhandeh, for Defendants,
in Support of Motion to Dismiss the Second
Amended Complaint, dated June 3, 2021
(Omitted herein)

v

**Page**

Exhibit 1 to Rouhandeh Declaration -
Declaration of Corey Hardin, Plaintiff, in
Opposition to Motion to Dismiss the Amended
Complaint, dated February 14, 2021 ..................... A-653

Exhibit 2 to Rouhandeh Declaration -
Declaration of David Muhammad, Plaintiff, in
Opposition to Motion to Dismiss the Amended
Complaint, dated February 14, 2021 ..................... A-655

Exhibit 3 to Rouhandeh Declaration -
Declaration of Chase Williams, Plaintiff, in
Opposition to Motion to Dismiss the Amended
Complaint, dated February 14, 2021 ..................... A-657

Exhibit 4 to Rouhandeh Declaration -
List of States with Blue Sky Law Limitations
Periods of 1 or 2 Years........................................... A-659

Notice of Appeal, dated April 29, 2022 ..................... A-661

1244.  Upon information and belief, the Tokens were offered or sold in North Dakota, including without limitation through solicitations directed by Binance to North Dakota and received in North Dakota.

1245.  Accordingly, Binance has violated the North Dakota Securities Act through Binance's sale of unregistered securities.

1246.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1247.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

<div align="center">

**ONE-HUNDRED-AND-THIRD CAUSE OF ACTION**
**(NORTH DAKOTA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**N.D.C.C. § 10-04-17**
**(Binance)**

</div>

1248.  Plaintiffs reallege the allegations above.

1249.  This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in North Dakota.

1250.  The North Dakota Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under North Dakota law. N.D.C.C. § 10-04-10. Any person who offers or sells a security in violation of Section 10 is liable to "such purchaser" who "may sue either at law or in equity to recover the full amount paid," together with "all taxable court costs, interest as provided in this subsection, and reasonable attorney's fees, less the amount of any income received on the securities, upon tender to the seller,

in person or in open court, of the securities sold or of the contracts made, or for damages if the purchaser no longer owns the securities." Id. § 10-04-17 (1).

1251.   When issued, the Tokens were securities within the meaning of the North Dakota Securities Act. *Id.* § 10-04-02(19). On information and belief, Binance transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in North Dakota. *Id.* §§ 10-04-02 (1), (3).

1252.   On information and belief, Binance transacted business as a broker-dealer or agent in North Dakota, including without limitation through solicitations directed by Binance to North Dakota and received in North Dakota.

1253.   Binance was not registered as a broker-dealer or agent in North Dakota, nor was it subject to any exemption from registration.

1254.   Accordingly, Binance has violated the North Dakota Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1255.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1256.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-FOURTH CAUSE OF ACTION
### (NORTH DAKOTA STATE LAW – ADDITIONAL LIABILITY)
### Control Person Liability
### N.D.C.C. § 10-04-17
### (Individual Defendants)

1257.   Plaintiffs reallege the allegations above.

1258.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in North Dakota.

1259.   Every person who directly or indirectly controls a seller liable under the North Dakota Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as well as any person who "supervises, or serves as an officer, director, or managing partner of a person liable under this section," an individual "who is an employee of or associated with a person liable under this section and who materially aids the conduct giving rise to the liability," as well as every "person that is a broker-dealer, agent, investment adviser, or investment adviser representative that materially aids the conduct giving rise to the liability," is jointly and severally liable with and to the same extent as the seller, unless that person or individual "did not know, and in the exercise of reasonable care could not have known, of the existence of conduct by reason of which the liability is alleged to exist." N.D.C.C. § 10-04-17(6).

1260.   When issued, the Tokens were securities within the meaning of the North Dakota Securities Act. *Id.* § 10-04-02 (19). On information and belief, Binance offered and sold the Tokens to members of the Class in North Dakota and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the North Dakota Securities Act, and Binance was not registered or exempt from registration as a broker-dealer or agent under North Dakota law. *Id.* § 10-04-04.

1261.   On information and belief, Binance offered and sold the Tokens and acted as a broker-dealer or agent in North Dakota, including without limitation through solicitations directed by Binance to North Dakota and received in North Dakota.

1262.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1263.   Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the North Dakota Securities Act through Binance's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1264.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1265.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ONE-HUNDRED-AND-FIFTH CAUSE OF ACTION
### (OHIO STATE LAW – PRIMARY LIABILITY)
#### Unregistered Sale of Securities
#### Ohio Rev. Code Ann. § 1707.43
#### (Binance)

1266.   Plaintiffs reallege the allegations above.

1267.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Ohio.

1268.   The Ohio Securities Act forbids the sale of unregistered securities. Ohio Rev. Code Ann. § 1707.09 (A)(1). Any person who sells a security in violation of Section 9(A)(1) is liable to

the purchaser "in an action at law in any court of competent jurisdiction" for "the full amount paid by the purchaser and for all taxable costs." *Id.* § 1707.43(A).

1269.   When issued, the Tokens were securities within the meaning of the Ohio Securities Act. *Id.* § 1707.01(B). On information and belief, Binance sold the Tokens to members of the Class in Ohio. The Tokens were neither registered under, nor subject to exemption from registration under the Ohio Securities Act. *Id.* § 1707.09.

1270.   The Tokens were sold in Ohio, including without limitation through solicitations directed by Binance to Ohio and received in Ohio.

1271.   Accordingly, Binance has violated the Ohio Securities Act through Binance's sale of unregistered securities.

1272.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1273.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-SIXTH CAUSE OF ACTION
### (OHIO STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Dealer
### Ohio Rev. Code Ann. § 1707.43
### (Binance)

1274.   Plaintiffs reallege the allegations above.

1275.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Ohio.

1276.   The Ohio Securities Act forbids any person from transacting business as a dealer unless he is registered or exempt from registration under Ohio law. Ohio Rev. Code Ann. §

1707.14.  Any person who sells a security in violation of Section 14 is "liable to the purchaser "in an action at law in any court of competent jurisdiction" for " the full amount paid by the purchaser and for all taxable costs. *Id.* § 1707.43(A).

1277.  When issued, the Tokens were securities within the meaning of the Ohio Securities Act. *Id.* § 1707.01(B). On information and belief, Binance transacted business as a dealer when it sold the Tokens to members of the Class in Ohio. *Id.* §§ 1707 E (1).

1278.  On information and belief, Binance transacted business as a dealer in Ohio, including without limitation through solicitations directed by Binance to Ohio and received in Ohio.

1279.  Binance was not registered as a dealer in Ohio, nor was it subject to any exemption from registration.

1280.  Accordingly, Binance has violated the Ohio Securities Act by transacting business as an unregistered dealer in the sale of securities.

1281.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1282.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE-HUNDRED-AND-SEVENTH CAUSE OF ACTION**
**(OHIO STATE LAW – ADDITIONAL LIABILITY)**
**Joint and Several Liability**
**Ohio Rev. Code Ann. § 1707.43**
**(Individual Defendants)**

1283.  Plaintiffs reallege the allegations above.

1284.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Ohio.

1285.   Every person that has "participated in or aided the seller in any way in making" the sale or contract for sale, are "jointly and severally liable" to the purchaser. Ohio Rev. Code Ann. § 1707.43.

1286.   When issued, the Tokens were securities within the meaning of the Ohio Securities Act. *Id.* § 1707.01(B). On information and belief, Binance sold the Tokens to members of the Class in Ohio and acted as the dealer for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Ohio Securities Act, and Binance was not registered or exempt from registration as a dealer under Ohio law. *Id.* §§ 1707.09, 1707.14.

1287.   Binance sold the Tokens and acted as a dealer in Ohio, including without limitation through solicitations directed by Binance to Ohio and received in Ohio.

1288.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered dealer as described herein.

1289.   Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Ohio Securities Act through Binance's sale of unregistered securities and operation as an unregistered dealer.

1290.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1291.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-EIGHTH CAUSE OF ACTION
### (OKLAHOMA STATE LAW – PRIMARY LIABILITY)
#### Unregistered Offer and Sale of Securities
#### Okla. Sta. Ann. tit. 71§ 1-509(C)
#### (Binance)

1292.   Plaintiffs reallege the allegations above.

1293.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Oklahoma.

1294.   The Oklahoma Securities Act forbids the offer or sale of unregistered securities. Okla. Sta. Ann. tit. 71 § 1-301. Any person who offers or sells a security in violation of Section 301 is liable to the "purchaser may maintain an action at law or in equity to recover the consideration paid for the security, and interest at the legal rate of interest per year from the date of the purchase, less the amount of any income received on the security, plus costs, and reasonable attorneys' fees determined by the court, upon the tender of the security, or for actual damages" "*Id.* § 1-509 (B)(1).

1295.   When issued, the Tokens were securities within the meaning of the Oklahoma Securities Act. *Id.* § 1-102 (32). On information and belief, Binance offered or sold the Tokens to members of the Class in Oklahoma. The Tokens were neither registered under, nor subject to exemption from registration under the Oklahoma Securities Act. *Id.* § 1-301.

1296.  Upon information and belief, the Tokens were offered or sold in Oklahoma, including without limitation through solicitations directed by Binance to Oklahoma and received in Oklahoma.

1297.  Accordingly, Binance has violated the Oklahoma Securities Act through Binance's sale of unregistered securities.

1298.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1299.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE-HUNDRED-AND-NINTH CAUSE OF ACTION**
**(OKLAHOMA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Okla. Sta. Ann. tit. 71§ 1-509 (D)**
**(Binance)**

1300.  Plaintiffs reallege the allegations above.

1301.  This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Oklahoma.

1302.  The Oklahoma Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Oklahoma law. Okla. Sta. Ann. tit. 71 §§ 1-401-2. Any person who offers or sells a security in violation of Sections 401 and 402 is liable to the customer, if purchaser, who "may maintain an action at law or in equity for recovery of actual damages…" in " the amount that would be recoverable upon a tender, less the value of the security when the purchaser disposed of it, and interest at the legal rate of interest

per year from the date of purchase, costs, and reasonable attorneys' fees determined by the court." *Id.* § § 1-509 (D).

1303.  When issued, the Tokens were securities within the meaning of the Oklahoma Securities Act. *Id.* § 1-102. On information and belief, Binance transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in Oklahoma. *Id.* §§ 1-102(4),(2).

1304.  On information and belief, Binance transacted business as a broker-dealer or agent in Oklahoma, including without limitation through solicitations directed by Binance to Oklahoma and received in Oklahoma.

1305.  Binance was not registered as a broker-dealer or agent in Oklahoma, nor was it subject to any exemption from registration.

1306.  Accordingly, Binance has violated the Oklahoma Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1307.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1308.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-TENTH CAUSE OF ACTION
### (OKLAHOMA STATE LAW – ADDITIONAL LIABILITY)
### Control Person Liability
### Okla. Sta. Ann. tit. 71§ 1-509 (G)
### (Individual Defendants)

1309.  Plaintiffs reallege the allegations above.

261

1310. This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Oklahoma.

1311. Every person who directly or indirectly controls an entity liable under the Oklahoma Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as every "managing partner, executive officer, or director" of such seller, "including an individual having similar status or performing similar functions," every employee of or associated with such a seller who materially aids in the sale" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. Okla. Sta. Ann. tit. 71§ 1-509(G).

1312. When issued, the Tokens were securities within the meaning of the Oklahoma Securities Act. *Id.* § 1-102. On information and belief, Binance offered and sold the Tokens to members of the Class in Oklahoma and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Oklahoma Securities Act, and Binance was not registered or exempt from registration as a broker-dealer or agent under Oklahoma law. *Id.* § 1-401-02.

1313. On information and belief, Binance offered and sold the Tokens and acted as a broker-dealer or agent in Oklahoma, including without limitation through solicitations directed by Binance to Oklahoma and received in Oklahoma.

1314. Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the

management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1315.  Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Oklahoma Securities Act through Binance's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1316.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1317.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE-HUNDRED-AND-ELEVENTH CAUSE OF ACTION**
**(OREGON STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**O.R.S. § 59:115**
**(Binance)**

1318.  Plaintiffs reallege the allegations above.

1319.  This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Oregon.

1320.  The Oregon Securities Act forbids the offer or sale of unregistered securities. O.R.S. § 59:055. Any person who offers or sells a security in violation of Section 55 "is liable to the purchaser," who may recover "the consideration paid for the security, and interest from the date of payment equal to the greater of the rate of interest specified in ORS 82.010 for judgements for the payment of money or the rate provided in the security if the security in an interest bearing

263

obligation, less any amount received on the security, or if the purchaser no longer owns the security, damages." Id. §§ 59.115 (2)(a)-(b).

1321.  When issued, the Tokens were securities within the meaning of the Oregon Securities Act. *Id.* § 59.015 (19). On information and belief, Binance offered or sold the Tokens to members of the Class in Oregon. The Tokens were neither registered under, nor subject to exemption from registration under the Oregon Securities Act. *Id.* § 59.055 .

1322.  Upon information and belief, the Tokens were offered or sold in Oregon, including without limitation through solicitations directed by Binance to Oregon and received in Oregon.

1323.  Accordingly, Binance has violated the Oregon Securities Act through Binance's sale of unregistered securities.

1324.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1325.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-TWELFTH CAUSE OF ACTION
### (OREGON STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Broker-Dealer
### O.R.S. § 59:115
### (Binance)

1326.  Plaintiffs reallege the allegations above.

1327.  This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Oregon.

1328.  The Oregon Securities Act forbids any person from transacting business as a broker-dealer or salesperson unless he is registered under Oregon law. O.R.S. § 59:165. Any

person who offers or sells a security in violation of Section 165 is "liable to the purchaser" who may recover "the consideration paid for the security, and interest from the date of payment equal to the greater of the rate of interest specified in ORS 82.010 for judgements for the payment of money or the rate provided in the security if the security in an interest bearing obligation, less any amount received on the security, or if the purchaser no longer owns the security, damages." *Id.* § 59.115 (2).

1329.  When issued, the Tokens were securities within the meaning of the Oregon Securities Act. *Id.* § 59.015 (19). On information and belief, Binance transacted business as a broker-dealer or salesperson when it offered or sold the Tokens to members of the Class in Oregon. *Id.* § 59.015 (1),(18).

1330.  On information and belief, Binance transacted business as a broker-dealer or salesperson in Oregon, including without limitation through solicitations directed by Binance to Oregon and received in Oregon.

1331.  Binance was not registered as a broker-dealer or salesperson in Oregon, nor was it subject to any exemption from registration.

1332.  Accordingly, Binance has violated the Oregon Securities Act by transacting business as an unregistered broker-dealer or salesperson in the sale of securities.

1333.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1334.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ONE-HUNDRED-AND-THIRTEENTH CAUSE OF ACTION
### (OREGON STATE LAW – ADDITIONAL LIABILITY)
#### Control Person Liability
#### O.R.S. § 59:115 (3)
#### (Individual Defendants)

1335.  Plaintiffs reallege the allegations above.

1336.  This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Oregon.

1337.  Every person who directly or indirectly controls an entity liable under the Oregon Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or salesperson in the sale of those securities, as well as every "partner, limited liability company manager, including a member who is a manager, officer or director of such seller", "every person occupying a similar status or performing similar functions," and "every person who participated or materially aids in the sale" is liable for unlawfully selling unregistered securities, unless that nonseller "sustains the burden of proof that the nonseller did not know, and, in the exercise of reasonable care could not have known, of the existence of facts on which the liability is based." O.R.S. § 59:115 (3).

1338.  When issued, the Tokens were securities within the meaning of the Oregon Securities Act. *Id.* § O.R.S.§ 59.015 (19).  On information and belief, Binance offered and sold the Tokens to members of the Class in Oregon and acted as the broker-dealer or salesperson for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Oregon Securities Act, and Binance was not registered as a broker-dealer or salesperson under Oregon law. *Id.* § 59.165.

1339.  Binance offered and sold the Tokens and acted as a broker-dealer or salesperson in Oregon, including without limitation through solicitations directed by Binance to Oregon and received in Oregon.

1340.  Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or salesperson as described herein.

1341.  Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Oregon Securities Act through Binance's offer or sale of unregistered securities and operation as an unregistered broker-dealer or salesperson.

1342.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1343.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE-HUNDRED-AND-FOURTEENTH CAUSE OF ACTION**
**(PENNSYLVANIA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**70 Pa. Stat. Ann. § 1-502**
**(Binance)**

1344.  Plaintiffs reallege the allegations above.

1345.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Pennsylvania.

1346.   The Pennsylvania Securities Act forbids the offer or sale of unregistered securities. 70 Pa. Stat. Ann. § 1-201. Any person who offers or sells a security in violation of Section 1-201 is "liable to the person purchasing the security offered or sold in violation of section 201 from him who may sue either at law or in equity to recover the consideration paid for the security, together with interest at the legal rate from the date of payment, less the amount of any income or distributions, in cash or in kind, received on the security, upon the tender of the security, or for damages if he no longer owns the security." *Id.* § 1-502.

1347.   When issued, the Tokens were securities within the meaning of the Pennsylvania Securities Act. *Id.* § 1-102(t). On information and belief, Binance offered or sold the Tokens to members of the Class in Pennsylvania. The Tokens were neither registered under, nor subject to exemption from registration under the Pennsylvania Securities Act. *Id.* § 1-202.

1348.   Upon information and belief, the Tokens were offered or sold in Pennsylvania, including without limitation through solicitations directed by Binance to Pennsylvania and received in Pennsylvania.

1349.   Accordingly, Binance has violated the Pennsylvania Securities Act through Binance's sale of unregistered securities.

1350.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1351.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

Case 22-972, Document 57, 07/28/2022, 3356258, Page24 of 257

### ONE-HUNDRED-AND-FIFTEENTH CAUSE OF ACTION
### (PENNSYLVANIA STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Broker-Dealer
### 70 Pa. Stat. Ann. § 1-501(a)
### (Binance)

1352.   Plaintiffs reallege the allegations above.

1353.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Pennsylvania.

1354.   The Pennsylvania Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Pennsylvania law. 70 Pa. Stat. Ann. § 1-301(a). Any person who offers or sells a security in violation of Section 1-301(a) is "liable to the person purchasing the security from him, who may sue either at law or in equity to recover the consideration paid for the security together with interest at the legal rate from the date of payment, less the amount of any income or distributions, in cash or in kind, received on the security, upon the tender of the security, or for damages if he no longer owns the security." *Id.* § 1-501(a).

1355.   When issued, the Tokens were securities within the meaning of the Pennsylvania Securities Act. *Id.* § 1-102(t). On information and belief, Binance transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in Pennsylvania. *Id.* § 1-102(c) ("Agent"), (e) ("Broker-dealer").

1356.   On information and belief, Binance transacted business as a broker-dealer or agent in Pennsylvania, including without limitation through solicitations directed by Binance to Pennsylvania and received in Pennsylvania.

1357.   Binance was not registered as a broker-dealer or agent in Pennsylvania, nor was it subject to any exemption from registration.

269

1358.   Accordingly, Binance has violated the Pennsylvania Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1359.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1360.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-SIXTEENTH CAUSE OF ACTION
### (PENNSYLVANIA STATE LAW – ADDITIONAL LIABILITY)
### Control Person Liability
### 70 Pa. Stat. Ann. § 1-503
### (Individual Defendants)

1361.   Plaintiffs reallege the allegations above.

1362.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Pennsylvania.

1363.   Every affiliate of an entity liable under the Pennsylvania Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as every "partner, principal executive officer or director of such person" and "every person occupying a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist.  70 Pa. Stat. Ann. § 1-503(a).

1364.   When issued, the Tokens were securities within the meaning of the Pennsylvania Securities Act. *Id.* § 1-102. On information and belief, Binance offered and sold the Tokens to

members of the Class in Pennsylvania and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Pennsylvania Securities Act, *id.* § 1-202, and Binance was not registered or exempt from registration as a broker-dealer or agent under Pennsylvania law. *Id.* §§ 1-301, 1-302.

1365.  On information and belief, Binance offered and sold the Tokens and acted as a broker-dealer or agent in Pennsylvania, including without limitation through solicitations directed by Binance to Pennsylvania and received in Pennsylvania.

1366.  Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1367.  Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Pennsylvania Securities Act through Binance's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1368.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1369.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

271

## ONE-HUNDRED-AND-SEVENTEENTH CAUSE OF ACTION
### (PUERTO RICO STATE LAW – PRIMARY LIABILITY)
#### Unregistered Offer and Sale of Securities
#### 10 L.P.R.A. § 890
#### (Binance)

1370.   Plaintiffs reallege the allegations above.

1371.   This Cause of Action is brought on behalf of Plaintiffs and Class members to whom Tokens were offered or sold in Puerto Rico.

1372.   The Puerto Rico Securities Act forbids the offer or sale of unregistered securities. 10 L.P.R.A. § 871. Any person who offers or sells a security in violation of Section 871 is "liable to the person who buys the security, who may file suit to recover the price paid for the security, in addition to the interest at the rate applicable to judicial awards … starting on the date in which the payment, costs and reasonable Attorney's fees were made less the sum of any income received on, upon the tender of the security, or for damages if he no longer owns the security." *Id.* § 890.

1373.   When issued, the Tokens were securities within the meaning of the Puerto Rico Securities Act. *Id.* § 881. Binance offered or sold the Tokens to a Plaintiff in Puerto Rico. The Tokens were neither registered under, nor subject to exemption from registration under the Puerto Rico Securities Act. *Id.* § 882.

1374.   The Tokens were offered or sold in Puerto Rico, including without limitation through solicitations directed by Binance to Puerto Rico and received in Puerto Rico.

1375.   Accordingly, Binance has violated the Puerto Rico Securities Act through Binance's sale of unregistered securities.

1376.   Plaintiffs and Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1377.   Plaintiffs and Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-EIGHTEENTH CAUSE OF ACTION
### (PUERTO RICO STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Broker-Dealer
### 10 L.P.R.A. § 890
### (Binance)

1378.   Plaintiffs reallege the allegations above.

1379.   This Cause of Action is brought on behalf of Plaintiffs and Class members to whom Tokens were offered or sold in Puerto Rico.

1380.   The Puerto Rico Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered under Puerto Rico law. 10 L.P.R.A. § 861(a). Any person who offers or sells a security in violation of Section 861(a) is "liable to the person who buys the security, who may file suit to recover the price paid for the security, in addition to the interest at the rate applicable to judicial awards … starting on the date in which the payment, costs and reasonable Attorney's fees were made less the sum of any income received on, upon the tender of the security, or for damages if he no longer owns the security." *Id.* § 890.

1381.   When issued, the Tokens were securities within the meaning of the Puerto Rico Securities Act. *Id.* § 881. Binance transacted business as a broker-dealer or agent when it offered or sold the Tokens to a Plaintiff in Puerto Rico. *Id.*

1382.   Binance transacted business as a broker-dealer or agent in Puerto Rico, including without limitation through solicitations directed by Binance to Puerto Rico and received in Puerto Rico.

1383.   Binance was not registered as a broker-dealer or agent in Puerto Rico.

1384.  Accordingly, Binance has violated the Puerto Rico Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1385.  Plaintiffs and Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1386.  Plaintiffs and Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE-HUNDRED-AND-NINTEENTH CAUSE OF ACTION**
**(PUERTO RICO STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**10 L.P.R.A. § 890**
**(Individual Defendants)**

1387.  Plaintiffs reallege the allegations above.

1388.  This Cause of Action is brought on behalf of Plaintiffs and Class members to whom Tokens were offered or sold in Puerto Rico.

1389.  Every person who directly or indirectly controls an entity liable under the Puerto Rico Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "every partner, officer, or director of such a seller," and "every person occupying a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. 10 L.P.R.A. § 890(b).

1390.  When issued, the Tokens were securities within the meaning of the Puerto Rico Securities Act. *Id.* § 881. Binance offered and sold the Tokens to a Plaintiff in Puerto Rico and

acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Puerto Rico Securities Act, and Binance was not registered as a broker-dealer or agent under Puerto Rico law. *Id.* § 861(a).

1391.   Binance offered and sold the Tokens and acted as a broker-dealer or agent in Puerto Rico, including without limitation through solicitations directed by Binance to Puerto Rico and received in Puerto Rico.

1392.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1393.   Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Puerto Rico Securities Act through Binance's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1394.   Plaintiffs and Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1395.   Plaintiffs and Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ONE-HUNDRED-AND-TWENTIETH CAUSE OF ACTION
### (RHODE ISLAND STATE LAW – PRIMARY LIABILITY)
#### Unregistered Offer and Sale of Securities
#### 7 R.I. Gen. Laws Ann. § 7-11-605
#### (Binance)

1396.  Plaintiffs reallege the allegations above.

1397.  This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Rhode Island.

1398.  The Rhode Island Securities Act forbids the offer or sale of unregistered securities. 7 R.I. Gen. Laws Ann. § 7-11-301. Any person who offers or sells a security in violation of Section 7-11-301 is "liable to the purchaser of the security from that person" and "[u]pon tender of the security, the purchaser may recover the consideration paid for the security and interest at the legal rate of this state from the date of payment, costs, and reasonable attorney's fees as determined by the court, less the amount of income received on the security," or if the "purchaser no longer owns the security, the purchaser may recover damages" in the "amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, plus interest at the legal rate of this state from the date of disposition of the security, costs and reasonable attorney's fees as determined by the court." *Id.* § 7-11-605.

1399.  When issued, the Tokens were securities within the meaning of the Rhode Island Securities Act. *Id.* § 7-11-101(22). On information and belief, Binance offered or sold the Tokens to members of the Class in Rhode Island. The Tokens were neither registered under, nor subject to exemption from registration under the Rhode Island Securities Act. *Id.* § 7-11-401.

1400.  Upon information and belief, the Tokens were offered or sold in Rhode Island, including without limitation through solicitations directed by Binance to Rhode Island and received in Rhode Island.

276

1401.   Accordingly, Binance has violated the Rhode Island Securities Act through Binance's sale of unregistered securities.

1402.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1403.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-TWENTY-FIRST CAUSE OF ACTION
### (RHODE ISLAND STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Broker-Dealer
### 7 R.I. Gen. Laws Ann. § 7-11-605
### (Binance)

1404.   Plaintiffs reallege the allegations above.

1405.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Rhode Island.

1406.   The Rhode Island Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Rhode Island law. 7 R.I. Gen. Laws Ann. § 7-11-201(a). Any person who offers or sells a security in violation of Section 7-11-201(a) is "liable to the purchaser of the security from that person" and "[u]pon tender of the security, the purchaser may recover the consideration paid for the security and interest at the legal rate of this state from the date of payment, costs, and reasonable attorney's fees as determined by the court, less the amount of income received on the security," or if the "purchaser no longer owns the security, the purchaser may recover damages" in the "amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, plus

Case 22-972, Document 57, 07/28/2022, 3356258, Page33 of 257

A-439

interest at the legal rate of this state from the date of disposition of the security, costs and reasonable attorney's fees as determined by the court." *Id.* § 7-11-605(a).

1407.   When issued, the Tokens were securities within the meaning of the Rhode Island Securities Act. *Id.* § 7-11-101(22). On information and belief, Binance transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in Rhode Island. *Id.* § 7-11-101(1).

1408.   On information and belief, Binance transacted business as a broker-dealer or agent in Rhode Island, including without limitation through solicitations directed by Binance to Rhode Island and received in Rhode Island.

1409.   Binance was not registered as a broker-dealer or agent in Rhode Island, nor was it subject to any exemption from registration.

1410.   Accordingly, Binance has violated the Rhode Island Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1411.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1412.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-TWENTY-SECOND CAUSE OF ACTION
### (RHODE ISLAND STATE LAW – ADDITIONAL LIABILITY)
### Control Person Liability
### R.I. Gen. Laws Ann. § 7-11-605(d)
### (Individual Defendants)

1413.   Plaintiffs reallege the allegations above.

1414.  This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Rhode Island.

1415.  Every person who directly or indirectly controls an entity liable under the Rhode Island Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "a partner, officer, or director of the person liable" and "a person occupying a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. R.I. Gen. Laws Ann. § 7-11-605(d).

1416.  When issued, the Tokens were securities within the meaning of the Rhode Island Securities Act. *Id.* § 7-11-101(22). On information and belief, Binance offered and sold the Tokens to members of the Class in Rhode Island and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Rhode Island Securities Act, *id.* § 7-11-401, and Binance was not registered or exempt from registration as a broker-dealer or agent under Rhode Island law. *Id.* § 7-11-202.

1417.  On information and belief, Binance offered and sold the Tokens and acted as a broker-dealer or agent in Rhode Island, including without limitation through solicitations directed by Binance to Rhode Island and received in Rhode Island.

1418. Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the

management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1419.  Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Rhode Island Securities Act through Binance's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1420.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1421.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE-HUNDRED-AND-TWENTY-THIRD CAUSE OF ACTION**
**(SOUTH CAROLINA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**S.C. Code Ann. § 35-1-509**
**(Binance)**

1422.  Plaintiffs reallege the allegations above.

1423.  This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in South Carolina.

1424.  The South Carolina Securities Act forbids the offer or sale of unregistered securities. S.C. Code Ann. § 35-1-301. Any person who sells a security in violation of Section 35-1-301 is liable to the purchaser who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs and reasonable attorneys' fees determined by the

court" or for "actual damages" in the "amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorneys' fees determined by the court." *Id.* § 35-1-509(b).

1425.   When issued, the Tokens were securities within the meaning of the South Carolina Securities Act. *Id.* § 35-1-102(29). On information and belief, Binance sold the Tokens to members of the Class in South Carolina. The Tokens were neither registered under, nor subject to exemption from registration under the South Carolina Securities Act. *Id.* § 35-1-201.

1426.   Upon information and belief, the Tokens were sold in South Carolina, including without limitation through solicitations directed by Binance to South Carolina and received in South Carolina.

1427.   Accordingly, Binance has violated the South Carolina Securities Act through Binance's sale of unregistered securities.

1428.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1429.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-TWENTY-FOURTH CAUSE OF ACTION
### (SOUTH CAROLINA STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Broker-Dealer
### S.C. Code Ann. § 35-1-509
### (Binance)

1430.   Plaintiffs reallege the allegations above.

1431.  This Cause of Action is brought on behalf of Class members to whom Tokens were sold in South Carolina.

1432.  The South Carolina Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under South Carolina law. S.C. Code Ann. § 35-1-401(a). Any person who sells a security in violation of Section 35-1-401(a) is liable to the purchaser who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs and reasonable attorneys' fees determined by the court" or for "actual damages" in the "amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorneys' fees determined by the court." *Id.* §§ 35-1-509(d), 35-1-509(b).

1433.  When issued, the Tokens were securities within the meaning of the South Carolina Securities Act. *Id.* § 35-1-102(29). On information and belief, Binance transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in South Carolina. *Id.* §§ 35-1-102(2) ("Agent"), 35-1-102(4) ("Broker-dealer").

1434.  On information and belief, Binance transacted business as a broker-dealer or agent in South Carolina, including without limitation through solicitations directed by Binance to South Carolina and received in South Carolina.

1435.  Binance was not registered as a broker-dealer or agent in South Carolina, nor was it subject to any exemption from registration.

1436.  Accordingly, Binance has violated the South Carolina Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1437.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1438.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-TWENTY-FIFTH CAUSE OF ACTION
#### (SOUTH CAROLINA STATE LAW – ADDITIONAL LIABILITY)
#### Control Person Liability
#### S.C. Code Ann. § 31-1-509
#### (Individual Defendants)

1439.   Plaintiffs reallege the allegations above.

1440.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in South Carolina.

1441.   Every person who directly or indirectly controls an entity liable under the South Carolina Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as an individual "who is a managing partner, executive officer, or director of a person liable, … including an individual having a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. S.C. Code. Ann. § 31-1-509(g).

1442.   When issued, the Tokens were securities within the meaning of the South Carolina Securities Act. *Id.* § 35-1-102(29). On information and belief, Binance sold the Tokens to members of the Class in South Carolina and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from

registration under the South Carolina Securities Act, *id.* § 35-1-201, and Binance was not registered or exempt from registration as a broker-dealer or agent under South Carolina law. *Id.* § 35-1-401.

1443.   On information and belief, Binance sold the Tokens and acted as a broker-dealer or agent in South Carolina, including without limitation through solicitations directed by Binance to South Carolina and received in South Carolina.

1444.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1445.   Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the South Carolina Securities Act through Binance's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1446.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1447.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-TWENTY-SIXTH CAUSE OF ACTION
### (SOUTH DAKOTA STATE LAW – PRIMARY LIABILITY)
#### Sale of Unregistered Securities
#### S.D. Codified Laws § 47-31B-509(b)
#### (Binance)

1448.   Plaintiffs reallege the allegations above.

1449.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in South Dakota.

1450.   The South Dakota Securities Act forbids the sale of unregistered securities. S.D. Codified Laws § 47-31B-301. Any person who sells a security in violation of Section 47-31B-301 is liable for "the consideration paid for the security, less the amount of any income received on the security, and interest at Category D, § 54-3-16 from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security, or for actual damages." *Id.* § 47-31B-509(b).

1451.   When issued, the Tokens were securities within the meaning of the South Dakota Securities Act. *Id.* § 47-31B-102(28). On information and belief, Binance sold the Tokens to members of the Class in South Dakota. The Tokens were neither registered under, nor subject to exemption from registration under the South Dakota Securities Act. *Id.* §§ 47-31B-201-47-31B-203.

1452.   Upon information and belief, the Tokens were sold in South Dakota, including without limitation through solicitations directed by Binance to South Dakota and received in South Dakota.

1453.   Accordingly, Binance has violated the South Dakota Securities Act through Binance's sale of unregistered securities.

1454.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1455.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-TWENTY-SEVENTH CAUSE OF ACTION
### (SOUTH DAKOTA STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Broker-Dealer
### S.D. Codified Laws § 47-31B-509(d)
### (Binance)

1456.   Plaintiffs reallege the allegations above.

1457.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in South Dakota.

1458.   The South Dakota Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under South Dakota law. S.D. Codified Laws § 47-31B-401(a).

1459.   . Any person who sells a security in violation of Section 47-31B-401(a) is liable for "the consideration paid for the security, less the amount of any income received on the security, and interest at Category D, § 54-3-16 from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security, or for actual damages." *Id.* § 47-31B-509(b),(d).

1460.   When issued, the Tokens were securities within the meaning of the South Dakota Securities Act. *Id.* § 47-31B-102(28). On information and belief, Binance transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in South Dakota. *Id.* § 47-31B-102(2),(4).

1461.   On information and belief, Binance transacted business as a broker-dealer or agent in South Dakota, including without limitation through solicitations directed by Binance to South Dakota and received in South Dakota.

1462.   Binance was not registered as a broker-dealer or agent in South Dakota, nor was it subject to any exemption from registration.

1463.   Accordingly, Binance has violated the South Dakota Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1464.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1465.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE-HUNDRED-AND-TWENTY-EIGHTH CAUSE OF ACTION**
**(SOUTH DAKOTA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**S.D. Codified Laws § 47-31B-509**
**(Individual Defendants)**

1466.   Plaintiffs reallege the allegations above.

1467.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in South Dakota.

1468.   Every person who directly or indirectly controls an entity liable under the South Dakota Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as an "individual who is a managing partner, executive officer, or director … employee of or associated with" an entity so

liable is "liable jointly and severally with and to the same extent as" such a person. S.D. Codified Laws § 47-31B-509.

1469.   When issued, the Tokens were securities within the meaning of the South Dakota Securities Act. *Id.* § 47-31B-102(28). On information and belief, Binance sold the Tokens to members of the Class in South Dakota and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the South Dakota Securities Act, and Binance was not registered as a broker-dealer or agent under South Dakota law. *Id.* §§ 47-31B-301, 47-31B-401(a).

1470.   On information and belief, Binance sold the Tokens and acted as a broker-dealer or agent in South Dakota, including without limitation through solicitations directed by Binance to South Dakota and received in South Dakota.

1471.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1472.   Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the South Dakota Securities Act through Binance's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1473.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1474.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-TWENTY-NINTH CAUSE OF ACTION
### (TENNESSEE STATE LAW – PRIMARY LIABILITY)
### Unregistered Sale of Securities
### Tenn. Code Ann. § 48-1-122
### (Binance)

1475.   Plaintiffs reallege the allegations above.

1476.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Tennessee.

1477.   The Tennessee Securities Act forbids the sale of unregistered securities. Tenn. Code Ann. § 48-1-104(a). Any person who sells a security in violation of Section 104(a) is "liable to the person purchasing the security from the seller to recover the consideration paid for the security, together with interest at the legal rate from the date of payment, less the amount of any income received on the security, upon the tender of the security, or, if the purchaser no longer owns the security, the amount that would be recoverable upon a tender, less the value of the security when the purchaser disposed of it and interest at the legal rate from the date of disposition." *Id.* § 48-1-122(a).

1478.   When issued, the Tokens were securities within the meaning of the Tennessee Securities Act. *Id.* § 48-1-102(20). On information and belief, Binance sold the Tokens to members of the Class in Tennessee. The Tokens were neither registered under, nor subject to exemption from registration under the Tennessee Securities Act. *Id.* § 48-1-103.

1479.   Upon information and belief, the Tokens were sold in Tennessee, including without limitation through solicitations directed by Binance to Tennessee and received in Tennessee.

1480.   Accordingly, Binance has violated the Tennessee Securities Act through Binance's sale of unregistered securities.

1481.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1482.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-THIRTIETH CAUSE OF ACTION
### (TENNESSEE STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Broker-Dealer
### Tenn. Code Ann. § 48-1-122
### (Binance)

1483.   Plaintiffs reallege the allegations above.

1484.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Tennessee.

1485.   The Tennessee Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Tennessee law. Tenn. Code Ann. § 48-1-109. Any person who sells a security in violation of Section 109 is "liable to the person purchasing the security from the seller to recover the consideration paid for the security, together with interest at the legal rate from the date of payment, less the amount of any income received on the security, upon the tender of the security, or, if the purchaser no longer owns the security, the amount that would be recoverable upon a tender, less the value of the

security when the purchaser disposed of it and interest at the legal rate from the date of disposition." *Id.* § 48-1-122(a).

1486.  When issued, the Tokens were securities within the meaning of the Tennessee Securities Act. *Id.* § 48-1-102(20). On information and belief, Binance transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in Tennessee. *Id.* § 48-1-102(3),(4).

1487.  On information and belief, Binance transacted business as a broker-dealer or agent in Tennessee, including without limitation through solicitations directed by Binance to Tennessee and received in Tennessee.

1488.  Binance was not registered as a broker-dealer or agent in Tennessee, nor was it subject to any exemption from registration.

1489.  Accordingly, Binance has violated the Tennessee Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1490.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1491.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-THIRTY-FIRST CAUSE OF ACTION
### (TENNESSEE STATE LAW – ADDITIONAL LIABILITY)
### Control Person Liability
### Tenn. Code Ann. § 48-1-122(g)
### (Individual Defendants)

1492.  Plaintiffs reallege the allegations above.

1493.  This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Tennessee.

1494.  Every person who directly or indirectly controls an entity liable under the Tennessee Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "every partner, principal executive officer, or director of such person, every person occupying a similar status or performing similar functions, every employee of such person who materially aids in the act or transaction constituting the violation, and every broker-dealer or agent who materially aids in the act or transaction constituting the violation" is "liable jointly and severally with and to the same extent as such person, unless the person who would be liable under this subsection (g) proves that the person who would be liable did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." *Id.* § 48-1-122(g).

1495.  When issued, the Tokens were securities within the meaning of the Tennessee Securities Act. *Id.* § 48-1-102(20). On information and belief, Binance sold the Tokens to members of the Class in Tennessee and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Tennessee Securities Act, and Binance was not registered or exempt from registration as a broker-dealer or agent under Tennessee law. *Id.* §§ 48-1-104(a), 48-1-109.

1496.  On information and belief, Binance sold the Tokens and acted as a broker-dealer or agent in Tennessee, including without limitation through solicitations directed by Binance to Tennessee and received in Tennessee.

1497.  Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1498.  Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Tennessee Securities Act through Binance's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1499.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1500.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-THIRTY-SECOND CAUSE OF ACTION
### (TEXAS STATE LAW – PRIMARY LIABILITY)
#### Unregistered Offer and Sale of Securities
#### Texas Civ. St. Art. § 581-33 A
#### (Binance)

1501.  Plaintiffs reallege the allegations above.

1502.  This Cause of Action is brought on behalf of Plaintiffs and Class members to whom Tokens were offered or sold in Texas.

1503.  The Texas Blue Sky Law – Securities forbids the offer or sale of unregistered securities. Texas Civ. St. Art. § 581-7. Any person who offers or sells a security in violation of

293

Section 581-7 is "is liable to the person buying the security from him, who may sue either at law or in equity for rescission or for damages if the buyer no longer owns the security." *Id.* § 581-33 A. Damages are defined as "(a) the consideration the buyer paid for the security plus interest thereon at the legal rate from the date of payment by the buyer, less (b) the greater of: (i) the value of the security at the time the buyer disposed of it plus the amount of any income the buyer received on the security; or (ii) the actual consideration received for the security at the time the buyer disposed of it plus the amount of any income the buyer received on the security." *Id.* § 581-33 D(3).

1504.   When issued, the Tokens were securities within the meaning of the Texas Blue Sky Law – Securities. *Id.* § 581-4 A. Binance offered or sold the Tokens to three Plaintiffs in Texas. The Tokens were neither registered under, nor subject to exemption from registration under the Texas Blue Sky Law – Securities. *Id.* § 581-6.

1505.   The Tokens were offered or sold in Texas, including without limitation through solicitations directed by Binance to Texas and received in Texas.

1506.   Accordingly, Binance has violated the Texas Blue Sky Law – Securities through Binance's sale of unregistered securities.

1507.   Plaintiffs and Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1508.   Plaintiffs and Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

Case 22-972, Document 57, 07/28/2022, 3356258, Page50 of 257

### ONE-HUNDRED-AND-THIRTY-THIRD CAUSE OF ACTION
#### (TEXAS STATE LAW – PRIMARY LIABILITY)
**Transacting Business as an Unregistered Dealer**
**Texas Civ. St. Art. § 581-33 A**
**(Binance)**

1509.  Plaintiffs reallege the allegations above.

1510.  This Cause of Action is brought on behalf of Plaintiffs and Class members to whom Tokens were offered or sold in Texas.

1511.  The Texas Blue Sky Law – Securities forbids any person from transacting business as a dealer or agent unless he is registered or exempt from registration under Texas law. Texas Civ. St. Art. § 581-12. Any person who offers or sells a security in violation of Sections 581-12 "is liable to the person buying the security from him, who may sue either at law or in equity for rescission or for damages if the buyer no longer owns the security." *Id.* § 581-33 A. Damages are defined as "(a) the consideration the buyer paid for the security plus interest thereon at the legal rate from the date of payment by the buyer, less (b) the greater of: (i) the value of the security at the time the buyer disposed of it plus the amount of any income the buyer received on the security; or (ii) the actual consideration received for the security at the time the buyer disposed of it plus the amount of any income the buyer received on the security." *Id.* § 581-33 D(3).

1512.  When issued, the Tokens were securities within the meaning of the Texas Blue Sky Law – Securities. *Id.* § 581-4 A. Binance transacted business as a dealer or agent when it offered or sold the Tokens to three Plaintiffs in Texas. *Id.* §§ 581-4 C, 581-4 D.

1513.  Binance transacted business as a dealer or agent in Texas, including without limitation through solicitations directed by Binance to Texas and received in Texas.

1514.  Binance was not registered as a dealer or agent in Texas, nor was it subject to any exemption from registration.

295

1515.   Accordingly, Binance has violated the Texas Blue Sky Law – Securities by transacting business as an unregistered dealer or agent in the sale of securities.

1516.   Plaintiffs and Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1517.   Plaintiffs and Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-THIRTY-FOURTH CAUSE OF ACTION
#### (TEXAS STATE LAW – ADDITIONAL LIABILITY)
#### Control Person Liability
#### Texas Civ. St. Art. § 581-33 F
#### (Individual Defendants)

1518.   Plaintiffs reallege the allegations above.

1519.   This Cause of Action is brought on behalf of Plaintiffs and Class members to whom Tokens were offered or sold in Texas.

1520.   Every person who directly or indirectly controls an entity liable under the Texas Blue Sky Law – Securities for unlawfully selling unregistered securities or for operating as an unregistered dealer or agent in the sale of those securities, is liable jointly and severally with and to the same extent as the seller, unless the individual sustains the burden of proof that the individual did not know and, in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. Texas Civ. St. Art. § 581-33 F.

1521.   When issued, the Tokens were securities within the meaning of the Texas Blue Sky Law – Securities. *Id.* § 581-4 A. Binance offered and sold the Tokens to three Plaintiffs in Texas and acted as the dealer or agent for the sale and purchase of those securities. *Id.* §§ 581-4 C, 581-4 D. The Tokens were neither registered under, nor subject to exemption from registration under

the Texas Blue Sky Law – Securities, and Binance was not registered or exempt from registration as a dealer or agent under Texas law. *Id.* §§ 581-5, 581-6.

1522.  Binance offered and sold the Tokens and acted as a dealer or agent in Texas, including without limitation through solicitations directed by Binance to Texas and received in Texas.

1523.  Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered dealer or agent as described herein.

1524.  Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Texas Blue Sky Law – Securities through Binance's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1525.  Plaintiffs and Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1526.  Plaintiffs and Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE-HUNDRED-AND-THIRTY-FIFTH CAUSE OF ACTION**
**(UTAH STATE LAW – PRIMARY LIABILITY)**
**Unregistered Offer and Sale of Securities**
**Utah Code § 61-1-22**
**(Binance)**

1527.   Plaintiffs reallege the allegations above.

1528.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Utah.

1529.   The Utah Securities Act forbids the offer or sale of unregistered securities. Utah Code Ann. § 61-1-7. Any person who offers or sells a security in violation of Section 61-1-7 is liable to the buyer for "the consideration paid for the security, together with interest at 12% per year from the date of payment, costs, and reasonable attorney fees, less the amount of income received on the security, upon the tender of the security or for damages if the person no longer owns the security." *Id.* § 61-1-22(b).

1530.   When issued, the Tokens were securities within the meaning of the Utah Securities Act. *Id.* § 61-1-13(ee). On information and belief, Binance offered or sold the Tokens to members of the Class in Utah. The Tokens were neither registered under, nor subject to exemption from registration under the Utah Securities Act. *Id.* § 61-14.

1531.   Upon information and belief, the Tokens were offered or sold in Utah, including without limitation through solicitations directed by Binance to Utah and received in Utah.

1532.   Accordingly, Binance has violated the Utah Securities Act through Binance's sale of unregistered securities.

1533.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1534.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-THIRTY-SIXTH CAUSE OF ACTION
### (UTAH STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Broker-Dealer
### Utah Code § 61-1-22
### (Binance)

1535.  Plaintiffs reallege the allegations above.

1536.  This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Utah.

1537.  The Utah Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Utah law. Utah Code § 61-1-3(1). Any person who offers or sells a security in violation of Section 61-1-3(1)is "liable to the buyer for "the consideration paid for the security, together with interest at 12% per year from the date of payment, costs, and reasonable attorney fees, less the amount of income received on the security, upon the tender of the security or for damages if the person no longer owns the security." *Id.* § 61-1-22(b).

1538.  When issued, the Tokens were securities within the meaning of the Utah Securities Act. *Id.* § 61-1-13(ee). On information and belief, Binance transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in Utah. *Id.* § 61-1-13(b),(c).

1539.  On information and belief, Binance transacted business as a broker-dealer or agent in Utah, including without limitation through solicitations directed by Binance to Utah and received in Utah.

1540.  Binance was not registered as a broker-dealer or agent in Utah, nor was it subject to any exemption from registration.

299

1541.   Accordingly, Binance has violated the Utah Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1542.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1543.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-THIRTY-SEVENTH CAUSE OF ACTION
#### (UTAH STATE LAW – ADDITIONAL LIABILITY)
#### Control Person Liability
#### Utah Code Ann. § 61-1-22
#### (Individual Defendants)

1544.   Plaintiffs reallege the allegations above.

1545.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Utah.

1546.   Every person who directly or indirectly controls an entity liable under the Utah Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "every partner, officer, or director of such a seller or buyer, every person occupying a similar status or performing similar functions, every employee of such a seller or buyer who materially aids in the sale or purchase, and every broker-dealer or agent who materially aids in the sale or purchase" are liable jointly and severally "with and to the same extent as the seller or purchaser, unless the nonseller or nonpurchaser who is so liable sustains the burden of proof that the nonseller or nonpurchaser did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." Utah Code Ann. § 61-1-22.

300

1547.   When issued, the Tokens were securities within the meaning of the Utah Securities Act. *Id.* § 61-1-13(ee). On information and belief, Binance offered and sold the Tokens to members of the Class in Utah and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Utah Securities Act, and Binance was not registered or exempt from registration as a broker-dealer or agent under Utah law. *Id.* §§ 61-1-3, 61-1-7.

1548.   On information and belief, Binance offered and sold the Tokens and acted as a broker-dealer or agent in Utah, including without limitation through solicitations directed by Binance to Utah and received in Utah.

1549.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1550.   Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Utah Securities Act through Binance's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1551.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1552.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ONE-HUNDRED-AND-THIRTY-EIGHTH CAUSE OF ACTION
### (VERMONT STATE LAW – PRIMARY LIABILITY)
### Unregistered Offer and Sale of Securities
### Vt. Stat. Ann. tit. 9, § 5509
### (Binance)

1553.  Plaintiffs reallege the allegations above.

1554.  This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Vermont.

1555.  The Vermont Securities Act forbids the offer or sale of unregistered securities. Vt. Stat. Ann. tit. 9, § 5309. Any person who offers or sells a security in violation of Section 5309 is liable for "the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorney's fees determined by the court, upon the tender of the security, or for actual damages." *Id.* § 5509.

1556.  When issued, the Tokens were securities within the meaning of the Vermont Securities Act. *Id.* § 5102(28). On information and belief, Binance offered or sold the Tokens to members of the Class in Vermont. The Tokens were neither registered under, nor subject to exemption from registration under the Vermont Securities Act. *Id.* §§ 5201-5203.

1557.  Upon information and belief, the Tokens were offered or sold in Vermont, including without limitation through solicitations directed by Binance to Vermont and received in Vermont.

1558.  Accordingly, Binance has violated the Vermont Securities Act through Binance's sale of unregistered securities.

1559.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1560.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-THIRTY-NINTH CAUSE OF ACTION
### (VERMONT STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Broker-Dealer
### Vt. Stat. Ann. tit. 9, § 5509
### (Binance)

1561.   Plaintiffs reallege the allegations above.

1562.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Vermont.

1563.   The Vermont Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Vermont law. Vt. Stat. Ann. tit. 9, § 5401. Any person who offers or sells a security in violation of Section 5401 is liable for "the consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate of interest from the date of the purchase, costs, and reasonable attorney's fees determined by the court, upon the tender of the security, or for actual damages." *Id.* § 5509 (b),(d).

1564.   When issued, the Tokens were securities within the meaning of the Vermont Securities Act. *Id.* § 5102(28). On information and belief, Binance transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in Vermont. *Id.* § 5102(1),(3).

303

1565.   On information and belief, Binance transacted business as a broker-dealer or agent in Vermont, including without limitation through solicitations directed by Binance to Vermont and received in Vermont.

1566.   Binance was not registered as a broker-dealer or agent in Vermont, nor was it subject to any exemption from registration.

1567.   Accordingly, Binance has violated the Vermont Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1568.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1569.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE-HUNDRED-AND-FORTIETH CAUSE OF ACTION**
**(VERMONT STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Vt. Stat. Ann. tit. 9, § 5509**
**(Individual Defendants)**

1570.   Plaintiffs reallege the allegations above.

1571.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Vermont.

1572.   Every person who directly or indirectly controls an entity liable under the Vermont Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "an individual who is a managing partner, executive officer, or director of a person liable under subsections (b) through (f) of this section, including an individual having a similar status or performing similar functions," is jointly

and severally liable with the entity "unless the individual sustains the burden of proof that the individual did not know and, in the exercise of reasonable care could not have known, of the existence of conduct by reason of which the liability is alleged to exist." Vt. Stat. Ann. tit. 9, § 5509(g).

1573.  When issued, the Tokens were securities within the meaning of the Vermont Securities Act. *Id.* § 5102(28). On information and belief, Binance offered and sold the Tokens to members of the Class in Vermont and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Vermont Securities Act, and Binance was not registered or exempt from registration as a broker-dealer or agent under Vermont law. *Id.* §§ 5309, 5401.

1574.  On information and belief, Binance offered and sold the Tokens and acted as a broker-dealer or agent in Vermont, including without limitation through solicitations directed by Binance to Vermont and received in Vermont.

1575.  Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1576.  Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Vermont Securities Act through Binance's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1577.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1578.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE-HUNDRED-AND-FORTY-FIRST CAUSE OF ACTION**
**(VIRGINIA STATE LAW – PRIMARY LIABILITY)**
**Unregistered Sale of Securities**
**Va. Code Ann. § 13.1-522 A**
**(Binance)**

1579.   Plaintiffs reallege the allegations above.

1580.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Virginia.

1581.   The Virginia Securities Act forbids the offer or sale of unregistered securities. Va. Code Ann. § 13.1-507. Any person who sells a security in violation of Section 13.1-507 "shall be liable to the person purchasing such security from him who may sue either at law or in equity to recover the consideration paid for such security, together with interest thereon at the annual rate of six percent, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of such security, or for the substantial equivalent in damages if he no longer owns the security." *Id.* § 13.1-522 A.

1582.   When issued, the Tokens were securities within the meaning of the Virginia Securities Act. *Id.* § 13.1-501 A. On information and belief, Binance sold the Tokens to members of the Class in Virginia. The Tokens were neither registered under, nor subject to exemption from registration under the Virginia Securities Act. *Id.* § 13.1-514 A.

306

1583.  Upon information and belief, the Tokens were sold in Virginia, including without limitation through solicitations directed by Binance to Virginia and received in Virginia.

1584.  Accordingly, Binance has violated the Virginia Securities Act through Binance's sale of unregistered securities.

1585.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1586.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE-HUNDRED-AND-FORTY-SECOND CAUSE OF ACTION**
**(VIRGINIA STATE LAW – PRIMARY LIABILITY)**
**Transacting Business as an Unregistered Broker-Dealer**
**Va. Code Ann. § 13.1-522 A**
**(Binance)**

1587.  Plaintiffs reallege the allegations above.

1588.  This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Virginia.

1589.  The Virginia Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Virginia law. Va. Code Ann. § 13.1-504 A. Any person who sells a security in violation of Section 13.1-504 A "shall be liable to the person purchasing such security from him who may sue either at law or in equity to recover the consideration paid for such security, together with interest thereon at the annual rate of six percent, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of such security, or for the substantial equivalent in damages if he no longer owns the security." *Id.* § 13.1-522 A.

1590.  When issued, the Tokens were securities within the meaning of the Virginia Securities Act. *Id.* § 13.1-501 A. On information and belief, Binance transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in Virginia. *Id.*

1591.  On information and belief, Binance transacted business as a broker-dealer or agent in Virginia, including without limitation through solicitations directed by Binance to Virginia and received in Virginia.

1592.  Binance was not registered as a broker-dealer or agent in Virginia, nor was it subject to any exemption from registration.

1593.  Accordingly, Binance has violated the Virginia Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1594.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1595.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

**ONE-HUNDRED-AND-FORTY-THIRD CAUSE OF ACTION**
**(VIRGINIA STATE LAW – ADDITIONAL LIABILITY)**
**Control Person Liability**
**Va. Code Ann. § 13.1-522 C**
**(Individual Defendants)**

1596.  Plaintiffs reallege the allegations above.

1597.  This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Virginia.

1598.  Every person who directly or indirectly controls an entity liable under the Virginia Securities Act for unlawfully selling unregistered securities or for operating as an unregistered

308

broker-dealer or agent in the sale of those securities, as well as "every partner, officer, or director of such a person, every person occupying a similar status or performing similar functions" is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. Va. Code Ann. § 13.1-522 C.

1599.  When issued, the Tokens were securities within the meaning of the Virginia Securities Act. *Id.* § 13.1-501 A. On information and belief, Binance sold the Tokens to members of the Class in Virginia and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Virginia Securities Act, and Binance was not registered as a broker-dealer or agent under Virginia law. *Id.* §§ 13.1-514, 13.1-514.1.

1600.  On information and belief, Binance sold the Tokens and acted as a broker-dealer or agent in Virginia, including without limitation through solicitations directed by Binance to Virginia and received in Virginia.

1601.  Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1602.   Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Virginia Securities Act through Binance's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1603.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1604.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-FORTY-FOURTH CAUSE OF ACTION
### (WASHINGTON STATE LAW – PRIMARY LIABILITY)
#### Unregistered Offer and Sale of Securities
#### Wash. Rev. Code § 21.20.430(1)
#### (Binance)

1605.   Plaintiffs reallege the allegations above.

1606.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Washington.

1607.   The Securities Act of Washington forbids the offer or sale of unregistered securities. Wash. Rev. Code § 21.20.140. Any person who offers or sells a security in violation of Section 21.20.140 is "liable to the person buying the security from him or her, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at eight percent per annum from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he or she no longer owns the security. " *Id.* § 21.20.430(1).

1608.   When issued, the Tokens were securities within the meaning of the Securities Act of Washington. *Id.* § 21.20.005(17). On information and belief, Binance offered or sold the Tokens

to members of the Class in Washington. The Tokens were neither registered under, nor subject to exemption from registration under the Securities Act of Washington. *Id.* § 21.20.310.

1609. Upon information and belief, the Tokens were offered or sold in Washington, including without limitation through solicitations directed by Binance to Washington and received in Washington.

1610. Accordingly, Binance has violated the Securities Act of Washington through Binance's sale of unregistered securities.

1611. Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1612. Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-FORTY-FIFTH CAUSE OF ACTION
### (WASHINGTON STATE LAW – ADDITIONAL LIABILITY)
#### Control Person Liability
#### Wash. Rev. Code Ann. § 21.20.430
#### (Individual Defendants)

1613. Plaintiffs reallege the allegations above.

1614. This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Washington.

1615. Every person who directly or indirectly controls an entity liable under the Securities Act of Washington for unlawfully selling unregistered securities, as well as "every partner, officer or director of such a seller, every person occupying a similar status or performing similar functions … are also liable jointly and severally with and to the same extent as the seller, unless the nonseller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable

311

care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." *Id.* § 21.20.430(3).

1616.  When issued, the Tokens were securities within the meaning of the Washington Securities Act. *Id.* § 21.20.005(17). On information and belief, Binance sold the Tokens to members of the Class in Washington. The Tokens were neither registered under, nor subject to exemption from registration under the Washington Securities Act.

1617.  On information and belief, Binance sold the Tokens in Washington, including without limitation through solicitations directed by Binance to Washington and received in Washington.

1618.  Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities.

1619.  Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Washington Securities Act through Binance's sale of unregistered securities.

1620.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1621.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ONE-HUNDRED-AND-FORTY-SIXTH CAUSE OF ACTION
### (WEST VIRGINIA STATE LAW – PRIMARY LIABILITY)
#### Unregistered Offer or Sale of Securities
#### W. Va. Code Ann. § 32-4-410(a)
#### (Binance)

1622.   Plaintiffs reallege the allegations above.

1623.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in West Virginia.

1624.   The West Virginia Uniform Securities Act forbids the offer or sale of unregistered securities. W. Va. Code Ann. § 32-3-301. Any person who offers or sells a security in violation of Section 32-3-301 is "liable to the person buying the security from him, who may assert a claim in a civil action to recover the consideration paid for the security, together with interest at nine percent per year from the date of payment, costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at nine percent per year from the date of disposition." *Id.* § 32-4-410(a).

1625.   When issued, the Tokens were securities within the meaning of the West Virginia Uniform Securities Act. *Id.* § 32-4-401(n). On information and belief, Binance offered or sold the Tokens to members of the Class in West Virginia. The Tokens were neither registered under, nor subject to exemption from registration under the West Virginia Uniform Securities Act. *Id.* § 32-4-402.

1626.   Upon information and belief, the Tokens were offered or sold in West Virginia, including without limitation through solicitations directed by Binance to West Virginia and received in West Virginia.

313

1627.  Accordingly, Binance has violated the West Virginia Uniform Securities Act through Binance's sale of unregistered securities.

1628.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1629.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-FORTY-SEVENTH CAUSE OF ACTION
#### (WEST VIRGINIA STATE LAW – PRIMARY LIABILITY)
#### Transacting Business as an Unregistered Broker-Dealer
#### W. Va. Code Ann. § 32-2-201
#### (Binance)

1630.  Plaintiffs reallege the allegations above.

1631.  This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in West Virginia.

1632.  The West Virginia Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered under West Virginia law. *Id.* § 32-2-201. Any person who offers or sells a security in violation of Section 32-2-201 is "liable to the person buying the security from him, who may assert a claim in a civil action to recover the consideration paid for the security, together with interest at nine percent per year from the date of payment, costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at nine percent per year from the date of disposition." *Id.* § 32-4-410(a).

1633.   When issued, the Tokens were securities within the meaning of the West Virginia Uniform Securities Act. *Id.* § 32-4-401(n). On information and belief, Binance transacted business as a broker-dealer or agent when it offered or sold the Tokens to members of the Class in West Virginia. *Id.* §§ 32-4-401(b), 32-4-401(c).

1634.   On information and belief, Binance transacted business as a broker-dealer or agent in West Virginia, including without limitation through solicitations directed by Binance to West Virginia and received in West Virginia.

1635.   Binance was not registered as a broker-dealer or agent in West Virginia.

1636.   Accordingly, Binance has violated the West Virginia Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1637.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1638.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-FORTY-EIGHTH CAUSE OF ACTION
### (WEST VIRGINIA STATE LAW – ADDITIONAL LIABILITY)
### Control Person Liability
### W. Va. Code Ann. § 32-4-410
### (Individual Defendants)

1639.   Plaintiffs reallege the allegations above.

1640.   This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in West Virginia.

1641.   Every person who directly or indirectly controls an entity liable under the West Virginia Uniform Securities Act for unlawfully selling unregistered securities or for operating as

315

an unregistered broker-dealer or agent in the sale of those securities, as well as "every partner, officer or director of such a seller, every person occupying a similar status or performing similar functions … are also liable jointly and severally with and to the same extent as the seller, unless the nonseller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." *Id.* § 32-4-410(b).

1642.   When issued, the Tokens were securities within the meaning of the West Virginia Uniform Securities Act. *Id.* § 32-4-401(n). On information and belief, Binance offered and sold the Tokens to members of the Class in West Virginia and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the West Virginia Uniform Securities Act, and Binance was not registered as a broker-dealer or agent under West Virginia law. *Id.* § 32-2-201.

1643.   On information and belief, Binance offered and sold the Tokens and acted as a broker-dealer or agent in West Virginia, including without limitation through solicitations directed by Binance to West Virginia and received in West Virginia.

1644.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful offers or sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

316

1645.  Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the West Virginia Uniform Securities Act through Binance's offer or sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1646.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1647.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-FORTY-NINTH CAUSE OF ACTION
### (WISCONSIN STATE LAW – PRIMARY LIABILITY)
#### Unregistered Sale of Securities
#### Wis. Stat. § 551.509
#### (Binance)

1648.  Plaintiffs reallege the allegations above.

1649.  This Cause of Action is brought on behalf of Class members to whom Tokens were sold in the state of Wisconsin.

1650.  The Wisconsin Uniform Securities Law forbids the sale of unregistered securities. Wis. Stat. § 551.301. Any person who sells a security in violation of Section 301 is liable to the purchaser for the "consideration paid for the security, less the amount of any income received on the security, and interest at the legal rate under s. 138.04 from the date of the purchase, costs, and reasonable attorney fees determined by the court, upon the tender of the security, or for actual damages as provided in par. (c)." *Id.* § 551.509(2)(a). Actual damages are defined as "the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at the legal rate under s. 138.04 from the date of the purchase, costs, and reasonable attorney fees determined by the court." *Id.* § 551.509(2)(c).

317

1651.  When issued, the Tokens were securities within the meaning of the Wisconsin Uniform Securities Law. *Id.* § 551.102(28). On information and belief, Binance sold the Tokens to members of the Class in the state of Wisconsin. The Tokens were neither registered under, nor subject to exemption from registration under the Wisconsin Uniform Securities Law. *Id.* § 551.301.

1652.  On information and belief, the Tokens were offered or sold in the state of Wisconsin, including without limitation through solicitations directed by Binance to the state of Wisconsin and received in the state of Wisconsin.

1653.  Accordingly, Binance has violated the Wisconsin Uniform Securities Law through Binance's sale of unregistered securities.

1654.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1655.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-FIFTIETH CAUSE OF ACTION
### (WISCONSIN STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Broker-Dealer
### Wis. Stat. § 551.509
### (Binance)

1656.  Plaintiffs reallege the allegations above.

1657.  This Cause of Action is brought on behalf of Class members to whom Tokens were sold in the state of Wisconsin.

1658.  The Wisconsin Uniform Securities Law forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Wisconsin law. Wis. Stat. §§ 551.401(1), 551.402(1).  Any "person acting as a broker-dealer or

318

agent that sells … a security in violation" of Sections 401 or 402 is "is liable to the customer …
[who] if a purchaser, may maintain an action for recovery of actual damages as specified in sub.
(2)(a) to (c)" (*Id.* § 551.509(4)) which in turn provide that a purchaser may "recover the
consideration paid for the security, less the amount of any income received on the security, and
interest at the legal rate under s. 138.04 from the date of the purchase, costs, and reasonable
attorney fees determined by the court, upon the tender of the security, or for actual damages as
provided in par. (c)." *Id.* § 551.509(2)(a). Actual damages are defined as "the amount that would
be recoverable upon a tender less the value of the security when the purchaser disposed of it, and
interest at the legal rate under s. 138.04 from the date of the purchase, costs, and reasonable
attorney fees determined by the court." *Id.* 551.509(2)(c).

1659.   When issued, the Tokens were securities within the meaning of the Wisconsin
Uniform Securities Law. *Id.* § 551.102(28). Binance transacted business as a broker-dealer or agent
when it sold the Tokens to members of the Class in the state of Wisconsin. *Id.* § 551.102(2), (4).

1660.   On information and belief, Binance transacted business as a broker-dealer or agent
in the state of Wisconsin, including without limitation through solicitations directed by Binance to
the state of Wisconsin and received in the state of Wisconsin.

1661.   Binance was not registered as a broker-dealer or agent in the state of Wisconsin,
nor was it subject to any exemption from registration.

1662.   Accordingly, Binance has violated the Wisconsin Uniform Securities Law by
transacting business as an unregistered broker-dealer or agent in the sale of securities.

1663.   Class members who own the Tokens have made or will make any necessary tender
and seek all remedies available at law or in equity for any Tokens purchased in the Class Period,
including any applicable costs, attorneys' fees, and interest.

1664.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## ONE-HUNDRED-AND-FIFTY-FIRST CAUSE OF ACTION
### (WISCONSIN STATE LAW – ADDITIONAL LIABILITY)
### Control Person Liability
### Wis. Stat. Ann. § 551.509
### (Individual Defendants)

1665.  Plaintiffs reallege the allegations above.

1666.  This Cause of Action is brought on behalf of Class members to whom Tokens were sold in the state of Wisconsin.

1667.  Every person who directly or indirectly controls an entity liable under the Wisconsin Uniform Securities Law for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as "managing partner, executive officer, or director of a person liable under subs. (2) to (6), including an individual having a similar status or performing similar functions," is jointly and severally liable "unless the individual sustains the burden of proof that the individual did not know, and in the exercise of reasonable care could not have known, of the existence of conduct by reason of which the liability is alleged to exist." Wis. Stat. Ann. § 551.509(7)(d).

1668.  When issued, the Tokens were securities within the meaning of the Wisconsin Uniform Securities Law. *Id.* § 551.102(28). On information and belief, Binance sold the Tokens to members of the Class in the state of Wisconsin and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Wisconsin Uniform Securities Law, and Binance was not registered or exempt from registration as a broker-dealer or agent under Wisconsin law. *Id.* §§ 551.301, 551.401(1), 551.402(1).

1669.   On information and belief, Binance sold the Tokens and acted as a broker-dealer or agent in the state of Wisconsin, including without limitation through solicitations directed by Binance to the state of Wisconsin and received in the state of Wisconsin.

1670.   Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1671.   Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Wisconsin Uniform Securities Law through Binance's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1672.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1673.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-FIFTY-SECOND CAUSE OF ACTION
### (WYOMING STATE LAW – PRIMARY LIABILITY)
### Unregistered Sale of Securities
### Wyo. Stat. Ann. § 17-4-509(b)
### (Binance)

1674.   Plaintiffs reallege the allegations above.

1675.  This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Wyoming.

1676.  The Wyoming Uniform Securities Act forbids the offer or sale of unregistered securities. Wyo. Stat. Ann. § 17-4-301. Any person who sells a security in violation of Section 17-4-301 is liable to the purchaser, who "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at six percent (6%) per year from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security." *Id.* § 17-4-509(b)(i). If the purchaser no longer owns the security, then he may seek actual damages, which are "the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it, and interest at six percent (6%) per year from the date of the purchase, costs and reasonable attorneys' fees determined by the court." *Id.* § 17-4-509(b)(iii).

1677.  When issued, the Tokens were securities within the meaning of the Wyoming Uniform Securities Act. *Id.* § 17-4-102(a)(xxviii). On information and belief, Binance offered or sold the Tokens to members of the Class in Wyoming. The Tokens were neither registered under, nor subject to exemption from registration under the Wyoming Uniform Securities Act. *Id.* § 17-4-201 - 204.

1678.  Upon information and belief, the Tokens were offered or sold in Wyoming, including without limitation through solicitations directed by Binance to Wyoming and received in Wyoming.

1679.  Accordingly, Binance has violated the Wyoming Uniform Securities Act through Binance's sale of unregistered securities.

322

1680.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1681.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-FIFTY-THIRD CAUSE OF ACTION
### (WYOMING STATE LAW – PRIMARY LIABILITY)
### Transacting Business as an Unregistered Broker-Dealer
### Wyo. Stat. Ann. § 17-4-509(d)
### (Binance)

1682.   Plaintiffs reallege the allegations above.

1683.   This Cause of Action is brought on behalf of Class members to whom Tokens were sold in Wyoming.

1684.   The Wyoming Uniform Securities Act forbids any person from transacting business as a broker-dealer or agent unless he is registered or exempt from registration under Wyoming law. *Id.* §§ 17-4-401, 17-4-402. Any person acting as a broker-dealer or agent who sells a security in violation of Sections 17-4-401(a) or 17-4-402(a) is liable to the customer. *Id.* § 17-4-509(d). The "customer, if a purchaser may maintain an action for recovery of actual damages as specified in paragraphs (b)(i) through (b)(iii) of this section." *Id.* Pursuant to § 17-4-509(b)(i) the purchaser "may maintain an action to recover the consideration paid for the security, less the amount of any income received on the security, and interest at six percent (6%) per year from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the security." *See Id.* § 17-4-509(d) (citing to § 17-4-509(b)(i) for recovery). If the purchaser no longer owns the security, then pursuant to § 17-4-509(b)(iii), the purchaser may seek actual damages, which are "the amount that would be recoverable upon a tender less the value of the security when

the purchaser disposed of it, and interest at six percent (6%) per year from the date of the purchase, costs and reasonable attorneys' fees determined by the court." *Id.* § 17-4-509(d) (citing to § 17-4-509(b)(iii) for recovery).

1685.  When issued, the Tokens were securities within the meaning of the Wyoming Uniform Securities Act. *Id.* § 17-4-102(a)(xxviii). On information and belief, Binance transacted business as a broker-dealer or agent when it sold the Tokens to members of the Class in Wyoming. *Id.* § 17-4-102(a)(ii) and (iv).

1686.  On information and belief, Binance transacted business as a broker-dealer or agent in Wyoming, including without limitation through solicitations directed by Binance to Wyoming and received in Wyoming.

1687.  Binance was not registered as a broker-dealer or agent in Wyoming, nor was it subject to any exemption from registration.

1688.  Accordingly, Binance has violated the Wyoming Uniform Securities Act by transacting business as an unregistered broker-dealer or agent in the sale of securities.

1689.  Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1690.  Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

### ONE-HUNDRED-AND-FIFTY-FOURTH CAUSE OF ACTION
### (WYOMING STATE LAW – ADDITIONAL LIABILITY)
### Control Person Liability
### Wyo. Stat. Ann. § 17-4-509(g)
### (Individual Defendants)

1691.  Plaintiffs reallege the allegations above.

1692.  This Cause of Action is brought on behalf of Class members to whom Tokens were offered or sold in Wyoming.

1693.  Every person who directly or indirectly controls a person liable under the Wyoming Uniform Securities Act for unlawfully selling unregistered securities or for operating as an unregistered broker-dealer or agent in the sale of those securities, as well as every managing partner, executive officer, or director of such a seller, including every person having a similar status or performing similar functions … is jointly and severally liable with and to the same extent as the seller, unless the non-seller sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of conduct by reason of which liability is alleged to exist. *Id.* §§ 17-4-509(g)(i) – (iv).

1694.  When issued, the Tokens were securities within the meaning of the Wyoming Uniform Securities Act. *Id.* § 17-4-102(a)(xxviii). On information and belief, Binance sold the Tokens to members of the Class in Wyoming and acted as the broker-dealer or agent for the sale and purchase of those securities. The Tokens were neither registered under, nor subject to exemption from registration under the Wyoming Uniform Securities Act, and Binance was not registered or exempt from registration as a broker-dealer or agent under Wyoming law. *Id.* §§ 17-4-401(a), 17-4-402(a).

1695.  On information and belief, Binance sold the Tokens and acted as a broker-dealer or agent in Wyoming, including without limitation through solicitations directed by Binance to Wyoming and received in Wyoming.

1696. Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts had, at the time of the wrongs alleged herein, and as set forth herein, the power and authority to directly or indirectly control the

325

management and activities of Binance and its employees, and to cause Binance to engage in the wrongful conduct complained of herein. Each Individual Defendant caused the unlawful sales of unregistered securities and the operation of an unregistered broker-dealer or agent as described herein.

1697.   Accordingly, the Individual Defendants, who directly or indirectly controlled Binance, have violated the Wyoming Uniform Securities Act through Binance's sale of unregistered securities and operation as an unregistered broker-dealer or agent.

1698.   Class members who own the Tokens have made or will make any necessary tender and seek all remedies available at law or in equity for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees, and interest.

1699.   Class members who no longer own the Tokens seek damages for any Tokens purchased in the Class Period, including any applicable costs, attorneys' fees and interest.

## VIII.   PRAYER FOR RELIEF

1700.   On behalf of themselves and the Class, Plaintiffs request relief as follows:

a.   That the Court determines that this action may be maintained as a class action, that Plaintiffs be named as Class Representatives of the Class, that the undersigned be named as Lead Class Counsel of the Class, and directs that notice of this action be given to Class members;

b.   That the Court enter an order declaring that Defendants' actions, as set forth in this Second Amended Complaint, violate the federal and state laws set forth above;

c.   That the Court award Plaintiffs and the Class damages in an amount to be determined at trial;

326

d. That the Court issue appropriate equitable and any other relief against Defendants to which Plaintiffs and the Class are entitled, including a declaration that the purchase agreements between each member of the Class and Binance are void;

e. That the Court award Plaintiffs and the Class pre- and post-judgment interest (including pursuant to statutory rates of interest set under State law);

f. That the Court award Plaintiffs and the Class their reasonable attorneys' fees and costs of suit; and

g. That the Court award any and all other such relief as the Court may deem just and proper under the circumstances.

## IX.   **JURY TRIAL**

1701.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs respectfully demand a trial by jury for all claims.

Dated:      December 15, 2020
              New York, New York

                                        Respectfully submitted,

*/s/ Philippe Z. Selendy*              */s/ Kyle W. Roche*
Philippe Z. Selendy                    Kyle W. Roche
Jordan A. Goldstein                    Edward Normand
Oscar Shine                            Velvel (Devin) Freedman (*pro hac vice*)
Mitchell Nobel                         Alex T. Potter
SELENDY & GAY, PLLC                    Richard Cipolla
1290 Sixth Avenue, 17th Floor          ROCHE CYRULNIK
New York, NY 10104                        FREEDMAN LLP
pselendy@selendygay.com                99 Park Avenue, 19th Floor
jgoldstein@selendygay.com              New York, NY 10016
oshine@selendygay.com                  kyle@rcfllp.com
mnobel@selendygay.com                  tnormand@rcfllp.com
                                       vel@rcfllp.com
                                       apotter@rcfllp.com
                                       rcipolla@rcfllp.com

327

A-489

Exhibit 1

A-490

{{"We've detected that you are using a small display"|T}} .
{{"Want to switch to the mobile version of the site"|T}} >>

- ○

  Exchange

  {{"Blockchain and crypto asset exchange" | T}}

  ○

  {{'Academy' | T}}

  {{'Blockchain and crypto education' | T}}

  ○

  BCF

  {{'Blockchain charity foundation' | T}}

  ○

  {{'Info' | T}}

  {{'Cryptocurrency information platform' | T}}

  ○

  Labs

  {{'Incubator for top blockchain projects' | T}}

  ○

  {{'Launch Pad' | T}}

  {{'Token launch platform' | T}}

  ○

  Research

  {{'Institutional-grade analysis and reports' | T}}

  ○

  Trust Wallet

  {{'Binance's official crypto wallet' | T}}

- {{"Exchange" | T}}

- {{"Basic" | T}}
- {{"Advanced" | T}}

**{{'Website Translator' | T}}**

Translations by Google is provided for convenience and is not verified contextually.
Please refer to original for accuracy.

{{l.name}}

- {{l.name}}
- **{{"User Center" | T}}**
  {{user.email}}
- **{{"Estimated Value" | T}}:**
  {{totalAsset.totalTransferBtc | number:8}} BTC
- {{ "Sub Account" | T }}
- {{"logout"|T}}

{{"login"|T}}  {{"or" | T}}  {{'register'|T}}

- {{"Funds" | T}}
  - {{"Balances"| T}}
  - {{"Deposits"| T}}
  - {{"Withdrawals"| T}}
  - {{"Transaction History" | T}}
  - {{"Buy with Credit Card" | T}}
- {{"Order Management" | T}}
  - {{"Open Orders" | T}}
  - {{"Order History" | T}}
  - {{"Trade History" | T}}
- {{"Careers" | T}}
- {{"Support" | T}}
- {{"Announcement" | T}}

# 币安服务协议

【最新修订】: **2018. 11 .29**

本协议是您与服务提供商币安之间就使用任何由币安网（https://www.binance.com），币
安API（https://api.binance.com)以及币安相关公司提供的服务时，所达成的权力义务关系的协
议。请确认您已阅读、理解，并接受所有本文包含的条款以及纳入通用数据保护条例（GDPR，
General Data Protection Regulation）的隐私政策。由于此协议具有法律约束力，请在使用我们
的服务前仔细阅读。注册访问和使用币安，表示您已同意本协议中所有条款。如有异议，请

您保持账户锁定状态（针对现有用户）并停止使用币安。

更多信息请参考币安官网。如果您对本协议有任何疑问，请联系我们的客户服务团队（https://support.binance.com/hc/en-us/requests/new）

## 协议条件

币安保留随时修改本协议条款的权力，修订通知将公布在以下链接并在协议中附最新修订时间："【最新修订：****年**月**日】"（https://support.binance.com/hc/en-us/articles/115000421672-Terms-of-Use）。最新版将于网站发布及向用户发布后立即生效。继续使用币安服务将视为您接受修改后的最新协议。

## 适用条件

您确认，在您完成注册程序或以其他币安允许的方式实际使用币安服务时，您应当是具备完全民事权利能力和完全民事行为能力的自然人、法人或其他组织。若您不具备前述主体资格，则您及您的监护人应承担因此而导致的一切后果，且币安有权注销或永久冻结您的账户，并向您及您的监护人索偿。

## 禁用条件

在访问和使用币安及其相关服务时，您需确保不在任何贸易或经济制裁名单中，如联合国安理会制裁名单,美国财政部海外资产控制办公室(OFAC, Office of Foreign Assets Control)制裁名单及其他任何同类名单。币安保留自选择服务市场和司法管辖区的权利，并可能限制或拒绝其对相关受制裁国家的服务。本协议的内容不得排除在用户所在国的法律之外。币安禁止黑名单用户使用与币安相关的任何服务。

## 币安服务描述

币安是提供线上数字货币交易的平台（币币交易），产品主要为加密代币。币安不提供法币交易，因此不受法币相关法规的制约。作为交易平台，币安并不是交易的买卖方，也不是做市商。交易者必须在开始交易之前在币安注册并开设账户，存储数字资产。交易者可提取其数字资产，但必须遵守条款中的条件限制。

币安尽力确保其网站发布信息的准确性，但无法保证内容100%的适用性，可靠性、完整性及准确性，因此将不对任何可能出现的因发布内容引起的损失而承担直接或间接责任。币安网站的信息主要为辅助用户做出独立判断，会时时更新，并不另行通知。币安不提供投资或咨询意见，也不会对其网站及其他传播媒介中所述信息的使用承担责任。用户应了解交易有风险，鼓励所有用户谨慎负责地进行交易行为。

币安强调平台安全的重要性并努力确保所提供服务的连续性与稳定性（在停机或维护期间会发布通知），但对恶意的黑客攻击，恐怖袭击和其他不可预见的情况将不承担责任。如发生异常交易，币安将保留取消，回滚及禁止其平台上所有类型交易的权利。币安不会要求用户提供密码，也不会要求用户转移不在币安交易平台上的资产，提醒用户谨慎处理可能导致被骗的打折促销活动。使用币安即视为您同意币安将不承担因上述及相关情况而导致的任何损失。

在使用币安及其他相关服务时，您确认所有与币安有关的信息都是真实，准确和完整的。

币安账户注册及要求

注册

所有用户在使用币安时需先注册账户（https://www.binance.com/register.html）注册时需提供您的真实姓名，电子邮件地址和密码，并接受使用条款，隐私政策同意书。在特定条件下，币安保留拒绝为您开设账户的权力。

用户身份验证

在币安注册账户，表示您同意分享个人信息以进行身份验证。这些信息用于在币安平台上检测洗钱，恐怖主义融资，欺诈和其他金融犯罪行为。除提供此类信息外，为遵守全球行业数据留存标准，您同意我们在您账户的使用期间以及账户关闭后5年内保留这些信息记录，同时授权我们直接或通过第三方进行信息查询。请注意这是验证您身份并保护您和我们免遭欺诈等金融犯罪行为所必要的。

身份验证时所收集信息包括但不限于：姓名，电子邮件地址，电话号码，用户名，身份证等。在提供信息时，请确保真实性及准确性。注册成功后，请实时更新个人信息以确保其真实有效性。如有合理理由怀疑您提供的信息是错误的，不真实的，过时的或不完整的，币安有权通知您更正或直接删除相关信息，并根据具体情况终止您在币安的部分或全部活动。如果我们无法通过您提供的联系信息找到您，则您应对使用币安服务期间产生的任何损失或费用负全责。您有义务保证所有资料都是最新的及真实有效的。

账户使用要求

币安账户只能由其账号所有者使用。币安保留暂停，冻结或取消账户所有者以外的人使用账户的权利并将不会对此类账户承担法律责任。

账户安全

币安优先维护客户资金安全性，对平台采取行业规范保护措施。但个人用户的行为也会造成

账户风险。我们建议您同时采取安全措施来保护您个人帐户和信息的安全。

您应自行负责保管您的币安账户和密码，（包括但不限于信息披露，信息发布，同意通过网站，续订协议等）。

您同意：
  （a）若发现任何人未经授权使用您的币安账户和密码及任何其他违反安全规则的行为，立即通知币安；
  （b）严格遵守平台规则，包括认证，交易，收费，提款等操作流程；
  （c）每次访问结束时安全地退出网站并注销痕迹。

如未遵守上述条例，币安将不对所造成的损失负责。

争议解决办法

币安保留解决争议的权利。包括对用户侵犯他人权利，违反法律法规，异常交易以及条款中未明确提及的其他相关问题的处理。用户同意承担纠纷解决过程中所产生的费用。

币安服务使用准则

在使用币安服务期间您同意遵守以下协议：
在使用币安服务期间所有活动都符合法律法规的要求以及币安的使用规则。
不违反公共利益，公共道德及其他合法权益。
不偷税漏税，不违反本协议及相关规定。
若违反上述承诺并因此造成法律后果，您将独立承担所有法律责任，并赔偿币安因此类违规行为而引起的诉讼，索赔费用。

未经币安书面同意，不得将本网站上显示的任何数据或信息用于商业目的。按照使用条款和隐私政策使用本网站，不采取不正当竞争行为，也不尝试干预币安的正常运营。此类恶意行为包括但不限于：
利用设备，软件或程序干扰网站；
数据加载请求不合理导致网络设备过载；
在市场上恶意买卖。

使用币安表示您同意币安在未事先通知的情况下，有权单方面判断您是否违反了上述任何约定并采取行动。包括但不限于：
阻止并关闭订单请求；
冻结帐户；
向当局报告事件；
发布所指控的违规行为和已采取的行动；

删除您发布的违规信息。

若您的违规行为给第三方造成任何损失，应当以个人名义承担所有法律责任，并保证币安免受罚款或额外费用等损失。若由于您的违规行为导致任何损失，第三方要求赔偿或遭受行政机构处罚，您将承担币安因此造成的损失，包括律师费。

## 服务费

币安保留向用户征收服务费的权利。 币安有权调整向用户收取的服务费价格。

## 职责

## 服务条款

币安将不对所提供服务相关技术的可靠性，稳定性，准确性和完整性提供任何书面形式的保证。 币安将仅用作交易平台使用，同时可获得与数字货币有关的信息并进行与数字货币有关的交易行为。 币安不能控制所交易数字货币的质量，安全性及合法性，以及交易信息的真实性或交易各方履行规则的能力。因此，在使用服务前，您必须慎重考虑投资风险，交易信息和投资决策的合法性及有效性。

## 责任范围责任范围

您同意币安将不承担因下列任何事件造成的损失，包括但不限于：
利润，商誉，数据损失或任何其他无形损失；
使用币安服务或使用币安服务失败；
未经授权使用您的账户或第三方擅自更改您的数据；
对币安服务的误解；
任何其他与币安不直接相关的服务所产生的损失。

币安均不对固定期网络维护或电力故障，自然灾害，服务提供方问题或政府行为等外部因素导致的服务故障或延迟所导致的损失负责。

## 赔偿

若出现任何违反本协议的行为，或您在使用币安服务期间违反相关法律，法规或第三方的权益。您同意赔偿币安及其关联公司，承包商，许可方及其各自董事，高级职员，员工和代理人免受索赔和损害（包括律师费，由监管机构施加的罚金或罚金）。

## 通告

请注意，Binance所有官方公告，新闻，活动，竞赛及空投项目等通知均会在以下链接中列出：https://support.binance.com/hc/zh-en/categories/115000056351-%E5%85%AC%E5%91%8A%E4%B8%AD%E5%BF%83。请用户及时查看。Binance将不对任何因用户未及时查看官网通知而造成的损失承担责任或进行赔偿。

终止协议

您同意我们有权立即暂停您的个人账户或与您相关的企业账户，冻结或锁定所有相关账户中的资金，并在我们怀疑您由以下情况时，如违反服务条款，隐私政策，反洗钱/ CTF法案或任何相关法律法规时暂停您访问币安。币安有权保留和使用交易数据及与此类账户相关的所有信息。以下情况同样适用：
账户受刑事调查或其他未决诉讼的影响；
检测到账户中的异常活动；
检测到对账户未经授权的访问；
接到法院或监管机构/政府机构的命令。

下述情况发生时，币安有权注销您的账户，并永久冻结您对币安账户的访问权限：
在币安终止向您提供服务后；
您直接或间接再次以任何其他人的名义注册币安账户；
您提供的用户信息内容不真实，不准确，过时或不完整；
当本协议（包括规则）被修改时，您明确表明不愿接受修改后的服务协议；
币安认为应该终止服务的任何其他情况。
若账户被终止，满足数据保留标准的账户和交易信息将被安全存储五年。此外，如果在账户终止过程中交易未完成，币安有权即时通知您的交易对手方。

已终止账户中的剩余资金（正常资金）

账户关闭后，账户中的所有欠费将自动支付给币安。在向币安支付所有未付费用后，用户有5个工作日从账户中提取资金。

已终止账户中的剩余资金（欺诈/洗钱/违反条款）

若由于舞弊，反洗钱调查或违反币安条款（例如，在受制裁国家使用币安进行交易）而导致账户被暂停/关闭，币安将全权托管其资金和用户数据/信息。

遵守当地法律

币安用户有责任遵守当地法律。用户有责任和义务遵守当地法律法规如税收政策。币安及其用户均声明其资金来源合法。币安将保持与全球执法机构的合作，并坚决扣留，冻结，终止被法律授权或调查的用户账户和资金。

A-497

隐私权政策

币安将不时在平台宣布和修改其隐私政策，隐私政策同时是本协议的组成部分。其最新版本详情参考以下页面（https://www.binance.com/statement.html）。

赔偿和免责声明

除非币安违反这些条款，您同意赔偿币安及其相关联公司免于承担第三方索赔。如服务描述中所述，币安尽全力维护其网站的数据完整性，但不对平台中提供的信息和服务做任何保证。币安不承担因使用其服务而导致的损失。

投诉

如有任何投诉及反馈问题，请联系https://support.binance.com/hc/zh-cn/requests/new，我们将尽最大努力为您解决。

# Binance Terms of Use

**[Last revised: 20 February 2019]**

This agreement is between you (referenced herein as "you" or with "your") and Binance. By accessing, using or clicking "I agree" to any of the services made available by Binance or one of its affiliates through the website (https://www.binance.com), the API (https://api.binance.com), our mobile applications, or any other related services provided by Binance or its affiliates as further described in Section 4 below (collectively, the "Services") you agree that you have read, understood and accepted all of the terms and conditions contained in this Terms of Use agreement (the or these "Terms"), as well as our Privacy Policy found at https://www.binance.com/statement.html. Additionally, when using certain features of the Services, you may be subject to additional terms and conditions applicable to such features.

PLEASE READ THESE TERMS CAREFULLY AS THEY GOVERN YOUR USE OF THE SERVICES. THESE TERMS CONTAINS IMPORTANT PROVISIONS INCLUDING AN

ARBITRATION PROVISION THAT REQUIRES ALL CLAIMS TO BE RESOLVED BY WAY OF BINDING ARBITRATION. THE TERMS OF THE ARBITRATION PROVISION ARE SET FORTH IN SECTION 14 BELOW ENTITLED "RESOLVING DISPUTES: FORUM, ARBITRATION, CLASS ACTION WAIVER, GOVERNING LAW." AS WITH ANY ASSET, THE VALUE OF DIGITAL CURRENCIES CAN GO UP OR DOWN AND THERE CAN BE A SUBSTANTIAL RISK THAT YOU WILL LOSE MONEY BUYING, SELLING, HOLDING, OR INVESTING IN DIGITAL CURRENCIES. BY USING THE SERVICES YOU ACKNOWLEDGE AND AGREE THAT (1) YOU ARE AWARE OF THE RISKS ASSOCIATED WITH TRANSACTING IN DIGITAL CURRENCIES (2) THAT YOU ASSUME ALL RISKS WITH RESPECT TO YOUR USE OF THE SERVICES AND TRADING IN DIGITAL CURRENCIES AND (3) BINANCE IS NOT RESPONSIBLE OR LIABLE FOR ANY SUCH RISKS OR ADVERSE OUTCOMES.

BY ACCESSING, USING OR ATTEMPTING TO USE THE SERVICES IN ANY CAPACITY, YOU ACKNOWLEDGE THAT YOU ACCEPT AND AGREE TO BE BOUND BY THESE TERMS. IF YOU DO NOT AGREE, DO NOT ACCESS OR USE THE SERVICES.

**1. Agreement Conditions**

Binance reserves the right to modify or change the Terms at any time and at its sole discretion. Binance will provide notice of these changes by updating the revised Terms on the webpage (https://support.binance.com/hc/en-us/articles/115000421672-Terms-of-Use) and changing the "[Last revised: ]" date on this page. Any and all modifications or changes to these Terms will be effective immediately upon being announced on the website or released to users. As such, your continued use of Binance's services acts as acceptance of the amended agreement and rules. If you do not agree to any modification to these Terms, you must stop using the Services. Binance encourages you to frequently review the Terms to ensure you understand the terms and conditions that apply to your access to, and use of, the Services.

**2. Eligibility**

By registering to use a Binance Account (as defined in Section 5 below), you represent and warrant that you (a) are at least 18 years old or of legal age to form a binding contract under applicable law, (b) are an individual, legal person or other organization with full legal capacity and authority to enter into these Terms, (c) have not previously been suspended or removed from using our Services and (d) you do not currently have an existing Binance Account. If you are entering into these Terms on behalf of a legal entity of which you are an employee or agent, you represent and warrant that you have all necessary rights and authority to bind such legal entity.

**3. Prohibition of use**

A-499

By accessing and using the Services, you represent and warrant that you are not on any trade or economic sanctions lists, such as the UN Security Council Sanctions list, designated as a "Specially Designated National" by OFAC (Office of Foreign Assets Control of the U.S. Treasury Department) or placed on the U.S. Commerce Department's "Denied Persons List". Binance maintains the right to select its markets and jurisdictions to operate and may restrict or deny the Services in certain countries at its discretion.

**4. Description of services**

Binance provides an online digital asset trading platform (crypto to crypto) for products commonly known as cryptographic tokens, digital tokens or cryptographic currency (collectively, "Digital Currency"). Binance does not provide fiat trading capabilities on as part of the Services. Binance functions as a trading platform provider and not as a buyer or seller in trades made between traders. Binance is also not a market maker. Users must register and open an account with Binance as further set forth in Section 5 below and deposit digital assets prior to commencement of trading. Traders may request the withdrawal of their digital assets, subject to the limitations as stated in these Terms.

Binance strives to maintain the accuracy of information posted on the Services however it cannot and does not guarantee the accuracy, suitability, reliability, completeness, performance or fitness for any purpose of the content made available through the Services, and will not be liable for any loss or damage that may arise directly or indirectly from your use of such content. Information on the Services can be subjected to change without notice and is provided for the primary purpose of facilitating users to arrive at independent decisions. Binance does not provide investment or advisory advice and will have no liability for the use or interpretation of information as stated on the Services or other communication mediums. All users of the Services must understand that there are risks involved in trading in Digital Currencies. Binance encourages all users to exercise prudence and trade responsibly within their own means.

**5. Binance Account Registration & Requirements**

**a. Registration**

All users of the Services (each, a "User") must register at (https://www.binance.com/register.html) for a Binance account (an "Account") before using the Services. To register for an Account, you must provide your real name, email address and password, as well as accept the Terms of Use, Privacy Policy and Consent Form. Binance may, in its sole discretion, refuse to open an account for you. You agree to provide complete and accurate information when opening an Account and agree to promptly update any information you provide to Binance so that such information is complete and accurate at all times. Each registration is for a single user only and each User (including with respect to any User that is a business or legal entity) may only maintain one active Account with Binance.

**b. User Identity Verification**

With registration of an account on Binance, you agree to share personal information requested for the purposes of identity verification. This information is used specifically for the detection of money laundering, terrorist financing, fraud and other financial crimes on the Binance platform. We will collect, use and share this information in accordance with our posted Privacy Policy. In addition to providing this information, to facilitate compliance with global industry standards for data retention, you agree to permit us to keep a record of such information for the lifetime of your account plus 5 years beyond account closing. You also authorise us to make inquiries, either directly or through third parties, that are deemed necessary to verify your identity or to protect you and/or us against financial crimes such as fraud.

The identity verification information we request may include, but is not limited to, your: Name, Email Address, Contact Information, Telephone Number, Username, Government Issued ID, Date of Birth and other information collected at the time of account registration. In providing this required information, you confirm that it is accurate and authentic. Post-registration, you must guarantee that the information is truthful, complete and updated in a timely manner with any changes. If there is any reasonable doubt that any information provided by you is wrong, untruthful, outdated or incomplete, Binance shall have the right to send you a notice to demand corrections, remove relevant information directly and, as the case may be, terminate all or part of the Services to you. You shall be solely and fully responsible for any loss or expenses incurred during the use of Binance Service if you cannot be reached through the contact information provided. You hereby acknowledge and agree that you have the obligation to keep all information provided up to date if there are any changes.

BY SIGNING UP FOR ACCOUNT YOU HEREBY AUTHORIZE BINANCE TO MAKE INQUIRIES, WHETHER DIRECTLY OR THROUGH THIRD PARTIES, THAT BINANCE CONSIDERS NECESSARY TO VERIFY YOUR IDENTITY OR PROTECT YOU AND/OR BINANCE AGAINST FRAUD OR OTHER FINANCIAL CRIMES, AND TO TAKE ACTION BINANCE REASONABLY DEEMS NECESSARY BASED ON THE RESULTS OF SUCH INQUIRIES. YOU ALSO ACKNOWLEDGE AND AGREE THAT YOUR PERSONAL INFORMATION MAY BE DISCLOSED TO CREDIT REFERENCE AND FRAUD PREVENTION OR FINANCIAL CRIME AGENCIES AND THAT THESE AGENCIES MAY RESPOND TO OUR INQUIRIES IN FULL.

**c. Account Usage Requirements**

Accounts can only be used by the person whose name they are registered under. Binance reserves the right to suspend, freeze or cancel accounts that are used by persons other than the persons whose names they are registered under. You shall immediately notify Binance if you suspect or become

A-501

aware of unauthorized use of your user name and password. Binance will not be liable for any loss or damage arising from any use of your Account by you or by any third party (whether or not authorized by you).

**d. Account Security**

Binance strives to maintain the safety of those user funds entrusted to us and has implemented industry standard protections for the Services. However, there are risks that are created by individual User actions. You agree to consider your access credentials such as user name and password as confidential information and not to disclose such information to any third party. You also agree that you alone are responsible for taking necessary safety precautions to protect your own account and personal information.

You shall be solely responsible for the safekeeping of your Binance account and password on your own, and you shall be responsible for all activities under Account and Binance will not be responsible for any loss or consequences of authorized or unauthorized use of your Account credentials including but not limited to information disclosure, information posting, consent to or submission of various rules and agreements by clicking on the website, online renewal of agreement, etc.

By creating an Account, you hereby agree that:
(i) you will notify Binance immediately if you are aware of any unauthorized use of your Binance account and password by any person or any other violations to the security rules;
(ii) you will strictly observe the security, authentication, dealing, charging, withdrawal mechanism or procedures of the website/service; and
(iii) you will log out from the website by taking proper steps at the end of every visit.

**6. Guidelines for Usage of the Services**

**a. License**

Subject to your continued compliance with the express terms and conditions of these Terms, Binance provides to you a revocable, limited, royalty-free, non-exclusive, non-transferable, and non-sublicensable license to access and use the Services on your computer or other internet compatible device for your personal, internal use only. You are not permitted to use the Services for any resale or commercial use including to place trades on behalf of another person or entity. All such use is expressly prohibited and shall constitute a material violation of these Terms. The content layout, formatting, and features of and access privileges for the Services shall be as specified by Binance in its sole discretion. All rights not expressly granted under these Terms are hereby reserved. Accordingly, you are hereby prohibited from using the Services in any manner that is not expressly and unambiguously authorized by these Terms.

A-502

These Terms provide only a limited license to access and use the Services. Accordingly, you hereby agree that Binance transfers no ownership or intellectual property interest or title in and to the Services or any Binance intellectual property to you or anyone else in connection with your use of the Services. All text, graphics, user interfaces, visual interfaces, photographs, sounds, artwork, computer code (including html code), programs, software, products, information, and documentation as well as the design, structure, selection, coordination, expression, "look and feel," and arrangement of any content contained on or available through the Services are exclusively owned, controlled, and/or licensed by Binance or its members, parent(s), licensors, or affiliates.

Binance will own any feedback, suggestions, ideas, or other information or materials regarding Binance or the Services that you provide, whether by email, through the Services or otherwise ("Feedback"). You hereby assign to Binance all right, title and interest to Feedback together with all associated intellectual property rights. You will not be entitled to, and hereby waive any claim for, acknowledgment or compensation based on any Feedback or any modifications made based on any Feedback.

**b. Restrictions**

When you use the Services you agree and covenant to observe the following:

    i. All the activities that you carry out during the use of the Services will be in compliance with the requirements of applicable laws, regulations, as well as the various guidelines of Binance:

    ii. Your use of the Services will not be in violation of public interests, public ethics or other's legitimate interests including taking any action that would interfere with, disrupt, negatively affect, or inhibit other Users from using the Services:

    iii. You agree not to use the services for engaging in market manipulation (such as pump and dump schemes, wash trading, self-trading, front running, quote stuffing, and spoofing or layering regardless of whether prohibited by law);

    iv. The following commercial uses of Binance data is prohibited unless written consent from Binance is granted:
    1) Exchange services that use quotes or order book information from Binance.
    2) Data feed or data stream services that make use of any market data from Binance.
    3) Any other websites/apps/services that charge for, or otherwise commercially monetize (including through advertising or referral fees), market data obtained from Binance.

A-503

v.   You may not modify, reproduce, duplicate, copy, download, store, further transmit, disseminate, transfer, disassemble, broadcast, publish, remove or alter any proprietary notices or labels, license, sublicense, sell, mirror, frame, rent, lease, private label, grant a security interest in, create derivative works of, or otherwise exploit the Properties, or any portion of the Properties without Binance's prior written consent.

vi.   You may not (i) use any "deep link," "page scrape," "robot," "spider," or other automatic device, program, script, algorithm, or methodology, or any similar or equivalent manual process, to access, acquire, copy, or monitor any portion of the Properties or in any way reproduce or circumvent the navigational structure or presentation of the Services to obtain or attempt to obtain any materials, documents, or information through any means not purposely made available through the Services, (ii) attempt to gain unauthorized access to any portion or feature of the Properties or any other systems or networks connected to the Services or to any Binance server or to any of the services offered on or through the Services, by hacking, password "mining," or any other illegitimate or prohibited means, (iii) probe, scan, or test the vulnerability of the Services or any network connected to the Properties, nor breach the security or authentication measures on the Services or any network connected to the Services, (iv) reverse look-up, trace, or seek to trace any information on any other user of or visitor to the Services, (v) take any action that imposes an unreasonable or disproportionately large load on the infrastructure of the Services or Binance's systems or networks or any systems or networks connected to the Services, (v) use any device, software, or routine to interfere with the proper working of the Services or any transaction conducted on the Services, or with any other person's use of the Services, (vi) forge headers, impersonate a person, or otherwise manipulate identifiers in order to disguise your identity or the origin of any message or transmittal you send to the Services, or (vii) use the Services in an unlawful manner.

By accessing the Service, you agree that Binance shall have the right to investigate any violation of these Terms, unilaterally determine whether you have violated these Terms, and take actions to apply relevant rules without receiving your consent or giving prior notice to you. Examples of such actions include, but are not limited to:

- ● block and close order requests
- ● freezing your account
- ● reporting the incident to authorities
- ● publishing the alleged violations and actions that have been taken
- ● deleting any information you published that is in violation

**7. Orders and Service Fees**

A-504

**a. Orders**

Upon placing an instruction to effect a trade using the Services (an "Order"), your Account will be updated to reflect the open Order and your Order will be included in Binance's order book for matching with Orders from other Users. If all or a portion of your Order is matched with another User, the Services will execute an exchange (a "Trade"). Upon execution of a Trade, your Account will be updated to reflect that the Order has either been closed due to having been fully executed, or updated to reflect any partial fulfillment of the Order. Orders will remain open until fully executed or cancelled in accordance with subsection (b) below. For purposes of effectuating a Trade, you authorize Binance to take temporary control of the Digital Currency that you are disposing of in the Trade.

**b. Cancellations**

You may only cancel an order initiated via the Services if such cancellation occurs before your Order has been matched with an Order from another user. Once your Order has been matched with an Order from another user, you may not change, withdraw, or cancel your authorization for Binance to complete such Order. If any order has been partially matched, you may cancel the unmatched portion of the Order unless and until the unmatched portion has been matched. Binance reserves the right to refuse any cancellation request associated with an Order after you have submitted such Order. If you have an insufficient amount of Digital Currency in your Account to fulfill an Order, Binance may cancel the entire Order or may fulfill a partial Order that can be covered by the Digital Currency in your Account (in each case after deducting any fees payable to Binance in connection with the Trade as described in subsection (c) below).

**c. Fees**

You agree to pay Binance the fees set forth at https://www.binance.com/en/fee/schedule which may be updated from time to time in Binance's sole discretion. Any such updated fees will apply prospectively to any trades or other transactions that take place following the effective date of such updated fees. You authorize Binance to remove any amounts from your Account for any applicable fees owed by you under these Terms.

**8. Liability**

**a. Disclaimer of Warranties**

TO THE MAXIMUM EXTENT PERMITTED UNDER APPLICABLE LAW, THE SERVICES, THE BINANCE MATERIALS AND ANY PRODUCT, SERVICE OR OTHER ITEM PROVIDED BY OR ON BEHALF OF BINANCE ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE"

A-505

BASIS AND BINANCE EXPRESSLY DISCLAIMS, AND YOU WAIVE, ANY AND ALL OTHER WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE OR NON-INFRINGEMENT OR WARRANTIES ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE IN TRADE. WITHOUT LIMITING THE FOREGOING, BINANCE DOES NOT REPRESENT OR WARRANT THAT THE SITE, THE SERVICES OR BINANCE MATERIALS ARE ACCURATE, COMPLETE, RELIABLE, CURRENT, ERROR-FREE, OR FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS. BINANCE DOES NOT GUARANTEE THAT ANY ORDER WILL BE EXECUTED, ACCEPTED, RECORDED OR REMAIN OPEN. EXCEPT FOR THE EXPRESS STATEMENTS SET FORTH IN THIS AGREEMENT, YOU HEREBY ACKNOWLEDGE AND AGREE THAT YOU HAVE NOT RELIED UPON ANY OTHER STATEMENT OR UNDERSTANDING, WHETHER WRITTEN OR ORAL, WITH RESPECT TO YOUR USE AND ACCESS OF THE SERVICES. WITHOUT LIMITING THE FOREGOING, YOU HEREBY UNDERSTAND AND AGREE THAT BINANCE WILL NOT BE LIABLE FOR ANY LOSSES OR DAMAGES ARISING OUT OF OR RELATING TO: (A) ANY INACCURACY, DEFECT OR OMISSION OF DIGITAL CURRENCY PRICE DATA, (B) ANY ERROR OR DELAY IN THE TRANSMISSION OF SUCH DATA, (C) INTERRUPTION IN ANY SUCH DATA AND (D) ANY DAMAGES INCURRED BY ANOTHER USER'S ACTIONS, OMISSIONS OR VIOLATION OF THIS AGREEMENT.

THE DISCLAIMER OF IMPLIED WARRANTIES CONTAINED HEREIN MAY NOT APPLY IF AND TO THE EXTENT IT IS PROHIBITED BY APPLICABLE LAW OF THE JURISDICTION IN WHICH YOU RESIDE.

**b. Disclaimer of Damages and Limitation of Liability**

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT WILL BINANCE, ITS AFFILIATES AND THEIR RESPECTIVE SHAREHOLDERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, ATTORNEYS, AGENTS, REPRESENTATIVES, SUPPLIERS OR CONTRACTORS BE LIABLE FOR ANY INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE, CONSEQUENTIAL OR SIMILAR DAMAGES OR LIABILITIES WHATSOEVER (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF DATA, INFORMATION, REVENUE, PROFITS OR OTHER BUSINESS OR FINANCIAL BENEFIT) ARISING OUT OF OR IN CONNECTION WITH THE SERVICES, ANY PERFORMANCE OR NON-PERFORMANCE OF THE SERVICES, OR ANY OTHER PRODUCT, SERVICE OR OTHER ITEM PROVIDED BY OR ON BEHALF OF BINANCE AND ITS AFFILIATES, WHETHER UNDER CONTRACT, STATUTE, STRICT LIABILITY OR OTHER THEORY EVEN IF BINANCE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES EXCEPT TO THE EXTENT OF A FINAL JUDICIAL DETERMINATION THAT SUCH DAMAGES WERE A

RESULT OF BINANCE'S GROSS NEGLIGENCE, FRAUD, WILLFUL MISCONDUCT OR INTENTIONAL VIOLATION OF LAW. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATION MAY NOT APPLY TO YOU.

NOTWITHSTANDING THE FOREGOING, IN NO EVENT WILL THE LIABILITY OF BINANCE, ITS AFFILIATES AND THEIR RESPECTIVE SHAREHOLDERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, ATTORNEYS, AGENTS, REPRESENTATIVES, SUPPLIERS OR CONTRACTORS ARISING OUT OF OR IN CONNECTION THE SERVICES, ANY PERFORMANCE OR NON-PERFORMANCE OF THE SERVICES, OR ANY OTHER PRODUCT, SERVICE OR OTHER ITEM PROVIDED BY OR ON BEHALF OF BINANCE OR ITS AFFILIATES WHETHER UNDER CONTRACT, STATUTE, STRICT LIABILITY OR OTHER THEORY, EXCEED THE AMOUNT OF THE FEES PAID BY YOU TO BINANCE UNDER THIS AGREEMENT IN THE TWELVE-MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO THE CLAIM FOR LIABILITY.

**c. Indemnification**

You agree to indemnify and hold harmless Binance, its affiliates, contractors, licensors, and their respective directors, officers, employees and agents from and against any claims, actions, proceedings, investigations, demands, suits, costs, expenses and damages (including attorneys' fees, fines or penalties imposed by any regulatory authority) arising out of or related to (i) your use of, or conduct in connection with, the Services, (ii) your breach or our enforcement of these Terms, or (iii) your violation of any applicable law, regulation, or rights of any third party during your use of the Service. If you are obligated to indemnify Binance, its affiliates, contractors, licensors, and their respective directors, officers, employees or agents pursuant to this clause, Binance will have the right, in its sole discretion, to control any action or proceeding and to determine whether Binance wishes to settle, and if so, on what terms.

**9. Announcements**

Please be aware that all official announcements, news, promotions, competitions and airdrops will be listed on https://support.binance.com/hc/en-us/categories/115000056351-Announcements where we urge all users to refer to regularly. Binance will not be held liable or responsible in any manner of compensation should users incur personal losses arising from ignorance or negligence of the announcements.

**10. Termination of Agreement**

You agree that Binance shall have the right to immediately suspend your account (and any accounts

A-507

beneficially owned by related entities or affiliates), freeze or lock the funds in all such accounts, and suspend your access to Binance for any reason including if it suspects any such accounts to be in violation of these Terms, our Privacy Policy, or any applicable laws and regulations. You agree that Binance shall not be liable to you for any permanent or temporary modification, suspension or termination of your Account or access to all or any portion of the Services. Binance shall have the right to keep and use the transaction data or other information related to such accounts. The above account controls may also be applied in the following cases:

- The account is subject to a governmental proceeding, criminal investigation or other pending litigation;
- We detect unusual activity in the account;
- We detect unauthorized access to the account;
- We are required to do so by a court order or command by a regulatory/government authority

In case of any of the following events, Binance shall have the right to directly terminate this agreement by cancelling your Account, and shall have the right to permanently freeze (cancel) the authorizations of your account on Binance and withdraw the corresponding Binance Account thereof:

- after Binance terminates services to you;
- you allegedly register or register in any other person's name as Binance user again, directly or indirectly;
- the information that you have provided is untruthful, inaccurate, outdated or incomplete;
- when these Terms are amended, you expressly state and notify Binance of your unwillingness to accept the amended Terms;
- you request that the Services be terminated; and
- any other circumstances where Binance deems it should terminate the services.

Should your Account be terminated, the Account and transactional information required for meeting data retention standards will be securely stored for 5 years. In addition, if a transaction is unfinished during the Account termination process, Binance shall have the right to notify your counterpart of the situation at that time. You acknowledge that a user initiated account exit (right to erasure under GDPR or other equivalent regulations) will also be subjected to the termination protocol stated above.

If Binance receives notice that any funds held in your Account are alleged to have been stolen or otherwise are not lawfully possessed by you, Binance may, but has no obligation to, place an administrative hold on the affected funds and your Account. If Binance does place an administrative hold on some or all of your funds or Account, Binance may continue such hold until such time as the dispute has been resolved and evidence of the resolution acceptable to Binance has been provided to Binance in a form acceptable to Binance. Binance will not involve itself in any such dispute or the

resolution of the dispute. You agree that Binance will have no liability or responsibility for any such hold, or for your inability to withdraw funds or execute trades during the period of any such hold.

**a. Remaining funds after Account termination**

Except as set forth in subsection (b) below, once the Account is closed/withdrawn, all remaining balance (which includes charges and liabilities owed to Binance) on the account will be payable immediately to Binance. Upon payment of all outstanding charges to Binance (if any), the User will have 5 business days to withdraw all funds from the Account.

**b. Remaining funds after Account termination due to fraud, violation of law, or violation of these terms)**

Binance maintains full custody of the funds and User data/information which may be turned over to governmental authorities in the event of Account suspension/closure arising from fraud investigations, violation of law investigations or violation of these Terms.

**11. No Financial Advice**

Binance is not your broker, intermediary, agent, or advisor and has no fiduciary relationship or obligation to you in connection with any trades or other decisions or activities effected by you using the Services. No communication or information provided to you by Binance is intended as, or shall be considered or construed as, investment advice, financial advice, trading advice, or any other sort of advice. All trades are executed automatically, based on the parameters of your order instructions and in accordance with posted trade execution procedures, and you are solely responsible for determining whether any investment, investment strategy or related transaction is appropriate for you based on your personal investment objectives, financial circumstances and risk tolerance. You should consult your legal or tax professional regarding your specific situation. Binance does not recommend that any Digital Currency should be bought, earned, sold, or held by you. Before making the decision to buy, sell or hold any Digital Currency, you should conduct your own due diligence and consult your financial advisors before making any investment decision. Binance will not be held responsible for the decisions you make to buy, sell, or hold Digital Currency based on the information provided by Binance.

**12. Compliance with Local Laws**

It is the responsibility of the User to abide by local laws in relation to the legal usage of Binance in their local jurisdiction. Users must also factor, to the extent of their local law all aspects of taxation, the withholding, collection, reporting and remittance to their appropriate tax authorities. All Users of Binance and any of its services acknowledge and declare that the source of their funds come from a

A-509

legitimate manner and are not derived from illegal activities. Binance maintains a stance of cooperation with law enforcement authorities globally and will not hesitate to seize, freeze, terminate the account and funds of Users which are flagged out or investigated by legal mandate.

**13. Privacy Policy**

Access to the Services will require the submission of certain personally identifiable information. Please review Binance's Privacy Policy found at https://www.binance.com/statement.html for a summary of Binance's practices related to the collection and use of personally identifiable information.

**14. RESOLVING DISPUTES: FORUM, ARBITRATION, CLASS ACTION WAIVER, GOVERNING LAW**

PLEASE READ THIS SECTION CAREFULLY, AS IT INVOLVES A WAIVER OF CERTAIN RIGHTS TO BRING LEGAL PROCEEDINGS, INCLUDING AS A CLASS ACTION FOR RESIDENTS OF THE U.S.

**a. Notification of Dispute.** Please contact Binance first! Binance wants to address your concerns without resorting to formal legal proceedings. Before filing a claim, you agree to try to resolve the dispute informally by contacting Binance first through https://support.binance.com/hc/en-us/requests/new.

**b. Agreement to Arbitrate.** You and Binance agree to resolve any claims relating to this Agreement (including any question regarding its existence, validity, termination, or any services or products provided and any representations made by us) through final and binding arbitration, except as set forth under Exceptions to Agreement to Arbitrate below. You agree to first give us an opportunity to resolve any claims by contacting us as set forth in subsection (a) above. If we are not able to resolve your claims within 60 days of receiving the notice, you may seek relief through arbitration or in the Small Claims Tribunals of Singapore ("SCT"), as set forth below.

**c. Arbitration Procedure.** Either you or Binance may submit a dispute (after having made good faith efforts to resolve such dispute in accordance with subsections (a) and (b) above) for final, binding resolution by arbitration under the arbitration rules of the Singapore International Arbitration Centre ("SIAC"), which are deemed to be incorporated by reference. The arbitration tribunal shall consist of a sole arbitrator to be appointed by the President of SIAC. The language of the arbitration hearings shall be English and the seat, or legal place, of arbitration shall be Singapore. **Judgment on any arbitral award may be entered in any court having jurisdiction over the party (or the assets of the party) due and owing such award.**

**d. Exceptions.** Either party may instead choose to assert the claims in the SCT if the claims fall within the jurisdiction of the SCT, and either party may seek injunctive relief or other urgent equitable relief in a court of competent jurisdiction. However, for the avoidance of doubt, where the claims fall outside of the jurisdiction of the SCT, the claims will be referred to and finally resolved by SIAC arbitration.

**e. Notice.** To begin an arbitration proceeding, you must send a letter requesting arbitration and describing your claims to Binance Europe Services Limited, Melita Court, Level 3, Triq Giuseppe Cali, Ta'Xbiex XBX 1420, Malta. If we request arbitration against you, we will give you notice at the email address or street address you have provided. SIAC Rules and filing instructions are available at http://www.siac.org.sg/our-rules or by calling +65 6713 9777.

**f. Controlling Law.** This Agreement is governed by the law of Singapore except for its conflicts of laws principles, unless otherwise required by a mandatory law of any other jurisdiction.

**15. Miscellaneous**

**a. Independent Parties.** Binance is an independent contractor and not an agent of you in the performance of these Terms. These Terms not to be interpreted as evidence of an association, joint venture, partnership, or franchise between the parties.

**b. Entire Agreement.** These Terms constitute the entire agreement between the parties regarding use of the Services and will supersede all prior agreements between the parties whether, written or oral. No usage of trade or other regular practice or method of dealing between the parties will be used to modify, interpret, supplement, or alter the terms of these Terms.

**c. Force Majeure.** Binance will not be liable for any delay or failure to perform as required by these Terms because of any cause or condition beyond Binance's reasonable control.

**d. Severability.** If any portion of these Terms are held invalid or unenforceable, such invalidity or enforceability will not affect the other provisions of these Terms, which will remain in full force and effect, and the invalid or unenforceable portion will be given effect to the greatest extent possible.

**e. Assignment.** You may not assign or transfer any right to use the Services or any of your rights or obligations under these Terms without prior written consent from us, including by operation of law or in connection with any change of control. Binance may assign or transfer any or all of its rights or obligations under these Terms, in whole or in part, without notice or obtaining your consent or approval.

**f. Waiver.** The failure of a party to require performance of any provision will not affect that party's

right to require performance at any time thereafter, nor will a waiver of any breach or default of these Terms or any provision of these Terms constitute a waiver of any subsequent breach or default or a waiver of the provision itself.

**g. Third-Party Website Disclaimer.** Any links to third-party websites from the Services does not imply endorsement by Binance of any products, services or information presented therein, nor does Binance guarantee the accuracy of the information contained on them. In addition, since Binance has no control over the terms of use or privacy practices of third-party websites, you should read and understand those policies carefully.

**h. Contact Information.** For more information on Binance, you can refer to the company and license information found on the website. If you have questions regarding this agreement, please feel free to contact Binance for clarification via our Customer Support team at https://support.binance.com/hc/en-us/requests/new.

- {{"About" | T}}
- {{"Terms" | T}}
- {{"Privacy" | T}}
- {{"Fees" | T}}
- {{"Contact" | T}}
- {{"API" | T}}
- {{"Apply to List" | T}}
- {{'Download' | T}}
- {{'BNB' | T}}
- {{'Blog' | T}}

-
-
-
-
-
-
-
-
-

© 2017 - {{today|date:'yyyy'}} Binance.com. All rights reserved
{{today|date:'yyyy-MM-dd HH:mm:ss'}}
24h {{"Trade Volume" | T}}:   {{volume[1]|number:2}} *{{volume[0]}}*/
{{websocketStatus | T}}

A-512

Exhibit 2

 BINANCE                                                    Register

# How can we help you?

Search here

Support Center

# FAQ

Account Functions          Tutorial          Crypto Deposit/Withdrawal          Buy Crypto (Fiat/P2P)

Spot & Margin Trading          Crypto Derivatives          Finance          API          Security          Terms of Use

## Account Functions

### Guide to Account Functions

How to Register on Binance【App】

How to register with mobile number

How to Register on Binance by Email

Binance Referral Program Guide

How to Disable an Account

View more ﹥

### Identity Verification

How to Complete Identity Verification

Corporate Account Application Q&A

### 2 Factor Verification

Google 2FA Guide

2FA Code Error

How to Reset Google Authentication【App】

A-514

How to Reset Google Authentication

How to reset SMS Authentication 【App】

View more ❯

Email Issues

How to Change Account Email

How to Reset Account Email 【App】

Not Receiving Emails From Binance

How to Whitelist Binance Emails

Voucher

How to Redeem a Futures Bonus Voucher/Cash Voucher

How to Redeem a Savings Trial Fund

How to Redeem a VIP Upgrade Voucher

Cashback Voucher Terms and Conditions

How to Redeem a Cashback Voucher

View more ❯

 Tutorial

How To Transfer Crypto for Free Between Binance and WazirX

How To Transfer Crypto for Free Between Binance and WazirX App

 Crypto Deposit/Withdrawal

Deposit/Withdraw Guide

How do I Deposit/Withdraw Cryptocurrency

About Segregated Witness (SegWit)

Crypto Deposit

How to Deposit Cryptos to Binance

Deposit Has Not Been Credited

Summary of Incorrect Deposit



Summary of Incorrect Deposit

Guidance for Self Service of Forgot/Wrong tag for Deposit

## Crypto Withdrawal

How to Withdraw from Binance

How to Make Internal Transfer within Binance

How to use the withdrawal address whitelist function

Missing Withdrawals

Withdrawal to a Wrong Address

View more  >

 ## Buy Crypto (Fiat/P2P)

### P2P Trading

▾ **Get started with P2P**

Glossary of P2P Trading Terms

How to Buy Cryptocurrency on Binance P2P in India?

How to buy cryptocurrency on Binance P2P in INDIA (App)?

How to Sell Cryptocurrencies on Binance P2P (app) for INR?

How to sell crypto on Binance P2P for INR (Desktop)

View more  >

▸ **P2P FAQ Center**

▸ **P2P Merchant and User Management**

▸ **P2P Security and Compliance**

### Credit/Debit Card

▾ **Credit/Debit Card Purchase Guide**

How to Buy Cryptos with Credit/Debit Card

Identity Verification for Buying Crypto with Credit/Debit Card

How to Buy Crypto with Credit/Debit Card on the Binance App

Instantly Buy Crypto with Visa on Mobile Browser

Deposit Fiat with Credit/Debit Card

Third Party Payment Channels

▼ **Flutterwave**

How to deposit and withdraw UGX on Binance.com

How to deposit/withdraw NGN on Binance using your bank account (Mobile and Web)

Account Verification Requirements for Ugandan Shilling (UGX) Fiat Channels

Account Verification Requirements for Naira (NGN) Fiat Channels

▸ **Etana**

▸ **Simplex**

▸ **Papara**

 Spot & Margin Trading

Spot Trading

How to Trade Spot on Binance Website

How to Spot Trade on Binance App

Trading Limits and Rules

What Do "Maker" and "Taker" Mean?

How to Use the Stop-Limit Function

View more ›

Margin Trading

Margin Trading on the Binance App

Tiered Leverage Function on Isolated Margin

Isolated Margin User Guide (Web)

What is Margin Trading

Isolated Margin Trading Rules

View more ›



Crypto Derivatives

Futures Contracts

▾ **Introduction to Binance Futures**

Differences Between Spot Trading and Futures Trading

Differences Between a Perpetual Contract and a Traditional Futures Contract

Liquidation

Insurance Fund

Counterparty Liquidation

▸ **USDⓈ-M Futures Contracts**

▸ **COIN-M Futures Contracts**

▸ **Futures Guide**

▸ **Binance Futures Referral Program**

▸ **Cross Collateral**

▸ **Hedge Mode**

▸ **Types of Orders**

▸ **Binance Futures Welcome Bonus Coupon**

▸ **Futures Service and Agreement**

▸ **Binance Futures Related Programs**

▸ **Index**

▸ **Trading Rules**

Options

▾ **Binance Options**

Overview of the Options

About Binance Options

How to Trade Options on Mobile Applications

Vol Option (Straddle)

## Leveraged Tokens

▾ **Terms of Use**

Binance Leveraged Tokens Trading Rules

Binance Leveraged Tokens Risk Disclosure Statement

▸ **Guides**

 ## Finance

### Binance Earn

About Binance Earn

### Flexible Savings

FAQ for Flexible Savings Products

How to use Binance Flexible Savings Products

How to activate automatic transfer function for Flexible Savings products

Binance Savings Service Agreement

### Fixed Savings

How to use Binance Locked Savings Service

How to Transfer Locked Savings Assets to Flexible Savings Assets?

### Activities

How to use Binance Savings Activities

### BNB Vault

About BNB Vault

### Locked Staking

Locked Staking FAQ

### DeFi Staking



DeFi Staking instruction and Frequently Asked Questions(FAQ)

## Liquid Swap

About Binance Liquid Swap

Binance Liquid Swap User Agreement

How to check share and history of BSwap

AMM, Shares and Revenue Formula Explained

How to use Binance Liquid Swap - Liquidity

View more >

## Dual Investment

What is Dual Savings? What are the advantages?

Terms of the Dual Currency Investments Purchase Agreement

## Launchpad&Launchpool

How to get started with Binance Launchpool

Binance Launchpad Lottery Ticket Allocation Rules

## Mining

▾ **Earnings**

Where can I check my earnings?

How are Earnings calculated?

▸ **Hashrate**

▸ **Miner Configuration**

▸ **Pool Tutorial**

## Crypto Loans

Binance Loans User Manual

How to use "Binance Loans" Service

Cryptocurrency Loan Service Agreement

Binance Card

Binance Cashback

 API

API Trading Rules

How to create API

API Frequently Asked Questions (FAQ)

 Security

Security Tips

Security Tips

Antivirus & Trojan Guidelines

Examples of Phishing Emails

Examples of Phishing Sites

Securing Your Trading Account

View more  >

Law Enforcement

How to Handle Stolen Funds Transferred to Binance

 Terms of Use

Binance Terms of Use

NPXS Monthly Token Unlock Program

Listing a Coin on Binance.com

Fee Structure on Binance

About Us                                                                        +

Products                                                                        +

A-521

Service                                                                          +

Support                                                                          +

Learn                                                                            +

Community

English (India)

© 2017 - 2021 Binance.com. All rights reserved

A-522

Exhibit 3

A-523

**EARLIEST AND LATEST ALLEGED PURCHASE OF EACH TOKEN BY EACH NAMED PLAINTIFF**

| Plaintiff | Token | Earliest Purchase | Last Purchase | Compl. Ex.[1] |
|---|---|---|---|---|
| JD Anderson | ELF | 1/11/2018 | 4/9/2018 | Ex. A |
| JD. Anderson | EOS | 5/19/2018 | 5/19/2018 | Ex. A |
| JD Anderson | ICX | 12/18/2017 | 12/18/2017 | Ex. A |
| JD Anderson | OMG | 4/6/2018 | 4/6/2018 | Ex. A |
| JD Anderson | TRX | 12/16/2017 | 5/4/2018 | Ex. A |
| JD Anderson | QSP | 1/11/2018 | 6/20/2018 | Ex. A |
| Cory Hardin | TRX | 3/29/2018 | 3/21/2020 | Ex. B |
| Eric Lee | ELF | 1/9/2018 | 1/9/2018 | Ex. C |
| Eric Lee | ICX | 1/11/2018 | 1/11/2018 | Ex. C |
| Eric Lee | TRX | 1/4/2018 | 1/4/2018 | Ex. C |
| Brett Messieh | ELF | 12/30/2017 | 12/30/2017 | Ex. D |
| Brett Messieh | ICX | 1/5/2018 | 3/27/2018 | Ex. D |
| Brett Messieh | KNC | 11/8/2017 | 11/8/2017 | Ex. D |
| Brett Messieh | LEND | 1/5/2018 | 1/5/2018 | Ex. D |
| Brett Messieh | OMG | 10/17/2017 | 10/17/2017 | Ex. D |
| Brett Messieh | QSP | 11/26/2017 | 11/29/2017 | Ex. D |
| David Muhammad | EOS | 6/4/2018 | 6/27/2019 | Ex. E |
| David Muhammad | FUN | 10/3/2018 | 10/3/2018 | Ex. E |
| David Muhammad | TRX | 4/23/2018 | 10/7/2018 | Ex. E |

---

[1] The exhibits identified in this column are appended to plaintiffs' first Amended Class Action Complaint (Dkt. 43) and incorporated in their Second Amended Class Action Complaint (¶¶15–22).

| Plaintiff | Token | Earliest Purchase | Last Purchase | Compl. Ex.[1] |
|-----------|-------|-------------------|---------------|---------------|
| Ranjith Thiagarajan | EOS | 3/29/2018 | 4/22/2020 | Ex. F |
| Chase Williams | EOS | 5/8/2018 | 6/12/2018 | Ex. G |
| Chase Williams | TRX | 5/8/2019 | 5/8/2019 | Ex. G |
| Chase Williams | QSP | 11/21/2017 | 12/22/2017 | Ex. G |
| Token Fund I LLC | EOS | 3/29/2018 | 4/22/2020 | Ex. H |

A-525

Exhibit 4

 **U.S. SECURITIES AND EXCHANGE COMMISSION**

q

Fast Answers

# National Securities Exchanges



A "national securities exchange" is a securities exchange that has registered with the SEC under Section 6 of the Securities Exchange Act of 1934.

Following is a list of exchanges registered with the SEC under Section 6(a) of the Exchange Act as national securities exchanges:

- BOX Exchange LLC (formerly BOX Options Exchange LLC)
- Cboe BYX Exchange, Inc. (formerly Bats BYX Exchange, Inc.; BATS Y-Exchange, Inc.)
- Cboe BZX Exchange, Inc. (formerly Bats BZX Exchange, Inc.; BATS Exchange, Inc.)
- Cboe C2 Exchange, Inc.
- Cboe EDGA Exchange, Inc. (formerly Bats EDGA Exchange, Inc.; EDGA Exchange, Inc.)
- Cboe EDGX Exchange, Inc. (formerly Bats EDGX Exchange, Inc.; EDGX Exchange, Inc.)
- Cboe Exchange, Inc.
- Investors Exchange LLC
- Long-Term Stock Exchange, Inc.
- MEMX, LLC
- Miami International Securities Exchange
- MIAX Emerald, LLC
- MIAX PEARL, LLC
- Nasdaq BX, Inc. (formerly NASDAQ OMX BX, Inc.; Boston Stock Exchange)
- Nasdaq GEMX, LLC (formerly ISE Gemini)
- Nasdaq ISE, LLC (formerly International Securities Exchange, LLC)
- Nasdaq MRX, LLC (formerly ISE Mercury)
- Nasdaq PHLX, LLC (formerly NASDAQ OMX PHLX, LLC; Philadelphia Stock Exchange)
- The Nasdaq Stock Market
- New York Stock Exchange LLC
- NYSE Arca, Inc.
- NYSE Chicago, Inc. (formerly Chicago Stock Exchange)
- NYSE MKT LLC (formerly NYSE AMEX and the American Stock Exchange)
- NYSE National, Inc. (formerly National Stock Exchange, Inc.)

Certain exchanges are also registered with the SEC through a notice filing under Section 6(g) of the Exchange Act for the purpose of trading security futures.

- CBOE Futures Exchange, LLC
- Chicago Board of Trade
- One Chicago, LLC
- The Island Futures Exchange, LLC (formerly registered)
- NQLX LLC (formerly registered)

There are also two exchanges that the SEC has exempted from registration as national securities exchanges on the basis of a limited volume of transactions:

- Arizona Stock Exchange (no longer operating pursuant to an exemption from registration as a national securities exchange)
- SWX Europe Limited (f/k/a Virt-x; no longer operating pursuant to an exemption from registration as a national securities exchange)

# Section 31 Fees

- Basic Information for Firms
- Section 31 of the Securities Exchange Act of 1934
- Section 31 Information
- Rule 31 under the Securities Exchange Act of 1934
- Rule 31T under the Securities Exchange Act of 1934
- Collection Practices under Section 31 of the Exchange Act
- Recent Fee Rate Advisories

  - Fee Rate Advisory #2 for Fiscal Year 2021 (January 15, 2021)
  - Fee Rate Advisory #2 for Fiscal Year 2020 (January 9, 2020)
  - Fee Rate Advisory #1 for Fiscal Year 2020 (August 23, 2019 )
  - Fee Rate Advisory #2 for Fiscal Year 2019 (March 12, 2019)
  - Fee Rate Advisory #1 for Fiscal Year 2019 (August 24, 2018 )
  - Fee Rate Advisory #3 for Fiscal Year 2018 (April 17, 2018)
  - Fee Rate Advisory #2 for Fiscal Year 2018 (September 29, 2017)
  - Fee Rate Advisory #1 for Fiscal Year 2018 (August 24, 2017 )
  - Fee Rate Advisory #3 for Fiscal Year 2017 (May 31, 2017)
  - Fee Rate Advisory #2 for Fiscal Year 2017 (September 30, 2016)
  - Fee Rate Advisory #1 for Fiscal Year 2017 (August 31, 2016)
  - Fee Rate Advisory #4 for Fiscal Year 2016 (February 25, 2016)
  - Fee Rate Advisory #3 for Fiscal Year 2016 (January 7, 2016)
  - Fee Rate Advisory #2 for Fiscal Year 2016 (September 30, 2015)
  - Fee Rate Advisory #1 for Fiscal Year 2016 (August 27, 2015)
  - Fee Rate Advisory #4 for Fiscal Year 2015 (February 27, 2015)
  - Fee Rate Advisory #3 for Fiscal Year 2015 (January 15, 2015)
  - Fee Rate Advisory #2 for Fiscal Year 2015 (September 30, 2014)
  - Fee Rate Advisory #1 for Fiscal Year 2015 (August 29, 2014)

SEC.gov | National Securities Exchanges

- o Fee Rate Advisory #4 for Fiscal Year 2014 (February 28, 2014)
- o Fee Rate Advisory #3 for Fiscal Year 2014 (February 12, 2014)
- o Fee Rate Advisory #2 for Fiscal Year 2014 (October 31, 2013)
- o Fee Rate Advisory #1 for Fiscal Year 2014 (August 30, 2013)
- o Fee Rate Advisory #3 for Fiscal Year 2013 (April 25, 2013)
- o Fee Rate Advisory #2 for Fiscal Year 2013 (November 15, 2012)
- o Fee Rate Advisory #1 for Fiscal Year 2013 (August 31, 2012)
- o Fee Rate Advisories for FY12
- o Fee Rate Advisories for FY11
- o Fee Rate Advisories for FY10
- o Fee Rate Advisories for FY09
- o Fee Rate Advisories for FY08
- o Fee Rate Advisories for FY07
- o Fee Rate Advisories for FY06
- o Fee Rate Advisories for FY05

## Additional Information

- Archives
- Disclosure of Order Execution and Order Routing Information
- Exchange Form 1 Amendments
- Exchange Form 19b-4(e) Submissions
- Guidance on SRO Automation
- Order Execution Data
- SRO Rule Filings
- Staff Guidance on SRO Fee Filings

*Modified: Jan. 15, 2021*



STAY CONNECTED

Twitter  Facebook  RSS  YouTube  Flickr  LinkedIn  Pinterest  Email Updates

Accessibility | Budget & Performance | Careers | Contact | Contracts | Data | Diversity and Inclusion | FOIA | Inspector General | Investor.gov | No FEAR Act & EEO Data Ombudsman | Plain Writing | Privacy & Security | Related Sites | Site Map | USA.gov Votes | Whistleblower Protection

A-529

Exhibit 5

A-530

SEC.gov | Company Information About Active Broker-Dealers

 U.S. SECURITIES AND EXCHANGE
COMMISSION

q

 Data

## Company Information About Active Broker-Dealers

**March 2007 - February 2021**

### What You Should Know About the Data File

This ascii text file contains the Central Index Key (CIK) numbers, company names, SEC reporting file numbers, and addresses (business addresses are provided when mailing addresses are not available) of active broker-dealers who are registered with the SEC.

The information in this file is raw data — data that is meant to be used as input to another program. The data items are provided as a "tab delimited" file. Although the file can be viewed in any program that accepts ASCII text (for example, a word processor), the data fields are best viewed when imported into a program that accepts delimited data, such as a spreadsheet. The record layout and maximum field sizes are shown below for those who want to process the data into another form.

| Field Name | Maximum Size |
|---|---|
| CIK NUMBER | 10 characters |
| COMPANY NAME | 60 characters |
| REPORTING FILE NUMBER | 25 characters |
| ADDRESS1 | 40 characters |
| ADDRESS2 | 40 characters |
| CITY | 30 characters |
| STATE CODE | 2 characters |
| ZIP CODE | 10 characters |

### What You Should Know About the Data Itself

To get a copy of the actual Forms BD filed with the SEC, please refer to How to Request Public Documents.

For technical questions regarding the website, send an e-mail message to webmaster@sec.gov. For additional information about the data, call the SEC's Office of

A-531

Freedom of Information and Privacy Act Operations at (202) 551-8300.

| File | Format | Size |
|------|--------|------|
|  | T | 348.34 KB |
|  | T | B |
|  | T | B |
|  | T | B |
|  | T | 351.38 KB |
|  | T | B |
|  | T | B |
|  | T | B |
|  | T | B |
|  | T | B |
|  | T | B |
|  | T | B |
|  | T | B |
|  | T | 360.82 KB |
|  | T | B |
|  | T | B |
|  | T | B |
|  | T | B |
|  | T | B |
|  | T | B |
|  | T | 359.84 KB |
|  | T | B |
|  | T | B |
|  | T | B |
|  | T | B |
|  | T | B |

SEC.gov | Company Information About Active Broker-Dealers

| | | |
|---|---|---|
| December 2018 | TXT | 366.61 KB |
| November 2018 | TXT | 367.02 KB |
| October 2018 | TXT | 367.87 KB |
| September 2018 | TXT | 368.78 KB |
| August 2018 | TXT | 369.6 KB |
| July 2018 | TXT | 369.99 KB |
| June 2018 | TXT | 370.83 KB |
| May 2018 | TXT | 371.27 KB |
| April 2018 | TXT | 371.73 KB |
| March 2018 | TXT | 372.37 KB |
| February 2018 | TXT | 374.16 KB |
| January 2018 | TXT | 375.29 KB |
| December 2017 | TXT | 376.7 KB |
| November 2017 | TXT | 378.33 KB |
| October 2017 | TXT | 379.11 KB |
| September 2017 | TXT | 384.77 KB |
| August 2017 | TXT | 385.79 KB |
| July 2017 | TXT | 385.87 KB |
| June 2017 | TXT | 385.99 KB |
| May 2017 | TXT | 386.98 KB |
| April 2017 | TXT | 379.74 KB |
| March 2017 | TXT | 379.46 KB |
| February 2017 | TXT | 382.58 KB |
| January 2017 | TXT | 384.72 KB |
| December 2016 | TXT | 386.75 KB |
| November 2016 | TXT | 387.48 KB |
| October 2016 | TXT | 389.88 KB |
| September 2016 | TXT | 390.54 KB |
| August 2016 | TXT | 391.72 KB |

SEC.gov | Company Information About Active Broker-Dealers

| | | |
|---|---|---|
| July 2016 | TXT | 392.43 KB |
| June 2016 | TXT | 393.18 KB |
| May 2016 | TXT | 393.19 KB |
| April 2016 | TXT | 392.83 KB |
| March 2016 | TXT | 393.22 KB |
| February 2016 | TXT | 395.89 KB |
| January 2016 | TXT | 397.76 KB |
| December 2015 | TXT | 399.65 KB |
| November 2015 | TXT | 400.17 KB |
| October 2015 | TXT | 400.9 KB |
| September 2015 | TXT | 402.08 KB |
| August 2015 | TXT | 402.79 KB |
| July 2015 | TXT | 403.35 KB |
| June 2015 | TXT | 404.03 KB |
| May 2015 | TXT | 405.1 KB |
| April 2015 | TXT | 406.06 KB |
| March 2015 | TXT | 406.47 KB |
| February 2015 | TXT | 408.67 KB |
| January 2015 | TXT | 410.25 KB |
| December 2014 | TXT | 410.25 KB |
| November 2014 | TXT | 412.14 KB |
| October 2014 | TXT | 412.41 KB |
| September 2014 | TXT | 414.32 KB |
| August 2014 | TXT | 415.11 KB |
| July 2014 | TXT | 410.6 KB |
| June 2014 | TXT | 412.02 KB |
| May 2014 | TXT | 413.3 KB |
| April 2014 | TXT | 414.51 KB |
| March 2014 | TXT | 415.61 KB |
| February 2014 | TXT | 418.25 KB |

SEC.gov | Company Information About Active Broker-Dealers

| | | |
|---|---|---|
| January 2014 | TXT | 420.32 KB |
| December 2013 | TXT | 422.03 KB |
| November 2013 | TXT | 424.73 KB |
| October 2013 | TXT | 426.54 KB |
| September 2013 | TXT | 426.85 KB |
| August 2013 | TXT | 427.93 KB |
| July 2013 | TXT | 429.24 KB |
| June 2013 | TXT | 429.23 KB |
| May 2013 | TXT | 431.85 KB |
| April 2013 | TXT | 433.05 KB |
| March 2013 | TXT | 434.27 KB |
| February 2013 | TXT | 437.02 KB |
| January 2013 | TXT | 438.61 KB |
| December 2012 | TXT | 440.44 KB |
| November 2012 | TXT | 442.06 KB |
| October 2012 | TXT | 443.14 KB |
| September 2012 | TXT | 444.28 KB |
| August 2012 | TXT | 445.18 KB |
| July 2012 | TXT | 447.61 KB |
| June 2012 | TXT | 448.21 KB |
| May 2012 | TXT | 450.89 KB |
| April 2012 | TXT | 452.07 KB |
| March 2012 | TXT | 452.31 KB |
| February 2012 | TXT | 454.58 KB |
| January 2012 | TXT | 456.54 KB |
| December 2011 | TXT | 457.35 KB |
| November 2011 | TXT | 458.87 KB |
| October 2011 | TXT | 460.11 KB |
| September 2011 | TXT | 461.58 KB |

SEC.gov | Company Information About Active Broker-Dealers

| | | |
|---|---|---|
| August 2011 | TXT | 463.51 KB |
| July 2011 | TXT | 464.01 KB |
| June 2011 | TXT | 465.67 KB |
| May 2011 | TXT | 466.21 KB |
| April 2011 | TXT | 469.35 KB |
| March 2011 | TXT | 470.54 KB |
| February 2011 | TXT | 475.56 KB |
| January 2011 | TXT | 477.92 KB |
| December 2010 | TXT | 479.48 KB |
| November 2010 | TXT | 479.1 KB |
| October 2010 | TXT | 479.24 KB |
| September 2010 | TXT | 481.08 KB |
| August 2010 | TXT | 483.05 KB |
| July 2010 | TXT | 484.16 KB |
| June 2010 | TXT | 486.01 KB |
| May 2010 | TXT | 486.32 KB |
| April 2010 | TXT | 486.99 KB |
| March 2010 | TXT | 489.22 KB |
| February 2010 | TXT | 495.15 KB |
| January 2010 | TXT | 497.48 KB |
| December 2009 | TXT | 498.55 KB |
| November 2009 | TXT | 500.3 KB |
| October 2009 | TXT | 499.32 KB |
| September 2009 | TXT | 501.61 KB |
| August 2009 | TXT | 502.28 KB |
| July 2009 | TXT | 502.89 KB |
| June 2009 | TXT | 504.72 KB |
| May 2009 | TXT | 509 KB |
| April 2009 | TXT | 510.38 KB |
| March 2009 | TXT | 513.17 KB |

SEC.gov | Company Information About Active Broker-Dealers

| February 2009 | TXT | 518.9 KB |
| January 2009 | TXT | 521.09 KB |
| December 2008 | TXT | 523.26 KB |
| November 2008 | TXT | 522.84 KB |
| October 2008 | TXT | 526.18 KB |
| September 2008 | TXT | 526.62 KB |
| August 2008 | TXT | 526.91 KB |
| July 2008 | TXT | 527.69 KB |
| June 2008 | TXT | 527.04 KB |
| April 2008 | TXT | 529.37 KB |
| March 2008 | TXT | 530.06 KB |
| February 2008 | TXT | 537.93 KB |
| January 2008 | TXT | 540.69 KB |
| December 2007 | TXT | 542.66 KB |
| November 2007 | TXT | 545.66 KB |
| October 2007 | TXT | 547.09 KB |
| September 2007 | TXT | 547.31 KB |
| August 2007 | TXT | 551.29 KB |
| June 2007 | TXT | 550.99 KB |
| March 2007 | TXT | 555.18 KB |

*Modified: Feb. 1, 2021*



STAY CONNECTED

Twitter    Facebook    RSS    YouTube    Flickr    LinkedIn    Pinterest    Email Updates

Accessibility | Budget & Performance | Careers | Contact | Contracts | Data | Diversity
and Inclusion | FOIA | Inspector General | Investor.gov | No FEAR Act & EEO Data
Ombudsman | Plain Writing | Privacy & Security | Related Sites | Site Map | USA.gov
Votes | Whistleblower Protection

A-537

Exhibit 6

# Framework for "Investment Contract" Analysis of Digital Assets

[1]

## I. Introduction

If you are considering an Initial Coin Offering, sometimes referred to as an "ICO," or otherwise engaging in the offer, sale, or distribution of a digital asset, [2] you need to consider whether the U.S. federal securities laws apply. A threshold issue is whether the digital asset is a "security" under those laws. [3] The term "security" includes an "investment contract," as well as other instruments such as stocks, bonds, and transferable shares. A digital asset should be analyzed to determine whether it has the characteristics of any product that meets the definition of "security" under the federal securities laws. In this guidance, we provide a framework for analyzing whether a digital asset has the characteristics of one particular type of security – an "investment contract." [4] Both the Commission and the federal courts frequently use the "investment contract" analysis to determine whether unique or novel instruments or arrangements, such as digital assets, are securities subject to the federal securities laws.

The U.S. Supreme Court's *Howey* case and subsequent case law have found that an "investment contract" exists when there is the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others. [5] The so-called "*Howey* test" applies to any contract, scheme, or transaction, regardless of whether it has any of the characteristics of typical securities. [6] The focus of the *Howey* analysis is not only on the form and terms of the instrument itself (in this case, the digital asset) but also on the circumstances surrounding the digital asset and the manner in which it is offered, sold, or resold (which includes secondary market sales). Therefore, issuers and other persons and entities engaged in the marketing, offer, sale, resale, or distribution of any digital asset will need to analyze the relevant transactions to determine if the federal securities laws apply.

The federal securities laws require all offers and sales of securities, including those involving a digital asset, to either be registered under its provisions or to qualify for an exemption from registration. The registration provisions require persons to disclose certain information to investors, and that information must be complete and not materially misleading. This requirement for disclosure furthers the federal securities laws' goal of providing investors with the information necessary to make informed investment decisions. Among the information that must be disclosed is information relating to the essential managerial efforts that affect the success of the enterprise. [7] This is true in the case of a corporation, for example, but also may be true for other types of enterprises regardless of their organizational structure or form. [8] Absent the disclosures required by law about those efforts and the progress and prospects of the enterprise, significant informational asymmetries may exist between the management and promoters of the enterprise on the one hand,

and investors and prospective investors on the other hand. The reduction of these information asymmetries through required disclosures protects investors and is one of the primary purposes of the federal securities laws.

## II. Application of *Howey* to Digital Assets

In this guidance, we provide a framework for analyzing whether a digital asset is an investment contract and whether offers and sales of a digital asset are securities transactions. As noted above, under the *Howey* test, an "investment contract" exists when there is the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others. Whether a particular digital asset at the time of its offer or sale satisfies the *Howey* test depends on the specific facts and circumstances. We address each of the elements of the *Howey* test below.

### A. The Investment of Money

The first prong of the *Howey* test is typically satisfied in an offer and sale of a digital asset because the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of real (or fiat) currency, another digital asset, or other type of consideration.[9]

### B. Common Enterprise

Courts generally have analyzed a "common enterprise" as a distinct element of an investment contract.[10] In evaluating digital assets, we have found that a "common enterprise" typically exists.[11]

### C. Reasonable Expectation of Profits Derived from Efforts of Others

Usually, the main issue in analyzing a digital asset under the *Howey* test is whether a purchaser has a reasonable expectation of profits (or other financial returns) derived from the efforts of others. A purchaser may expect to realize a return through participating in distributions or through other methods of realizing appreciation on the asset, such as selling at a gain in a secondary market. When a promoter, sponsor, or other third party (or affiliated group of third parties) (each, an "Active Participant" or "AP") provides essential managerial efforts that affect the success of the enterprise, and investors reasonably expect to derive profit from those efforts, then this prong of the test is met. Relevant to this inquiry is the "economic reality"[12] of the transaction and "what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect."[13] The inquiry, therefore, is an objective one, focused on the transaction itself and the manner in which the digital asset is offered and sold.

The following characteristics are especially relevant in an analysis of whether the third prong of the *Howey* test is satisfied:

#### 1. Reliance on the Efforts of Others

The inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues:

- Does the purchaser reasonably expect to rely on the efforts of an AP?

- Are those efforts "the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise,"[14] as opposed to efforts that are more ministerial in nature?

Although no one of the following characteristics is necessarily determinative, the stronger their presence, the more likely it is that a purchaser of a digital asset is relying on the "efforts of others":

- An AP is responsible for the development, improvement (or enhancement), operation, or promotion of the network,[15] particularly if purchasers of the digital asset expect an AP to be performing or overseeing tasks that are necessary for the network or digital asset to achieve or retain its intended purpose or functionality.[16]

  o Where the network or the digital asset is still in development and the network or digital asset is not fully functional at the time of the offer or sale, purchasers would reasonably expect an AP to further develop the functionality of the network or digital asset (directly or indirectly). This particularly would be the case where an AP promises further developmental efforts in order for the digital asset to attain or grow in value.

- There are essential tasks or responsibilities performed and expected to be performed by an AP, rather than an unaffiliated, dispersed community of network users (commonly known as a "decentralized" network).

- An AP creates or supports a market for,[17] or the price of, the digital asset. This can include, for example, an AP that: (1) controls the creation and issuance of the digital asset; or (2) takes other actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity, through, for example, buybacks, "burning," or other activities.

- An AP has a lead or central role in the direction of the ongoing development of the network or the digital asset. In particular, an AP plays a lead or central role in deciding governance issues, code updates, or how third parties participate in the validation of transactions that occur with respect to the digital asset.

- An AP has a continuing managerial role in making decisions about or exercising judgment concerning the network or the characteristics or rights the digital asset represents including, for example:

  o Determining whether and how to compensate persons providing services to the network or to the entity or entities charged with oversight of the network.

  o Determining whether and where the digital asset will trade. For example, purchasers may reasonably rely on an AP for liquidity, such as where the AP has arranged, or promised to arrange for, the trading of the digital asset on a secondary market or platform.

  o Determining who will receive additional digital assets and under what conditions.

  o Making or contributing to managerial level business decisions, such as how to deploy funds raised from sales of the digital asset.

  o Playing a leading role in the validation or confirmation of transactions on the network, or in some other way having responsibility for the ongoing security of the network.

  o Making other managerial judgements or decisions that will directly or indirectly impact the success of the network or the value of the digital asset generally.

- Purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset, such as where:

  o The AP has the ability to realize capital appreciation from the value of the digital asset. This can be demonstrated, for example, if the AP retains a stake or interest in the digital asset. In these instances, purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset.

A-541

- The AP distributes the digital asset as compensation to management or the AP's compensation is tied to the price of the digital asset in the secondary market. To the extent these facts are present, the compensated individuals can be expected to take steps to build the value of the digital asset.

    ○ The AP owns or controls ownership of intellectual property rights of the network or digital asset, directly or indirectly.

    ○ The AP monetizes the value of the digital asset, especially where the digital asset has limited functionality.

In evaluating whether a digital asset previously sold as a security should be reevaluated at the time of later offers or sales, there would be additional considerations as they relate to the "efforts of others," including but not limited to:

- Whether or not the efforts of an AP, including any successor AP, continue to be important to the value of an investment in the digital asset.

- Whether the network on which the digital asset is to function operates in such a manner that purchasers would no longer reasonably expect an AP to carry out essential managerial or entrepreneurial efforts.

- Whether the efforts of an AP are no longer affecting the enterprise's success.

## 2. Reasonable Expectation of Profits

An evaluation of the digital asset should also consider whether there is a reasonable expectation of profits.  Profits can be, among other things, capital appreciation resulting from the development of the initial investment or business enterprise or a participation in earnings resulting from the use of purchasers' funds.[18]  Price appreciation resulting solely from external market forces (such as general inflationary trends or the economy) impacting the supply and demand for an underlying asset generally is not considered "profit" under the *Howey* test.

The more the following characteristics are present, the more likely it is that there is a reasonable expectation of profit:

- The digital asset gives the holder rights to share in the enterprise's income or profits or to realize gain from capital appreciation of the digital asset.

    ○ The opportunity may result from appreciation in the value of the digital asset that comes, at least in part, from the operation, promotion, improvement, or other positive developments in the network, particularly if there is a secondary trading market that enables digital asset holders to resell their digital assets and realize gains.

    ○ This also can be the case where the digital asset gives the holder rights to dividends or distributions.

- The digital asset is transferable or traded on or through a secondary market or platform, or is expected to be in the future.[19]

- Purchasers reasonably would expect that an AP's efforts will result in capital appreciation of the digital asset and therefore be able to earn a return on their purchase.

- The digital asset is offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services or those who have a need for the functionality of the network.

    ○ The digital asset is offered and purchased in quantities indicative of investment intent instead of quantities indicative of a user of the network.  For example, it is offered and purchased in quantities significantly greater than any likely user would reasonably need, or so small as to make actual use of the asset in the network impractical.

A-542

2/11/2021

- There is little apparent correlation between the purchase/offering price of the digital asset and the market price of the particular goods or services that can be acquired in exchange for the digital asset.

- There is little apparent correlation between quantities the digital asset typically trades in (or the amounts that purchasers typically purchase) and the amount of the underlying goods or services a typical consumer would purchase for use or consumption.

- The AP has raised an amount of funds in excess of what may be needed to establish a functional network or digital asset.

- The AP is able to benefit from its efforts as a result of holding the same class of digital assets as those being distributed to the public.

- The AP continues to expend funds from proceeds or operations to enhance the functionality or value of the network or digital asset.

- The digital asset is marketed, directly or indirectly, using any of the following:

  o The expertise of an AP or its ability to build or grow the value of the network or digital asset.

  o The digital asset is marketed in terms that indicate it is an investment or that the solicited holders are investors.

  o The intended use of the proceeds from the sale of the digital asset is to develop the network or digital asset.

  a The future (and not present) functionality of the network or digital asset, and the prospect that an AP will deliver that functionality.

  o The promise (implied or explicit) to build a business or operation as opposed to delivering currently available goods or services for use on an existing network.

  o The ready transferability of the digital asset is a key selling feature.

  o The potential profitability of the operations of the network, or the potential appreciation in the value of the digital asset, is emphasized in marketing or other promotional materials.

  o The availability of a market for the trading of the digital asset, particularly where the AP implicitly or explicitly promises to create or otherwise support a trading market for the digital asset.

In evaluating whether a digital asset previously sold as a security should be revaluated at the time of later offers or sales, there would be additional considerations as they relate to the "reasonable expectation of profits," including but not limited to:

- Purchasers of the digital asset no longer reasonably expect that continued development efforts of an AP will be a key factor for determining the value of the digital asset.

- The value of the digital asset has shown a direct and stable correlation to the value of the good or service for which it may be exchanged or redeemed.

- The trading volume for the digital asset corresponds to the level of demand for the good or service for which it may be exchanged or redeemed.

- Whether holders are then able to use the digital asset for its intended functionality, such as to acquire goods and services on or through the network or platform.

- Whether any economic benefit that may be derived from appreciation in the value of the digital asset is incidental to obtaining the right to use it for its intended functionality.

- No AP has access to material, non-public information or could otherwise be deemed to hold material inside information about the digital asset.

### 3. Other Relevant Considerations

When assessing whether there is a reasonable expectation of profit derived from the efforts of others, federal courts look to the economic reality of the transaction.[20] In doing so, the courts also have considered whether the instrument is offered and sold for use or consumption by purchasers.[21]

Although no one of the following characteristics of use or consumption is necessarily determinative, the stronger their presence, the less likely the *Howey* test is met:

- The distributed ledger network and digital asset are fully developed and operational.

- Holders of the digital asset are immediately able to use it for its intended functionality on the network, particularly where there are built-in incentives to encourage such use.

- The digital assets' creation and structure is designed and implemented to meet the needs of its users, rather than to feed speculation as to its value or development of its network. For example, the digital asset can only be used on the network and generally can be held or transferred only in amounts that correspond to a purchaser's expected use.

- Prospects for appreciation in the value of the digital asset are limited. For example, the design of the digital asset provides that its value will remain constant or even degrade over time, and, therefore, a reasonable purchaser would not be expected to hold the digital asset for extended periods as an investment.

- With respect to a digital asset referred to as a virtual currency, it can immediately be used to make payments in a wide variety of contexts, or acts as a substitute for real (or fiat) currency.

  o This means that it is possible to pay for goods or services with the digital asset without first having to convert it to another digital asset or real currency.

  o If it is characterized as a virtual currency, the digital asset actually operates as a store of value that can be saved, retrieved, and exchanged for something of value at a later time.

- With respect to a digital asset that represents rights to a good or service, it currently can be redeemed within a developed network or platform to acquire or otherwise use those goods or services. Relevant factors may include:

  o There is a correlation between the purchase price of the digital asset and a market price of the particular good or service for which it may be redeemed or exchanged.

  o The digital asset is available in increments that correlate with a consumptive intent versus an investment or speculative purpose.

  o An intent to consume the digital asset may also be more evident if the good or service underlying the digital asset can only be acquired, or more efficiently acquired, through the use of the digital asset on the network.

- Any economic benefit that may be derived from appreciation in the value of the digital asset is incidental to obtaining the right to use it for its intended functionality.

- The digital asset is marketed in a manner that emphasizes the functionality of the digital asset, and not the potential for the increase in market value of the digital asset.

- Potential purchasers have the ability to use the network and use (or have used) the digital asset for its intended functionality.

2/11/2021

- Restrictions on the transferability of the digital asset are consistent with the asset's use and not facilitating a speculative market.

- If the AP facilitates the creation of a secondary market, transfers of the digital asset may only be made by and among users of the platform.

Digital assets with these types of use or consumption characteristics are less likely to be investment contracts. For example, take the case of an online retailer with a fully-developed operating business. The retailer creates a digital asset to be used by consumers to purchase products only on the retailer's network, offers the digital asset for sale in exchange for real currency, and the digital asset is redeemable for products commensurately priced in that real currency. The retailer continues to market its products to its existing customer base, advertises its digital asset payment method as part of those efforts, and may "reward" customers with digital assets based on product purchases. Upon receipt of the digital asset, consumers immediately are able to purchase products on the network using the digital asset. The digital assets are not transferable; rather, consumers can only use them to purchase products from the retailer or sell them back to the retailer at a discount to the original purchase price. Under these facts, the digital asset would not be an investment contract.

Even in cases where a digital asset can be used to purchase goods or services on a network, where that network's or digital asset's functionality is being developed or improved, there may be securities transactions if, among other factors, the following is present: the digital asset is offered or sold to purchasers at a discount to the value of the goods or services; the digital asset is offered or sold to purchasers in quantities that exceed reasonable use; and/or there are limited or no restrictions on reselling those digital assets, particularly where an AP is continuing in its efforts to increase the value of the digital assets or has facilitated a secondary market.

## III. Conclusion

The discussion above identifies some of the factors market participants should consider in assessing whether a digital asset is offered or sold as an investment contract and, therefore, is a security. It also identifies some of the factors to be considered in determining whether and when a digital asset may no longer be a security. These factors are not intended to be exhaustive in evaluating whether a digital asset is an investment contract or any other type of security, and no single factor is determinative; rather, we are providing them to assist those engaging in the offer, sale, or distribution of a digital asset, and their counsel, as they consider these issues. We encourage market participants to seek the advice of securities counsel and engage with the Staff through www.sec.gov/finhub.

[1] This framework represents the views of the Strategic Hub for Innovation and Financial Technology ("FinHub," the "Staff," or "we") of the Securities and Exchange Commission (the "Commission"). It is not a rule, regulation, or statement of the Commission, and the Commission has neither approved nor disapproved its content. Further, this framework does not replace or supersede existing case law, legal requirements, or statements or guidance from the Commission or Staff. Rather, the framework provides additional guidance in the areas that the Commission or Staff has previously addressed. See, e.g., Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO (Exchange Act Rel. No. 81207) (July 25, 2017) ("The DAO Report"); William Hinman, Digital Asset Transactions: When Howey Met Gary (Plastic), Remarks at the Yahoo Finance All Markets Summit: Crypto (June 14, 2018), available at https://www.sec.gov/news/speech/speech-hinman-061418.

[2] The term "digital asset," as used in this framework, refers to an asset that is issued and transferred using distributed ledger or blockchain technology, including, but not limited to, so-called "virtual currencies," "coins," and "tokens."

[3] The term "security" is defined in Section 2(a)(1) of the Securities Act of 1933 (the "Securities Act"), Section 3(a)(10) of the Securities Exchange Act of 1934, Section 2(a)(36) of the Investment Company Act of 1940, and Section 202(a)(18) of the Investment Advisers Act of 1940.

[4] This framework is intended to be instructive and is based on the Staff's experiences to date and relevant law and legal precedent. It is not an exhaustive treatment of the legal and regulatory issues relevant to conducting an analysis of whether a product is a security, including an investment contract analysis with respect to digital assets generally. We expect that analysis concerning digital assets as securities may evolve over time as the digital asset market matures. Also, no one factor is necessarily dispositive as to whether or not an investment contract exists.

[5] *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) ("*Howey*"). *See also United Housing Found., Inc. v. Forman*, 421 U.S. 837 (1975) ("*Forman*"); *Tcherepnin v. Knight*, 389 U.S. 332 (1967) ("*Tcherepnin*"); *SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344 (1943) ("*Joiner*").

[6] Whether a contract, scheme, or transaction is an investment contract is a matter of federal, not state, law and does not turn on whether there is a formal contract between parties. Rather, under the *Howey* test, "form [is] disregarded for substance and the emphasis [is] on economic reality." *Howey*, 328 U.S. at 298. The Supreme Court has further explained that that the term security "embodies a flexible rather than a static principle" in order to meet the "variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.* at 299.

[7] Issuers of digital assets, like all issuers, must provide full and fair disclosure of material information consistent with the requirements of the federal securities laws. Issuers of digital assets should be guided by the regulatory framework and concepts of materiality. What is material depends upon the nature and structure of the issuer's particular network and circumstances. *See TSC Industries v. Northway*, 426 U.S. 438, 449 (1976) (a fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important" in making an investment decision or if it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" to the shareholder).

[8] *See The DAO Report.*

[9] The lack of monetary consideration for digital assets, such as those distributed via a so-called "bounty program" does not mean that the investment of money prong is not satisfied. As the Commission explained in *The DAO Report*, "[i]n determining whether an investment contract exists, the investment of 'money' need not take the form of cash" and "in spite of *Howey*'s reference to an 'investment of money,' it is well established that cash is not the only form of contribution or investment that will create an investment contract." *The DAO Report* at 11 (citation omitted). *See In re Tomahawk Exploration LLC*, Securities Act Rel. 10530 (Aug. 14, 2018) (issuance of tokens under a so-called "bounty program" constituted an offer and sale of securities because the issuer provided tokens to investors in exchange for services designed to advance the issuer's economic interests and foster a trading market for its securities). Further, the lack of monetary consideration for digital assets, such as those distributed via a so-called "air drop," does not mean that the investment of money prong is not satisfied; therefore, an airdrop may constitute a sale or distribution of securities. In a so-called "airdrop," a digital asset is distributed to holders of another digital asset, typically to promote its circulation.

[10] In order to satisfy the "common enterprise" aspect of the *Howey* test, federal courts require that there be either "horizontal commonality" or "vertical commonality." *See Revak v. SEC Realty Corp.*, 18 F.3d. 81, 87-88 (2d Cir. 1994) (discussing horizontal commonality as "the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits" and two variants of vertical commonality, which focus "on the relationship between the promoter and the body of investors"). The Commission, on the other hand, does not require vertical or horizontal commonality *per se*, nor does it view a "common enterprise" as a distinct element of the term "investment contract." *In re Barkate*, 57 S.E.C. 488, 496 n.13 (Apr. 8, 2004); *see also* the Commission's Supplemental Brief at 14 in *SEC v. Edwards*, 540 U.S. 389 (2004) (on remand to the 11th Circuit).

[11] Based on our experiences to date, investments in digital assets have constituted investments in a common enterprise because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts. *See SEC v. Int'l Loan Network, Inc.*, 968 F.2d 1304, 1307 (D.C. Cir. 1992).

[12] *Howey*, 328 U.S. at 298. *See also Tcherepnin*, 389 U.S. at 336 ("In searching for the meaning and scope of the word 'security' in the [Acts], form should be disregarded for substance and the emphasis should be on economic reality.")

[13] *Joiner*, 320 U.S. at 352-53.

[14] *SEC v. Glenn W. Turner Enter., Inc.*, 474 F.2d 476, 482 (9th Cir.), *cert. denied*, 414 U.S. 821, 94 S. Ct. 117, 38 L. Ed. 2d 53 (1973) ("*Turner*").

[15] In this guidance, we are using the term "network" broadly to encompass the various elements that comprise a digital asset's network, enterprise, platform, or application.

[16] We recognize that holders of digital assets may put forth some effort in the operations of the network, but those efforts do not negate the fact that the holders of digital assets are relying on the efforts of the AP. That a scheme assigns "nominal or limited responsibilities to the [investor] does not negate the existence of an investment contract." *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 483 n.15 (5th Cir. 1974) (citation and quotation marks omitted). If the AP provides efforts that are "the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise," and the AP is not merely performing ministerial or routine tasks, then there likely is an investment contract. *See Turner*, 474 U.S. at 482; *see also The DAO Report* (although DAO token holders had certain voting rights, they nonetheless reasonably relied on the managerial efforts of others). Managerial and entrepreneurial efforts typically are characterized as involving expertise and decision-making that impacts the success of the business or enterprise through the application of skill and judgment.

[17] *See, e.g., Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce Fenner & Smith*, 756 F.2d 230 (2d Cir. 1985).

[18] *See Forman*, 421 U.S. at 852.

[19] Situations where the digital asset is exchangeable or redeemable solely for goods or services within the network or on a platform, and may not otherwise be transferred or sold, may more likely be a payment for a good or service in which the purchaser is motivated to use or consume the digital asset. *See* discussion of "Other Relevant Considerations."

[20] As noted above, under *Howey*, courts conduct an objective inquiry focused on the transaction itself and the manner in which it is offered.

[21] *See Forman*, 421 U.S. at 852-53 (where a purchaser is not "'attracted solely by the prospects of a return' on his investment . . . [but] is motivated by a desire to use or consume the item purchased . . . the securities laws do not apply.").

*Modified: April 3, 2019*

A-546

A-547

Exhibit 7

**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES EXCHANGE ACT OF 1934**

**Release No. 81207 / July 25, 2017**

**Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO**

I.   **Introduction and Summary**

    The United States Securities and Exchange Commission's ("Commission") Division of Enforcement ("Division") has investigated whether The DAO, an unincorporated organization; Slock.it UG ("Slock.it"), a German corporation; Slock.it's co-founders; and intermediaries may have violated the federal securities laws. The Commission has determined not to pursue an enforcement action in this matter based on the conduct and activities known to the Commission at this time.

    As described more fully below, The DAO is one example of a Decentralized Autonomous Organization, which is a term used to describe a "virtual" organization embodied in computer code and executed on a distributed ledger or blockchain. The DAO was created by Slock.it and Slock.it's co-founders, with the objective of operating as a for-profit entity that would create and hold a corpus of assets through the sale of DAO Tokens to investors, which assets would then be used to fund "projects." The holders of DAO Tokens stood to share in the anticipated earnings from these projects as a return on their investment in DAO Tokens. In addition, DAO Token holders could monetize their investments in DAO Tokens by re-selling DAO Tokens on a number of web-based platforms ("Platforms") that supported secondary trading in the DAO Tokens.

    After DAO Tokens were sold, but before The DAO was able to commence funding projects, an attacker used a flaw in The DAO's code to steal approximately one-third of The DAO's assets. Slock.it's co-founders and others responded by creating a work-around whereby DAO Token holders could opt to have their investment returned to them, as described in more detail below.

    The investigation raised questions regarding the application of the U.S. federal securities laws to the offer and sale of DAO Tokens, including the threshold question whether DAO Tokens are securities. Based on the investigation, and under the facts presented, the Commission has determined that DAO Tokens are securities under the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act").[1] The Commission deems it appropriate and in the public interest to issue this report of investigation ("Report") pursuant to

---

[1] This Report does not analyze the question whether The DAO was an "investment company," as defined under Section 3(a) of the Investment Company Act of 1940 ("Investment Company Act"), in part, because The DAO never commenced its business operations funding projects. Those who would use virtual organizations should consider their obligations under the Investment Company Act.

Section 21(a) of the Exchange Act[2] to advise those who would use a Decentralized Autonomous Organization ("DAO Entity"), or other distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance with the U.S. federal securities laws. All securities offered and sold in the United States must be registered with the Commission or must qualify for an exemption from the registration requirements. In addition, any entity or person engaging in the activities of an exchange must register as a national securities exchange or operate pursuant to an exemption from such registration.

This Report reiterates these fundamental principles of the U.S. federal securities laws and describes their applicability to a new paradigm—virtual organizations or capital raising entities that use distributed ledger or blockchain technology to facilitate capital raising and/or investment and the related offer and sale of securities. The automation of certain functions through this technology, "smart contracts,"[3] or computer code, does not remove conduct from the purview of the U.S. federal securities laws.[4] This Report also serves to stress the obligation to comply with the registration provisions of the federal securities laws with respect to products and platforms involving emerging technologies and new investor interfaces.

**II.   Facts**

A.   Background

From April 30, 2016 through May 28, 2016, The DAO offered and sold approximately 1.15 billion DAO Tokens in exchange for a total of approximately 12 million Ether ("ETH"), a

---

[2] Section 21(a) of the Exchange Act authorizes the Commission to investigate violations of the federal securities laws and, in its discretion, to "publish information concerning any such violations." This Report does not constitute an adjudication of any fact or issue addressed herein, nor does it make any findings of violations by any individual or entity. The facts discussed in Section II, *infra*, are matters of public record or based on documentary records. We are publishing this Report on the Commission's website to ensure that all market participants have concurrent and equal access to the information contained herein.

[3] Computer scientist Nick Szabo described a "smart contract" as:

> a computerized transaction protocol that executes terms of a contract. The general objectives of smart contract design are to satisfy common contractual conditions (such as payment terms, liens, confidentiality, and even enforcement), minimize exceptions both malicious and accidental, and minimize the need for trusted intermediaries. Related economic goals include lowering fraud loss, arbitrations and enforcement costs, and other transaction costs.

*See* Nick Szabo, *Smart Contracts*, 1994, http://www.virtualschool.edu/mon/Economics/SmartContracts.html.

[4] *See SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 351 (1943) ("[T]he reach of the [Securities] Act does not stop with the obvious and commonplace. Novel, uncommon, or irregular devices, whatever they appear to be, are also reached if it be proved as matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character in commerce as 'investment contracts,' or as 'any interest or instrument commonly known as a "security".'"); *see also Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990) ("Congress' purpose in enacting the securities laws was to regulate investments, in whatever form they are made and by whatever name they are called.").

A-550

virtual currency[5] used on the Ethereum Blockchain.[6]  As of the time the offering closed, the total ETH raised by The DAO was valued in U.S. Dollars ("USD") at approximately $150 million.

The concept of a DAO Entity is memorialized in a document (the "White Paper"), authored by Christoph Jentzsch, the Chief Technology Officer of Slock.it, a "Blockchain and IoT [(internet-of-things)] solution company," incorporated in Germany and co-founded by Christoph Jentzsch, Simon Jentzsch (Christoph Jentzsch's brother), and Stephan Tual ("Tual").[7]  The White Paper purports to describe "the first implementation of a [DAO Entity] code to automate organizational governance and decision making."[8]  The White Paper posits that a DAO Entity "can be used by individuals working together collaboratively outside of a traditional corporate form.  It can also be used by a registered corporate entity to automate formal governance rules contained in corporate bylaws or imposed by law."  The White Paper proposes an entity—a DAO Entity—that would use smart contracts to attempt to solve governance issues it described as inherent in traditional corporations.[9]  As described, a DAO Entity purportedly would supplant traditional mechanisms of corporate governance and management with a blockchain such that contractual terms are "formalized, automated and enforced using software."[10]

---

[5]  The Financial Action Task Force defines "virtual currency" as:

> a digital representation of value that can be digitally traded and functions as:  (1) a medium of exchange; and/or (2) a unit of account; and/or (3) a store of value, but does not have legal tender status (i.e., when tendered to a creditor, is a valid and legal offer of payment) in any jurisdiction. It is not issued or guaranteed by any jurisdiction, and fulfils the above functions only by agreement within the community of users of the virtual currency. Virtual currency is distinguished from fiat currency (a.k.a. "real currency," "real money," or "national currency"), which is the coin and paper money of a country that is designated as its legal tender; circulates; and is customarily used and accepted as a medium of exchange in the issuing country.  It is distinct from e-money, which is a digital representation of fiat currency used to electronically transfer value denominated in fiat currency.

*FATF Report, Virtual Currencies, Key Definitions and Potential AML/CFT Risks*, FINANCIAL ACTION TASK FORCE (June 2014), http://www.fatf-gafi.org/media/fatf/documents/reports/Virtual-currency-key-definitions-and-potential-aml-cft-risks.pdf.

[6]  Ethereum, developed by the Ethereum Foundation, a Swiss nonprofit organization, is a decentralized platform that runs smart contracts on a blockchain known as the Ethereum Blockchain.

[7]  Christoph Jentzsch released the final draft of the White Paper on or around March 23, 2016.  He introduced his concept of a DAO Entity as early as November 2015 at an Ethereum Developer Conference in London, as a medium to raise funds for Slock.it, a German start-up he co-founded in September 2015.  Slock.it purports to create technology that embeds smart contracts that run on the Ethereum Blockchain into real-world devices and, as a result, for example, permits anyone to rent, sell or share physical objects in a decentralized way.  *See* SLOCK.IT, https://slock.it/.

[8]  Christoph Jentzsch, *Decentralized Autonomous Organization to Automate Governance Final Draft – Under Review*, https://download.slock.it/public/DAO/WhitePaper.pdf.

[9]  *Id.*

[10]  *Id.*  The White Paper contained the following statement:

> A word of caution, at the outset:  the legal status of [DAO Entities] remains the subject of active and vigorous debate and discussion.  Not everyone shares the same definition.  Some have said that [DAO Entities] are autonomous code and can operate independently of legal systems; others

B.    The DAO

"The DAO" is the "first generation" implementation of the White Paper concept of a
DAO Entity, and it began as an effort to create a "crowdfunding contract" to raise "funds to grow
[a] company in the crypto space."[11] In November 2015, at an Ethereum Developer Conference
in London, Christoph Jentzsch described his proposal for The DAO as a "for-profit DAO
[Entity]," where participants would send ETH (a virtual currency) to The DAO to purchase DAO
Tokens, which would permit the participant to vote and entitle the participant to "rewards."[12]
Christoph Jentzsch likened this to "buying shares in a company and getting … dividends."[13] The
DAO was to be "decentralized" in that it would allow for voting by investors holding DAO
Tokens.[14] All funds raised were to be held at an Ethereum Blockchain "address" associated with
The DAO and DAO Token holders were to vote on contract proposals, including proposals to
The DAO to fund projects and distribute The DAO's anticipated earnings from the projects it
funded.[15] The DAO was intended to be "autonomous" in that project proposals were in the form
of smart contracts that exist on the Ethereum Blockchain and the votes were administered by the
code of The DAO.[16]

---

have said that [DAO Entities] must be owned or operate[d] by humans or human created entities.
There will be many use cases, and the DAO [Entity] code will develop over time. Ultimately,
how a DAO [Entity] functions and its legal status will depend on many factors, including how
DAO [Entity] code is used, where it is used, and who uses it. This paper does not speculate about
the legal status of [DAO Entities] worldwide. This paper is not intended to offer legal advice or
conclusions. Anyone who uses DAO [Entity] code will do so at their own risk.

*Id.*

[11] Christoph Jentzsch, *The History of the DAO and Lessons Learned*, SLOCK.IT BLOG (Aug. 24, 2016),
https://blog.slock.it/the-history-of-the-dao-and-lessons-learned-d06740f8cfa5#.5o62zo8uv. Although The DAO has
been described as a "crowdfunding contract," The DAO would not have met the requirements of Regulation
Crowdfunding, adopted under Title III of the Jumpstart Our Business Startups (JOBS) Act of 2012 (providing an
exemption from registration for certain crowdfunding), because, among other things, it was not a broker-dealer or a
funding portal registered with the SEC and the Financial Industry Regulatory Authority ("FINRA"). *See Regulation
Crowdfunding: A Small Entity Compliance Guide for Issuers*, SEC (Apr. 5, 2017),
https://www.sec.gov/info/smallbus/secg/rccomplianceguide-051316.htm; *Updated Investor Bulletin: Crowdfunding
for Investors*, SEC (May 10, 2017), https://www.sec.gov/oiea/investor-alerts-bulletins/ib_crowdfunding-.html.

[12] *See* Slockit, *Slock.it DAO demo at Devcon1: IoT + Blockchain*, YOUTUBE (Nov. 13, 2015),
https://www.youtube.com/watch?v=49wHQoJxYPo.

[13] *Id.*

[14] *See* Jentzsch, *supra* note 8.

[15] *Id.* In theory, there was no limitation on the type of project that could be proposed. For example, proposed
"projects" could include, among other things, projects that would culminate in the creation of products or services
that DAO Token holders could use or charge others for using.

[16] *Id.*

On or about April 29, 2016, Slock.it deployed The DAO code on the Ethereum Blockchain, as a set of pre-programmed instructions.[17]  This code was to govern how The DAO was to operate.

To promote The DAO, Slock.it's co-founders launched a website ("The DAO Website"). The DAO Website included a description of The DAO's intended purpose:  "To blaze a new path in business for the betterment of its members, existing simultaneously nowhere and everywhere and operating solely with the steadfast iron will of unstoppable code."[18]  The DAO Website also described how The DAO operated, and included a link through which DAO Tokens could be purchased.  The DAO Website also included a link to the White Paper, which provided detailed information about a DAO Entity's structure and its source code, and, together with The DAO Website, served as the primary source of promotional materials for The DAO.  On The DAO Website and elsewhere, Slock.it represented that The DAO's source code had been reviewed by "one of the world's leading security audit companies" and "no stone was left unturned during those five whole days of security analysis."[19]

Slock.it's co-founders also promoted The DAO by soliciting media attention and by posting almost daily updates on The DAO's status on The DAO and Slock.it websites and numerous online forums relating to blockchain technology.  Slock.it's co-founders used these posts to communicate to the public information about how to participate in The DAO, including: how to create and acquire DAO Tokens; the framework for submitting proposals for projects; and how to vote on proposals.  Slock.it also created an online forum on The DAO Website, as well as administered "The DAO Slack" channel, an online messaging platform in which over 5,000 invited "team members" could discuss and exchange ideas about The DAO in real time.

     *1.*    *DAO Tokens*

In exchange for ETH, The DAO created DAO Tokens (proportional to the amount of ETH paid) that were then assigned to the Ethereum Blockchain address of the person or entity remitting the ETH.  A DAO Token granted the DAO Token holder certain voting and ownership rights.  According to promotional materials, The DAO would earn profits by funding projects

---

[17] According to the White Paper, a DAO Entity is "activated by deployment on the Ethereum [B]lockchain.  Once deployed, a [DAO Entity's] code requires 'ether' [ETH] to engage in transactions on Ethereum.  Ether is the digital fuel that powers the Ethereum Network."  The only way to update or alter The DAO's code is to submit a new proposal for voting and achieve a majority consensus on that proposal.  *See* Jentzsch, *supra* note 8.  According to Slock.it's website, Slock.it gave The DAO code to the Ethereum community, noting that:

> The DAO framework is [a] side project of Slock.it UG and a gift to the Ethereum community.  It consisted of a definitive whitepaper, smart contract code audited by one of the best security companies in the world and soon, a complete frontend interface.  All free and open source for anyone to re-use, it is our way to say 'thank you' to the community.

SLOCK.IT, https://slock.it.  The DAO code is publicly-available on GitHub, a host of source code.  *See The Standard DAO Framework, Inc., Whitepaper*, GITHUB, https://github.com/slockit/DAO.

[18] The DAO Website was available at https://daohub.org.

[19] Stephen Tual, *Deja Vu DAO Smart Contracts Audit Results*, SLOCK.IT BLOG (Apr. 5, 2016), https://blog.slock.it/deja-vu-dai-smart-contracts-audit-results-d26bc088e32e.

that would provide DAO Token holders a return on investment. The various promotional materials disseminated by Slock.it's co-founders touted that DAO Token holders would receive "rewards," which the White Paper defined as, "any [ETH] received by a DAO [Entity] generated from projects the DAO [Entity] funded." DAO Token holders would then vote to either use the rewards to fund new projects or to distribute the ETH to DAO Token holders.

From April 30, 2016 through May 28, 2016 (the "Offering Period"), The DAO offered and sold DAO Tokens. Investments in The DAO were made "pseudonymously" (i.e., an individual's or entity's pseudonym was their Ethereum Blockchain address). To purchase a DAO Token offered for sale by The DAO, an individual or entity sent ETH from their Ethereum Blockchain address to an Ethereum Blockchain address associated with The DAO. All of the ETH raised in the offering as well as any future profits earned by The DAO were to be pooled and held in The DAO's Ethereum Blockchain address. The token price fluctuated in a range of approximately 1 to 1.5 ETH per 100 DAO Tokens, depending on when the tokens were purchased during the Offering Period. Anyone was eligible to purchase DAO Tokens (as long as they paid ETH). There were no limitations placed on the number of DAO Tokens offered for sale, the number of purchasers of DAO Tokens, or the level of sophistication of such purchasers.

DAO Token holders were not restricted from re-selling DAO Tokens acquired in the offering, and DAO Token holders could sell their DAO Tokens in a variety of ways in the secondary market and thereby monetize their investment as discussed below. Prior to the Offering Period, Slock.it solicited at least one U.S. web-based platform to trade DAO Tokens on its system and, at the time of the offering, The DAO Website and other promotional materials disseminated by Slock.it included representations that DAO Tokens would be available for secondary market trading after the Offering Period via several platforms. During the Offering Period and afterwards, the Platforms posted notices on their own websites and on social media that each planned to support secondary market trading of DAO Tokens.[20]

In addition to secondary market trading on the Platforms, after the Offering Period, DAO Tokens were to be freely transferable on the Ethereum Blockchain. DAO Token holders would also be permitted to redeem their DAO Tokens for ETH through a complicated, multi-week (approximately 46-day) process referred to as a DAO Entity "split."[21]

        2.    *Participants in The DAO*

According to the White Paper, in order for a project to be considered for funding with "a DAO [Entity]'s [ETH]," a "Contractor" first must submit a proposal to the DAO Entity. Specifically, DAO Token holders expected Contractors to submit proposals for projects that could provide DAO Token holders returns on their investments. Submitting a proposal to The DAO involved: (1) writing a smart contract, and then deploying and publishing it on the

---

[20]   The Platforms are registered with FinCEN as "Money Services Businesses" and provide systems whereby customers may exchange virtual currencies for other virtual currencies or fiat currencies.

[21]   According to the White Paper, the primary purpose of a split is to protect minority shareholders and prevent what is commonly referred to as a "51% Attack," whereby an attacker holding 51% of a DAO Entity's Tokens could create a proposal to send all of the DAO Entity's funds to himself or herself.

Ethereum Blockchain; and (2) posting details about the proposal on The DAO Website, including the Ethereum Blockchain address of the deployed contract and a link to its source code. Proposals could be viewed on The DAO Website as well as other publicly-accessible websites. Per the White Paper, there were two prerequisites for submitting a proposal. An individual or entity must: (1) own at least one DAO Token; and (2) pay a deposit in the form of ETH that would be forfeited to the DAO Entity if the proposal was put up for a vote and failed to achieve a quorum of DAO Token holders. It was publicized that Slock.it would be the first to submit a proposal for funding.[22]

ETH raised by The DAO was to be distributed to a Contractor to fund a proposal only on a majority vote of DAO Token holders.[23] DAO Token holders were to cast votes, which would be weighted by the number of tokens they controlled, for or against the funding of a specific proposal. The voting process, however, was publicly criticized in that it could incentivize distorted voting behavior and, as a result, would not accurately reflect the consensus of the majority of DAO Token holders. Specifically, as noted in a May 27, 2016 blog post by a group of computer security researchers, The DAO's structure included a "strong positive bias to vote YES on proposals and to suppress NO votes as a side effect of the way in which it restricts users' range of options following the casting of a vote."[24]

Before any proposal was put to a vote by DAO Token holders, it was required to be reviewed by one or more of The DAO's "Curators." At the time of the formation of The DAO, the Curators were a group of individuals chosen by Slock.it.[25] According to the White Paper, the Curators of a DAO Entity had "considerable power." The Curators performed crucial security functions and maintained ultimate control over which proposals could be submitted to, voted on, and funded by The DAO. As stated on The DAO Website during the Offering Period, The DAO relied on its Curators for "failsafe protection" and for protecting The DAO from "malicious [sic] actors." Specifically, per The DAO Website, a Curator was responsible for: (1) confirming that any proposal for funding originated from an identifiable person or organization; and (2)

---

[22] It was stated on The DAO Website and elsewhere that Slock.it anticipated that it would be the first to submit a proposal for funding. In fact, a draft of Slock.it's proposal for funding for an "Ethereum Computer and Universal Sharing Network" was publicly-available online during the Offering Period.

[23] DAO Token holders could vote on proposals, either by direct interaction with the Ethereum Blockchain or by using an application that interfaces with the Ethereum Blockchain. It was generally acknowledged that DAO Token holders needed some technical knowledge in order to submit a vote, and The DAO Website included a link to a step-by-step tutorial describing how to vote on proposals.

[24] By voting on a proposal, DAO Token holders would "tie up" their tokens until the end of the voting cycle. *See* Jentzsch, *supra* note 8 at 8 ("The tokens used to vote will be blocked, meaning they can not [sic] be transferred until the proposal is closed."). If, however, a DAO Token holder abstained from voting, the DAO Token holder could avoid these restrictions; any DAO Tokens not submitted for a vote could be withdrawn or transferred at any time. As a result, DAO Token holders were incentivized either to vote yes or to abstain from voting. *See* Dino Mark et al., *A Call for a Temporary Moratorium on The DAO*, HACKING, DISTRIBUTED (May 27, 2016, 1:35 PM), http://hackingdistributed.com/2016/05/27/dao-call-for-moratorium/.

[25] At the time of The DAO's launch, The DAO Website identified eleven "high profile" individuals as holders of The DAO's Curator "Multisig" (or "private key"). These individuals all appear to live outside of the United States. Many of them were associated with the Ethereum Foundation, and The DAO Website touted the qualifications and trustworthiness of these individuals.

confirming that smart contracts associated with any such proposal properly reflected the code the Contractor claims to have deployed on the Ethereum Blockchain. If a Curator determined that the proposal met these criteria, the Curator could add the proposal to the "whitelist," which was a list of Ethereum Blockchain addresses that could receive ETH from The DAO if the majority of DAO Token holders voted for the proposal.

Curators of The DAO had ultimate discretion as to whether or not to submit a proposal for voting by DAO Token holders. Curators also determined the order and frequency of proposals, and could impose subjective criteria for whether the proposal should be whitelisted. One member of the group chosen by Slock.it to serve collectively as the Curator stated publicly that the Curator had "complete control over the whitelist ... the order in which things get whitelisted, the duration for which [proposals] get whitelisted, when things get unwhitelisted ... [and] clear ability to control the order and frequency of proposals," noting that "curators have tremendous power."[26] Another Curator publicly announced his subjective criteria for determining whether to whitelist a proposal, which included his personal ethics.[27] Per the White Paper, a Curator also had the power to reduce the voting quorum requirement by 50% every other week. Absent action by a Curator, the quorum could be reduced by 50% only if no proposal had reached the required quorum for 52 weeks.

### 3.   Secondary Market Trading on the Platforms

During the period from May 28, 2016 through early September 2016, the Platforms became the preferred vehicle for DAO Token holders to buy and sell DAO Tokens in the secondary market using virtual or fiat currencies. Specifically, the Platforms used electronic systems that allowed their respective customers to post orders for DAO Tokens on an anonymous basis. For example, customers of each Platform could buy or sell DAO Tokens by entering a market order on the Platform's system, which would then match with orders from other customers residing on the system. Each Platform's system would automatically execute these orders based on pre-programmed order interaction protocols established by the Platform.

None of the Platforms received orders for DAO Tokens from non-Platform customers or routed its respective customers' orders to any other trading destinations. The Platforms publicly displayed all their quotes, trades, and daily trading volume in DAO Tokens on their respective websites. During the period from May 28, 2016 through September 6, 2016, one such Platform executed more than 557,378 buy and sell transactions in DAO Tokens by more than 15,000 of its U.S. and foreign customers. During the period from May 28, 2016 through August 1, 2016, another such Platform executed more than 22,207 buy and sell transactions in DAO Tokens by more than 700 of its U.S. customers.

---

[26] Epicenter, *EB134 – Emin Gün Sirer And Vlad Zamfir: On A Rocky DAO*, YOUTUBE (June 6, 2016), https://www.youtube.com/watch?v=ON5GhIQdFU8.

[27] Andrew Quentson, *Are the DAO Curators Masters or Janitors?*, THE COIN TELEGRAPH (June 12, 2016), https://cointelegraph.com/news/are-the-dao-curators-masters-or-janitors.

4.    *Security Concerns, The "Attack" on The DAO, and The Hard Fork*

In late May 2016, just prior to the expiration of the Offering Period, concerns about the safety and security of The DAO's funds began to surface due to vulnerabilities in The DAO's code. On May 26, 2016, in response to these concerns, Slock.it submitted a "DAO Security Proposal" that called for the development of certain updates to The DAO's code and the appointment of a security expert.[28]  Further, on June 3, 2016, Christoph Jentzsch, on behalf of Slock.it, proposed a moratorium on all proposals until alterations to The DAO's code to fix vulnerabilities in The DAO's code had been implemented.[29]

On June 17, 2016, an unknown individual or group (the "Attacker") began rapidly diverting ETH from The DAO, causing approximately 3.6 million ETH—1/3 of the total ETH raised by The DAO offering—to move from The DAO's Ethereum Blockchain address to an Ethereum Blockchain address controlled by the Attacker (the "Attack").[30]  Although the diverted ETH was then held in an address controlled by the Attacker, the Attacker was prevented by The DAO's code from moving the ETH from that address for 27 days.[31]

In order to secure the diverted ETH and return it to DAO Token holders, Slock.it's co-founders and others endorsed a "Hard Fork" to the Ethereum Blockchain.  The "Hard Fork," called for a change in the Ethereum protocol on a going forward basis that would restore the DAO Token holders' investments as if the Attack had not occurred.  On July 20, 2016, after a majority of the Ethereum network adopted the necessary software updates, the new, forked Ethereum Blockchain became active.[32]  The Hard Fork had the effect of transferring all of the funds raised (including those held by the Attacker) from The DAO to a recovery address, where DAO Token holders could exchange their DAO Tokens for ETH.[33]  All DAO Token holders

---

[28] *See* Stephan Tual, *Proposal #1-DAO Security, Redux*, SLOCK.IT BLOG (May 26, 2016), https://blog.slock.it/both-our-proposals-are-now-out-voting-starts-saturday-morning-ba322d6d3aea.  The unnamed security expert would "act as the first point of contact for security disclosures, and continually monitor, pre-empt and avert any potential attack vectors The DAO may face, including social, technical and economic attacks."  *Id.*  Slock.it initially proposed a much broader security proposal that included the formation of a "DAO Security" group, the establishment of a "Bug Bounty Program," and routine external audits of The DAO's code.  However, the cost of the proposal (125,000 ETH), which would be paid from The DAO's funds, was immediately criticized as too high and Slock.it decided instead to submit the revised proposal described above.  *See* Stephan Tual, *DAO.Security, a Proposal to guarantee the integrity of The DAO*, SLOCK.IT BLOG (May 25, 2016), https://blog.slock.it/dao-security-a-proposal-to-guarantee-the-integrity-of-the-dao-3473899ace9d.

[29] *See TheDAO Proposal_ID 5*, ETHERSCAN, https://etherscan.io/token/thedao-proposal/5.

[30] *See* Stephan Tual, *DAO Security Advisory: live updates*, SLOCK.IT BLOG (June 17, 2016), https://blog.slock.it/dao-security-advisory-live-updates-2a0a42a2d07b.

[31] *Id.*

[32] A minority group, however, elected not to adopt the new Ethereum Blockchain created by the Hard Fork because to do so would run counter to the concept that a blockchain is immutable.  Instead they continued to use the former version of the blockchain, which is now known as "Ethereum Classic."

[33] *See* Christoph Jentzsch, *What the 'Fork' Really Means*, SLOCK.IT BLOG (July 18, 2016), https://blog.slock.it/what-the-fork-really-means-6fe573ac31dd.

who adopted the Hard Fork could exchange their DAO Tokens for ETH, and avoid any loss of the ETH they had invested.[34]

## III.  Discussion

The Commission is aware that virtual organizations and associated individuals and entities increasingly are using distributed ledger technology to offer and sell instruments such as DAO Tokens to raise capital.  These offers and sales have been referred to, among other things, as "Initial Coin Offerings" or "Token Sales."  Accordingly, the Commission deems it appropriate and in the public interest to issue this Report in order to stress that the U.S. federal securities law may apply to various activities, including distributed ledger technology, depending on the particular facts and circumstances, without regard to the form of the organization or technology used to effectuate a particular offer or sale.  In this Report, the Commission considers the particular facts and circumstances of the offer and sale of DAO Tokens to demonstrate the application of existing U.S. federal securities laws to this new paradigm.

### A.   Section 5 of the Securities Act

The registration provisions of the Securities Act contemplate that the offer or sale of securities to the public must be accompanied by the "full and fair disclosure" afforded by registration with the Commission and delivery of a statutory prospectus containing information necessary to enable prospective purchasers to make an informed investment decision. Registration entails disclosure of detailed "information about the issuer's financial condition, the identity and background of management, and the price and amount of securities to be offered … ." *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 360 (S.D.N.Y. 1998), *aff'd*, 155 F.3d 129 (2d Cir. 1998).  "The registration statement is designed to assure public access to material facts bearing on the value of publicly traded securities and is central to the Act's comprehensive scheme for protecting public investors." *SEC v. Aaron*, 605 F.2d 612, 618 (2d Cir. 1979) (citing *SEC v. Ralston Purina Co.,* 346 U.S. 119, 124 (1953)), *vacated on other grounds*, 446 U.S. 680 (1980). Section 5(a) of the Securities Act provides that, unless a registration statement is in effect as to a security, it is unlawful for any person, directly or indirectly, to engage in the offer or sale of securities in interstate commerce.  Section 5(c) of the Securities Act provides a similar prohibition against offers to sell, or offers to buy, unless a registration statement has been filed. Thus, both Sections 5(a) and 5(c) of the Securities Act prohibit the unregistered offer or sale of securities in interstate commerce.  15 U.S.C. § 77e(a) and (c).  Violations of Section 5 do not require scienter. *SEC v. Universal Major Indus. Corp.*, 546 F.2d 1044, 1047 (2d Cir. 1976).

---

[34] *Id.*

10

B.    DAO Tokens Are Securities

*1.    Foundational Principles of the Securities Laws Apply to Virtual Organizations or Capital Raising Entities Making Use of Distributed Ledger Technology*

Under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act, a security includes "an investment contract." *See* 15 U.S.C. §§ 77b-77c. An investment contract is an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. *See SEC v. Edwards*, 540 U.S. 389, 393 (2004); *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946); *see also United Housing Found., Inc. v. Forman*, 421 U.S. 837, 852-53 (1975) (The "touchstone" of an investment contract "is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others."). This definition embodies a *"flexible rather than a static principle*, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299 (emphasis added). The test "permits the fulfillment of the statutory purpose of compelling full and fair disclosure relative to the issuance of 'the many types of instruments that in our commercial world fall within the ordinary concept of a security.'" *Id.* In analyzing whether something is a security, "form should be disregarded for substance," *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967), "and the emphasis should be on economic realities underlying a transaction, and not on the name appended thereto." *United Housing Found.*, 421 U.S. at 849.

*2.    Investors in The DAO Invested Money*

In determining whether an investment contract exists, the investment of "money" need not take the form of cash. *See, e.g.*, *Uselton v. Comm. Lovelace Motor Freight, Inc.*, 940 F.2d 564, 574 (10th Cir. 1991) ("[I]n spite of *Howey's* reference to an 'investment of money,' it is well established that cash is not the only form of contribution or investment that will create an investment contract.").

Investors in The DAO used ETH to make their investments, and DAO Tokens were received in exchange for ETH. Such investment is the type of contribution of value that can create an investment contract under *Howey*. *See SEC v. Shavers*, No. 4:13-CV-416, 2014 WL 4652121, at *1 (E.D. Tex. Sept. 18, 2014) (holding that an investment of Bitcoin, a virtual currency, meets the first prong of *Howey*); *Uselton*, 940 F.2d at 574 ("[T]he 'investment' may take the form of 'goods and services,' or some other 'exchange of value'.") (citations omitted).

*3.    With a Reasonable Expectation of Profits*

Investors who purchased DAO Tokens were investing in a common enterprise and reasonably expected to earn profits through that enterprise when they sent ETH to The DAO's Ethereum Blockchain address in exchange for DAO Tokens. "[P]rofits" include "dividends, other periodic payments, or the increased value of the investment." *Edwards*, 540 U.S. at 394. As described above, the various promotional materials disseminated by Slock.it and its co-founders informed investors that The DAO was a for-profit entity whose objective was to fund

projects in exchange for a return on investment.[35]  The ETH was pooled and available to The DAO to fund projects.  The projects (or "contracts") would be proposed by Contractors.  If the proposed contracts were whitelisted by Curators, DAO Token holders could vote on whether The DAO should fund the proposed contracts.  Depending on the terms of each particular contract, DAO Token holders stood to share in potential profits from the contracts.  Thus, a reasonable investor would have been motivated, at least in part, by the prospect of profits on their investment of ETH in The DAO.

>               4.      *Derived from the Managerial Efforts of Others*

>                       a.      The Efforts of Slock.it, Slock.it's Co-Founders, and The DAO's
>                               Curators Were Essential to the Enterprise

Investors' profits were to be derived from the managerial efforts of others—specifically, Slock.it and its co-founders, and The DAO's Curators.  The central issue is "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973).  The DAO's investors relied on the managerial and entrepreneurial efforts of Slock.it and its co-founders, and The DAO's Curators, to manage The DAO and put forth project proposals that could generate profits for The DAO's investors.

Investors' expectations were primed by the marketing of The DAO and active engagement between Slock.it and its co-founders with The DAO and DAO Token holders.  To market The DAO and DAO Tokens, Slock.it created The DAO Website on which it published the White Paper explaining how a DAO Entity would work and describing their vision for a DAO Entity.  Slock.it also created and maintained other online forums that it used to provide information to DAO Token holders about how to vote and perform other tasks related to their investment.  Slock.it appears to have closely monitored these forums, answering questions from DAO Token holders about a variety of topics, including the future of The DAO, security concerns, ground rules for how The DAO would work, and the anticipated role of DAO Token holders.  The creators of The DAO held themselves out to investors as experts in Ethereum, the blockchain protocol on which The DAO operated, and told investors that they had selected persons to serve as Curators based on their expertise and credentials.  Additionally, Slock.it told investors that it expected to put forth the first substantive profit-making contract proposal—a blockchain venture in its area of expertise.  Through their conduct and marketing materials, Slock.it and its co-founders led investors to believe that they could be relied on to provide the significant managerial efforts required to make The DAO a success.

Investors in The DAO reasonably expected Slock.it and its co-founders, and The DAO's Curators, to provide significant managerial efforts after The DAO's launch.  The expertise of The DAO's creators and Curators was critical in monitoring the operation of The DAO, safeguarding investor funds, and determining whether proposed contracts should be put for a

---

[35]  That the "projects" could encompass services and the creation of goods for use by DAO Token holders does not change the core analysis that investors purchased DAO Tokens with the expectation of earning profits from the efforts of others.

vote. Investors had little choice but to rely on their expertise. At the time of the offering, The DAO's protocols had already been pre-determined by Slock.it and its co-founders, including the control that could be exercised by the Curators. Slock.it and its co-founders chose the Curators, whose function it was to: (1) vet Contractors; (2) determine whether and when to submit proposals for votes; (3) determine the order and frequency of proposals that were submitted for a vote; and (4) determine whether to halve the default quorum necessary for a successful vote on certain proposals. Thus, the Curators exercised significant control over the order and frequency of proposals, and could impose their own subjective criteria for whether the proposal should be whitelisted for a vote by DAO Token holders. DAO Token holders' votes were limited to proposals whitelisted by the Curators, and, although any DAO Token holder could put forth a proposal, each proposal would follow the same protocol, which included vetting and control by the current Curators. While DAO Token holders could put forth proposals to replace a Curator, such proposals were subject to control by the current Curators, including whitelisting and approval of the new address to which the tokens would be directed for such a proposal. In essence, Curators had the power to determine whether a proposal to remove a Curator was put to a vote.[36]

And, Slock.it and its co-founders did, in fact, actively oversee The DAO. They monitored The DAO closely and addressed issues as they arose, proposing a moratorium on all proposals until vulnerabilities in The DAO's code had been addressed and a security expert to monitor potential attacks on The DAO had been appointed. When the Attacker exploited a weakness in the code and removed investor funds, Slock.it and its co-founders stepped in to help resolve the situation.

    b.  DAO Token Holders' Voting Rights Were Limited

Although DAO Token holders were afforded voting rights, these voting rights were limited. DAO Token holders were substantially reliant on the managerial efforts of Slock.it, its co-founders, and the Curators.[37] Even if an investor's efforts help to make an enterprise profitable, those efforts do not necessarily equate with a promoter's significant managerial efforts or control over the enterprise. *See, e.g.*, *Glenn W. Turner*, 474 F.2d at 482 (finding that a multi-level marketing scheme was an investment contract and that investors relied on the promoter's managerial efforts, despite the fact that investors put forth the majority of the labor that made the enterprise profitable, because the promoter dictated the terms and controlled the scheme itself); *Long v. Shultz*, 881 F.2d 129, 137 (5th Cir. 1989) ("An investor may authorize the assumption of particular risks that would create the possibility of greater profits or losses but still depend on a third party for all of the essential managerial efforts without which the risk could not

---

[36] DAO Token holders could put forth a proposal to split from The DAO, which would result in the creation of a new DAO Entity with a new Curator. Other DAO Token holders would be allowed to join the new DAO Entity as long as they voted yes to the original "split" proposal. Unlike all other contract proposals, a proposal to split did not require a deposit or a quorum, and it required a seven-day debating period instead of the minimum two-week debating period required for other proposals.

[37] Because, as described above, DAO Token holders were incentivized either to vote yes or to abstain from voting, the results of DAO Token holder voting would not necessarily reflect the actual view of a majority of DAO Token holders.

pay off."). *See also generally SEC v. Merchant Capital, LLC*, 483 F.3d 747 (11th Cir. 2007) (finding an investment contract even where voting rights were provided to purported general partners, noting that the voting process provided limited information for investors to make informed decisions, and the purported general partners lacked control over the information in the ballots).

The voting rights afforded DAO Token holders did not provide them with meaningful control over the enterprise, because (1) DAO Token holders' ability to vote for contracts was a largely perfunctory one; and (2) DAO Token holders were widely dispersed and limited in their ability to communicate with one another.

First, as discussed above, DAO Token holders could only vote on proposals that had been cleared by the Curators.[38] And that clearance process did not include any mechanism to provide DAO Token holders with sufficient information to permit them to make informed voting decisions. Indeed, based on the particular facts concerning The DAO and the few draft proposals discussed in online forums, there are indications that contract proposals would not have necessarily provide enough information for investors to make an informed voting decision, affording them less meaningful control. For example, the sample contract proposal attached to the White Paper included little information concerning the terms of the contract. Also, the Slock.it co-founders put forth a draft of their own contract proposal and, in response to questions and requests to negotiate the terms of the proposal (posted to a DAO forum), a Slock.it founder explained that the proposal was intentionally vague and that it was, in essence, a take it or leave it proposition not subject to negotiation or feedback. *See, e.g., SEC v. Shields*, 744 F.3d 633, 643-45 (10th Cir. 2014) (in assessing whether agreements were investment contracts, court looked to whether "the investors actually had the type of control reserved under the agreements to obtain access to information necessary to protect, manage, and control their investments at the time they purchased their interests.").

Second, the pseudonymity and dispersion of the DAO Token holders made it difficult for them to join together to effect change or to exercise meaningful control. Investments in The DAO were made pseudonymously (such that the real-world identities of investors are not apparent), and there was great dispersion among those individuals and/or entities who were invested in The DAO and thousands of individuals and/or entities that traded DAO Tokens in the secondary market—an arrangement that bears little resemblance to that of a genuine general partnership. *Cf. Williamson v. Tucker*, 645 F.2d 404, 422-24 (5th Cir. 1981) ("[O]ne would not expect partnership interests sold to large numbers of the general public to provide any real partnership control; at some point there would be so many [limited] partners that a partnership vote would be more like a corporate vote, each partner's role having been diluted to the level of a single shareholder in a corporation.").[39] Slock.it did create and maintain online forums on which

---

[38] Because, in part, The DAO never commenced its business operations funding projects, this Report does not analyze the question whether anyone associated with The DAO was an "[i]nvestment adviser" under Section 202(a)(11) of the Investment Advisers Act of 1940 ("Advisers Act"). *See* 15 U.S.C. § 80b-2(a)(11). Those who would use virtual organizations should consider their obligations under the Advisers Act.

[39] The Fifth Circuit in *Williamson* stated that:

investors could submit posts regarding contract proposals, which were not limited to use by DAO Token holders (anyone was permitted to post). However, DAO Token holders were pseudonymous, as were their posts to the forums. Those facts, combined with the sheer number of DAO Token holders, potentially made the forums of limited use if investors hoped to consolidate their votes into blocs powerful enough to assert actual control. This was later demonstrated through the fact that DAO Token holders were unable to effectively address the Attack without the assistance of Slock.it and others. The DAO Token holders' pseudonymity and dispersion diluted their control over The DAO. *See Merchant Capital*, 483 F.3d at 758 (finding geographic dispersion of investors weighing against investor control).

These facts diminished the ability of DAO Token holders to exercise meaningful control over the enterprise through the voting process, rendering the voting rights of DAO Token holders akin to those of a corporate shareholder. *Steinhardt Group, Inc. v. Citicorp.*, 126 F.3d 144, 152 (3d Cir. 1997) ("It must be emphasized that the assignment of nominal or limited responsibilities to the participant does not negate the existence of an investment contract; where the duties assigned are so narrowly circumscribed as to involve little real choice of action … a security may be found to exist … . [The] emphasis must be placed on economic reality.") (citing *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 483 n. 14 (5th Cir. 1974)).

By contract and in reality, DAO Token holders relied on the significant managerial efforts provided by Slock.it and its co-founders, and The DAO's Curators, as described above. Their efforts, not those of DAO Token holders, were the "undeniably significant" ones, essential to the overall success and profitability of any investment into The DAO. *See Glenn W. Turner*, 474 F.2d at 482.

C.   Issuers Must Register Offers and Sales of Securities Unless a Valid Exemption Applies

The definition of "issuer" is broadly defined to include "every person who issues or proposes to issue any security" and "person" includes "any unincorporated organization." 15 U.S.C. § 77b(a)(4). The term "issuer" is flexibly construed in the Section 5 context "as issuers devise new ways to issue their securities and the definition of a security itself expands." *Doran v. Petroleum Mgmt. Corp.*, 545 F.2d 893, 909 (5th Cir. 1977); *accord SEC v. Murphy*, 626 F.2d 633, 644 (9th Cir. 1980) ("[W]hen a person [or entity] organizes or sponsors the organization of

---

A general partnership or joint venture interest can be designated a security if the investor can establish, for example, that (1) an agreement among the parties leaves so little power in the hands of the partner or venture that the arrangement in fact distributes power as would a limited partnership; or (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or (3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise exercise meaningful partnership or venture powers.

*Williamson*, 645 F.2d at 424 & n.15 (court also noting that, "this is not to say that other factors could not also give rise to such a dependence on the promoter or manager that the exercise of partnership powers would be effectively precluded.").

limited partnerships and is primarily responsible for the success or failure of the venture for which the partnership is formed, he will be considered an issuer … .").

The DAO, an unincorporated organization, was an issuer of securities, and information about The DAO was "crucial" to the DAO Token holders' investment decision. *See Murphy*, 626 F.2d at 643 ("Here there is no company issuing stock, but instead, a group of individuals investing funds in an enterprise for profit, and receiving in return an entitlement to a percentage of the proceeds of the enterprise.") (citation omitted). The DAO was "responsible for the success or failure of the enterprise," and accordingly was the entity about which the investors needed information material to their investment decision. *Id.* at 643-44.

During the Offering Period, The DAO offered and sold DAO Tokens in exchange for ETH through The DAO Website, which was publicly-accessible, including to individuals in the United States. During the Offering Period, The DAO sold approximately 1.15 billion DAO Tokens in exchange for a total of approximately 12 million ETH, which was valued in USD, at the time, at approximately $150 million. Because DAO Tokens were securities, The DAO was required to register the offer and sale of DAO Tokens, unless a valid exemption from such registration applied.

Moreover, those who participate in an unregistered offer and sale of securities not subject to a valid exemption are liable for violating Section 5. *See, e.g.*, *Murphy*, 626 F.2d at 650-51 ("[T]hose who ha[ve] a necessary role in the transaction are held liable as participants.") (citing *SEC v. North Am. Research & Dev. Corp.*, 424 F.2d 63, 81 (2d Cir. 1970); *SEC v. Culpepper*, 270 F.2d 241, 247 (2d Cir. 1959); *SEC v. International Chem. Dev. Corp.*, 469 F.2d 20, 28 (10th Cir. 1972); *Pennaluna & Co. v. SEC*, 410 F.2d 861, 864 n.1, 868 (9th Cir. 1969)); *SEC v. Softpoint, Inc.*, 958 F. Supp 846, 859-60 (S.D.N.Y. 1997) ("The prohibitions of Section 5 … sweep[] broadly to encompass 'any person' who participates in the offer or sale of an unregistered, non-exempt security."); *SEC v. Chinese Consol. Benevolent Ass'n.*, 120 F.2d 738, 740-41 (2d Cir. 1941) (defendant violated Section 5(a) "because it engaged in selling unregistered securities" issued by a third party "when it solicited offers to buy the securities 'for value'").

   D.    A System that Meets the Definition of an Exchange Must Register as a National
         Securities Exchange or Operate Pursuant to an Exemption from Such Registration

Section 5 of the Exchange Act makes it unlawful for any broker, dealer, or exchange, directly or indirectly, to effect any transaction in a security, or to report any such transaction, in interstate commerce, unless the exchange is registered as a national securities exchange under Section 6 of the Exchange Act, or is exempted from such registration. *See* 15 U.S.C. §78e. Section 3(a)(1) of the Exchange Act defines an "exchange" as "any organization, association, or group of persons, whether incorporated or unincorporated, which constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange as that term is generally understood … ." 15 U.S.C. § 78c(a)(1).

Exchange Act Rule 3b-16(a) provides a functional test to assess whether a trading system meets the definition of exchange under Section 3(a)(1). Under Exchange Act Rule 3b-16(a), an

16

organization, association, or group of persons shall be considered to constitute, maintain, or provide "a marketplace or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange," if such organization, association, or group of persons: (1) brings together the orders for securities of multiple buyers and sellers; and (2) uses established, non-discretionary methods (whether by providing a trading facility or by setting rules) under which such orders interact with each other, and the buyers and sellers entering such orders agree to the terms of the trade.[40]

A system that meets the criteria of Rule 3b-16(a), and is not excluded under Rule 3b-16(b), must register as a national securities exchange pursuant to Sections 5 and 6 of the Exchange Act[41] or operate pursuant to an appropriate exemption. One frequently used exemption is for alternative trading systems ("ATS").[42] Rule 3a1-1(a)(2) exempts from the definition of "exchange" under Section 3(a)(1) an ATS that complies with Regulation ATS,[43] which includes, among other things, the requirement to register as a broker-dealer and file a Form ATS with the Commission to provide notice of the ATS's operations. Therefore, an ATS that operates pursuant to the Rule 3a1-1(a)(2) exemption and complies with Regulation ATS would not be subject to the registration requirement of Section 5 of the Exchange Act.

The Platforms that traded DAO Tokens appear to have satisfied the criteria of Rule 3b-16(a) and do not appear to have been excluded from Rule 3b-16(b). As described above, the Platforms provided users with an electronic system that matched orders from multiple parties to buy and sell DAO Tokens for execution based on non-discretionary methods.

## IV.   Conclusion and References for Additional Guidance

Whether or not a particular transaction involves the offer and sale of a security—regardless of the terminology used—will depend on the facts and circumstances, including the

---

[40] See 17 C.F.R. § 240.3b-16(a). The Commission adopted Rule 3b-16(b) to exclude explicitly certain systems that the Commission believed did not meet the exchange definition. These systems include systems that merely route orders to other execution facilities and systems that allow persons to enter orders for execution against the bids and offers of a single dealer system. See Securities Exchange Act Rel. No. 40760 (Dec. 8, 1998), 63 FR 70844 (Dec. 22, 1998) (Regulation of Exchanges and Alternative Trading Systems) ("Regulation ATS"), 70852.

[41] 15 U.S.C. § 78e. A "national securities exchange" is an exchange registered as such under Section 6 of the Exchange Act. 15 U.S.C. § 78f.

[42] Rule 300(a) of Regulation ATS promulgated under the Exchange Act provides that an ATS is:

any organization, association, person, group of persons, or system: (1) [t]hat constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange within the meaning of [Exchange Act Rule 3b-16]; and (2) [t]hat does not: (i) [s]et rules governing the conduct of subscribers other than the conduct of subscribers' trading on such [ATS]; or (ii) [d]iscipline subscribers other than by exclusion from trading.

Regulation ATS, supra note 40, Rule 300(a).

[43] See 17 C.F.R. § 240.3a1-1(a)(2). Rule 3a1-1 also provides two other exemptions from the definition of "exchange" for any ATS operated by a national securities association, and any ATS not required to comply with Regulation ATS pursuant to Rule 301(a) of Regulation ATS. See 17 C.F.R. §§ 240.3a1-1(a)(1) and (3).

economic realities of the transaction. Those who offer and sell securities in the United States must comply with the federal securities laws, including the requirement to register with the Commission or to qualify for an exemption from the registration requirements of the federal securities laws. The registration requirements are designed to provide investors with procedural protections and material information necessary to make informed investment decisions. These requirements apply to those who offer and sell securities in the United States, regardless whether the issuing entity is a traditional company or a decentralized autonomous organization, regardless whether those securities are purchased using U.S. dollars or virtual currencies, and regardless whether they are distributed in certificated form or through distributed ledger technology. In addition, any entity or person engaging in the activities of an exchange, such as bringing together the orders for securities of multiple buyers and sellers using established non-discretionary methods under which such orders interact with each other and buyers and sellers entering such orders agree upon the terms of the trade, must register as a national securities exchange or operate pursuant to an exemption from such registration.

To learn more about registration requirements under the Securities Act, please visit the Commission's website here. To learn more about the Commission's registration requirements for investment companies, please visit the Commission's website here. To learn more about the Commission's registration requirements for national securities exchanges, please visit the Commission's website here. To learn more about alternative trading systems, please see the Regulation ATS adopting release here.

For additional guidance, please see the following Commission enforcement actions involving virtual currencies:

- *SEC v. Trendon T. Shavers and Bitcoin Savings and Trust*, Civil Action No. 4:13-CV-416 (E.D. Tex., complaint filed July 23, 2013)

- *In re Erik T. Voorhees*, Rel. No. 33-9592 (June 3, 2014)

- *In re BTC Trading, Corp. and Ethan Burnside*, Rel. No. 33-9685 (Dec. 8, 2014)

- *SEC v. Homero Joshua Garza, Gaw Miners, LLC, and ZenMiner, LLC (d/b/a Zen Cloud)*, Civil Action No. 3:15-CV-01760 (D. Conn., complaint filed Dec. 1, 2015)

- *In re Bitcoin Investment Trust and SecondMarket, Inc.*, Rel. No. 34-78282 (July 11, 2016)

- *In re Sunshine Capital, Inc.*, File No. 500-1 (Apr. 11, 2017)

And please see the following investor alerts:

- *Bitcoin and Other Virtual Currency-Related Investments* (May 7, 2014)

- *Ponzi Schemes Using Virtual Currencies* (July 2013)

By the Commission.

18

A-566

Exhibit 8

2/11/2021

Case 22-972, Document 57, 07/28/2022, 3356258, Page161 of 257

Case 1:20-cv-03B03-ALC Document 60-8 Filed 02/16/21 Page 2 of 5

Public Statement

# Statement on Potentially Unlawful Online Platforms for Trading Digital Assets

## Divisions of Enforcement and Trading and Markets

**March 7, 2018**

Online trading platforms have become a popular way investors can buy and sell digital assets, including coins and tokens offered and sold in so-called Initial Coin Offerings ("ICOs"). The platforms often claim to give investors the ability to quickly buy and sell digital assets. Many of these platforms bring buyers and sellers together in one place and offer investors access to automated systems that display priced orders, execute trades, and provide transaction data.

A number of these platforms provide a mechanism for trading assets that meet the definition of a "security" under the federal securities laws. If a platform offers trading of digital assets that are securities and operates as an "exchange," as defined by the federal securities laws, then the platform must register with the SEC as a national securities exchange or be exempt from registration. The federal regulatory framework governing registered national securities exchanges and exempt markets is designed to protect investors and prevent against fraudulent and manipulative trading practices.

## Considerations for Investors Using Online Trading Platforms

To get the protections offered by the federal securities laws and SEC oversight when trading digital assets that are securities, investors should use a platform or entity registered with the SEC, such as a national securities exchange, alternative trading system ("ATS"), or broker-dealer.

The SEC staff has concerns that many online trading platforms appear to investors as SEC-registered and regulated marketplaces when they are not. Many platforms refer to themselves as "exchanges," which can give the misimpression to investors that they are regulated or meet the regulatory standards of a national securities exchange. Although some of these platforms claim to use strict standards to pick only high-quality digital assets to trade, the SEC does not review these standards or the digital assets that the platforms select, and the so-called standards should not be equated to the listing standards of national securities exchanges. Likewise, the SEC does not review the trading protocols used by these platforms, which determine how orders interact and execute, and access to a platform's trading services may not be the same for all users. Again, investors should not assume the trading protocols meet the standards of an SEC-registered national securities exchange. Lastly, many of these platforms give the impression that they perform exchange-like functions by offering order books with updated bid and ask pricing and data about executions on the system, but there is no reason to believe that such information has the same integrity as that provided by national securities exchanges.

A-568

2/11/2021

In light of the foregoing, here are some questions investors should ask before they decide to trade digital assets on an online trading platform:

- Do you trade securities on this platform? If so, is the platform registered as a national securities exchange (see our link to the list below)?

- Does the platform operate as an ATS? If so, is the ATS registered as a broker-dealer and has it filed a Form ATS with the SEC (see our link to the list below)?

- Is there information in FINRA's BrokerCheck® about any individuals or firms operating the platform?

- How does the platform select digital assets for trading?

- Who can trade on the platform?

- What are the trading protocols?

- How are prices set on the platform?

- Are platform users treated equally?

- What are the platform's fees?

- How does the platform safeguard users' trading and personally identifying information?

- What are the platform's protections against cybersecurity threats, such as hacking or intrusions?

- What other services does the platform provide? Is the platform registered with the SEC for these services?

- Does the platform hold users' assets? If so, how are these assets safeguarded?

## Resources for Investors

Investor.gov Spotlight on Initial Coin Offerings and Digital Assets

Chairman Jay Clayton Statement on Cryptocurrencies and Initial Coin Offerings

Chairman Jay Clayton's Testimony on Virtual Currencies: The Roles of the SEC and CFTC

Report of Investigation Pursuant to Section 21(a) of the Securities and Exchange Act of 1934: The DAO

Investors can find a list of SEC-registered national securities exchanges here: List of Active National Securities Exchanges

Investors can find a list of ATSs that have filed a Form ATS with the SEC here: List of Active Alternative Trading Systems

## Considerations for Market Participants Operating Online Trading Platforms

A platform that trades securities and operates as an "exchange," as defined by the federal securities laws, must register as a national securities exchange or operate under an exemption from registration, such as the exemption provided for ATSs under SEC Regulation ATS. An SEC-registered national securities exchange must, among other things, have rules designed to prevent fraudulent and manipulative acts and practices. Additionally, as a self-regulatory organization ("SRO"), an SEC-registered national securities exchange must have rules and procedures governing the discipline of its members and persons associated with its members, and enforce compliance by its members and persons associated with its members with the federal

A-569

securities laws and the rules of the exchange. Further, a national securities exchange must itself comply with the federal securities laws and must file its rules with the Commission.

An entity seeking to operate as an ATS is also subject to regulatory requirements, including registering with the SEC as a broker-dealer and becoming a member of an SRO. Registration as a broker-dealer subjects the ATS to a host of regulatory requirements, such as the requirement to have reasonable policies and procedures to prevent the misuse of material non-public information, books and records requirements, and financial responsibility rules, including, as applicable, requirements concerning the safeguarding and custody of customer funds and securities. The overlay of SRO membership imposes further regulatory requirements and oversight. An ATS must comply with the federal securities laws and its SRO's rules, and file a Form ATS with the SEC.

Some online trading platforms may not meet the definition of an exchange under the federal securities laws, but directly or indirectly offer trading or other services related to digital assets that are securities. For example, some platforms offer digital wallet services (to hold or store digital assets) or transact in digital assets that are securities. These and other services offered by platforms may trigger other registration requirements under the federal securities laws, including broker-dealer, transfer agent, or clearing agency registration, among other things. In addition, a platform that offers digital assets that are securities may be participating in the unregistered offer and sale of securities if those securities are not registered or exempt from registration.

In advancing the SEC's mission to protect investors, the SEC staff will continue to focus on platforms that offer trading of digital assets and their compliance with the federal securities laws.

## Consultation with Securities Counsel and the SEC Staff

We encourage market participants who are employing new technologies to develop trading platforms to consult with legal counsel to aid in their analysis of federal securities law issues and to contact SEC staff, as needed, for assistance in analyzing the application of the federal securities laws.In particular, staff providing assistance on these matters can be reached at FinTech@sec.gov.

## Resources for Market Participants

Regulation of Exchanges and Alternative Trading Systems

## Select Commission Enforcement Actions

SEC v. Jon E. Montroll and Bitfunder

In re BTC Trading, Corp. and Ethan Burnside.

SEC v. REcoin Group Foundation, LLC et al.

SEC v. PlexCorps et al.

In re Munchee, Inc.

SEC v. AriseBank et al.

A-570

A-571

Exhibit 9

A-572

# SEC chief says agency won't change securities laws to cater to cryptocurrencies

PUBLISHED WED, JUN 6 201810:45 AM EDTUPDATED MON, JUN 11 20189:35 AM EDT



**Kate Rooney**
**@KROONEY**

SHARE

## KEY POINTS

The head of the Securities and Exchange Commission Chairman made it clear Wednesday that the agency won't be bending the rules for cryptocurrency when it comes to defining what is or what isn't a security.

"We are not going to do any violence to the traditional definition of security that has worked for a long time," SEC Chairman Jay Clayton told CNBC Wednesday.

The agency is also not adjusting rules for initial coin offerings, and Clayton underlined that tokens or digital assets used in that fundraising process are securities.

VIDEO 04:27

A-573

SEC chairman: Cryptocurrencies like bitcoin are not securities

The head of the Securities and Exchange Commission made it clear Wednesday that the agency won't bend the rules for cryptocurrency when it comes to defining what is or what isn't a security.

"We are not going to do any violence to the traditional definition of a security that has worked for a long time," U.S. Securities and Exchange Commission Chairman Jay Clayton told CNBC Wednesday. "We've been doing this a long time, there's no need to change the definition."

Clayton said the U.S. has built a $19 trillion securities market that's "the envy of the world" following the current rules.

The agency is not adjusting rules for the fundraising process known as initial coin offerings, or ICOs, either, he said. ICOs have raised $9.1 billion this year alone, according to the latest research from Autonomous Next.

"If you have an ICO or a stock, and you want to sell it in a private placement, follow the private placement rules," Clayton said, "If you want to do any IPO with a token, come see us."

The SEC is "happy to help you do that public offering" if issuers take the responsibility SEC laws require, he said.

The chairman also addressed a growing debate over which cryptocurrencies should fall under SEC jurisdiction.

"Cryptocurrencies: These are replacements for sovereign currencies, replace the dollar, the euro, the yen with bitcoin," Clayton said. "That type of currency is not a security."

A token, or a digital asset used in a fundraising process known as an initial coin offering, or ICO, are securities by Clayton's definition.

A-574

"A token, a digital asset, where I give you my money and you go off and make a venture, and in return for giving you my money I say 'you can get a return' that is a security and we regulate that," Clayton said. "We regulate the offering of that security and regulate the trading of that security."

Whether an asset is a security right now follows the "Howey Test." The ruling comes from a 1946 U.S. Supreme Court case that classifies a security as an investment of money in a common enterprise, in which the investor expects profits primarily from others' efforts.

Clayton made it clear in March that all ICOs constitute securities, and reiterated that Wednesday saying "if it's a security, we're regulating it."

But companies tied to those cryptocurrencies have argued that some should fall under a different category, in many cases because of their utility.

The financial watchdog has been balancing consumer protection and innovation in what has become multibillion-dollar cryptocurrency market. The market capitalization of bitcoin alone is more than $130 billion, according to CoinMarketCap.

On Tuesday, the SEC picked a new leader for its emerging cryptocurrency division. Valerie Szczepanik, who already worked at the agency, was promoted to a role that didn't exist until this week: Associate Director of the Division of Corporation Finance and Senior Advisor for Digital Assets and Innovation.

Bitcoin began its price descent in March, falling below $10,000 after the agency said it would require digital asset exchanges to register with the agency.

Prices have struggled to recover since. Bitcoin is down roughly 50 percent in 2018 after climbing more than 1,300 percent last year, according to data from CoinDesk. The cryptocurrency was trading near $7,628 as of 5 p.m ET Wednesday.

**Bitcoin's three-month performance**



*Source: CoinDesk*

In late April, SEC Commissioner Robert Jackson told CNBC the agency was not looking to ban the fundraising process known as initial coin offerings, or ICOs, and remains open to a legal avenue for crypto investments.

One month later, the SEC created the website HoweyCoins.com to show investors some of the ways a site can look valid when it actually could be a scam. The agency has cracked down on ICOs year: It has continuously warned of pump-and-dump schemes, issued subpoenas and charged multiple coin projects with fraud.

Fundstrat co-founder Tom Lee and other bitcoin pundits have predicted that institutional investors need more guidance from regulators like the SEC until they fully buy into crypto. Lee told CNBC this week that investors are in "purgatory with regard to regulatory clarity."

A-576

Exhibit 10

Speech

# Digital Asset Transactions: When Howey Met Gary (Plastic)



**William Hinman**
*Director, Division of Corporation Finance*

**San Francisco, CA**

**June 14, 2018**

## Remarks at the Yahoo Finance All Markets Summit: Crypto

Thank you Andy. I am pleased to be here today.[1] This event provides a great opportunity to address a topic that is the subject of considerable debate in the press and in the crypto-community – whether a digital asset offered as a security can, over time, become something other than a security.[2]

To start, we should frame the question differently and focus not on the digital asset itself, but on the circumstances surrounding the digital asset and the manner in which it is sold. To that end, a better line of inquiry is: "Can a digital asset that was originally offered in a securities offering ever be later sold in a manner that does not constitute an offering of a security?" In cases where the digital asset represents a set of rights that gives the holder a financial interest in an enterprise, the answer is likely "no." In these cases, calling the transaction an initial coin offering, or "ICO," or a sale of a "token," will not take it out of the purview of the U.S. securities laws.

But what about cases where there is no longer any central enterprise being invested in or where the digital asset is sold only to be used to purchase a good or service available through the network on which it was created? I believe in these cases the answer is a qualified "yes." I would like to share my thinking with you today about the circumstances under which that could occur.

Before I turn to the securities law analysis, let me share what I believe may be most exciting about distributed ledger technology – that is, the potential to share information, transfer value, and record transactions in a decentralized digital environment. Potential applications include supply chain management, intellectual property rights licensing, stock ownership transfers and countless others. There is real value in creating applications that can be accessed and executed electronically with a public, immutable record and without the need for a trusted third party to verify transactions. Some

A-577

people believe that this technology will transform e-commerce as we know it. There is excitement and a great deal of speculative interest around this new technology. Unfortunately, there are also cases of fraud. In many regards, it is still "early days."

But I am not here to discuss the promise of technology – there are many in attendance and speaking here today that can do a much better job of that. I would like to focus on the application of the federal securities laws to digital asset transactions – that is how tokens and coins are being issued, distributed and sold. While perhaps a bit dryer than the promise of the blockchain, this topic is critical to the broader acceptance and use of these novel instruments.

I will begin by describing what I often see. Promoters,[3] in order to raise money to develop networks on which digital assets will operate, often sell the tokens or coins rather than sell shares, issue notes or obtain bank financing. But, in many cases, the economic substance is the same as a conventional securities offering. Funds are raised with the expectation that the promoters will build their system and investors can earn a return on the instrument – usually by selling their tokens in the secondary market once the promoters create something of value with the proceeds and the value of the digital enterprise increases.

When we see that kind of economic transaction, it is easy to apply the Supreme Court's "investment contract" test first announced in *SEC v. Howey*,[4] That test requires an investment of money in a common enterprise with an expectation of profit derived from the efforts of others. And it is important to reflect on the facts of *Howey*. A hotel operator sold interests in a citrus grove to its guests and claimed it was selling real estate, not securities. While the transaction was recorded as a real estate sale, it also included a service contract to cultivate and harvest the oranges. The purchasers could have arranged to service the grove themselves but, in fact, most were passive, relying on the efforts of Howey-in-the-Hills Service, Inc. for a return. In articulating the test for an investment contract, the Supreme Court stressed: "Form [is] disregarded for substance and the emphasis [is] placed upon economic reality."[5] So the purported real estate purchase was found to be an investment contract – an investment in orange groves was in these circumstances an investment in a security.

Just as in the *Howey* case, tokens and coins are often touted as assets that have a use in their own right, coupled with a promise that the assets will be cultivated in a way that will cause them to grow in value, to be sold later at a profit. And, as in *Howey* – where interests in the groves were sold to hotel guests, not farmers – tokens and coins typically are sold to a wide audience rather than to persons who are likely to use them on the network.

In the ICOs I have seen, overwhelmingly, promoters tout their ability to create an innovative application of blockchain technology. Like in *Howey*, the investors are passive. Marketing efforts are rarely narrowly targeted to token users. And typically at the outset, the business model and very viability of the application is still uncertain. The purchaser usually has no choice but to rely on the efforts of the promoter to build the network and make the enterprise a success. At that stage, the purchase of a token looks a lot like a bet on the success of the enterprise and not the purchase of something used to exchange for goods or services on the network.

As an aside, you might ask, given that these token sales often look like securities offerings, why are the promoters choosing to package the investment as a coin or token offering? This is an especially good question if the network on which the token or coin will function is not yet operational. I think there can be a number of reasons. For a while, some believed such labeling might, by itself, remove the transaction from the securities laws. I think people now realize labeling an investment opportunity as a coin or token does not achieve that result. Second, this labeling might have been used to bring some marketing "sizzle" to the enterprise. That might still work to some extent, but the track record of ICOs is still being sorted out and some of that sizzle may now be more of a potential warning flare for investors.

Some may be attracted to a blockchain-mediated crowdfunding process. Digital assets can represent an efficient way to reach a global audience where initial purchasers have a stake in the success of the network and become part of a network where their participation adds value beyond their investment

contributions. The digital assets are then exchanged – for some, to help find the market price for the new application; for others, to speculate on the venture. As I will discuss, whether a transaction in a coin or token on the secondary market amounts to an offer or sale of a security requires a careful and fact-sensitive legal analysis.

I believe some industry participants are beginning to realize that, in some circumstances, it might be easier to start a blockchain-based enterprise in a more conventional way. In other words, conduct the initial funding through a registered or exempt equity or debt offering and, once the network is up and running, distribute or offer blockchain-based tokens or coins to participants who need the functionality the network and the digital assets offer. This allows the tokens or coins to be structured and offered in a way where it is evident that purchasers are not making an investment in the development of the enterprise.

Returning to the ICOs I am seeing, strictly speaking, the token – or coin or whatever the digital information packet is called – all by itself is not a security, just as the orange groves in *Howey* were not. Central to determining whether a security is being sold is how it is being sold and the reasonable expectations of purchasers. When someone buys a housing unit to live in, it is probably not a security.[6] But under certain circumstances, the same asset can be offered and sold in a way that causes investors to have a reasonable expectation of profits based on the efforts of others. For example, if the housing unit is offered with a management contract or other services, it can be a security.[7] Similarly, when a CD, exempt from being treated as a security under Section 3 of the Securities Act, is sold as a part of a program organized by a broker who offers retail investors promises of liquidity and the potential to profit from changes in interest rates, the *Gary Plastic* case teaches us that the instrument can be part of an investment contract that is a security.[8]

The same reasoning applies to digital assets. The digital asset itself is simply code. But the way it is sold – as part of an investment; to non-users; by promoters to develop the enterprise – can be, and, in that context, most often is, a security – because it evidences an investment contract. And regulating these transactions as securities transactions makes sense. The impetus of the Securities Act is to remove the information asymmetry between promoters and investors. In a public distribution, the Securities Act prescribes the information investors need to make an informed investment decision, and the promoter is liable for material misstatements in the offering materials. These are important safeguards, and they are appropriate for most ICOs. The disclosures required under the federal securities laws nicely complement the *Howey* investment contract element about the efforts of others. As an investor, the success of the enterprise – and the ability to realize a profit on the investment – turns on the efforts of the third party. So learning material information about the third party – its background, financing, plans, financial stake and so forth – is a prerequisite to making an informed investment decision. Without a regulatory framework that promotes disclosure of what the third party alone knows of these topics and the risks associated with the venture, investors will be uninformed and are at risk.

But this also points the way to when a digital asset transaction may no longer represent a security offering. If the network on which the token or coin is to function is sufficiently decentralized – where purchasers would no longer reasonably expect a person or group to carry out essential managerial or entrepreneurial efforts – the assets may not represent an investment contract. Moreover, when the efforts of the third party are no longer a key factor for determining the enterprise's success, material information asymmetries recede. As a network becomes truly decentralized, the ability to identify an issuer or promoter to make the requisite disclosures becomes difficult, and less meaningful.

And so, when I look at Bitcoin today, I do not see a central third party whose efforts are a key determining factor in the enterprise. The network on which Bitcoin functions is operational and appears to have been decentralized for some time, perhaps from inception. Applying the disclosure regime of the federal securities laws to the offer and resale of Bitcoin would seem to add little value.[9] And putting aside the fundraising that accompanied the creation of Ether, based on my understanding of the present state of Ether, the Ethereum network and its decentralized structure, current offers and sales of Ether are not securities transactions. And, as with Bitcoin, applying the disclosure regime of the federal securities laws to current transactions in Ether would

seem to add little value. Over time, there may be other sufficiently decentralized networks and systems where regulating the tokens or coins that function on them as securities may not be required. And of course there will continue to be systems that rely on central actors whose efforts are a key to the success of the enterprise. In those cases, application of the securities laws protects the investors who purchase the tokens or coins.

I would like to emphasize that the analysis of whether something is a security is not static and does not strictly inhere to the instrument.[10] Even digital assets with utility that function solely as a means of exchange in a decentralized network could be packaged and sold as an investment strategy that can be a security. If a promoter were to place Bitcoin in a fund or trust and sell interests, it would create a new security. Similarly, investment contracts can be made out of virtually any asset (including virtual assets), provided the investor is reasonably expecting profits from the promoter's efforts.

Let me emphasize an earlier point: simply labeling a digital asset a "utility token" does not turn the asset into something that is not a security.[11] I recognize that the Supreme Court has acknowledged that if someone is purchasing an asset for consumption only, it is likely not a security.[12] But, the economic substance of the transaction always determines the legal analysis, not the labels.[13] The oranges in *Howey* had utility. Or in my favorite example, the Commission warned in the late 1960s about investment contracts sold in the form of whisky warehouse receipts.[14] Promoters sold the receipts to U.S. investors to finance the aging and blending processes of Scotch whisky. The whisky was real – and, for some, had exquisite utility. But Howey was not selling oranges and the warehouse receipts promoters were not selling whisky for consumption. They were selling investments, and the purchasers were expecting a return from the promoters' efforts.

Promoters and other market participants need to understand whether transactions in a particular digital asset involve the sale of a security. We are happy to help promoters and their counsel work through these issues. We stand prepared to provide more formal interpretive or no-action guidance about the proper characterization of a digital asset in a proposed use.[15] In addition, we recognize that there are numerous implications under the federal securities laws of a particular asset being considered a security. For example, our Divisions of Trading and Markets and Investment Management are focused on such issues as broker-dealer, exchange and fund registration, as well as matters of market manipulation, custody and valuation. We understand that market participants are working to make their services compliant with the existing regulatory framework, and we are happy to continue our engagement in this process.

What are some of the factors to consider in assessing whether a digital asset is offered as an investment contract and is thus a security? Primarily, consider whether a third party – be it a person, entity or coordinated group of actors – drives the expectation of a return. That question will always depend on the particular facts and circumstances, and this list is illustrative, not exhaustive:

1. Is there a person or group that has sponsored or promoted the creation and sale of the digital asset, the efforts of whom play a significant role in the development and maintenance of the asset and its potential increase in value?

2. Has this person or group retained a stake or other interest in the digital asset such that it would be motivated to expend efforts to cause an increase in value in the digital asset? Would purchasers reasonably believe such efforts will be undertaken and may result in a return on their investment in the digital asset?

3. Has the promoter raised an amount of funds in excess of what may be needed to establish a functional network, and, if so, has it indicated how those funds may be used to support the value of the tokens or to increase the value of the enterprise? Does the promoter continue to expend funds from proceeds or operations to enhance the functionality and/or value of the system within which the tokens operate?

4. Are purchasers "investing," that is seeking a return? In that regard, is the instrument marketed and sold to the general public instead of to potential users of the network for a price that reasonably correlates with the market value of the good or service in the network?

5. Does application of the Securities Act protections make sense? Is there a person or entity others are relying on that plays a key role in the profit-making of the enterprise such that disclosure of their activities and plans would be important to investors? Do informational asymmetries exist between the promoters and potential purchasers/investors in the digital asset?

6. Do persons or entities other than the promoter exercise governance rights or meaningful influence?

While these factors are important in analyzing the role of any third party, there are contractual or technical ways to structure digital assets so they function more like a consumer item and less like a security. Again, we would look to the economic substance of the transaction, but promoters and their counsels should consider these, and other, possible features. This list is not intended to be exhaustive and by no means do I believe each and every one of these factors needs to be present to establish a case that a token is not being offered as a security. This list is meant to prompt thinking by promoters and their counsel, and start the dialogue with the staff – it is not meant to be a list of all necessary factors in a legal analysis.

1. Is token creation commensurate with meeting the needs of users or, rather, with feeding speculation?

2. Are independent actors setting the price or is the promoter supporting the secondary market for the asset or otherwise influencing trading?

3. Is it clear that the primary motivation for purchasing the digital asset is for personal use or consumption, as compared to investment? Have purchasers made representations as to their consumptive, as opposed to their investment, intent? Are the tokens available in increments that correlate with a consumptive versus investment intent?

4. Are the tokens distributed in ways to meet users' needs? For example, can the tokens be held or transferred only in amounts that correspond to a purchaser's expected use? Are there built-in incentives that compel using the tokens promptly on the network, such as having the tokens degrade in value over time, or can the tokens be held for extended periods for investment?

5. Is the asset marketed and distributed to potential users or the general public?

6. Are the assets dispersed across a diverse user base or concentrated in the hands of a few that can exert influence over the application?

7. Is the application fully functioning or in early stages of development?

These are exciting legal times and I am pleased to be part of a process that can help promoters of this new technology and their counsel navigate and comply with the federal securities laws.

---

[1] The Securities and Exchange Commission disclaims responsibility for any private publication or statement of any SEC employee or Commissioner. This speech expresses the author's views and does not necessarily reflect those of the Commission, the Commissioners or other members of the staff.

[2] Section 2(a)(1) of the Securities Act of 1933 (Securities Act) [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Securities Exchange Act of 1934 (Exchange Act) [15 U.S.C. § 78c(a)(10)] define "security." These definitions contain "slightly different formulations" of the term "security," but the U.S. Supreme Court has "treated [them] as essentially identical in meaning." *SEC v. Edwards*, 540 U.S. 389, 393 (2004).

[3] I am using the term "promoters" in a broad, generic sense. The important factor in the legal analysis is that there is a person or coordinated group (including "any unincorporated organization" see 5 U.S.C. § 77n(a)(4)) that is working actively to develop or guide the development of the infrastructure of the network. This person or group could be founders, sponsors, developers or "promoters" in the traditional sense. The presence of promoters in this context is important to distinguish from the circumstance where multiple, independent actors work on the network but no individual actor's or coordinated group of actors' efforts are essential efforts that affect the failure or success of the enterprise.

A-582

2/11/2021

[4] *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). Depending on the features of any given instrument and the surrounding facts, it may also need to be evaluated as a possible security under the general definition of security – see footnote 2 – and the case law interpreting it.

[5] *Id.* at 298.

[6] *United Housing Found., Inc. v. Forman*, 421 U.S. 837 (1975).

[7] *Guidelines as to the Applicability of the Federal Securities Laws to Offers and Sales of Condominiums or Units in a Real Estate Development*, SEC Rel. No. 33-5347 (Jan. 4, 1973).

[8] *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230 (2d Cir. 1985).

[9] Secondary trading in digital assets by regulated entities may otherwise implicate the federal securities laws, as well as the Commodity Exchange Act. In addition, as SEC Chairman Jay Clayton has stated, regulated financial entities that allow for payment in cryptocurrencies, allow customers to purchase cryptocurrencies on margin or otherwise use cryptocurrencies to facilitate securities transactions should exercise caution, including ensuring that their cryptocurrency activities are not undermining their anti-money laundering and know-your-customer obligations. *Statement on Cryptocurrencies and Initial Coin Offerings* (Dec. 11, 2017). In addition, other laws and regulations, such as IRS regulations and state money servicing laws, may be implicated.

[10] The Supreme Court's investment contract test "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299.

[11] "[T]he name given to an instrument is not dispositive." *Forman*, 421 U.S. at 850.

[12] *Forman*, 421 U.S. at 853.

[13] *See* footnotes 10 and 11.

[14] SEC Rel. No. 33-5018 (Nov. 4, 1969); *Investment in Interests in Whisky*, SEC Rel. No. 33-5451 (Jan 7, 1974).

[15] For example, some have raised questions about the offering structure commonly referred to as a Simple Agreement for Future Tokens, or "SAFT." Because the legal analysis must follow the economic realities of the particular facts of an offering, it may not be fruitful to debate a hypothetical structure in the abstract and nothing in these remarks is meant to opine on the legality or appropriateness of a SAFT. From the discussion in this speech, however, it is clear I believe a token once offered in a security offering can, depending on the circumstances, later be offered in a non-securities transaction. I expect that some, perhaps many, may not. I encourage anyone that has questions on a particular SAFT structure to consult with knowledgeable securities counsel or the staff.

A-583

Exhibit 11

{{webtitle}} - {{'binancetitle'| T}}

{{"We've detected that you are using a small display"|T}} .

{{"Want to switch to the mobile version of the site"|T}} >>

- {{"Exchange" | T}}
- {{"Pro" | T}}

- English
- 简体中文
- 한국어
- 日本語

{{"User Center" | T}}  |  {{"logout"|T}}
{{'login"|T}}  |  {{'register'|T}}

- {{"Funds" | T}}▾
  - {{"czth"| T}}
  - {{"History" | T}}
- {{"Order Management" | T}}▾
  - {{"Open Orders" | T}}
  - {{"Trade History" | T}}
- {{"Support" | T}}
- {{"Announcement" | T}}

# 服务协议

最新修订日期：**2017年7月6日**

币安尊重并保护所有使用币安平台服务用户的个人隐私权。为了给您提供更准确、更有个性化的服务，币安会按照本隐私权政策的规定使用和披露您的个人信息。但币安将以高度的勤勉、审慎义务对待这些信息。除本隐私权政策另有规定外，在未征得您事先许可的情况下，币安不会将这些信息对外披露或向第三方提供。币安会不时更新本隐私权政策。您在同意币安服务协议之时，即视为您已经同意本隐私权政策全部内容。本隐私权政策属于币安服务协议不可分割的一部分。

本协议由您与币安的经营者共同缔结，本协议具有合同效力。

币安的经营者是指法律认可的经营该平台网站的责任主体，有关币安经营者的信息请查看币安首页底部公布的公司信息和证照信息。本协议中币安的经营者可单称或统称为"币安 Limited"。"币安"指由币安运营的网络平台，包括但不限于币安网，域名为 https://www.binance.com/ 该网站属于加密网站。

## 一 协议内容及签署

本协议内容包括协议正文及所有币安已经发布的或将来可能发布的各类规则。所有规则为本协议不可分割的组成部分，与协议正文具有同等法律效力。除另行明确声明外，任何币安及其关联公司提供的服务（以下称为币安服务）均受本协议约束。

A-585

您应当在使用币安服务之前认真阅读全部协议内容，对于协议中以加粗字体显示的内容，您应重点阅读。如您对协议有任何疑问的，应向币安咨询。但无论您事实上是否在使用币安服务之前认真阅读了本协议内容，只要您使用币安服务，则本协议即对您产生约束，届时您不应以未阅读本协议的内容或者未获得币安对您问询的解答等理由，主张本协议无效，或要求撤销本协议。您承诺接受并遵守本协议的约定。如果您不同意本协议的约定，您应立即停止注册/激活程序或停止使用币安服务。

二、注册与账户

**1、注册者资格**

您确认，在您完成注册程序或以其他币安允许的方式实际使用币安服务时，您应当是具备完全民事权利能力和完全民事行为能力的自然人、法人或其他组织。若您不具备前述主体资格，则您及您的监护人应承担因此而导致的一切后果，且币安有权注销或永久冻结您的账户，并向您及您的监护人索偿。

**2、注册和账户**

在您按照注册页面提示填写信息、阅读并同意本协议且完成全部注册程序后，或在您按照激活页面提示填写信息、阅读并同意本协议且完成全部激活程序后，或您以其他币安允许的方式实际使用币安服务时，您即受本协议约束。您可以使用您提供或确认的邮箱、手机号码或者币安允许的其它方式作为登录手段进入币安。您必须提供您的真实姓名、身份证件类型和身份证件号码等法律法规规定的信息。如果您在注册时提供的信息不准确，币安对此不承担任何责任，您将承担因此产生的任何直接或间接损失及不利后果。

币安账户只能由本人持有并使用，币安保留冻结，停止，或注销非本人使用的账户，并不承担任何法律责任。

**3、用户信息**

在完成注册或激活流程时，您应当按照法律法规要求，按相应页面的提示准确提供并及时更新您的资料，以使之真实、及时、完整和准确。如有合理理由怀疑您提供的资料错误、不实、过时或不完整的，币安有权向您发出询问及/或要求改正的通知，并有权直接做出删除相应资料的处理，直至中止、终止对您提供部分或全部币安服务。币安对此不承担任何责任，您将承担因此产生的任何直接或间接损失及不利后果。

**4、账户安全**

您须自行负责对您的币安登录名 昵称和密码 保密，且须对您在该登录名、币安 昵称和密码 下发生的所有活动（包括但不限于信息披露、发布信息、网上点击同意或提交各类规则协议、网上续签协议或购买服务等）承担责任。您同意：(a) 如发现任何人未经授权使用您的币安昵称和密码账户，或发生违反保密规定的任何其他情况，您会立即通知币安；(b)确保您严格遵守网站/服务的安全、认证、交易、充值、提现机制或者流程；及 (c) 确保您在每个上网时段结束时，以正确步骤离开网站/服务。币安不能也不会对因您未能遵守本款规定而发生的任何损失负责。您理解币安对您的请求采取行动需要合理时间，币安对在采取行动前已经产生的后果（包括但不限于您的任何损失）不承担任何责任。

三、币安服务

通过币安及其关联公司提供的币安服务和其它服务，会员可在币安上发布交易信息、查询交易信息、达成交易意向并进行交易、参加币安组织的活动以及使用其它信息服务及技术服务。您在币安上交易过程中与其他会员发生交易纠纷时，一旦您或其它会员任一方或双方同意提交币安要求调处，则币安有权根据单方判断做出调处决定，您了解并同意接受币安的判断和调处决定。

您了解并同意，币安有权应政府部门（包括司法及行政部门）的要求，向其提供您向币安提供的用户信息和交易记录等必要信息。如您涉嫌侵犯他人知识产权等合法权益，则币安亦有权在初步判断涉嫌侵权行为存在的情况下，向权利人提供您必要的身份信息。

您在使用币安服务过程中，所产生的应纳税赋，以及一切硬件、软件、服务及其它方面的费用，均由您独自承担。使用该服务时，您同意所有交易一旦执行便不可更改。使用该服务时，您同意无论损益，币安有权随时清算交易。

四、币安服务使用规范

在币安上使用币安服务过程中，您承诺遵守以下约定：在使用币安服务过程中实施的所有行为均遵守国家法律、法规等规范性文件及币安各项规则的规定和要求，不违背社会公共利益或公共道德，不损害他人的合法权益，不偷逃应缴税费，不违反本协议及相关规则。您如果违反前述承诺，产生任何法律后果，您应以自己的名义独立承担所有的法律责任，并确保币安免于产生任何损失。与其他会员交易过程中，遵守诚实信用原则，不采取不正当竞争行为，不扰乱网上交易的正常秩序，不从事与网上交易无关的行为。不对币安上的任何数据作商业性利用，包括但不限于在未经币安事先书面同意的情况下，以复制、传播等任何方式使用币安站上展示的资料。不使用任何装置、软件或例行程序干预或试图干预币安的正常运作或正在币安上进行的任何交易、活动。您不得采取任何将导致不合理的庞大数据负载加诸币安网络设备的行动。

您了解并同意：币安有权对您是否违反上述承诺做出单方认定，并根据单方认定结果适用规则予以处理或终止向您提供服务，且无须征得您的同意或提前通知予您。基于维护币安交易秩序及交易安全的需要，币安有权在发生恶意出售或者购买等扰乱市场正常交易秩序的情形下，执行关闭相应交易订单等操作。经国家行政或司法机关的生效法律文书确认您存在违法或侵权行为，或者币安根据自身的判断，认为您的行为涉嫌违反本协议和/或规则的条款或涉嫌违反法律法规的规定的，则币安有权在币安上公示您的该等涉嫌违法或违约行为及币安已对您采取的措施。对于您在币安上发布的涉嫌违法或涉嫌侵犯他人合法权利或违反本协议和/或规则的信息，币安有权不经通知您即予以删除，且按照规则的规定进行处罚。对于您在币安上实施的行为，包括您未在币安上实施但已经对币安及其用户产生影响的行为，币安有权单方认定您行为的性质及是否构成对本协议和/或规则的违反，并据此作出相应处罚。您应自行保存与您行为有关的全部证据，并应对无法提供充实证据而承担的不利后果。对于您涉嫌违反承诺的行为对任意第三方造成损害的，您均应当以自己的名义独立承担所有的法律责任，并应确保币安免于因此产生损失或增加费用。如您涉嫌违反有关法律或者本协议之规定，使币安遭受任何损失，或受到任何第三方的索赔，或受到任何行政管理部门的处罚，您应当赔偿币安因此造成的损失及（或）发生的费用，包括合理的律师费用。

五、责任范围和责任限制

{{webtitle}} - {{'binancetitle'|T}}

明示或暗示的保证，包括但不限于币安服务的适用性、没有错误或疏漏、持续性、准确性、可靠性、适用于某一特定用途。同时，币安也不对该服务所涉及的技术及信息的有效性、准确性、正确性、可靠性、质量、稳定、完整及时性作出任何承诺和保证。

您了解币安上的信息系用户自行发布，且可能存在风险和瑕疵。币安仅作为交易地点。币安仅作为您获取比特币信息、物色交易对象、就比特币的交易进行协商及开展交易的场所，但币安无法控制交易所涉及的比特币的质量、安全或合法性、交易信息的真实性或准确性、以及交易各方履行其在交易协议中各项义务的能力。您应自行谨慎判断确定相关比特币及/或信息的真实性、合法性和有效性，并自行承担因此产生的责任与损失。

除非法律法规明确要求，或出现以下情况，否则，币安没有义务对所有用户的信息数据、比特币信息、交易行为以及与交易有关的其它事项进行事先审查：币安有合理的理由认为特定会员及具体交易事项可能存在重大违法或违约情形。币安有合理的理由认为用户在币安的行为涉嫌违法或不当。币安或币安授权的第三方或您与币安一致同意的第三方有权基于不可撤销的授权受理您与其他会员因交易产生的争议，并有权单方判断与该争议相关的事实及应适用的规则，进而作出处理决定，包括但不限于调整相关订单的交易状态，指令第三方支付公司或者客服将争议货款的全部或部分支付给交易一方或双方。该处理决定对您有约束力。如您未在限期内执行处理决定，则币安有权利（但无义务）直接使用您尚在币安账户内的款项，或您向币安及其关联公司交纳的保证金代为支付。您应及时补足保证金并弥补币安及其关联公司的损失，否则币安及其关联公司有权直接抵减您在其它合同项下的权益，并有权继续追偿。

您理解并同意，币安或币安授权的第三方或您与币安一致同意的第三方并非司法机构，仅能以普通人的身份对证据进行鉴别，币安或币安授权的第三方或您与币安一致同意的第三方对争议的调处完全是基于您不可撤销的授权，其无法保证争议处理结果符合您的期望，也不对争议调处结论承担任何责任。如您因此遭受损失，您同意自行向受益人索偿。

您了解并同意，币安不对因下述任一情况而导致您的任何损害赔偿承担责任，包括但不限于利润、商誉、使用、数据等方面的损失或其它无形损失的损害赔偿（无论币安是否已被告知该等损害赔）

六、协议终止

您同意，币安有权自行全权决定以任何理由不经事先通知的中止、终止向您提供部分或全部币安服务，暂时冻结或永久冻结（注销）您的账户在币安的权限，且无须为此向您或任何第三方承担任何责任，但是币安有权利继续保存该账户相关的交易数据、记录等信息以及应用、使用该信息。出现以下情况时，币安有权直接以注销账户的方式终止本协议，并有权永久冻结（注销）您的账户在币安的权限和收回账户对应的币安昵称：币安终止向您提供服务后，您涉嫌再一次直接或间接或以他人名义注册为币安用户的；

您提供的电子邮箱不存在或无法接收电子邮件，且没有其他方式可以与您进行联系，或币安以其它联系方式通知您更改电子邮件信息，而您在币安通知后三个工作日内仍未更改为有效的电子邮箱的；

您提供的用户信息中的主要内容不真实或不准确或不及时或不完整；本协议（含规则）变更时，您明示并通知币安不愿接受新的服务协议的；其它币安认为应当终止服务的情况。

您的账户服务被终止或者账户在币安的权限被永久冻结（注销）后，币安没有义务为您保留或向您披露您账户中的任何信息，也没有义务向您或第三方转发任何您未曾阅读或发送过的信息。

您同意，您与币安的合同关系终止后，币安仍享有下列权利：继续保存您的用户信息及您使用币安服务期间的所有交易信息。您在使用币安服务期间存在违法行为或违反本协议和/或规则的行为的，币安仍可依据本协议向您主张权利。币安中止或终止向您提供币安服务后，对于您在服务中止或终止之前的交易行为依下列原则处理，您应独力处理并完全承担进行以下处理所产生的任何争议、损失或增加的任何费用，并应确保币安免于因此产生任何损失或承担任何费用：您在服务中止或终止之前上传至币安的比特数字货币尚未交易的，币安有权在中止或终止服务的同时删除此项物品的相关信息；您在服务中止或终止之前已经与其他会员达成买卖合同，但合同尚未实际履行的，币安有权删除该买卖合同及其交易比特币的相关信息；您在服务中止或终止之前已经与其他会员达成买卖合同且已部分履行的，币安可以不删除该项交易，但币安有权在中止或终止服务的同时将相关情形通知您的交易对方。

七、隐私权政策

币安将在币安平台公布并不时修订隐私权政策，隐私权政策构成本协议的有效组成部分。

# Terms of Use

---

**Date of latest amendment: July 6th, 2017**

This agreement is made by and between you and operator of Binance and has the legal effect as a legal contract. The operator of Binance means the legal entity that, recognized by law, operates the networking platform. Please refer to the company and license information at the bottom of the website of Binance for the information regarding the operator of Binance. The operator of Binance may be referred to, individually or collectively, as "Binance Limited" in this agreement. "Binance" means the networking platform operated by Binance, including but not limited to the Binance website, with the domain name of Binance.com, https://www. Binance.com, which is encrypted.

**1. Agreement and Execution**

The content of this agreement includes main body of this agreement and various rules that have been posted or may be posted from time to time by Binance. All of the rules shall be an integral part of this agreement, and shall have the same legal effect as the main body of this agreement. Unless otherwise expressly provided, any

A-589

{{webtitle}} - {{'binancetitle'| T}}

service provided by Binance and its affiliates (hereinafter referred as "Binance Service") shall be bound by this agreement. You shall carefully read through this agreement before using any Binance Service, and pay close attention to the content written in bold font. You may consult Binance if you have any question with regard to this agreement. However, regardless whether you have carefully read through this agreement before using Binance Service, you shall be bound by this agreement as long as you use Binance Service. You shall not claim to void or rescind this agreement on the ground that you did not read this agreement or you did not receive any respond from Binance to your consultation. You hereby promise to accept and observe this agreement. If you do not agree to this agreement, you shall immediately stop registration/activation or stop using Binance Service. Binance may make or amend this agreement and various rules from time to time as needed, and announce the same on the website, without any individual notice to you. The amended agreement and rules shall come into effect immediately and automatically upon being announced on the website. If you do not agree to the relevant amendment, you shall immediately stop using Binance Service. If you continue using Binance Service, you shall be deemed as having accepted the amended agreement and rules.

**2. Registration and Account**

**1、 Eligibility of Registrants**

You hereby confirm that you are an individual, legal person or other organization with full capacity for civil rights and civil conducts when you complete the registration or actually use Binance Service in any other way allowed by Binance. If you do not have the said capacity, you and your guardian shall undertake all the consequences resulted therefrom, and Binance shall have the right to cancel or permanently freeze your account, and claims against you and your guardian for compensation.

**2、 Registration and Account**

You shall be bound by this agreement once you have filled in information, read and agreed to this agreement and completed the registration process following the instructions on the registration page or you have filled information, read and agreed to this agreement and completed the activation process following the instructions on the activation page, or upon your actual use of Binance Service in a way permitted by Binance. You may log in Binance by your email address or mobile number that you have provided or confirmed or any other means permitted by Binance. You must provide your real name, ID type, ID number and other information required by the laws and regulations. If any information you have provided during the registration is inaccurate, Binance will not take any responsibility and any loss, direct or indirect, and adverse consequence resulted therefrom will be borne by you. Binance accounts can only be used by the person whose name they are registered under. Binance reserves the right to suspend, freeze, or cancel accounts that are used by persons other than the persons whose names the accounts are registered under. Binance will also not take legal responsibility for these accounts.

**3、 User's Information**

During the registration or activation, you shall accurately provide and timely update your information by following the instructions on the relevant page according to the laws and regulations in order to make it truthful,

{{webtitle}} - {{'binancetitle'| T}}

timely, complete and accurate. If there is any reasonable doubt that any information provided by you is wrong, untruthful, outdated or incomplete, Binance shall have the right to send you a notice to make enquiry and demand corrections, remove relevant information directly and, as the case may be, terminate all or part of Binance Service to you. Binance will not take any responsibility and any loss, direct or indirect, and adverse consequence resulted therefrom will be borne by you. You shall accurately fill in and timely update your email address, telephone number, contact address, postal code and other contact information so that Binance or any other user will be able to effectively contact you. You shall be solely and fully responsible for any loss or extra expenses incurred during the use of Binance Service by you if you cannot be contacted through these contact information. You hereby acknowledge and agree that you have the obligation to keep your contact information effective and to take actions as required by Binance if there is any change or update.

**4、 Account Security**

You shall be solely responsible for the safekeeping of your Binance account and password on your own, and you shall be responsible for all activities under your log-in email, Binance account and password (including but not limited to information disclosure, information posting, consent to or submission of various rules and agreements by clicking on the website, online renewal of agreement or online purchase of services, etc.). You hereby agree that: a) you will notify Binance immediately if you are aware of any unauthorized use of your Binance account and password by any person or any other violations to the security rules; b) you will strictly observe the security, authentication, dealing, charging, withdrawal mechanism or procedures of the website/service; and c) you will log out the website by taking proper steps at the end of every visit. Binance shall not and will not be responsible for any loss caused by your failure to comply with this provision. You understand that Binance needs reasonable time to take actions upon your request, and Binance will not undertake any responsibility for the consequences (including but not limited to any of your loss) that have occurred prior to such actions.

**3. Binance Service**

Through Binance Service and other services provided by Binance and its affiliates, members may post deal information, access to the pricing and dealing information of a deal and carry out the deal, participate in activities organized by Binance and enjoy other information services and technical services. If you have any dispute with other members arising from any transaction on Binance, once such dispute is submitted by one or both of you and the other member to Binance for dispute resolution, Binance shall have the right to make decision at its sole discretion. You hereby acknowledge and accept the discretion and decision of Binance. You acknowledge and agree that, Binance may, on requests from governmental authorities (including judicial and administrative departments), provide user information provided by you to Binance, transaction records and any other necessary information. If you allegedly infringe upon any other's intellectual rights or other legitimate interests, Binance may provide the necessary ID information of you to the interest holder if Binance preliminarily decides that the infringement exists. All the applicable taxes and all the expenses in relation to hardware, software, service and etc. arising during your use of the Binance Service shall be solely borne by you. By using this service you accept that all trade executions are final and irreversible. By using this service you accept that Binance reserves the right to liquidate any trades at any time regardless of the profit or loss position.

A-591

{{webtitle}} - {{'binancetitle'| T}}

**4. User's Guide of Binance Service**

You hereby promise to observe the following covenants during your use of Binance Service on Binance: All the activities that you carry out during the use of Binance Service will be in compliance with the requirements of laws, regulations, regulatory documents and various rules of Binance, will not be in violation of public interests, public ethics or other's legitimate interests, will not constitute evasion of payable taxes or fees and will not violate this agreement or relevant rules. If you violate the foregoing promises and thereby cause any legal consequence, you shall independently undertake all of the legal liabilities in your own name and hold Binance harmless from any loss resulted from such violation. During any transaction with other members, you will be in good faith, will not take any acts of unfair competition, will not disturb the normal order of online transactions, and will not engage in any acts unrelated to online transactions. You will not use any data on Binance for commercial purposes, including but not limited to using any data displayed on Binance through copy, dissemination or any other means without prior written consent of Binance. You will not use any device, software or subroutine to intervene or attempt to intervene the normal operation of Binance or any ongoing transaction or activities on Binance. You will not adopt any action that will induce unreasonable size of data loading on the network equipments of Binance. You acknowledge and agree: Binance shall have the right to unilaterally determine whether you have violated any of the covenants above and, according to such unilateral determination, apply relevant rules and take actions thereunder or terminate services to you, without your consent or prior notice to you. As required to maintain the order and security of transactions on Binance, Binance shall have the right to close relevant orders and take other actions in case of any malicious sale or purchase or any other events disturbing the normal order of transaction of the market. If your violation or infringement has been held by any effective legal documents issued by judicial or administrative authorities, or Binance determines at its sole discretion that it is likely that you have violated the terms of this agreement or the rules or the laws and regulations, Binance shall have the right to publish on Binance such alleged violations and the actions that having been taken against you by Binance. As to any information you may have published on Binance that allegedly violates or infringes upon the law, other's legitimate interests or this agreement or the rules, Binance shall have the right to delete such information without any notice to you and impose punishments according to the rules. As to any act you may have carried out on Binance, including those you have not carried out on Binance but have had impacts on Binance and its users, Binance shall have the right to unilaterally determine its nature and whether it constitutes violation of this agreement or any rules, and impose punishments accordingly. You shall keep all the evidence related to your acts on your own and shall undertake all the adverse consequences resulted from your failure to discharge your burden of proof. If your alleged violation to your promises causes any losses to any third party, you shall solely undertake all the legal liabilities in your own name and hold Binance harmless from any loss or extra expenses. If, due to any alleged violation by you to the laws or this agreement, Binance incurs any losses, is claimed by any third party for compensation or suffers any punishment imposed by any administrative authorities, you shall indemnify Binance against any losses and expense caused thereby, including reasonable attorney's fee.


**5. Scope and Limitation of Liability**

Binance will provide Binance Service at an "as is" and "commercially available" condition. Binance disclaims any express or implied warranty with regards to Binance Service, however, including but not limited to applicability, free from error or omission, continuity, accuracy, reliability or fitness for a particular purpose.

Meanwhile, Binance disclaims any promise or warranty with regards to the effectiveness, accuracy, correctness, reliability, quality, stability, completeness and timeliness of the technology and information involved by Binance Service. You are fully aware that the information on Binance is published by users on their own and may contain risks and defects. Binance serves merely as a venue of transactions. Binance serves merely as a venue where you acquire coin related information, search for counterparties of transactions and negotiate and conduct transactions, but Binance cannot control the quality, security or legality of the coin involved in any transaction, truthfulness or accuracy of the transaction information, or capacity of the parties to any transaction to perform its obligations under the transaction documents. You shall cautiously make judgment on your own on the truthfulness, legality and effectiveness of the coin and information in question, and undertake any liabilities and losses that may be caused thereby. Unless expressly required by laws and regulations or any of the following circumstances occurs, Binance shall not have any duty to conduct preliminary review on information data, transaction activity and any other transaction related issues of all users: Binance has reasonable cause to suspect that a particular member and a particular transaction may materially violate the law or agreement. Binance has reasonable cause to suspect that the activities conducted on Binance by a member may be illegal or improper. You acknowledge and agree, Binance shall not be liable for any of your losses caused by any of the following events, including but not limited to losses of profits, goodwill, usage or data or any other intangible losses (regardless whether Binance has been advised of the possibility of such losses): use or failure to use Binance Service. unauthorized use of your account or unauthorized alternation of your data by any third parties. expenses and losses incurred from purchase or acquisition of any data or information or engagement in transaction through Binance Service, or any alternatives of the same. your misunderstanding on Binance Service. any other losses related to Binance Service which are not attributable to Binance. In no event shall Binance be liable for any failure or delay of service resulted from regular equipment maintenance of the information network, connection error of information network, error of computers, communication or other systems, power failure, strike, labor disputes, riots, revolutions, chaos, insufficiency of production or materials, fire, flood, tornado, blast, war, governmental acts or judicial orders. You agree to indemnify and hold harmless Binance, its contractors, and its licensors, and their respective directors, officers, employees and agents from and against any and all claims and expenses, including attorneys' fees, arising out of your use of the Website, including but not limited to out of your violation this Agreement.

**6. Termination of Agreement**

You hereby agree that, Binance shall have the right to terminate all or part of Binance Service to you, temporarily freeze or permanently freeze (cancel) the authorizations of your account on Binance at Binance's sole discretion, without any prior notice, for whatsoever reason, and Binance shall not be liable to you; however, Binance shall have the right to keep and use the transaction data, records and other information that is related to such account. In case of any of the following events, Binance shall have the right to directly terminate this agreement by cancelling your account, and shall have the right to permanently freeze (cancel) the authorizations of your account on Binance and withdraw the corresponding Binance account thereof: after Binance terminates services to you, you allegedly register or register in any other person's name as Binance user again, directly or indirectly; the main content of user's information that you have provided is untruthful, inaccurate, outdated or incomplete; when this agreement (including the rules) is amended, you expressly state and notify Binance of your unwillingness to accept the amended service agreement; any other circumstances where Binance deems it should terminate the services. After the account service is terminated or the authorizations of your account on

A-593

{{webtitle}} - {{'binancetitle'| T}}

Binance is permanently froze (cancelled), Binance shall not have any duty to keep or disclose to you any information in your account or forward any information you have not read or sent to you or any third party. You agree that, after the termination of agreement between you and Binance, Binance shall still have the rights to: keep your user's information and all the transaction information during your use of Binance Service. Claim against you according to this agreement if you have violated any laws, this agreement or the rules during your use of Binance Service. After Binance suspends or terminates Binance Service to you, your transaction activities prior to such suspension or termination will be dealt with according to the following principles and you shall will take care of on your own efforts and fully undertake any disputes, losses or extra expenses caused thereby and keep Binance harmless from any losses or expenses: Binance shall have the right to delete, at the same time of suspension or termination of services, information related to any un-traded coin tokens that you have uploaded to Binance prior to the suspension or termination. If you have reached any purchase agreement with any other member prior to the suspension or termination but such agreement has not been actually performed, Binance shall have the right to delete information related to such purchase agreement and the coins in question. If you have reached any purchase agreement with any other member prior to the suspension or termination and such agreement has been partially performed, Binance may elect not to delete the transaction; provided, however, Binance shall have the right to notify your counterparty of the situation at the same time of the suspension or termination.

**7. Privacy Policy**

Binance may announce and amend its privacy policy on the platform of Binance from time to time and the privacy policy shall be an integral part of this agreement.

- {{"About" | T}}
- {{"Terms" | T}}
- {{"Privacy" | T}}
- {{"Fees" | T}}
- {{"Contact" | T}}
- {{"API" | T}}

{{"Contact Us" | T}} :  support@binance.zendesk.com

-
-
-
-
-
-

{{webtitle}} - {{'binancetitle'| T}}



{{"QQ Group" | T}}: 199906603

{{webtitle}} - {{'binancetitle | T}}



- 

{{"Custom Service" | T}}



{{"Binance News" | T}}

© 2017 Binance.com All Rights Reserved
{{today|date:'yyyy-MM-dd HH:mm:ss'}}
24h {{"Trade Volume" | T}} :   {{val|number:2}} *{{key}}*/
{{websocketStatus | T}}

A-596

Exhibit 12

Binance Terms of Use | Binance

Buy Crypto    Markets    Trade    Derivatives    Finance                          |

# Binance Terms of Use

**Last revised: 13 January, 2021**

These Binance Terms of Use is entered into between you (hereinafter referred to as "you" or "your") and Binance operators (as deþned below). By accessing, downloading, using or clicking on "I agree" to accept any Binance Services (as deþned below) provided by Binance (as deþned below), you agree that you have read, understood and accepted all of the terms and conditions stipulated in these Terms of Use (hereinafter referred to as "these Terms") as well as our Privacy Policy at  https://www.binance.com/en/privacy. In addition, when using some features of the Services, you may be subject to speciþc additional terms and conditions applicable to those features.

Please read the terms carefully as they govern your use of Binance Services.**THESE TERMS CONTAIN IMPORTANT PROVISIONS INCLUDING AN ARBITRATION PROVISION THAT REQUIRES ALL CLAIMS TO BE RESOLVED BY WAY OF LEGALLY BINDING ARBITRATION.**   The terms of the arbitration provision are set forth in Article 10, "Resolving Disputes: Forum, Arbitration, Class Action Waiver", hereunder. As with any asset, the values of Digital Currencies (as deþned below) may ßuctuate signiþcantly and there is a substantial risk of economic losses when purchasing, selling, holding or investing in Digital Currencies and their derivatives.**BY MAKING USE OF BINANCE SERVICES, YOU ACKNOWLEDGE AND AGREE THAT: (1) YOU ARE AWARE OF THE RISKS ASSOCIATED WITH TRANSACTIONS OF DIGITAL CURRENCIES AND THEIR DERIVATIVES; (2) YOU SHALL ASSUME ALL RISKS RELATED TO THE USE OF BINANCE SERVICES AND TRANSACTIONS OF DIGITAL CURRENCIES AND THEIR DERIVATIVES; AND (3) BINANCE SHALL NOT BE LIABLE FOR ANY SUCH RISKS OR ADVERSE OUTCOMES.**

By accessing, using or attempting to use Binance Services in any capacity, you acknowledge that you accept and agree to be bound by these Terms. If you do not agree, do not access Binance or utilize Binance services.

## I. Definitions

**1. Binance** refers to an ecosystem comprising Binance websites (whose domain names include but are not limited to  https://www.binance.com), mobile applications, clients, applets and other applications that are developed to offer Binance Services, and includes independently-operated platforms, websites and clients within the ecosystem (e.g. Binance's Open Platform, Binance Launchpad, Binance Labs, Binance Charity, Binance DEX, Binance X, JEX, Trust Wallet, and þat gateways). In case of any inconsistency between relevant terms of use of the above platforms and the contents of these Terms, the respective applicable terms of such platforms shall

Binance Terms of Use | Binance

prevail.

**2. Binance Operators** refer to all parties that run Binance, including but not limited to legal persons, unincorporated organizations and teams that provide Binance Services and are responsible for such services. For convenience, unless otherwise stated, references to "Binance" and "we" in these Terms specifically mean Binance Operators.**UNDER THESE TERMS, BINANCE OPERATORS MAY CHANGE AS BINANCE'S BUSINESS ADJUSTS, IN WHICH CASE, THE CHANGED OPERATORS SHALL PERFORM THEIR OBLIGATIONS UNDER THESE TERMS WITH YOU AND PROVIDE SERVICES TO YOU, AND SUCH CHANGE DOES NOT AFFECT YOUR RIGHTS AND INTERESTS UNDER THESE TERMS. ADDITIONALLY, THE SCOPE OF BINANCE OPERATORS MAY BE EXPANDED DUE TO THE PROVISION OF NEW BINANCE SERVICES, IN WHICH CASE, IF YOU CONTINUE TO USE BINANCE SERVICES, IT IS DEEMED THAT YOU HAVE AGREED TO JOINTLY EXECUTE THESE TERMS WITH THE NEWLY ADDED BINANCE OPERATORS. IN CASE OF A DISPUTE, YOU SHALL DETERMINE THE ENTITIES BY WHICH THESE TERMS ARE PERFORMED WITH YOU AND THE COUNTERPARTIES OF THE DISPUTE, DEPENDING ON THE SPECIFIC SERVICES YOU USE AND THE PARTICULAR ACTIONS THAT AFFECT YOUR RIGHTS OR INTERESTS.**

**3. Binance Services** refer to various services provided to you by Binance that are based on Internet and/or blockchain technologies and offered via Binance websites, mobile applications, clients and other forms (including new ones enabled by future technological development). Binance Services include but are not limited to such Binance ecosystem components as Digital Asset Trading Platforms, the financing sector, Binance Labs, Binance Academy, Binance Charity, Binance Info, Binance Launchpad, Binance Research, Binance Chain, Binance X, Binance Fiat Gateway, existing services offered by Trust Wallet and novel services to be provided by Binance.

**4. Binance Platform Rules** refer to all rules, interpretations, announcements, statements, letters of consent and other contents that have been and will be subsequently released by Binance, as well as all regulations, implementation rules, product process descriptions, and announcements published in the Help Center or within products or service processes.

**5. Users** refer to all individuals, institutions or organizations that access, download or use Binance or Binance Services and who meet the criteria and conditions stipulated by Binance. If there exist other agreements for such entities as developers, distributors, market makers, and Digital Currencies exchanges, such agreements shall be followed.

**6. Digital Currencies** refer to encrypted or digital tokens or cryptocurrencies with a certain value that are based on blockchain and cryptography technologies and are issued and managed in a decentralized form.

**7. Digital Assets** refer to Digital Currencies, their derivatives or other types of digitalized assets with a certain value.

**8. Binance Accounts** refer to the foundational virtual accounts, including main accounts and subaccounts, which are opened by Binance for Users to record on Binance their usage of Binance Services, transactions, asset changes and basic information. Binance Accounts serve as the basis for Users to enjoy and exercise their rights on Binance.

**9. Crypto-to-crypto Trading** refers to spot transactions in which one digital currency is exchanged for another digital currency.

**10. Fiat Trading** refers to spot transactions in which Digital Currencies are exchanged for Þat currencies or vice versa.

**11. Collateral Accounts** refer to special accounts opened by Users on Binance to deposit and withdraw collateral (such as margins) in accordance with these Terms (including the Binance Contract Services Agreement and Binance Platform Rules), as required for contract transactions, leveraged trading and/or currency borrowing services.

**12. Loan/Lending** refers to Binance's lending of Digital Currencies to Users at an interest collected in certain ways (in the form of Digital Currencies), including but not limited to the leveraged trading and currency lending services currently offered, and other forms of loan/lending services to be launched by Binance.

## II. General Provisions

## 1. About These Terms

### a. Contractual Relationship

These Terms consitute a legal agreement and create a binding contract between you and Binance Operators.

### b. Supplementary Terms

Due to the rapid development of Digital Currencies and Binance, these Terms between you and Binance Operators do not enumerate or cover all rights and obligations of each party, and do not guarantee full alignment with needs arising from future development. Therefore,THE PRIVACY POLICY (https://www.binance.com/en/privacy), BINANCE PLATFORM RULES, AND ALL OTHER AGREEMENTS ENTERED INTO SEPARATELY BETWEEN YOU AND BINANCE ARE DEEMED SUPPLEMENTARY TERMS THAT ARE AN INTEGRAL PART OF THESE TERMS AND SHALL HAVE THE SAME LEGAL EFFECT. YOUR USE OF BINANCE SERVICES IS DEEMED YOUR ACCEPTANCE OF THE ABOVE SUPPLEMENTARY TERMS.

### c. Changes to These Terms

Binance reserves the right to change or modify these Terms in its discretion at any time. Binance will notify such changes by updating the terms on its website (https://www.binance.com/en/terms) and modifying the [Las revised] date displayed on this page. ANY AND ALL MODIFICATIONS OR CHANGES TO THESE TERMS WILL BECOME EFFECTIVE UPON PUBLICATION ON THE WEBSITE OR RELEASE TO USERS. THEREFORE, YOUR CONTINUED USE OF BINANCE SERVICES IS DEEMED YOUR ACCEPTANCE

Binance Terms of Use | Binance

OF THE MODIFIED AGREEMENT AND RULES. IF YOU DO NOT AGREE TO ANY CHANGES TO THESE TERMS, YOU MUST STOP USING BINANCE SERVICES IMMEDIATELY. YOU ARE RECOMMENDED TO FREQUENTLY REVIEW THESE TERMS TO ENSURE YOUR UNDERSTANDING OF THE TERMS AND CONDITIONS THAT APPLY TO YOUR ACCESS TO AND USE OF BINANCE SERVICES.

### d. Prohibition of Use

BY ACCESSING AND USING BINANCE SERVICES, YOU REPRESENT AND WARRANT THAT YOU HAVE NOT BEEN INCLUDED IN ANY TRADE EMBARGOES OR ECONOMIC SANCTIONS LIST (SUCH AS THE UNITED NATIONS SECURITY COUNCIL SANCTIONS LIST), THE LIST OF SPECIALLY DESIGNATED NATIONALS MAINTAINED BY OFAC (THE OFFICE OF FOREIGN ASSETS CONTROL OF THE U.S. DEPARTMENT OF THE TREASURY), OR THE DENIED PERSONS OR ENTITY LIST OF THE U.S. DEPARTMENT OF COMMERCE. BINANCE RESERVES THE RIGHT TO CHOOSE MARKETS AND JURISDICTIONS TO CONDUCT BUSINESS, AND MAY RESTRICT OR REFUSE, IN ITS DISCRETION, THE PROVISION OF BINANCE SERVICES IN CERTAIN COUNTRIES OR REGIONS.

## 2. About Binance

As an important part of the Binance Ecosystem, Binance mainly serves as a global online platform for Digital Assets trading, and provides Users with a trading platform, financing services, technical services and other Digital Assets-related services. As further detailed in Article 3 below, Users must register and open an account with Binance, and deposit Digital Assets into their account prior to trading. Users may, subject to the restrictions set forth in these Terms, apply for the withdrawal of Digital Assets.

Although Binance has been committed to maintaining the accuracy of the information provided through Binance Services, Binance cannot and does not guarantee its accuracy, applicability, reliability, integrity, performance or appropriateness, nor shall Binance be liable for any loss or damage that may be caused directly or indirectly by your use of these contents. The information about Binance Services may change without notice, and the main purpose of providing such information is to help Users make independent decisions. Binance does not provide investment or consulting advice of any kind, and is not responsible for the use or interpretation of information on Binance or any other communication medium. All Users of Binance Services must understand the risks involved in Digital Assets trading, and are recommended to exercise prudence and trade responsibly within their own capabilities.

## 3. Binance Account Registration and Requirements

### a. Registration

All Users mus apply for a Binance Account at ([https://accounts.binance.com/en/regiser](https://accounts.binance.com/en/regiser) ) before using Binance Services. When you regiser a Binance Account, you mus provide your real name, email address and password, and accept these Terms, the Privacy Policy, and other Binance Platform Rules. Binance may refuse, in its discretion, to open a Binance Account for you. You agree to provide complete and accurate information when opening a Binance Account, and agree to timely update any information you provide to Binance to maintain the integrity and accuracy of the information. Only one User can be regisered at a time, but each individual User (including any User that is a business or legal entity) may maintain only one main account at any given time. Insitutional Users (including Users that are businesses and other legal entities) can open one or more subaccounts under the main account with the consent of Binance. For certain Binance Services, you may be required to set up a special account independent from your Binance Account, based on the provisions of these Terms or the Supplementary Terms. The regisration, use, protection and management of such trading accounts are equally governed by the provisions of this article and article 6, unless otherwise sated in these  Terms or

A-601

Binance Terms of Use | Binance

the Supplementary Terms.

## b. Eligibility

By regisering to use a Binance  Account, you represent and warrant that (i) as an individual, you are at leas 18 or are of legal age to form a binding contract under applicable laws; (ii) as an individual, legal person, or other organization, you have full legal capacity and sufcient authorizations to enter into these  Terms; (iii) you have not been previously suspended or removed from using Binance Services; (iv) you do not currently have a Binance Account; (v) you are a non-U.S User, unless you only log on to websites for U.S. Users and use Binance Services for U.S. Users. If you act as an employee or agent of a legal entity, and enter into these Terms on their behalf, you represent and warrant that you have all the necessary rights and authorizations to bind such legal entity; (vi) your use of Binance Services will not violate any and all laws and regulations applicable to you, including but not limited to regulations on anti-money laundering, anti-corruption, and counter-terroris fnancing.

## c. User Identity Verification

Your regisration of an account with Binance will be deemed your agreement to provide required personal information for identity verifcation. Such information will be used to verify Users'  identity, identify traces of money laundering, terroris fnancing, fraud and other fnancial crimes through Binance, or for other lawful purposes sated by Binance. W e will collect, use and share such information in accordance with our Privacy Policy. In addition to providing such information, you agree to allow us to keep a record of that information during the period for which your account is active and within fve (5) years after your account is closed, in compliance with global indusry sandards on data sorage.   You also authorize us to conduct necessary invesigations directly or through a third party to verify your identity or protect you and/or us from fnancial crimes, such as fraud.  The information we require to verify your identity may include, but is not limited to, your name, email address, contact information, phone number, username, government-issued ID, date of birth, and other information collected during account regisration. When providing the required information, you confrm it is true and accurate. AFTER REGISTRATION, YOU MUST ENSURE THAT THE INFORMATION IS TRUE, COMPLETE, AND TIMELY UPDATED WHEN CHANGED. IF THERE ARE ANY GROUNDS FOR BELIEVING THAT ANY OF THE INFORMATION YOU PROVIDED IS INCORRECT, FALSE, OUTDATED OR INCOMPLETE, BINANCE RESERVES THE RIGHT TO SEND YOU A NOTICE TO DEMAND CORRECTION, DIRECTLY DELETE THE RELEVANT INFORMATION, AND, AS THE CASE MAY BE, TERMINATE ALL OR PART OF BINANCE SERVICES WE PROVIDE FOR YOU. IF WE ARE UNABLE TO REACH YOU WITH THE CONTACT INFORMATION YOU PROVIDED, YOU SHALL BE FULLY LIABLE FOR ANY LOSS OR EXPENSE CAUSED TO BINANCE DURING YOUR USE OF BINANCE SERVICES. YOU HEREBY ACKNOWLEDGE AND AGREE THAT YOU HAVE THE OBLIGATION TO UPDATE ALL THE INFORMATION IF THERE IS ANY CHANGE.
BY REGISTERING AN ACCOUNT, YOU HEREBY AUTHORIZE BINANCE TO CONDUCT INVESTIGATIONS THAT BINANCE CONSIDERS NECESSARY, EITHER DIRECTLY OR THROUGH A THIRD PARTY, TO VERIFY YOUR IDENTITY OR PROTECT YOU, OTHER USERS AND/OR BINANCE FROM FRAUD OR OTHER FINANCIAL CRIMES, AND TO TAKE NECESSARY ACTIONS BASED ON THE RESULTS OF SUCH INVESTIGATIONS. YOU ALSO ACKNOWLEDGE AND AGREE THAT YOUR PERSONAL INFORMATION MAY BE DISCLOSED TO CREDIT BUREAUS AND AGENCIES FOR FRAUD PREVENTION OR FINANCIAL CRIME PREVENTION, WHICH MAY RESPOND TO OUR INVESTIGATIONS IN FULL.

## d. Account Usage Requirements

The Binance Account can only be used by the account regisrant. Binance reserves the right to suspend, freeze or cancel the use of Binance Accounts by persons other than account regisrant. If you suspect or become aware of any unauthorized use of your username and password, you should notify Binance immediately. Binance assumes no liability for any loss or damage arising from the use of Binance Account by you or any third party with or without your authorization.

## e. Account Security

Binance has been committed to maintaining the security of User entrusted funds, and has implemented indusry sandard protection for Binance Services. However, the actions of individual Users may pose risks. You shall agree to treat your access credentials (such

A-602

as username and password) as confidential information, and not to disclose such information to any third party. You also agree to be solely responsible for taking the necessary security measures to protect your Binance Account and personal information. You should be solely responsible for keeping safe of your Binance Account and password, and be responsible for all the transactions under your Binance Account. Binance assumes no liability for any loss or consequences caused by authorized or unauthorized use of your account credentials, including but not limited to information disclosure, information release, consent or submission of various rules and agreements by clicking on the website, online agreement renewal, etc.

By creating a Binance Account, you hereby agree that:

   i. you will notify Binance immediately if you are aware of any unauthorized use of your Binance Account and password or any other violation of security rules;

   ii. you will strictly abide by all mechanisms or procedures of Binance regarding security, authentication, trading, charging, and withdrawal; and

   iii. you will take appropriate steps to logout from Binance at the end of each visit.

**f. Personal Data**

Your personal data will be properly protected and kept confidential, but Binance has the right to collect, process, use or disclose your personal data in accordance with the Terms (including the Privacy Policy) or applicable laws. Depending on the products or services concerned, your personal data may be disclosed to the following third parties:

   i. your transaction counterparty;

   ii. Binance Operators, and the shareholders, partners, investors, directors, supervisors, senior managers and employees of such entities;

   iii. our joint ventures, alliance partners and business partners;

   iv. our agents, contractors, suppliers, third-party service providers and professional advisers, including the parties who have been contracted to provide us with administrative, financial, research, operations, IT and other services, in such areas as telecommunications, information technology, payroll, information processing, training, market research, storage and archival;

   v. third-party business partners who provide goods and services or sponsor contests or other promotional activities, whether or not in cooperation with us;

   vi. insurance companies or insurance investigators and credit providers;

   vii. credit bureaus, or any debt collection agencies or dispute resolution centers in the event of violation or dispute;

   viii. business partners, investors, trustees or assignees (actual or expected) that promote business asset transactions (which can be broadened to include any merger, acquisition or asset sale) of Binance Operators;

   ix. professional consultants such as auditors and lawyers;

x.    relevant government regulatory agencies or law enforcement agencies to comply with laws or regulations formulated by government authorities;

xi.    assignees of our rights and obligations;

xii.    banks, credit card companies and their respective service providers;

xiii.    persons with your consent as determined by you or the applicable contract.

## III. Binance Services

Upon completion of the registration and identity verification for your Binance Account, you may use various Binance Services, including but not limited to, Crypto-to-crypto Trading, Fiat Trading, contract trading, leveraged trading, Binance Savings services, staking, acquiring market-related data, research and other information released by Binance, participating in User activities held by Binance, etc., in accordance with the provisions of these Terms (including Binance Platform Rules and other individual agreements). Binance has the right to:

- Provide, modify or terminate, in its discretion, any Binance Services based on its development plan; and

- Allow or prohibit some Users' use of any Binance Services in accordance with relevant Binance Platform Rules.

## 1. Service Usage Guidelines

### a. License

Provided that you consantly comply with the express terms and conditions sated in these Terms, Binance grants you a revocable, limited, royalty-free, non-exclusive, non-transferable, and non-sublicensable license to access and use Binance Services through your computer or Internet compatible devices for your personal/internal purposes. You are prohibited to use Binance Services for resale or commercial purposes, including transactions on behalf of other persons or entities. All the above actions are expressly prohibited and consitute a material violation of these Terms. The content layout, format, function and access rights regarding Binance Services should be sipulated in the discretion of Binance. Binance reserves all rights not expressly granted in these Terms. Therefore, you are hereby prohibited from using Binance Services in any way not expressly authorized by these Terms.

These Terms only grant a limited license to access and use Binance Services. Therefore, you hereby agree that when you use Binance Services, Binance does not transfer Binance Services or the ownership or intellectual property rights of any Binance intellectual property to you or anyone else. All the text, graphics, user interfaces, visual interface, photos, sounds, process fow diagrams, computer code (including html code), programs, software, products, information and documents, as well as the design, sructure, selection, coordination, expression, look and feel, and layout of any content included in the services or provided through Binance Services, are exclusively owned, controlled and/or licensed by Binance Operators or its members, parent companies, licensors or afliates.

Binance owns any feedback, suggesions, ideas, or other information or materials (hereinafter collectively referred to as "Feedback") about Binance or Binance Services that you provide through email, Binance Services, or other ways. You hereby transfer all rights, ownership and interess of the Feedback and all related intellectual property rights to Binance. You have no right and hereby waive any reques for acknowledgment or compensation based on any Feedback, or any modifcations based on any Feedback.

### b. Restrictions

When you use Binance Services, you agree and undertake to comply with the following provisions:

i. During the use of Binance Services, all activities you carry out should comply with the requirements of applicable laws and regulations, these Terms, and various guidelines of Binance;

ii. Your use of Binance Services should not violate public interests, public morals, or the legitimate interests of others, including any actions that would interfere with, disrupt, negatively affect, or prohibit other Users from using Binance Services;

iii. You agree not to use the services for market manipulation (such as pump and dump schemes, wash trading, self-trading, front running, quote stuffing, and spoofing or layering, regardless of whether prohibited by law);

iv. Without written consent from Binance, the following commercial uses of Binance data are prohibited:
1) Trading services that make use of Binance quotes or market bulletin board information.
2) Data feeding or streaming services that make use of any market data of Binance.
3) Any other websites/apps/services that charge for or otherwise profit from (including through advertising or referral fees) market data obtained from Binance.

v. Without prior written consent from Binance, you may not modify, replicate, duplicate, copy, download, store, further transmit, disseminate, transfer, disassemble, broadcast, publish, remove or alter any copyright statement or label, or license, sub-license, sell, mirror, design, rent, lease, private label, grant security interests in the properties or any part of the properties, or create their derivative works or otherwise take advantage of any part of the properties.

vi. You may not (i) use any deep linking, web crawlers, bots, spiders or other automatic devices, programs, scripts, algorithms or methods, or any similar or equivalent manual processes to access, obtain, copy or monitor any part of the properties, or replicate or bypass the navigational structure or presentation of Binance Services in any way, in order to obtain or attempt to obtain any materials, documents or information in any manner not purposely provided through Binance Services; (ii) attempt to access any part or function of the properties without authorization, or connect to Binance Services or any Binance servers or any other systems or networks of any Binance Services provided through the services by hacking, password mining or any other unlawful or prohibited means; (iii) probe, scan or test the vulnerabilities of Binance Services or any network connected to the properties, or violate any security or authentication measures on Binance Services or any network connected to Binance Services; (iv) reverse look-up, track or seek to track any information of any other Users or visitors of Binance Services; (v) take any actions that imposes an unreasonable or disproportionately large load on the infrastructure of systems or networks of Binance Services or Binance, or the infrastructure of any systems or networks connected to Binance services; (vi) use any devices, software or routine programs to interfere with the normal operation of Binance Services or any transactions on Binance Services, or any other person's use of Binance Services; (vii) forge headers, impersonate, or otherwise manipulate identification, to disguise your identity or the origin of any messages or transmissions you send to Binance, or (viii) use Binance Services in an illegal way.

A-605

By accessing Binance Services, you agree that Binance has the right to investigate any violation of these Terms, unilaterally determine whether you have violated these Terms, and take actions under relevant regulations without your consent or prior notice. Examples of such actions include, but are not limited to:

- Blocking and closing order requests;

- Freezing your account;

- Reporting the incident to the authorities;

- Publishing the alleged violations and actions that have been taken;

- Deleting any information you published that are found to be violations.

## 2. Crypto-to-crypto Trading

Upon completion of the registration and identity veriþcation for your Binance Account, you may conduct Crypto-to-crypto Trading on Binance in accordance with the provisions of these Terms and Binance Platform Rules.

### a. Orders

Upon sending an insruction of using Binance Services for Crypto-to-crypto Trading (an "Order"), your account will be immediately updated to reflect the open Orders, and your Orders will be included in Binance's order book to match other users' Orders. If one of your Orders fully or partially matches another user's Order, Binance will execute an exchange (a "Transaction"). Once the Transaction is executed, your account will be updated to reflect that the Order has been fully executed and closed, or the Order has been partially executed. The Order will remain uncompleted until it is fully executed or cancelled under paragraph (b) below. To conclude a Transaction, you authorize Binance to temporarily control the Digital Currencies involved in your Transaction.

### b. Cancellation

For Orders initiated through Binance Services, you may only cancel them before they have been matched with other Users' Orders. Once your Order has been matched with another user's Order, you may not change, revoke or cancel Binance's authorization to complete the Order. For any partially matched Order, you may cancel the unmatched part of the Order unless such portion has been matched. Binance reserves the right to reject any cancellation reques related to the Order you have submitted. If your account does not have sufcient amount of Digital Currencies to execute an Order , Binance may cancel the entire Order, or execute part of the Order with the amount of Digital Currencies you have in your account (in each case, any Transaction related fees payable to Binance are deducted as sated in paragraph (c) below).

### c. Fees

You agree to pay Binance the fees specifed in  https://www.binance.com/en/fee/schedule. Binance may, in its discretion, update the fees at any time. Any updated fees will apply to any sales or other Transactions that occur following the efective date of the updated fees. You authorize Binance to deduct from your account any applicable fees that you owe under these Terms.

### d. Other Types of Crypto-to-crypto Trading

A-606

In addition to the Crypto-to-crypto Trading that allows users to directly place orders as mentioned in paragraph (a) above, Binance may, in its discretion, provide technical and platform services for other types of Crypto-to-crypto Trading under its separately formulated Binance Platform Rules, such as One Cancels the Other (OCO) and block trade.

## 3. Fiat Trading

Prior to conducting Fiat Trading, in accordance with type of Þat trading, you shall separately read and sign User Agreements with various Binance partnered OTC platforms, and comply with the Legal Statement, Privacy Policy，P2P User Transaction Policy  (/en/support/faq/360041066751)  and other speciÞc Binance Platform Rules related to Fiat Trading as well as the business rules of such partners, and open an account on such Binance OTC platforms, following the completion of the registration and identity veriÞcation for your Binance Account, if applicable.

a. Fiat Payments

In order to provide adequate operational support for you in respect of refunds and cancelations (where applicable), the following Binance Operators shall be responsible for transactions as below:

- in respect of transactions available (Bank Card, GBP deposit/withdraw), BINANCE UAB (registration number: 305595206) and having its registered ofÞce at Didz◻ioji g. 18, Vilnius, Lithuania

- BINANCE DIGITAL LIMITED (registration number: 12340481) having its registered ofÞce at Hub 26 Hunsworth Lane, Cleckheaton, England, BD19 4LN will only be responsible for receiving/transferring GBP on behalf of Binance UAB and will not be responsible for providing any Digital Assets exchange or custody services to you.

## 4. Futures Trading

Unless otherwise speciÞed by Binance, to conduct Futures Trading, you must conclude with Binance a separate Binance Futures Service Agreement (/en/support/faq/360033180732) and open a special Collateral Account, following the completion of registration and identity veriÞcation for your Binance Account. You acknowledge and agree that:

a. You fully understand the high risks of Futures Trading, including but not limited to the risk of major Þuctuations of Digital Assets in Futures Trading, and the risk of exacerbated adverse outcome when leverage is used;

b. You have sufÞcient investment knowledge and experience and the capacity to take risks arising from Futures Trading, and agree to independently assume all the risks arising from the investment of Futures Trading;

c. Before performing Futures Trading, you have read and understood all the contents of the Binance Futures Service Agreement and the relevant Binance Platform Rules, and have consulted relevant professionals to make informed decisions on whether and how to complete Futures Trading according to their recommendations and your own reasonable judgment;

d. You agree and authorize Binance to take various reasonable measures in its discretion (including but not limited to forced liquidation and forced position reduction under speciÞc circumstances) in accordance with the

A-607

Binance Futures Service Agreement and the relevant Binance Platform Rules to protect the legitimate interests of you, Binance and other Users.

## 5. Margins Trading

Unless otherwise specified by Binance, prior to conducting Margins Trading, you must open a special Collateral Account and/or complete other related procedures, following the completion of registration and identity verification for your Binance Account.

### a. Risks of Margins Trading

Margins Trading is highly risky. As a leveraged trader, you acknowledge and agree that you access and use Margins Trading and borrowing services at your own risk, which include but are not limited to:

   i. The liquidity, market depth and dynamics of the trading market fluctuate violently and change rapidly. The use of leverage may work to your advantage or disadvantage, which may result in major gains or losses as the case may be.

   ii. You are not eligible to receive forked currencies split from any blockchain assets in your Collateral Account, even if you have not engaged in any Margins Trading or borrowing at all.

   iii. Loans carry risk, and the value of your blockchain assets may decline. If the value of your assets drops to a certain level, you are responsible for dealing with these market circumstances.

   iv. In some market situations, you may find it difficult or impossible to liquidate a position. This may occur, for example, as a result of insufficient market liquidity or technical issues on Binance.

   v. Placing contingent Orders does not necessarily limit your losses to the expected amount, as market conditions may prevent you from executing such orders.

   vi. Margins Trading does not have guaranteed measures against losses. As a borrower, you may suffer losses that exceed the amount you deposited into your Collateral Account.

### b. To start Margins Trading:

   i. You represent and warrant that you are neither from the U.S. nor on any list of trade embargoes or economic sanctions, such as the Specially Designated National by OFAC (The Office of Foreign Assets Control of the U.S. Department of the Treasury).

   ii. You should fully understand the risks associated with Margins Trading and Lending, and be fully responsible for any trading and non-trading activities under your Binance Account and Collateral Account. You should not engage in Transactions or invest in funds that are beyond your financial capacities;

   iii. You are fully responsible for knowing the true status of any position, even if Binance may present it

Binance Terms of Use | Binance

incorrectly at any time;

iv.  You agree to keep enough Digital Assets in your Collateral Account, as required by Binance for Users' engagement in Margins Trading, and promptly repay your loan in full. Failure to keep enough assets or to timely repay the outstanding loan may result in forced liquidation of the assets in your Collateral Account;

v.  Even if with the ability to forcefully liquidate any position, Binance cannot guarantee to stop losses. If your assets are insufficient to repay the outstanding loan after the liquidation of your position, you are still liable for any further shortfall of assets;

vi.  Binance may take measures, in its discretion and on your behalf, to reduce your potential losses, including but not limited to, transferring assets from your Collateral Account into your Binance Account and/or vice versa;

vii.  During Binance system maintenance, you agree to be fully responsible for managing your Collateral Account under risks, including but not limited to, closing positions and repaying your loan.

viii.  You agree to conduct all Transactions, Margins Trading and/or borrowing on your own, and be fully responsible for your activities. Binance assumes no liability for any loss or damage caused by your use of any Binance services or your unawareness of the risks associated with the use of Digital Assets or with your use of Binance Services.

## 6. Lending Services

Unless otherwise provided by Binance, to borrow currencies, you must conclude with Binance a separate Lending Services User Agreement and open a special Collateral Account and/or finish other relevant procedures, following the completion of registration and identity verification for your Binance Account. You understand and agree that:

a. There are considerable risks involved in Lending Services, which include without limitation to risks of fluctuation of the borrowed Digital Assets' value, derivative risks and technical risks. You shall carefully consider and exercise clear judgment to evaluate your financial situation and the aforesaid risks to make any decision on using Lending Services, and you shall be responsible for all losses arising therefrom;

b. you shall cooperate to provide the information and materials related to identity verification and Lending Services as required by Binance, and be solely responsible for taking necessary security measures to protect the security of your Collateral Account and personal information;

c. you shall carefully read relevant Binance Platform Rules before using Lending Services, and be aware of, understand and observe the specific information and rules regarding the operations of Lending Services, and you undertake that the use of the assets borrowed shall conform to requirements of these Terms and related laws and regulations;

d. Binance has the full right to manage your Collateral Account and collateral during the period in which Lending Services are offered, and reserves the right, under the circumstances specified in the Lending Services User Agreement or these Terms, to implement various risk control measures, which include but are not limited to forced liquidation. Such steps may cause major losses to you and you shall be solely responsible for the outcomes of such measures;

e. Binance has the right to temporarily or permanently prohibit you from using Lending Services when it deems it necessary or reasonable, and to the maximum extent permitted by law, without liability of any kind to you.

## 7. Binance Savings Service

Binance offers Binance Savings, a service to provide Users with value-added services for their idle Digital Assets. To use Binance Savings service, you must conclude with Binance a separate Binance Savings Service User Agreement (/en/support/faq/360032559032) and open a special Binance Savings service account, following the completion of registration and identity verification for your Binance Account. When using Binance Savings service, you should note that:

a. Binance Savings assets will be used in cryptocurrency leveraged borrowing and other businesses.

b. When you use Binance Savings service, you will unconditionally authorize Binance to distribute and grant the leveraged interest according to Binance Platform Rules.

c. You shall abide by relevant laws and regulations to ensure that the sources of Digital Assets are legitimate and compliant when using Binance Savings service.

d. When you use Binance Savings service, you should fully recognize the risks of investing in Digital Assets and operate cautiously.

e. You agree that all investment operations conducted on Binance represent your true investment intentions and that unconditionally accept the potential risks and benefits of your investment decisions.

f. Binance reserves the right to suspend or terminate Binance Savings service. If necessary, Binance can suspend and terminate Binance Savings service at any time.

g. Due to network delay, computer system failures and other force majeure, which may lead to delay, suspension, termination or deviation of execution of Binance Savings service, Binance will use reasonable effort to ensure but not promise that Binance Savings service execution system runs stably and effectively. Binance does not take any responsibility if the final execution fails to match your expectations due to the above factors.

## 8. Staking Programs

A-610

Binance will from time to time launch Staking Programs for specific types of Digital Currencies to reward, as per certain rules, users who hold such Digital Currencies in their Binance Accounts. When participating in Staking Programs, you should note that:

a. Unless otherwise stipulated by Binance, Staking Programs are free of charge and Users may trade during the staking period;

b. Binance does not guarantee Users' proceeds under any Staking Program;

c. Binance has the right to initiate or terminate Staking Program for any Digital Currencies or modify rules on such programs in its sole discretion;

d. Users shall ensure that sources of the Digital Currencies they hold in Binance Accounts are legal and compliant and undertake to observe related laws and regulations. Otherwise, Binance has the right to take necessary steps in accordance with these Terms or Binance Platform Rules, including, without limitation, freezing Binance Accounts or deducting the Digital Currencies awarded to Users who violate the rules of respective Staking Programs.

## 9. Binance POS Service Agreement

a. Binance.com launched Binance POS service for Binance.com users to gain proceeds through idle cryptocurrency assets.

b. Binance POS assets will be used in cryptocurrency staking to gain proceeds and other businesses.

c. When you use Binance POS service, you will unconditionally authorize Binance.com to distribute the staking interest according to the rules of the platform.

d. You shall abide by the relevant laws of the State to ensure that the sources of assets are legitimate and compliant when using Binance POS service.

e. When you use Binance POS service, you should fully recognize the risks of investment in cryptocurrency and operate cautiously.

f. You agree that all investment operations conducted on Binance.com represent your true investment intentions and that unconditionally accept the potential risks and benefits of your investment decisions.

g. Binance.com reserves the right to suspend or terminate Binance POS service. If necessary, Binance.com can suspend and terminate Binance POS service at any time.

A-611

h. Due to network delay, computer system failures and other force majeure, which may lead to delay, suspension or deviation of Binance POS service execution, Binance.com will use commercially reasonable effort to ensure but not promise that Binance POS service execution system run stably and effectively. Binance.com does not take any responsibility if the final execution doesn't match your expectations due to the above factors.

## IV. Liabilitys

## 1. Disclaimer of Warranties

**TO THE MAXIMUM EXTENT PERMITTED UNDER APPLICABLE LAW, BINANCE SERVICES, BINANCE MATERIALS AND ANY PRODUCT, SERVICE OR OTHER ITEM PROVIDED BY OR ON BEHALF OF BINANCE ARE OFFERED ON AN "AS IS" AND "AS AVAILABLE" BASIS, AND BINANCE EXPRESSLY DISCLAIMS, AND YOU WAIVE, ANY AND ALL OTHER WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE OR NON-INFRINGEMENT OR WARRANTIES ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE IN TRADE. WITHOUT LIMITING THE FOREGOING, BINANCE DOES NOT REPRESENT OR WARRANT THAT THE SITE, BINANCE SERVICES OR BINANCE MATERIALS ARE ACCURATE, COMPLETE, RELIABLE, CURRENT, ERROR-FREE, OR FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS. BINANCE DOES NOT GUARANTEE THAT ANY ORDER WILL BE EXECUTED, ACCEPTED, RECORDED OR REMAIN OPEN. EXCEPT FOR THE EXPRESS STATEMENTS, AGREEMENTS AND RULES SET FORTH IN THESE TERMS, YOU HEREBY ACKNOWLEDGE AND AGREE THAT YOU HAVE NOT RELIED UPON ANY OTHER STATEMENT OR AGREEMENT, WHETHER WRITTEN OR ORAL, WITH RESPECT TO YOUR USE AND ACCESS OF BINANCE SERVICES. WITHOUT LIMITING THE FOREGOING, YOU HEREBY UNDERSTAND AND AGREE THAT BINANCE WILL NOT BE LIABLE FOR ANY LOSSES OR DAMAGES ARISING OUT OF OR RELATING TO: (A) ANY INACCURACY, DEFECT OR OMISSION OF DIGITAL ASSETS PRICE DATA, (B) ANY ERROR OR DELAY IN THE TRANSMISSION OF SUCH DATA, (C) INTERRUPTION IN ANY SUCH DATA, (D) REGULAR OR UNSCHEDULED MAINTENANCE CARRIED OUT BY BINANCE AND SERVICE INTERRUPTION AND CHANGE RESULTING FROM SUCH MAINTENANCE, (E) ANY DAMAGES INCURRED BY OTHER USERS' ACTIONS, OMISSIONS OR VIOLATION OF THESE TERMS, (F) ANY DAMAGE CAUSED BY ILLEGAL ACTIONS OF OTHER THIRD PARTIES OR ACTIONS WITHOUT AUTHORIZED BY BINANCE; AND (G) OTHER EXEMPTIONS MENTIONED IN DISCLAIMERS AND PLATFORM RULES ISSUED BY BINANCE.
THE DISCLAIMER OF IMPLIED WARRANTIES CONTAINED HEREIN MAY NOT APPLY IF AND TO THE EXTENT IT IS PROHIBITED BY APPLICABLE LAW OF THE JURISDICTION IN WHICH YOU RESIDE.**

## 2. Disclaimer of Damages and Limitation of Liability

**TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT WILL BINANCE, ITS AFFILIATES AND THEIR RESPECTIVE SHAREHOLDERS, MEMBERS, DIRECTORS, OFFICERS,**

Binance Terms of Use | Binance

EMPLOYEES, ATTORNEYS, AGENTS, REPRESENTATIVES, SUPPLIERS OR CONTRACTORS BE LIABLE FOR ANY INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE, CONSEQUENTIAL OR SIMILAR DAMAGES OR LIABILITIES WHATSOEVER (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF DATA, INFORMATION, REVENUE, PROFITS OR OTHER BUSINESSES OR FINANCIAL BENEFITS) ARISING OUT OF BINANCE SERVICES, ANY PERFORMANCE OR NON-PERFORMANCE OF BINANCE SERVICES, OR ANY OTHER PRODUCT, SERVICE OR OTHER ITEM PROVIDED BY OR ON BEHALF OF BINANCE AND ITS AFFILIATES, WHETHER UNDER CONTRACT, STATUTE, STRICT LIABILITY OR OTHER THEORY EVEN IF BINANCE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES EXCEPT TO THE EXTENT OF A FINAL JUDICIAL DETERMINATION THAT SUCH DAMAGES WERE A RESULT OF BINANCE'S GROSS NEGLIGENCE, FRAUD, WILLFUL MISCONDUCT OR INTENTIONAL VIOLATION OF LAW. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATION MAY NOT APPLY TO YOU. NOTWITHSTANDING THE FOREGOING, IN NO EVENT WILL THE LIABILITY OF BINANCE, ITS AFFILIATES AND THEIR RESPECTIVE SHAREHOLDERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, ATTORNEYS, AGENTS, REPRESENTATIVES, SUPPLIERS OR CONTRACTORS ARISING OUT OF SERVICES OFFERED BY OR ON BEHALF OF BINANCE AND ITS AFFILIATES, ANY PERFORMANCE OR NON-PERFORMANCE OF BINANCE SERVICES, OR ANY OTHER PRODUCT, SERVICE OR OTHER ITEM, WHETHER UNDER CONTRACT, STATUTE, STRICT LIABILITY OR OTHER THEORY, EXCEED THE AMOUNT OF THE FEES PAID BY YOU TO BINANCE UNDER THESE TERMS IN THE TWELVE-MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO THE CLAIM FOR LIABILITY.

## 3. Indemnification

You agree to indemnify and hold harmless Binance Operators, their affiliates, contractors, licensors, and their respective directors, officers, employees and agents from and against any claims, actions, proceedings, investigations, demands, suits, costs, expenses and damages (including attorneys' fees, fines or penalties imposed by any regulatory authority) arising out of or related to (i) your use of, or conduct in connection with, Binance Services, (ii) your breach or our enforcement of these Terms, or (iii) your violation of any applicable law, regulation, or rights of any third party during your use of Binance Services. If you are obligated to indemnify Binance Operators, their affiliates, contractors, licensors, and their respective directors, officers, employees or agents pursuant to these Terms, Binance will have the right, in its sole discretion, to control any action or proceeding and to determine whether Binance wishes to settle, and if so, on what terms.

## V. Announcements

Please be aware that all official announcements, news, promotions, competitions and airdrops will be listed on /en/support/announcement.**USERS UNDERTAKE TO REFER TO THESE MATERIALS REGULARLY AND PROMPTLY. BINANCE WILL NOT BE HELD LIABLE OR RESPONSIBLE IN ANY MANNER OF COMPENSATION SHOULD USERS INCUR PERSONAL LOSSES ARISING FROM IGNORANCE OR**

NEGLIGENCE OF THE ANNOUNCEMENTS.

## VI. Termination of Agreement

### 1. Suspension of Binance Accounts

You agree that Binance shall have the right to immediately suspend your Binance Account (and any accounts beneficially owned by related entities or affiliates), freeze or lock the Digital Assets or funds in all such accounts, and suspend your access to Binance for any reason including if Binance suspects any such accounts to be in violation of these Terms, our Privacy Policy, or any applicable laws and regulations. You agree that Binance shall not be liable to you for any permanent or temporary modification of your Binance Account, or suspension or termination of your access to all or any portion of Binance Services. Binance shall reserve the right to keep and use the transaction data or other information related to such Binance Accounts. The above account controls may also be applied in the following cases:

- The Binance Account is subject to a governmental proceeding, criminal investigation or other pending litigation;

- We detect unusual activities in the Binance Account;

- We detect unauthorized access to the Binance Account;

- We are required to do so by a court order or command by a regulatory/government authority.

### 2. Cancellation of Binance Accounts

In case of any of the following events, Binance shall have the right to directly terminate these Terms by cancelling your Binance Account, and shall enjoy the right but not the obligation to permanently freeze (cancel) the authorizations of your Binance Account on Binance and withdraw the corresponding Binance Account thereof:

- after Binance terminates services to you;

- you allegedly register or register in any other person's name as a Binance User again, directly or indirectly;

- the information that you have provided is untruthful, inaccurate, outdated or incomplete;

- when these Terms are amended, you state your unwillingness to accept the amended Terms by applying for cancellation of your Binance Account or by other means;

- you request that Binance Services be terminated; and

- any other circumstances where Binance deems it should terminate Binance Services.

Should your Binance Account be terminated, the account and transactional information that meet data retention sandards will be securely sored for 5 years. In addition, if a transaction is unfinished during the account termination process, Binance shall have the right to notify your counterparty of the situation at that time. You acknowledge that a user-initiated account exit (right to erasure under

GDPR or other equivalent regulations) will also be subjected to the termination protocol sated above.

If Binance is informed that any Digital Assets or funds held in your Binance Account are solen or otherwise are not lawfully possessed by you, Binance may, but has no obligation to, place an adminisrative hold on the afected funds and your Binance Account. If Binance does lay down an adminisrative hold on some or all of your funds or Binance  Account, Binance may continue such hold until such time as the dispute has been resolved and evidence of the resolution acceptable to Binance has been provided to Binance in a form acceptable to Binance. Binance will not involve itself in any such dispute or the resolution of the dispute. You agree that Binance will have no liability or responsibility for any such hold, or for your inability to withdraw Digital Assets or funds or execute trades during the period of any such hold.

## 3. Remaining Funds After Binance Account Termination

Except as set forth in paragraph 4 below, once a Binance Account is closed/withdrawn, all remaining account balance (which includes charges and liabilities owed to Binance) will be payable immediately to Binance. Upon payment of all outstanding charges to Binance (if any), Users will have 5 business days to withdraw all Digital Assets or funds from the account.

## 4. Remaining Funds After Binance Account Termination Due to Fraud, Violation of Law, or Violation of These Terms

Binance maintains full custody of the Digital Assets, funds and User data/information which may be turned over to governmental authorities in the event of Binance Accounts' suspension/closure arising from fraud investigations, investigations of violation of law or violation of these Terms.

## VII. No Financial Advice

Binance is not your broker, intermediary, agent, or advisor and has no Þduciary relationship or obligation to you in connection with any trades or other decisions or activities effected by you using Binance Services. No communication or information provided to you by Binance is intended as, or shall be considered or construed as, investment advice, Þnancial advice, trading advice, or any other sort of advice. Unless otherwise speciÞed in these Terms, all trades are executed automatically, based on the parameters of your order instructions and in accordance with posted trade execution procedures, and you are solely responsible for determining whether any investment, investment strategy or related transaction is appropriate for you according to your personal investment ob̩jectives, Þnancial circumstances and risk tolerance, and you shall be solely responsible for any loss or liability therefrom. You should consult legal or tax professionals regarding your speciÞc situation. Binance does not recommend that any Digital Asset should be bought, earned, sold, or held by you. Before making the decision to buy, sell or hold any Digital Asset, you should conduct your own due diligence and consult your Þnancial advisors prior to making any investment decision. Binance will not be held responsible for the decisions you make to buy, sell, or hold Digital Asset based on the information provided by Binance.

## VIII. Compliance with Local Laws

It is Users' responsibility to abide by local laws in relation to the legal usage of Binance Services in their local jurisdiction as well as other laws and regulations applicable to Users. Users must also factor, to the extent of their

local laws all aspects of taxation, the withholding, collection, reporting and remittance to their appropriate tax authorities. **ALL USERS OF BINANCE SERVICES ACKNOWLEDGE AND DECLARE THAT THEIR FUNDS COME FROM LEGITIMATE SOURCES AND DO NOT ORIGINATE FROM ILLEGAL ACTIVITIES; USERS AGREE THAT BINANCE WILL REQUIRE THEM TO PROVIDE OR OTHERWISE COLLECT THE NECESSARY INFORMATION AND MATERIALS AS PER RELEVANT LAWS OR GOVERNMENT ORDERS TO VERIFY THE LEGALITY OF THE SOURCES AND USE OF THEIR FUNDS.** Binance maintains a stance of cooperation with law enforcement authorities globally and will not hesitate to seize, freeze, terminate Users' accounts and funds which are ßagged out or investigated by legal mandate.

## IX. Privacy Policy

Access to Binance Services will require the submission of certain personally identiÞable information. Please review Binance's Privacy Policy at  https://www.binance.com/en/privacy  for a summary of Binance's guidelines regarding the collection and use of personally identiÞable information.

## X. Resolving Disputes: Forum, Arbitration, Class Action Waiver

PLEASE READ THIS SECTION CAREFULLY, AS IT INVOLVES A WAIVER OF CERTAIN RIGHTS TO BRING LEGAL PROCEEDINGS, INCLUDING AS A CLASS ACTION.

**1. Notice of Claim and Dispute Resolution Period.** Please contact Binance Þrst! Binance wants to address your concerns without resorting to formal legal proceedings, if possible. If you have a dispute with Binance, then you should contact Binance and a ticket number will be assigned. Binance will attempt to resolve your dispute internally as soon as possible. The parties agree to negotiate in good faith to resolve the dispute (which discussions shall remain conÞdential and be suħject to applicable rules protecting settlement discussions from use as evidence in any legal proceeding).

In the event the dispute cannot be resolved satisfactorily, and you wish to assert a legal claim against Binance, then you agree to set forth the basis of such claim in writing in a "Notice of Claim," as a form of prior notice to Binance. The Notice of Claim must (1) describe the nature and basis of the claim or dispute, (2) set forth the speciÞc relief sought, (3) provide the original ticket number, and (4) include your Binance account email. The Notice of Claim should be submitted to an email address or hyperlink provided in your correspondence with Binance. After you have provided the Notice of Claim to Binance, the dispute referenced in the Notice of Claim may be submitted by either Binance or you to arbitration in accordance with paragraph 2 of this Section, below. For the avoidance of doubt, the submission of a dispute to Binance for resolution internally and the delivery of a Notice of Claim to Binance are prerequisites to commencement of an arbitration proceeding (or any other legal proceeding). During the arbitration, the amount of any settlement offer made by you or Binance shall not be disclosed to the arbitrator.

**2. Agreement to Arbitrate.** You and Binance agree that, suħject to paragraph 1 above, any dispute, claim, or

A-616

controversy between you and Binance arising in connection with or relating in any way to these Terms or to your relationship with Binance as a user of Binance Services (whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory, and whether the claims arise during or after the termination of these Terms) will be determined by mandatory Þnal and binding individual (not class) arbitration, except as set forth below under Exceptions to Agreement to Arbitrate. You and Binance further agree that the arbitrator shall have the exclusive power to rule on his or her own jurisdiction, including without limitation any objections with respect to the existence, scope or validity of the Agreement to Arbitrate, or to the arbitrability of any claim or counterclaim. Arbitration is more informal than a lawsuit in court. THERE IS NO JUDGE OR JURY IN ARBITRATION, AND COURT REVIEW OF AN ARBITRATION AWARD IS LIMITED. There may be more limited discovery than in court. The arbitrator must follow this agreement and can award the same damages and relief as a court (including, if applicable, attorney fees), except that the arbitrator may not award declaratory or injunctive relief beneÞting anyone but the parties to the arbitration. The arbitration provisions set forth in this Section will survive termination of these Terms. Arbitration Rules. The arbitration shall be subject to the Rules of Arbitration of the International Chamber of Commerce (the "ICC") then in force (the "ICC Rules"), as modiÞed by this Section X. The arbitration will be administered by the International Court of Arbitration of the ICC. Unless the parties agree otherwise, there shall be only one arbitrator appointed in accordance with the ICC Rules. Any arbitration will be conducted in the English language, unless otherwise required by a mandatory law of a member state of the European Union or any other jurisdiction. Regardless of the manner in which the arbitration is conducted, the arbitrator shall issue a reasoned written decision sufÞcient to explain the essential Þndings and conclusions on which the decision and award, if any, are based. JUDGMENT ON ANY ARBITRAL AWARD MAY BE GIVEN IN ANY COURT HAVING JURISDICTION OVER THE PARTY (OR OVER THE ASSETS OF THE PARTY) AGAINST WHOM SUCH AN AWARD IS RENDERED. Time for Filing: ANY ARBITRATION AGAINST BINANCE MUST BE COMMENCED BY FILING A REQUEST FOR ARBITRATION WITHIN ONE (1) YEAR, AFTER THE DATE THE PARTY ASSERTING THE CLAIM FIRST KNOWS OR REASONABLY SHOULD KNOW OF THE ACT, OMISSION OR DEFAULT GIVING RISE TO THE CLAIM; AND THERE SHALL BE NO RIGHT TO ANY REMEDY FOR ANY CLAIM NOT ASSERTED WITHIN THAT TIME PERIOD. THIS ONE YEAR LIMITATION PERIOD IS INCLUSIVE OF THE INTERNAL DISPUTE RESOLUTION PROCEDURE SET FORTH IN PARAGRAPH 1 OF THIS SECTION, ABOVE. THERE SHALL BE NO RIGHT TO ANY REMEDY FOR ANY CLAIM NOT ASSERTED WITHIN THAT TIME PERIOD. If applicable law prohibits a one-year limitation period for asserting claims, any claim must be asserted within the shortest time period permitted by applicable law. Process; Notice: The party who intends to seek arbitration after the expiration of the Dispute Resolution Period set forth in paragraph 1, above, must submit a request to the ICC in accordance with the ICC Rules. If we request arbitration against you, we will give you notice at the email address or mailing address you have provided. You agree that any notice sent to this email or mailing address shall be deemed effective for all purposes, including without limitation to determinations of adequacy of service. It is your obligation to ensure that the email address and/or mailing address on Þle with Binance is up-to-date and accurate. Seat of Arbitration: The seat of the arbitration shall be Switzerland. Place of Hearing: The location of any in-person arbitration hearing shall be Switzerland, unless otherwise agreed to by the parties. Governing Law / Jurisdiction: The governing law of the arbitration shall be determined in accordance with the ICC Rules. ConÞdentiality. The parties agree that the arbitration shall be kept conÞdential. The existence of the arbitration, any nonpublic information provided in the arbitration, and any submissions, orders or awards made in the

arbitration (together, the "Conﬁdential Information") shall not be disclosed to any non-party except the tribunal, the ICC, the parties, their counsel, experts, witnesses, accountants and auditors, insurers and reinsurers, and any other person necessary to the conduct of the arbitration. Notwithstanding the foregoing, a party may disclose Conﬁdential Information to the extent that disclosure may be required to fulﬁll a legal duty, protect or pursue a legal right, or enforce or challenge an award in bona ﬁde legal proceedings. This conﬁdentiality provision shall survive termination of these Terms and of any arbitration brought pursuant to these Terms.

**3. Class Action Waiver.**  You and Binance agree that any claims relating to these Terms or to your relationship with Binance as a user of Binance Services (whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory, and whether the claims arise during or after the termination of these Terms) shall be brought against the other party in an arbitration on an individual basis only and not as a plaintiff or class member in a purported class or representative action. You and Binance further agree to waive any right for such claims to be brought, heard, or arbitrated as a class, collective, representative, or private attorney general action, to the extent permissible by applicable law. Combining or consolidating individual arbitrations into a single arbitration is not permitted without the consent of all parties, including Binance.

**4. Modifications.** Binance reserves the right to update, modify, revise, suspend, or make any future changes to Section X regarding the parties' Agreement to Arbitrate, subject to applicable law. You hereby consent and agree that it is your responsibility to ensure that your understanding of this Section is up to date. Subject to the applicable law, your continued use of your Binance account shall be deemed to be your acceptance of any modiﬁcations to Section X regarding the parties' Agreement to Arbitrate. You agree that if you object to the modiﬁcations to Section X, Binance may block access to your account pending closure of your account. In such circumstances, the Terms of Use prior to modiﬁcation shall remain in full force and effect pending closure of your account.

**5. Severability.**  If any portion of these Terms are adjudged to be invalid or unenforceable for any reason or to any extent, the remainder of these Terms will remain valid and enforceable and the invalid or unenforceable portion will be given effect to the greatest extent permitted by law. pending closure of your account.

## XI. Miscellaneous

**1. Independent Parties.** Binance is an independent contractor but not an agent of you in the performance of these Terms. These Terms shall not be interpreted as facts or evidence of an association, joint venture, partnership, or franchise between the parties.

**2. Entire Agreement.** These Terms constitute the entire agreement between the parties regarding use of Binance Services and will supersede all prior written or oral agreements between the parties. No usage of trade or other regular practice or method of dealing between the parties will be used to modify, interpret, supplement, or alter the terms herein.

Binance Terms of Use | Binance

**3. Interpretation and Revision.** Binance reserves the right to alter, revise, modify, and/or change these Terms at any time. All changes will take effect immediately upon being published on Binance websites. It is your responsibility to regularly check relevant pages on our websites/applications to confirm the latest version of these Terms. If you do not agree to any such modifications, your only remedy is to terminate your usage of Binance Services and cancel your account. You agree that, unless otherwise expressly provided in these Terms, Binance will not be responsible for any modification or termination of Binance Services by you or any third party, or suspension or termination of your access to Binance Services.

**4. Force Majeure.** Binance will not be liable for any delay or failure to perform as required by these Terms because of any cause or condition beyond Binance's reasonable control.

**5. Severability.** If any portion of these Terms is held invalid or unenforceable, such invalidity or enforceability will not affect the other provisions of these Terms, which will remain in full force and effect, and the invalid or unenforceable portion will be given effect to the greatest extent possible.

**6. Assignment.** You may not assign or transfer any right to use Binance Services or any of your rights or obligations under these Terms without prior written consent from Binance, including any right or obligation related to the enforcement of laws or the change of control. Binance may assign or transfer any or all of its rights or obligations under these Terms, in whole or in part, without notice or obtaining your consent or approval.

**7. Waiver.** The failure of one party to require performance of any provision will not affect that party's right to require performance at any time thereafter. At the same time, the waiver of one party to seek recovery for the other party's violation of these Terms or any provision of applicable terms shall not constitute a waiver by that party of any subsequent breach or violation by the other party or of the provision itself.

**8. Third-Party Website Disclaimer.** Any links to third-party websites from Binance Services does not imply endorsement by Binance of any product, service, information or disclaimer presented therein, nor does Binance guarantee the accuracy of the information contained on them. If you suffer loss from using such third-party product and service, Binance will not be liable for such loss. In addition, since Binance has no control over the terms of use or privacy policies of third-party websites, you should read and understand those policies carefully.

**9. Matters Related to Apple Inc.** If you use any device manufactured by Apple Inc. to participate in any commercial activities or reward programs through Binance Services, such activities and programs are provided by Binance and are not associated with Apple Inc. in any manner.

**10. Contact Information.** For more information on Binance, you may refer to the company and license information found on Binance websites. If you have questions regarding these Terms, please feel free to contact Binance for clarification via our Customer Support team at  https://binance.zendesk.com/hc/en-us/requests/new.

Binance Terms of Use | Binance

## About Us

About

Careers

Business Contacts

Community

Binance Blog

Terms

Privacy

Announcements

News

## Products

Exchange

Academy

BCF

Card

Labs

Launchpad

Research

Trus Wallet

## Service

Downloads

Buy Crypto

Fees

Key Client Privileges

Referral

BNB

Buy BUSD

OTC Trading

Lising Application

Trading Rules

Fiat Gateway Application

P2P Merchant Application

## Support

Give Us Feedback

Support Center

Submit a reques

API Documentation

Binance Verify

## Learn

Buy Bitcoin

Buy Ethereum

Buy Ripple

Buy Litecoin

Buy Bitcoin Cash

Buy Dogecoin

## Community

© 2017 - 2021 Binance.com. All rights reserved

A-620

Exhibit 13

**STATUTORY NEXUS REQUIREMENT FOR EACH BLUE SKY LAW FOR STATES IN WHICH NO PLAINTIFF ALLEGES TO RESIDE OR TRANSACT**

| State | Statute(s) | Relevant Statutory Language[1] |
|---|---|---|
| **Alabama** (Counts 6–8, ¶¶ 405–430) | Ala. Code §§ 8-6-4, 8-6-3(a) | Ala. Code § 8-6-4 (prohibiting sale of unregistered security "**in this state**"); *id.* § 8-6-3(a) (prohibiting transacting business as unregistered broker-dealer "**in this state**") |
| **Alaska** (Counts 9–11, ¶¶ 431–456) | Alaska Stat. Ann. §§ 45.56.100, 45.56.300(a) | Alaska Stat. Ann. § 45.56.100 (prohibiting sale of unregistered security "**in this state**"); *id.* § 45.56.300(a) (prohibiting transacting business as unregistered broker-dealer "**in this state**") |
| **Arizona** (Counts 12–14, ¶¶ 457–482) | Ariz. Rev. Stat. Ann. §§ 44-1841, 44-1842(A) | Ariz. Rev. Stat. Ann. § 44-1841 (prohibiting sale of unregistered securities "**within or from this state**"); *id.* § 44-1842(A) (prohibiting acting as an unregistered "dealer or salesman" "**within or from this state**") |
| **Arkansas** (Counts 15–17, ¶¶ 483–508) | Ark. Code Ann. §§ 23-42-301, 23-42-501 | Ark. Code Ann. § 23-42-301 (prohibiting transacting business as unregistered broker-dealer "**in this state**"); *id.* § 23-42-501 (prohibiting sale of unregistered security "**in this state**") |

---

[1] All emphases are added.

| State | Statute(s) | Relevant Statutory Language[1] |
|---|---|---|
| **Colorado** (Counts 21–23, ¶¶ 535–560) | Colo. Rev. Stat. Ann. §§ 11-51-301, 11-51-401(1) | Colo. Rev. Stat. Ann. § 11-51-301 (prohibiting sale of unregistered security "**in this state**"); *id.* § 11-51-401(1) (prohibiting transacting business as unregistered broker-dealer "**in this state**") |
| **Connecticut** (Counts 24–26, ¶¶ 561–586) | Conn. Gen. Stat. Ann. §§ 36b-6(a), 36b-16 | Conn. Gen. Stat. Ann. § 36b-6(a) (prohibiting transacting business as unregistered broker-dealer "**in this state**"); *id.* § 36b-16 (prohibiting sale of unregistered security "**in this state**") |
| **Delaware** (Counts 27–28, ¶¶ 587–604) | Del. Code tit. 6 § 73-301(a) | Del. Code tit. 6, § 73-301(a) (prohibiting transacting business as unregistered broker-dealer "**in this state**") |
| **District of Columbia** (Counts 29–31, ¶¶ 605–630) | D.C. Code Ann. §§ 31-5602.01(a), 31-5603.01 | D.C. Code Ann. § 31-5602.01(a) (prohibiting transacting business as unlicensed broker-dealer "**in the District of Columbia**"); *id.* § 31-5603.01 (prohibiting sale of unregistered security "**in the District**") |

| State | Statute(s) | Relevant Statutory Language[1] |
|---|---|---|
| **Georgia** (Counts 35–37, ¶¶ 657–682) | Ga. Code Ann. §§ 10-5-20, 10-5-30(a) | Ga. Code Ann. § 10-5-20 (prohibiting sale of unregistered security "**in this state**"); *id.* § 10-5-30 (prohibiting transacting business as unregistered broker-dealer "**in this state**") |
| **Hawaii** (Counts 38–40, ¶¶ 683–708) | Haw. Rev. Stat. Ann. §§ 485A-301, 485A-401(a) | HRS § 485A-301 (prohibiting sale of unregistered security "**in this State**"); *id.* § 485A-401(a) (prohibiting transacting business as unregistered broker-dealer "**in this State**") |
| **Idaho** (Counts 41–43, ¶¶ 709–734) | Idaho Code Ann. §§ 30-14-301, 30-14-401(a) | Idaho Code Ann. § 30-14-301 (prohibiting sale of unregistered security "**in this state**"); *id.* § 30-14-401 (prohibiting transacting business as unregistered broker-dealer "**in this state**") |
| **Illinois** (Counts 44–46, ¶¶ 735–763) | 815 Ill. Comp. Stat. Ann. 5/5, 5/2.7 | 815 Ill. Comp. Stat. Ann. 5/5 (prohibiting sale of unregistered security "**in this State**"); *id.* 5/2.7 (defining "dealer[s]" subject to registration requirements as persons who engage in conduct "**in this State**") |

A-624

| **State** | **Statute(s)** | **Relevant Statutory Language¹** |
|---|---|---|
| **Indiana** (Counts 47–49, ¶¶ 764–789) | Ind. Code. Ann. §§ 23-19-3-1, 23-19-4-1(a) | Indiana Code § 23-19-3-1 (prohibiting sale of unregistered security "**in this state**"); *id.* § 23-19-4-1(a) (prohibiting transacting business as unregistered broker-dealer "**in this state**") |
| **Iowa** (Counts 50–52, ¶¶ 790–815) | Iowa Code Ann. §§ 502.301, 502.401(1) | Iowa Code Ann. § 502.301 (prohibiting sale of unregistered security "**in this state**"); *id.* § 502.401(1) (prohibiting transacting business as unregistered broker-dealer "**in this state**") |
| **Kansas** (Counts 53–55, ¶¶ 816–841) | Kan. Stat. Ann. §§ 17-12a301, 17-12a401(a) | Kan. Stat. Ann. § 17-12a301 (prohibiting sale of unregistered security "**in this state**"); *id.* § 17-12a401(a) (prohibiting transacting business as unregistered broker-dealer "**in this state**") |
| **Kentucky** (Counts 56–58, ¶¶ 842–867) | Ky. Rev. Stat. Ann. §§ 292.340, 292.330(1) | Ky. Rev. Stat. Ann. § 292.340 (prohibiting sale of unregistered security "**in this state**"); *id.* § 292.330(1) (prohibiting transacting business as unregistered broker-dealer "**in this state**") |

4

A-625

| **State** | **Statute(s)** | **Relevant Statutory Language¹** |
|---|---|---|
| **Louisiana** (Counts 59–61, ¶¶ 868–893) | La. Rev. Stat. Ann. §§ 51:705, 51:703(1) | La. Stat. Ann. § 51:705 (prohibiting sale of unregistered security "**in this state**"); *id.* § 51:703(1) (prohibiting transacting business as unregistered dealer "**within or from this state**") |
| **Maine** (Counts 62–64, ¶¶ 894–919) | Me. Rev. Stat. tit. 32, §§ 16301, 16401(1), 16402(1) | Me. Rev. Stat. tit. 32, § 16301 (prohibiting sale of unregistered security "**in this state**"); *id.* §§ 16401(1), 16402(1) (prohibiting transacting business as unregistered broker-dealer or agent "**in this state**") |
| **Maryland** (Counts 65–67, ¶¶ 920–945) | Md. Code Ann., Corps. & Ass'ns §§ 11-501, 11-401(a) | Md. Code Ann., Corps. & Ass'ns § 11-501 (prohibiting sale of unregistered security "**in this state**"); *id.* § 11-401(a) (prohibiting transacting business as unregistered broker-dealer "**in this state**") |
| **Massachusetts** (Counts 68–70, ¶¶ 946–971) | Mass. Gen. Laws Ann. ch. 110A, §§ 301, 201(a) | Mass. Gen. Laws Ann. ch. 110A, § 301 (prohibiting sale of unregistered security "**in the commonwealth**"); *id.* § 201(a) (prohibiting transacting business as unregistered broker-dealer "**in this commonwealth**") |

| **State** | **Statute(s)** | **Relevant Statutory Language[1]** |
|---|---|---|
| **Michigan** (Counts 71–73, ¶¶ 972–997) | Mich. Comp. Laws Ann. §§ 451.2301, 451.2401(1) | Mich. Comp. Laws Ann. § 451.2301 (prohibiting sale of unregistered security "**in this state**"); *id.* § 451.2401(1) (prohibiting transacting business as unregistered broker-dealer "**in this state**") |
| **Minnesota** (Counts 74–76, ¶¶ 998–1023) | Minn. Stat. Ann. §§ 80A.49, 80A.56(a) | Minn. Stat. Ann. § 80A.49 (prohibiting sale of unregistered security "**in this state**"); *id.* § 80A.56(a) (prohibiting transacting business as unregistered broker-dealer "**in this state**") |
| **Mississippi** (Counts 77–79, ¶¶ 1024–1049) | Miss. Code Ann. §§ 75-71-301, § 75-71-401(a) | Miss. Code Ann. § 75-71-301 (prohibiting sale of unregistered security "**in this state**"); *id.* § 75-71-401(a) (prohibiting transacting business as unregistered broker-dealer "**in this state**") |
| **Missouri** (Counts 80–82, ¶¶ 1050–1075) | Mo. Rev. Stat. §§ 409.3-301, 409.4-401(a) | Mo. Rev. Stat. § 409.3-301 (prohibiting sale of unregistered security "**in this state**"); *id.* § 409.4-401(a) (prohibiting transacting business as unregistered broker-dealer "**in this state**") |

Case 22-972, Document 57, 07/28/2022, 3356258, Page221 of 257

Case 1:20-cv-02803-ALC  Document 60-13  Filed 02/16/21  Page 8 of 13

| **State** | **Statute(s)** | **Relevant Statutory Language[1]** |
|---|---|---|
| **Montana** (Counts 83–84, ¶¶ 1076–1092) | Mont. Code Ann. § 30-10-202 | Mont. Code Ann. § 30-10-202 (prohibiting sale of unregistered security "**in this state**") |
| **Nebraska** (Counts 85–86, ¶¶ 1093–1109) | Neb. Rev. Stat. § 8-1104 | Neb. Rev. Stat. § 8-1104 (prohibiting sale of unregistered security "**in this state**") |
| **New Hampshire** (Counts 90–92, ¶¶ 1136–1161) | N.H. Rev. Stat. §§ 421-B:3-301, 421-B:4-401(a), 421-B:4-402(a) | N.H. Rev. Stat. § 421-B:3-301(a) (prohibiting sale of unregistered security "**in this state**"); *id.* §§ 421-B:4-401(a), 421-B:4-402(a) (prohibiting transacting business as unregistered broker-dealer "**in this state**") |
| **New Jersey** (Counts 93–95, ¶¶ 1162–1187) | NJ Stat. Ann. §§ 49:3-60, 49:3-56 | NJ Stat. Ann. § 49:3-60(e) (prohibiting sale of unregistered security "**in this state**"); *id.* § 49:3-56(a) (prohibiting transacting business as unregistered broker-dealer "**in this state**") |

7

| State | Statute(s) | Relevant Statutory Language[1] |
|---|---|---|
| **New Mexico** (Counts 96–98, ¶¶ 1188–1213) | N.M. Stat. Ann. § 58-13C-301; *id.* 58-13C-40 –402 | N.M. Stat. Ann. § 58-13C-301 (prohibiting sale of unregistered security "**in New Mexico**"); *id.* N.M. Stat. Ann. §§ 58-13C-401–402 (prohibiting transacting business as unregistered broker-dealer "**in New Mexico**") |
| **North Carolina** (Counts 99–101, ¶¶ 1214–1239) | N.C. Gen. Stat. Ann. §§ 78A-2, 78A-36(a) | N.C. Gen. Stat. Ann. § 78A-24 (prohibiting sale of unregistered security "**in this State**"); *id.* § 78A-36(a) (prohibiting transacting business as unregistered broker-dealer "**in this State**") |
| **North Dakota** (Counts 102–104, ¶¶ 1240–1265) | N.D.C.C. §§ 10-04-04, 10-04-10 | N.D.C.C. § 10-04-04 (prohibiting sale of unregistered security "**in this state**"); *id.* § 10-04-10 (prohibiting transacting business as unregistered broker-dealer "**in this state**") |
| **Ohio** (Counts 105–107, ¶¶ 1266–1291) | Ohio Rev. Code Ann. §§ 1707.09, 1707.01 | Ohio Rev. Code Ann. § 1707.09(A)(1) (prohibiting sale of unregistered security "**in this state**"); *id.* § 1707.01(E)(1) (defining "dealer" subject to registration requirements as persons who engage in conduct "**in this state**") |

8

A-629

| **State** | **Statute(s)** | **Relevant Statutory Language¹** |
|---|---|---|
| **Oklahoma** (Counts 105–107, ¶¶ 1292–1317) | Unregistered Offer and Sale of Securities | Okla. Sta. Ann. tit. 71 § 1-301 (prohibiting sale of unregistered security "**in this state**"); *id.* §§ 1-401 (prohibiting transacting business as unregistered broker-dealer "**in this state**") |
| **Oregon** (Counts 111–113, ¶¶ 1318–1343) | O.R.S. §§ 59:055, 59:165 | O.R.S. § 59:055 (prohibiting sale of unregistered security "**in this state**"); *id.* § 59:165(1) (prohibiting transacting business as unregistered broker-dealer "**in this state**") |
| **Pennsylvania** (Counts 114–116, ¶¶ 1344–1369) | 70 Pa. Stat. Ann. §§ 1-201, 1-301 | 70 Pa. Stat. Ann. § 1-201 (prohibiting sale of unregistered security "**in this State**"); *id.* § 1-301(a) (prohibiting transacting business as unregistered broker-dealer "**in this State**") |
| **Rhode Island** (Counts 120–122, ¶¶ 1396–1421) | 7 R.I. Gen. Laws Ann. §§ 7-11-301, 7-11-201 | 7 R.I. Gen. Laws Ann. § 7-11-301 (prohibiting sale of unregistered security "**in this state**"); *id.* § 7-11-201(a) (prohibiting transacting business as unregistered broker-dealer "**in this state**") |

9

| **State** | **Statute(s)** | **Relevant Statutory Language[1]** |
|---|---|---|
| **South Carolina** (Counts 123–125, ¶¶ 1422–1447) | S.C. Code Ann. §§ 35-1-301, 35-1-401 | S.C. Code Ann. § 35-1-301 (prohibiting sale of unregistered security "**in this State**"); *id.* § 35-1-401(a) (prohibiting transacting business as unregistered broker-dealer "**in this State**") |
| **South Dakota** (Counts 126–128, ¶¶ 1448–1474) | S.D. Codified Laws §§ 47-31B-301, 47-31B-401 | S.D. Codified Laws § 47-31B-301 (prohibiting sale of unregistered security "**in this state**"); *id.* § 47-31B-401(a) (prohibiting transacting business as unregistered broker-dealer "**in this state**") |
| **Tennessee** (Counts 129–131, ¶¶ 1475–1500) | Tenn. Code Ann. §§ 48-1-104, 48-1-109 | Tenn. Code Ann. § 48-1-104(a) ((prohibiting sale of unregistered security "**in this state**"); *id.* § 48-1-109(a) (prohibiting transacting business as unregistered broker-dealer "**in this state**") |
| **Utah** (Counts 135–137, ¶¶ 1527–1552) | Utah Code Ann. §§ 61-1-7, 61-1-3 | Utah Code Ann. § 61-1-7 (prohibiting sale of unregistered security "**in this state**"); *id.* § 61-1-3(1) (prohibiting transacting business as unregistered broker-dealer "**in this state**") |

| **State** | **Statute(s)** | **Relevant Statutory Language[1]** |
|---|---|---|
| **Vermont** (Counts 138–140, ¶¶ 1553–1578) | 9 V.S.A. §§ 5301, 5401 | 9 V.S.A. § 5301 (prohibiting sale of unregistered security "**in this State**"); *id.* § 5401 (prohibiting transacting business as unregistered broker-dealer "**in this State**") |
| **Virginia** (Counts 141–143, ¶¶ 1579–1604) | Va. Code Ann. § 13.1-504 | Va. Code Ann. § 13.1-504 (prohibiting transacting business as unregistered broker-dealer "**in this Commonwealth**") |
| **Washington** (Counts 144–145, ¶¶ 1605–1621) | Wash. Rev. Code § 21.20.140 | Wash. Rev. Code § 21.20.140 (prohibiting sale of unregistered security "**in this state**") |
| **West Virginia** (Counts 146–148, ¶¶ 1622–1647) | W. Va. Code Ann. §§ 32-3-301, 32-2-201 | W. Va. Code Ann. § 32-3-301 (prohibiting sale of unregistered security "**in this state**"); *id.* 32-2-201(a) (prohibiting transacting as unregistered broker-dealer "**in this state**") |

11

A-632

| **State** | **Statute(s)** | **Relevant Statutory Language[1]** |
|---|---|---|
| **Wisconsin**<br>(Counts 149–151,<br>¶¶ 1648–1673) | Wis. Stat. §§ 551.301, 551.401, 551.402 | Wis. Stat. § 551.301 (prohibiting sale "**in this state**"); *id.* §§ 551.401(1), 551.402(1) (prohibiting transacting as unregistered broker-dealer "**in this state**") |
| **Wyoming**<br>(Counts 152–154,<br>¶¶ 1674–1699) | Wyo. Stat. Ann. §§ 17-4-301, 17-4-401, 17-4-402 | Wyo. Stat. Ann. § 17-4-301 (requiring that the person sell the security "**in the state**"); *id.* §§ 17-4-401(a), 17-4-402(a) (prohibiting transacting business as unauthorized broker-dealer "**in this state**") |

A-633

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: ___04/06/2021___

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

JD ANDERSON, CORY HARDIN, ERIC LEE, BRETT
MESSIEH, DAVID MUHAMMAD, RANJITH
THIAGARAJAN, CHASE WILLIAMS, and TOKEN FUND
I LLC, individually and on behalf of all others similarly
situated,

        Plaintiffs,

    - against -

BINANCE, CHANGPENG ZHAO, YI HE, and ROGER
WANG,

        Defendants.

---

No. 1:20-cv-02803-ALC

STIPULATION AND
    ORDER
REGARDING VOLUNTARY
DISMISSAL OF
DEFENDANTS HE AND
WANG

      Plaintiffs JD Anderson, Cory Hardin, Eric Lee, Brett Messieh, David Muhammad,

Ranjith Thiagarajan, Chase Williams, and Token Fund I LLC (together, "Plaintiffs"),

individually and on behalf of all others similarly situated, and Defendants Binance, Changpeng

Zhao, Yi He, and Roger Wang (collectively "Defendants," and together with Plaintiffs, the

"Parties"), by and through their undersigned counsel, hereby stipulate as follows:

      WHEREAS, the Parties agree that Defendants He and Wang may be voluntarily

dismissed from the above-caption action pursuant to Federal Rule of Civil Procedure

41(a)(1)(A)(ii);

      WHEREAS, the briefing schedule regarding Defendants' motion to dismiss (ECF No.

57) should remain in full force and effect.

      IT IS HEREBY STIPULATED AND AGREED, by and between the Parties, through

their undersigned counsel, that all of claims alleged against Defendants He and Wang in the

A-634

above-captioned action are voluntarily dismissed pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii).

IT IS FURTHER STIPULATED AND AGREED, by and between the Parties, through their undersigned counsel, that the briefing schedule regarding Defendants' motion to dismiss (ECF No. 57) shall remain in full force and effect.

IT IS FURTHER STIPULATED AND AGREED, by and between the Parties, through their undersigned counsel, that the claims against Defendants Binance and Changpeng Zhao shall not be affected by this Stipulation and Proposed Order.

A-635

Dated: April 5, 2021
        New York, NY

Philippe Z. Selendy
Jordan A. Goldstein
Oscar Shine
Mitchell Nobel
SELENDY & GAY PLLC
1290 Sixth Avenue, 17th Floor
New York, NY 10104
pselendy@selendygay.com
jgoldstein@selendygay.com
oshine@selendygay.com
mnobel@selendygay.com

Kyle W. Roche
Edward Normand
Velvel (Devin) Freedman (pro hac vice)
Alex T. Potter
Richard Cipolla
ROCHE FREEDMAN LLP
99 Park Avenue, 19th Floor
New York, NY
kyle@rcfllp.com
tnormand@rcfllp.com
vel@rcfllp.com
apotter@rcfllp.com
rcipolla@rcfllp.com

*Attorneys for Plaintiffs*

James P. Rouhandeh
Daniel J. Schwartz
M. Nick Sage
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
james.rouhandeh@davispolk.com
daniel.schwartz@davispolk.com
m.nick.sage@davispolk.com

*Attorneys for Defendants*

SO ORDERED:

This ___6___ day of ___April___ 2021.

Hon. Andrew L. Carter
United States District Judge

3

A-636

# Exhibit 1

Case 1:20-cv-02803-ALC   Document 65-1   Filed 04/19/21   Page 2 of 2



A-638

# Exhibit 2

Feb 7, 2018, 04:45am EST

# From Zero To Crypto Billionaire In Under A Year: Meet The Founder Of Binance



**Pamela Ambler** Former Staff
Asia

[Follow]

🕑 **This article is more than 3 years old.**

This story appears in the February 28, 2018 issue of Forbes. Subscribe



Changpeng Zhao, Founder of Binance　VIRGILE SIMON BERTRAND FOR FORBES

Changpeng " CZ" Zhao

CEO, Binance

**Crypto Net Worth: $1.1 billion-$2 billion***

Seven months ago Binance didn't exist. Since then, its 1.4 million-transactions-per-second capability have attracted 6 million users, making it the world's largest crypto-exchange. "No decentralized exchange today can handle our volume, and none are as secure as we are," says its founder, Changpeng Zhao, known as CZ. The market seems to buy it: Since its July initial coin offering, a Binance token BNB has soared from about 10 cents to $13, giving it a market capitalization of $1.3 billion. Zhao, 41, who wears a black hoodie, like some cross between Mark Zuckerberg and Steve Jobs, also owns the biggest stake in the coins.

The man who's only indulgence is mobile phones (he owns three), sold his house in Shanghai in 2014 to go all in on Bitcoin and doesn't own any cars, yachts nor fancy watches. Among the crypto-rich, Zhao falls squarely in the builder camp.

CZ was born in Jiangsu, China. Both of his parents were educators; his father, a professor, was labeled a "pro-bourgeois intellect" and temporarily exiled shortly after CZ was born. The family eventually emigrated to Vancouver, Canada, in the late 1980s. As a teenager, CZ pitched in to cover the household expenses, flipping burgers at McDonald's and working overnight shifts at a gas station.

After studying computer science at Montreal's McGill University, Zhao spent time in both Tokyo and New York, first building a system for matching trade orders on the Tokyo Stock Exchange and then, at Bloomberg's Tradebook where he developed software for futures trading. But even after the 27-year old coding whiz was promoted three times in less than two years to manage teams in New Jersey, London and Tokyo, Zhao became impatient. So in 2005 he quit and moved to Shanghai to start his Fusion Systems, a company known for building some of the fastest high-frequency trading systems for brokers.

Then, in 2013, Zhao learned about Bitcoin from a venture capitalist with whom he played poker. He began bouncing around prominent crypto

A-642

projects. He joined Blockchain.info as the third member of the cryptocurrency wallet's team. As head of development for eight months, he worked closely with well-known Bitcoin evangelists like Roger Ver and Ben Reeves. He also worked at OKCoin as chief technology officer for less than a year, a platform for spot trading between fiat and digital assets.

All the while, Zhao was thinking about starting his own pure play digital asset exchange that would not touch fiat currencies. Without the connection to financial institutions, the risks and regulatory complications that his former colleague Ver warned him about would be lower. But it wasn't until last year when the ICO boom gained steam and volume began to soar, that he decided to make his move.  The $15 million he raised in Binance's 200 million token crowd-sale last July caught Bitcoin's breathtaking ascent perfectly.

Zhao's recent relocation to the land of the rising sun, and then to Formosa has meant some changes. Binance's trading volume is no longer dominated by China. Today, 38% of Binance's users are in the U.S. Its second-biggest market is Japan. Because Binance didn't have a record of scaling business in Japan, the company's ability to sign a lease on a large office was limited. "We were growing so fast... they say the taxes you paid last year is not going to be able to cover one month of rent."

So Binance was forced into a space with only room for small work stations crammed next to each other. "We have desks right outside the toilet," declares Zhao. At the time this issue goes to print, he's broadcasting to his 33,000 followers on Twitter that Binance is hiring developers and customer support staff in Taiwan. CZ says he plans to double the size of his existing team to 300 in the next three to six months.



Changpeng Zhao   VIRGILE SIMON BERTRAND

Binance now supports about 120 coins, working with 100 plus wallets and 240 trading pairs. "We've received over 5000 applications for coin listings," boasts Zhao explaining that his team only welcomes projects that have strong credibility, user base, and liquidity. At 3%, the chances of getting in are lower than being accepted into Harvard.

In a nod to idealists—who believe the blockchain will reclaim an Internet co-opted by power-hungry behemoths like Google, Amazon and Facebook, and usher in digital innovation and prosperity, accessible to all—Binance has embraced community voting for listing tokens.

But make no mistake, builder Zhao, is in the crypto-gold rush to win. His trades are fastest and most reliable, and unlike most other coins, his offer real value to holders in the form of a 50% discount on trading fees. And as the biggest owner of Binance tokens his plan to use 20% of its profits every quarter to shrink Binance's token capitalization by 50% will only move him higher on our crypto-rich list.

*All cryptocurrency/U.S. dollar conversions are as of January 19, 2018.*

## Read More:

Introducing *Forbes'* First-Ever List Of Cryptocurrency's Richest People

Why *Forbes* Created Its Cryptocurrency Rich List

Full List Of Cryptocurrency's Wealthiest People

*An Intrepid Investor's Guide To Buying Bitcoin And Other Crypto Assets*

*Follow me on* Twitter *or* LinkedIn. *Send me a secure* tip.

 **Pamela Ambler**

Pamela covers entrepreneurs, wealth, blockchain and the crypto economy as a senior reporter across digital and print platforms. Prior to Forbes, she served as on-air...

**Read More**

Reprints & Permissions

ADVERTISEMENT

# Exhibit 3



**Tweet**

**CZ 🔶 Binance**
@cz_binance

Thank you!

As a CEO, it is my duty to promote $BNB. I owe it to our hodlers. And I like to interact with our $BNB supporters. Nothing wrong with that, I hope. If you don't like it, easier to click Unfollow (on all of us), than asking us to change for you. Good luck!

> **SnailKing** @eskaroy · Mar 7, 2019
> Replying to @pierre_crypt0
> 1) parse through @cz_binance's timeline, most of his tweets and retweets are about tech. If you're mostly getting BNB shilling, could it be the people you follow are too price-oriented?

6:14 AM · Mar 7, 2019 · Twitter Web Client

**147** Retweets **26** Quote Tweets **1,463** Likes

A-647

# Exhibit 4

A-648



A-649

# Exhibit 5



A-651

# Exhibit 6

A-652



**CZ** 🔶 **Binance** ✔
@cz_binance                                    ⋯

Had some system performance bottlenecks, trading
saw some delays, fixed now. Withdrawals also saw
some delays, fixed as well, but there is a backlog will
take another 15 minute to drain.

Seeing ATH in system traffic, by far!

1:06 PM · May 27, 2019 · Twitter Web Client

**209** Retweets    **54** Quote Tweets    **1,719** Likes

A-653

Exhibit 1

**A-654**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YOREK**

| | |
|---|---|
| COREY HARDIN, DAVID MUHAMMAD, and CHASE WILLIAMS, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | Case No. 1:20-cv-02804-VSB |
| v. | Honorable Vernon S. Broderick |
| TRON FOUNDATION, JUSTIN SUN, and ZHIQIANG (LUCIEN) CHEN, | |
| Defendants. | |

**DECLARATION OF COREY HARDIN**

I, COREY HARDIN, declare as follows:

1.      I am a Plaintiff in the above-captioned case and submit this declaration based upon my personal knowledge.

2.      I respectfully submit this declaration in support of the opposition to Defendants' motion to dismiss the Amended Class Action Complaint.

3.      I purchased and sold Defendant Tron Foundation's ("Tron") digital token, TRX, in 2018, 2019 and 2020 on the Binance exchange, on the dates set forth in my Certification in Support of Lead Plaintiff Motion for Securities Class Action (ECF No. 29-1).

4.      Before purchasing and selling that TRX, I visited Tron's website, reviewed Tron's whitepaper, and saw its social media posts.

5.      I bought TRX in part because of how Tron touted its product offerings and the value of the network and TRX.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 14, 2021.

*Corey Hardin*
Corey Hardin (Feb 14, 2021 10:30 PST)
Corey Hardin

A-655

Exhibit 2

**A-656**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

COREY HARDIN, DAVID MUHAMMAD, and
CHASE WILLIAMS, individually and on behalf of
all others similarly situated,

                          Plaintiffs,

                v.

TRON FOUNDATION, JUSTIN SUN, and
ZHIQIANG (LUCIEN) CHEN,

                          Defendants.

---

Case No. 1:20-cv-02804-VSB

Honorable Vernon S. Broderick

**DECLARATION OF DAVID MUHAMMAD**

I, DAVID MUHAMMAD, declare as follows:

1.      I am a Plaintiff in the above-captioned case and submit this declaration based upon my personal knowledge.

2.      I respectfully submit this declaration in support of the opposition to Defendants' motion to dismiss the Amended Class Action Complaint.

3.      I purchased and sold Defendant Tron Foundation's ("Tron") digital token, TRX, in 2018, 2019 and 2020 on the Binance exchange, on the dates set forth in my Certification in Support of Lead Plaintiff Motion for Securities Class Action (ECF No. 29-2).

4.      Before purchasing and selling that TRX, I visited Tron's website, reviewed Tron's whitepaper, and saw its social media posts.

5.      I bought TRX in part because of how Tron touted its product offerings and the value of the network and TRX.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 14, 2021.

                                      David Muhammad (Feb 14, 2021 11:36 CST)
                                      David Muhammad

A-657

Exhibit 3

A-658

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| COREY HARDIN, DAVID MUHAMMAD, and CHASE WILLIAMS, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | Case No. 1:20-cv-02804-VSB |
| v. | Honorable Vernon S. Broderick |
| TRON FOUNDATION, JUSTIN SUN, and ZHIQIANG (LUCIEN) CHEN, | |
| Defendants. | |

### DECLARATION OF CHASE WILLIAMS

I, CHASE WILLIAMS, declare as follows:

1.      I am a Plaintiff in the above-captioned case and submit this declaration based upon my personal knowledge.

2.      I respectfully submit this declaration in support of the opposition to Defendants' motion to dismiss the Amended Class Action Complaint.

3.      I purchased and sold Defendant Tron Foundation's ("Tron") digital token, TRX, in 2019 on the Binance exchange, on the dates set forth in my Certification in Support of Lead Plaintiff Motion for Securities Class Action (ECF No. 29-3).

4.      Before purchasing and selling that TRX, I visited Tron's website, reviewed Tron's whitepaper, and saw its social media posts.

5.      I bought TRX in part because of how Tron touted its product offerings and the value of the network and TRX.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 14, 2021.

Chase Clifford Williams (Feb 14, 2021 12:27 MST)

Chase Williams

A-659

Exhibit 4

A-660

**STATES WITH BLUE SKY LAW LIMITATIONS PERIODS OF 1 OR 2 YEARS**

| STATE | STATUTE | LIMITATIONS PERIOD |
|---|---|---|
| Alabama | Ala. Code § 8-6-19(f) | 2 years |
| Arizona | A.R.S. § 44-2004 | 1 year |
| California | Cal. Corp. Code § 25507(a) | 1 year |
| Colorado | Colo. Rev. Stat. § 11-51-604(8) | 2 years |
| Connecticut | Conn. Gen. Stat. § 36b-29(f) | 2 years |
| District of Columbia | D.C. Code Ann. § 31-5606.05(f)(2)(A) | 1 year |
| Georgia | Ga. Code Ann. § 10-5-58(j) | 2 years |
| Hawaii | HRS § 485A-509(j)(1) | 1 year |
| Idaho | I.C. § 30-14-509(j)(1) | 1 year |
| Iowa | I.C.A. § 502.509(10)(a) | 1 year |
| Kansas | Kan. Stat. Ann. § 17-12a509(j)(1) | 1 year |
| Louisiana | La. Stat. Ann. § 51:714(C)(1) | 2 years |
| Maine | Me. Rev. Stat. tit. 32, § 16509(10) | 2 years |
| Maryland | Md. Code Ann., Corps. & Ass'ns § 11-703(2) | 1 year |
| Michigan | Mich. Comp. Laws Ann. § 451.2509(10) | 1 year |
| Minnesota | Minnesota Statutes § 80A.76(j)(1) | 1 year |
| Mississippi | Miss. Code Ann. § 75-71-509(j)(1) | 1 year |
| Missouri | Mo. Rev. Stat. § 409.5-509(j)(1) | 1 year |
| Montana | Mont. Code Ann. § 30-10-307 | 2 years |
| Nevada | Nev. Rev. Stat. § 90.670 | 2 years |
| New Hampshire | N.H. Rev. Stat. Ann. § 421-B:5-509 | 2 years |
| New Jersey | N.J. Stat. Ann. § 49:3-71(g) | 2 years |
| New Mexico | N.M. Stat. Ann. § 58-13C-509(j) | 2 years |
| North Carolina | N.C. Gen. Stat. Ann. § 78A-56(a) | 2 years |
| Ohio | Ohio Rev. Code Ann. § 1707.43 | 2 years |
| Oklahoma | OK ST T. 71 § 1-509(J)(1) | 1 year |
| Puerto Rico | P.R. Laws Ann Tit. 10, § 890 | 2 years |
| Pennsylvania | 70 P.S. § 1-504 | 1 year |
| Rhode Island | RI Gen L § 7-11-605 | 1 year |
| South Dakota | S.D. Codified Laws § 47-31B-509(j)(1) | 1 year |
| Tennessee | Tenn. Code Ann. § 48-1-122 | 2 years |
| Utah | Utah Code Ann. § 61-1-22 | 2 years |
| Vermont | Vt. Stat. Ann. tit. 9, § 5509 | 1 year |
| Virginia | VA ST § 13.1-522(D) | 2 years |
| Wisconsin | Wis. Stat. § 551.509(10) | 1 year |
| Wyoming | Wyo. Stat. Ann. § 17-4-509(k) | 1 year |

A-661

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JD ANDERSON, COREY HARDIN, ERIC LEE, BRETT MESSIEH, DAVID MUHAMMAD, RANJITH THIAGARAJAN, CHASE WILLIAMS, and TOKEN FUND I LLC, individually and on behalf of all others similarly situated, | Case No. 1:20-cv-02803-ALC<br>Honorable Andrew L. Carter, Jr.<br><br>**NOTICE OF APPEAL** |
| Plaintiffs, | |
| v. | |
| BINANCE, CHANGPENG ZHAO, YI HE, and ROGER WANG, | |
| Defendants. | |

Notice is hereby given that JD Anderson, Corey Hardin, Eric Lee, Brett Messieh, David Muhammad, Ranjith Thiagarajan, Chase Williams, and Token Fund I LLC, on behalf of themselves and all others similarly situated, by and through their undersigned counsel, hereby appeal to the United States Court of Appeals for the Second Circuit from the Order Granting Defendants' Motion to Dismiss (ECF No. 77, the "Order"), signed and entered on March 31, 2022, and Judgment (ECF No. 78, the "Judgment"), signed and entered on March 31, 2022, in the above-captioned action. This appeal is taken from each and every part of the Order and Judgment, and from the Order and Judgment as a whole.

A-662

Dated:   April 29, 2022                                   Respectfully submitted,
         New York, NY


_s/ Kyle W. Roche_                                        _s/ Jordan A. Goldstein_

  Kyle W. Roche                                             Philippe Z. Selendy
  Edward Normand                                            Jordan A. Goldstein
  Velvel (Devin) Freedman                                   Oscar Shine
     (*pro hac vice*)                                       Mitchell Nobel
  Alex T. Potter                                            SELENDY GAY ELSBERG PLLC
  Richard R. Cipolla                                        1290 Sixth Avenue, 17th Floor
  ROCHE FREEDMAN LLP                                        New York, NY  10104
  99 Park Avenue, 19th Floor                                Tel: (212) 390-9000
  New York, NY  10016                                       pselendy@selendygay.com
  Tel: (646) 350-0527                                       jgoldstein@selendygay.com
  kyle@rochefreedman.com                                    oshine@selendygay.com
  tnormand@rochefreedman.com                                mnobel@selendygay.com
  vel@rochefreedman.com
  apotter@rochefreedman.com
  rcipolla@rochefreedman.com

                                                           *Co-Lead Counsel and Attorneys for*
                                                           *Plaintiffs and the Proposed Class*

2

A-663

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 29, 2022, I caused the foregoing Notice of Appeal to be served

via the Electronic Case Filing (ECF) system in the United States District Court for the Southern

District of New York, on all parties registered for CM/ECF in the above-captioned action.


Dated:   April 29, 2022
         New York, NY


*s/ Jordan A. Goldstein*
Jordan A. Goldstein