# 22-0972-cv

# United States Court of Appeals

*for the*

# Second Circuit

CHASE WILLIAMS, individually and on behalf
of all others similarly situated,

*Plaintiff-Appellant,*

JD ANDERSON, COREY HARDIN, ERIC LEE, individually
and on behalf of all others similarly situated, BRETT MESSIEH, DAVID
MUHAMMAD, RANJITH THIAGARAJAN, TOKEN FUND I LLC,

*Lead-Plaintiffs-Appellants,*

– v. –

BINANCE, CHANGPENG ZHAO,

*Defendants-Appellees,*

YI HE, ROGER WANG,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFFS-APPELLANTS

CAITLIN J. HALLIGAN
JORDAN GOLDSTEIN
DAVID COON
SELENDY GAY ELSBERG PLLC
*Attorneys for Plaintiffs-Appellants*
1290 Avenue of the Americas
New York, New York 10104
(212) 390-9000

## CORPORATE DISCLOSURE STATEMENT
## PURSUANT TO RULE 26.1 OF THE
## <u>FEDERAL RULES OF APPELLATE PROCEDURE</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Token Fund I LLC, Plaintiff-Appellant in this action, states that it does not have a corporate parent, and there is no publicly held corporation that owns 10 percent or more of its stock.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... iii

PRELIMINARY STATEMENT ...........................................................................1

STATEMENT OF JURISDICTION.....................................................................6

STATEMENT OF ISSUES ...................................................................................7

STATEMENT OF THE CASE..............................................................................7

    I.      Crypto-Assets ........................................................................8

    II.     ICOs And Crypto Exchanges ................................................9

    III.    The Rise Of Binance .............................................................11

    IV.    Procedural History................................................................12

SUMMARY OF ARGUMENT ...........................................................................14

ARGUMENT .......................................................................................................18

    I.      Plaintiffs' Claims Arise From Domestic Securities Transactions That Are Subject To Federal And State Securities Laws.......................................................................18

    II.     Plaintiffs' Federal Claims Based On Purchases Within One Year Before Filing Suit Are Timely ...........................................26

          A.     Plaintiffs' Exchange Act Claims Based On Purchases Within One Year Before Filing Suit Are Timely ....................27

          B.     Plaintiffs' Securities Act Claims Based On Purchases Within One Year Before Filing Suit Are Timely ....................33

               1.     The Limitations Period For Section 12(a)(1) Claims Runs From The Time Of Purchase.....................34

               2.     Plaintiffs' Token Purchases And Binance's Solicitations Occurred Within One Year Before Filing.................................................................36

    III.    Plaintiffs' State Securities Laws Claims Are Timely .........................38

i

IV. The District Court Improperly Dismissed State Claims
On Behalf Of Absent Class Members .................................................. 41

CONCLUSION ......................................................................................... 42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
    677 F.3d 60 (2d Cir. 2012) ...................................................................18, 19

*Anderson v. Binance*,
    2022 WL 976824 (S.D.N.Y. Mar. 31, 2022)................................................13

*Baroi v. Platinum Condo. Dev., LLC*,
    2012 WL 4606720 (D. Nev. Oct. 1, 2012)...................................................40

*Celsion Corp. v. Stearns Mgmt. Corp.*,
    157 F. Supp. 2d 942 (N.D. Ill. 2001).........................................................32

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. MBIA, Inc.*,
    637 F.3d 169 (2d Cir. 2011) ..........................................................31, 33, 35

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014) ..................................................................20, 22

*CTS Corp. v. Waldburger*,
    573 U.S. 1 (2014).........................................................................................33

*Diskin v. Lomasney & Co.*,
    452 F.2d 871 (2d Cir. 1971) ........................................................ 34-35, 36

*EMA Fin., LLC v. NFusz, Inc.*,
    509 F. Supp. 3d 18 (S.D.N.Y. 2020) .........................................................30

*Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v.*
    *Nomura Holding Am., Inc.*,
    873 F.3d 85 (2d Cir. 2017) ...................................................................19, 24

*Fernandez v. UBS AG*,
    222 F. Supp. 3d 358 (S.D.N.Y. 2016) ........................................................39

*Ghartey v. St. John's Queens Hosp.*,
    869 F.2d 160 (2d Cir. 1989) .......................................................................30

*Giunta v. Dingman*,
    893 F.3d 73 (2d Cir. 2018) .....................................................18, 19, 20, 24

*In re Asacol Antitrust Litig.*,
    907 F.3d 42 (1st Cir. 2018)..........................................................................41

iii

*In re Bibox Group Holdings Ltd. Securities Litigation*,
 534 F. Supp. 3d 326 (S.D.N.Y. 2021), *reconsideration denied in
 part sub nom. In Re Bibox Grp. Holdings Ltd. Sec. Litig.*, 2021 WL
 2188177 (S.D.N.Y. May 28, 2021) ...............................................................42

*In re Tezos Securities Litigation*,
 2018 WL 4293341 (N.D. Cal. Aug. 7, 2018) ..............................................25

*In re Vivendi, S.A. Sec. Litig.*,
 838 F.3d 223 (2d Cir. 2016) ........................................................................19

*Kahn v. Kohlberg, Kravis, Roberts & Co.*,
 970 F.2d 1030 (2d Cir. 1992) ......................................................................32

*Langan v. Johnson & Johnson Consumer Cos.*,
 897 F.3d 88 (2d Cir. 2018) ....................................................................41, 42

*McCool v. Strata Oil Co.*,
 972 F.2d 1452 (7th Cir. 1992) .....................................................................33

*Morrison v. National Australia Bank Ltd.*,
 561 U.S. 254 (2010)...............................................................................14, 18

*Myun-Uk Choi v. Tower Research Capital LLC*,
 890 F.3d 60 (2d Cir. 2018) ....................................................................19, 23

*NNN Siena Off. Park I 2, LLC v. Wachovia Bank Nat. Ass'n*,
 2014 WL 4417858 (D. Nev. Sept. 8, 2014)................................................40

*Pinter v. Dahl*,
 486 U.S. 622 (1988)......................................................................................35

*Reg'l Props., Inc. v. Fin. & Real Estate Consulting Co.*,
 678 F.2d 552 (5th Cir. 1982) .......................................................................30

*Rotkiske v. Klemm*,
 140 S. Ct. 355 (2019)....................................................................................30

*Rotstain v. Trustmark Nat'l Bank*,
 2016 WL 8216509 (N.D. Tex. July 27, 2016)............................................38

*Siragusa v. Brown*,
 114 Nev. 1384 (1998), *aff'd* 673 F. App'x 725 (9th Cir. 2016)...................40

*Slomiak v. Bear Stearns & Co.*,
 597 F. Supp. 676 (S.D.N.Y. 1984) ........................................................ 29-30

iv

*Staehr v. Hartford Fin. Servs. Grp.*,
    547 F.3d 406 (2d Cir. 2008) .........................................................................27

*United States v. Vilar*,
    729 F.3d 62 (2d Cir. 2013) ............................................................19, 20, 24

*Wigand v. Flo-Tek, Inc.*,
    609 F.2d 1028 (2d Cir. 1979) ....................................................................35

## Statutes & Other Authorities:

15 U.S.C. § 77k .............................................................................................30

15 U.S.C. § 77*l*(a)(1) ......................................................................................1

15 U.S.C. § 77*l*(a)(2) ....................................................................................30

15 U.S.C. § 77m ........................................................................................4, 33

15 U.S.C. § 77v ...............................................................................................6

15 U.S.C. § 78aa(a) .........................................................................................6

15 U.S.C. § 78cc ............................................................................................27

15 U.S.C. § 78cc(b) ................................................................................*passim*

15 U.S.C. § 78cc(b)(B) .................................................................................27

28 U.S.C. § 1291 .............................................................................................6

28 U.S.C. § 1331 .............................................................................................6

28 U.S.C. § 1332(d)(2) ...................................................................................6

28 U.S.C. § 1367(a) .........................................................................................6

10 L.P.R.A. § 890(e) ......................................................................................39

Fed. R. Civ. P. 12(b)(6) ...........................................................................18, 26

Nev. Stat. § 90.660(1) ...................................................................................40

Nev. Stat. § 90.670 ........................................................................................40

Texas Civ. St. Art. 581-33H(1) .....................................................................38

Alexis M. Tellerd, Comment, *Time to Validate Validators: Determining the Legal Duty of Cryptocurrency Validators Under the Bank Secrecy Act*, 8 Nat'l Sec. L.J. 297 ........................................................... 21-22

*Ethereum Mainnet Statistics*, ethernodes.org - The Ethereum Network & Node Explorer (last visited July 25, 2022)..................................................22

Heather Hughes, *Blockchain and the Future of Secured Transactions Law*, 3 Stan. J. Blockchain L. & Pol'y 21 (2020) ....................................................8

Shahar Somin et al., *ERC20 Transactions over Ethereum Blockchain: Network Analysis and Predictions*, 1–2 (Apr. 17, 2020)..............................22

U.S. Securities and Exchange Commission, *SEC Nearly Doubles Size of Enforcement's Crypto Assets and Cyber Unit* (May 3, 2022)........................1

Vitalik Buterin, *Ethereum: A Next-Generation Smart Contract and Decentralized Application Platform*, 32–33 (2014) ......................................22

Wulf A. Kaal, *Initial Coin Offerings: The Top 25 Jurisdictions and Their Comparative Regulatory Responses (as of May 2018)*, 1 Stan. J. Blockchain L. & Pol'y 41 (2018) ............................................. 9-10

## PRELIMINARY STATEMENT

As the Securities and Exchange Commission has cautioned, "[c]rypto markets have exploded in recent years, with retail investors bearing the brunt of abuses … [by] fraudulent and unregistered crypto asset offerings and platforms."[1]  Binance operates the largest online exchange in the world for trading crypto-assets.  As part of a wave of schemes devised to trick consumers into purchasing speculative crypto "tokens"—that is, digital assets commonly used to invest in startup projects—Binance unlawfully promoted, offered, and sold billions of dollars' worth of tokens that were not registered as securities, in violation of Section 12(a)(1) of the Securities Act of 1933, 15 U.S.C. § 77*l*(a)(1) ("Securities Act"), and without registering itself as a securities exchange and broker/dealer, in violation of Section 29(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78cc(b) ("Exchange Act").  Plaintiffs bring claims on behalf of themselves and all others similarly situated under Sections 12(a)(1) and 15 of the Securities Act, Sections 20 and 29(b) of the Exchange Act, and state "blue sky" securities laws, seeking rescission of their purchases of unregistered securities on Binance (or in the alternative, damages), together with interest and reasonable attorneys' fees and costs.

---

[1] U.S. Securities and Exchange Commission, *SEC Nearly Doubles Size of Enforcement's Crypto Assets and Cyber Unit* (May 3, 2022), https://www.sec.gov/news/press-release/2022-78.

The district court's dismissal of all of Plaintiffs' claims as impermissibly extraterritorial and untimely was inconsistent with this Court's precedents and would lead to perverse results.[2]  As this Court has explained in prior cases, when an investor places a purchase order for a security in the United States, and additional transactional steps that bind the investor to the transaction—such as entering an agreement to purchase the security, sending payment for the transaction, or matching counterparties to the trade—occur in the United States, that purchase is a domestic transaction subject to U.S. securities laws.  Here, Plaintiffs alleged just that: in addition to placing purchase orders for securities in the United States, they agreed to purchase securities in the United States pursuant to contracts with Binance; they sent payment for the securities from their U.S. states of residence via Binance's crypto-asset exchange hosted on U.S. computer infrastructure; and their purchases became final and binding within the United States when the trades were validated on U.S.-based computers servicing the Ethereum blockchain.

---

[2] Plaintiffs JD Anderson, Corey Hardin, David Muhammad, Ranjith Thiagarajan, Chase Williams, and Token Fund I LLC each brought claims arising from purchases within the relevant federal or state statutes of limitations.  Plaintiff Eric Lee's and Brett Messieh's claims relied upon equitable doctrines of injury evading discovery and the fraud-based discovery rule for timeliness.  Plaintiffs do not appeal the district court's ruling that these doctrines did not apply here and thus do not appeal the dismissal of Plaintiffs Lee's and Messieh's claims as untimely.

The district court's ruling that Plaintiffs' purchases were extraterritorial ignored most of those transactional steps, and its cramped consideration of Plaintiffs' allegations accounted only for Plaintiffs' submission of purchase orders for the securities in the United States. Plaintiffs' transactional steps that took place in the U.S. bound them to the transactions. Those allegations must be taken as true on a motion to dismiss, and under this Court's precedents, they are sufficient to establish domestic transactions. The district court's decision effectively immunizes Binance from liability for operating an unregistered exchange even though it intentionally and extensively targeted U.S. investors—a gambit this Court should not reward.

The district court's ruling that Plaintiffs' claims are untimely even though they arise from purchases made within one year of filing is likewise irreconcilable with this Court's precedents. With respect to Plaintiffs' claims under the Exchange Act, the district court recognized that such claims are subject to a one-year statute of limitations, which begins to run upon the "discovery that [the] sale or purchase involves [a] violation." 15 U.S.C. § 78cc(b). But after finding—without adequate support in the operative Complaint—that Plaintiffs knew the exchange was not registered earlier than a year prior to filing, the district court held that knowledge started the clock on the limitations period, *before* the purchases underlying Plaintiffs' claims had even taken place. That determination rested on two errors: First, the court's factual finding that Plaintiffs knew Binance violated Section 29(b)

more than one year prior to filing was inappropriate on a motion to dismiss and inconsistent with Plaintiffs' well-pleaded allegations.[3]   Second, and more egregiously, the court essentially engrafted a knowledge defense found nowhere in the Exchange Act or relevant precedent, and applied it to *shorten* the one-year period Plaintiffs had to bring their claims, rather than lengthen it—precisely the opposite of what Congress intends when it includes a discovery rule in a statute of limitations. That result is particularly unfair because under the terms of the statute, Plaintiffs' claims could not have accrued, and the limitations period could not have begun to run, until the purchases giving rise to Plaintiffs' claims had actually occurred.

The district court's holding that Plaintiffs' Securities Act claims were untimely also requires reversal.  A Section 12(a)(1) claim must be brought "within one year after the violation upon which it is based."  15 U.S.C. § 77m.  Although the relevant purchases occurred within one year prior to filing this action, the district court held that the limitations period began to run *prior to* purchase because "the violation alleged for the Section 12(a)(1) claim is solicitation, which occurred earlier than one year of filing."  SPA-5.  But this Court has expressly held that the statute of limitations for Section 12(a)(1) claims runs from the date of a plaintiff's purchase,

---

[3] Plaintiffs alleged that prior to April 3, 2019, investors would *not* reasonably have understood that the Tokens were securities, and that Plaintiffs did not have knowledge that they had claims against Binance for the unlawful offer and sale of the Tokens. *E.g.*, A-197–201 (SAC ¶¶ 103–19).

not the defendant's last solicitation.  Plaintiffs' claims arising from purchases made within one year of filing are therefore timely as a matter of law.  Even if the statute of limitations had started to run upon Binance's last solicitation, Plaintiffs alleged that Binance continuously solicited the securities throughout the Class Period and within one year of filing, which is an independent reason why Plaintiffs' claims arising from purchases made within a year prior to filing this action are timely.

In addition, the district court's dismissal of all of Plaintiffs' claims as untimely simply ignored applicable state-law limitations periods, pursuant to which Plaintiffs indisputably have timely claims under state blue sky laws.  For example, Plaintiffs Anderson, Muhammad, and Williams bring claims under the Texas blue sky statute arising from their purchases of the EOS, TRX, ELF, FUN, ICX, OMG, and QSP tokens within three years before the filing of this action.  Because the Texas statute imposes a three-year repose period after the sale of an unregistered security, with no statute of limitations, no notice provision, and no knowledge defense, all of Plaintiffs' claims under Texas law are necessarily timely.  Likewise, Plaintiffs Token Fund I LLC and Hardin bring claims under the Puerto Rico and Nevada blue sky statutes, respectively, arising from purchases that clearly fall within the limitations periods applicable to those statutes.

Accordingly, for the reasons explained herein, Plaintiffs have asserted timely claims under the Securities Act and the Exchange Act, and under the blue sky laws

of Nevada, Puerto Rico, and Texas, arising from their domestic purchases of the EOS, TRX, ELF, FUN, ICX, OMG, and QSP tokens. The judgment of the district court should therefore be reversed.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because the matter in controversy exceeds the value of $5,000,000, exclusive of interests and costs, and is a class action in which any member of a class of plaintiffs is a citizen of a State different from any defendant, and in which any member of a class of plaintiffs is a citizen of a State and any defendant is a citizen or subject of a foreign state.

The district court also had jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' Second Amended Complaint, A-150 ("SAC"), asserts federal claims under the Securities Act and the Exchange Act. The district court further had jurisdiction over the Securities Act claims pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and over the Exchange Act claims pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa(a).

The district court had jurisdiction over violations of state securities laws pursuant to its supplemental jurisdiction under 28 U.S.C. § 1367(a).

Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1291 because this is an appeal from a final decision of the district court.

## STATEMENT OF ISSUES

1.     Whether federal and state securities laws apply to purchases of unregistered securities from an unregistered exchange or an unregistered broker/dealer when Plaintiffs' purchases were placed and became irrevocable within the United States, regardless of where the defendant is located.

2.     Whether Plaintiffs' claims arising under Section 12(a)(1) of the Securities Act and Section 29(b) of the Exchange Act, which were all asserted within three years of the securities being *bona fide* offered to the public and within one year of Plaintiffs' purchasing them, are timely.

3.     Whether Plaintiffs' claims under state securities laws are timely, including those that set out longer statutes of limitations than those provided under federal law.

## STATEMENT OF THE CASE

Plaintiffs-Appellants JD Anderson, Corey Hardin, Eric Lee, Brett Messieh, David Muhammad, Ranjith Thiagarajan, Chase Williams, and Token Fund I LLC (collectively, "Plaintiffs") respectfully request that this Court reverse the judgment of the United States District Court for the Southern District of New York (Carter, J.) granting Defendants-Appellees Binance and Changpeng Zhao's (collectively, "Defendants" or "Binance") motion to dismiss Plaintiffs' Second Amended Complaint.

## I.      Crypto-Assets

A crypto-asset is a digital asset that relies on cryptographic principles—the practice of encrypting and decrypting a message or piece of data—to secure transactions.  A-162–63 (SAC ¶ 2); Heather Hughes, *Blockchain and the Future of Secured Transactions Law*, 3 Stan. J. Blockchain L. & Pol'y 21, 31 n.37 (2020). Crypto-assets can be designed to serve as a medium of exchange, a store of value, or both.  A-174 (SAC ¶ 40).  All crypto-assets employ a digital ledger, called a "blockchain," that records the ownership and transfers of a specific crypto-asset.  A-162–63 (SAC ¶ 2).

A blockchain operates by storing electronic information about any given crypto-asset within a computer network.  It sequentially groups information about transactions involving the asset into blocks of a certain size, which are linked to other blocks of data about that same asset to form a "chain."  Hughes, *supra*, at 31. As new data is added during subsequent transactions, it is stored in a new block at the end of the chain that, when full, is locked, timestamped, and linked to the older blocks.  *See id.*  That structure creates a tamper-proof timeline of data that can be used to track and verify transactions because it is implemented in a "decentralized" manner—that is, all users may add data to the blockchain by engaging in transactions, but none may modify prior blocks or their timestamps.  *See id.*; *see also* A-175 (SAC ¶¶ 42–43); A-176 (SAC ¶ 50).  One of the most popular blockchain

networks is Ethereum, a software platform built upon Ethereum's version of blockchain technology.  A-176 (SAC ¶ 50).

Certain crypto-assets, known as "security tokens," are issued for the purpose of raising capital for a project that will be funded by the proceeds of those token sales.  Such tokens thus derive their value from the expected value of the project or issuer itself.  A-163–64 (SAC ¶ 4).  One popular form of security token is known as an "ERC-20 token," and transactions in these tokens are executed using the Ethereum blockchain.  A-178 (SAC ¶¶ 56–59).  Each of the crypto-assets underlying Plaintiffs' claims in this action (together, the "Tokens") are ERC-20 tokens.  Applying the analysis set forth by the SEC on April 3, 2019 for determining whether a digital asset is an investment contract and whether offers and sales of a digital asset are securities transactions under Supreme Court precedent, each of the Tokens is a security subject to federal and state securities laws.  A-201–03 (SAC ¶¶ 120–24).

## II.   ICOs And Crypto Exchanges

As crypto-assets boomed in 2017 and 2018, A-178–79 (SAC ¶ 61), numerous ERC-20 tokens (including each of the Tokens at issue here) were sold to the public in so-called "initial coin offerings" ("ICOs"), A-179 (SAC ¶¶ 62–66).  ICOs are the crypto-asset equivalent of an initial public offering—they are a mechanism by which issuers of new crypto-assets can sell those crypto-assets to public investors.  *See* Wulf A. Kaal, *Initial Coin Offerings: The Top 25 Jurisdictions and Their*

*Comparative Regulatory Responses (as of May 2018)*, 1 Stan. J. Blockchain L. & Pol'y 41, 41–42 (2018). Between 2017 and 2018, nearly $20 billion was raised through approximately 800 ICOs, the vast majority of which involved ERC-20 tokens. A-179 (SAC ¶¶ 64–65).

During the relevant period, issuers of ERC-20 tokens often released a "whitepaper" that provided a barebones description of a particular project to be funded by the token sales and the terms of the ICO. A-179 (SAC ¶ 66). These whitepapers generally lacked the warning statements and standardized format found in SEC registration statements, both of which aid potential investors in assessing the risks associated with a security. A-179–80 (SAC ¶ 67).

After an ICO, newly-issued tokens were frequently listed on crypto-asset exchanges, such as Binance, for secondary-market trading. A-175 (SAC ¶¶ 45–46); A-179–80 (SAC ¶¶ 63, 69–70). Investors could buy the tokens using other crypto-assets or traditional currencies and speculate on anticipated price increases. A-175–76 (SAC ¶¶ 45–48); A-180 (SAC ¶ 69). These exchanges became integral to the massive growth in the market for crypto-assets and ICOs. As Defendant Zhao put it when referring to Binance, "we are the heart" of the crypto-asset economy. A-186 (SAC ¶ 89).

### III. The Rise Of Binance

Binance is an online crypto-asset exchange run by Defendant Zhao, Yi He, and Roger Wang. It was launched in July 2017, and within one year had reportedly become the largest crypto-asset exchange in the world. A-170–72 (SAC ¶¶ 23–32). Issuers of new tokens often sought to list them on exchanges like Binance after launching an ICO to gain access to an array of eager yet unsophisticated retail investors. A-185 (SAC ¶¶ 85–86).

Binance reaped massive profits by soliciting and selling numerous crypto-assets, including the Tokens, on its unregistered exchange. A-167 (SAC ¶ 12) A-168–70 (SAC ¶¶ 15–22); A-178 (SAC ¶ 58); A-181 (SAC ¶ 74); A-185–86 (SAC ¶¶ 85–91); A-263 (SAC ¶ 365); A-265 (SAC ¶ 375); A-268 (SAC ¶ 386); A-274 (SAC ¶ 425). Binance promoted itself through email and social media solicitations encouraging investors to purchase crypto-assets on Binance, through promotions such as reward programs for investors who purchased crypto-assets on the exchange, through continuous solicitations on its website displaying detailed price and trading data for crypto-assets on Binance, and through publication on its website of investor reports rating the Tokens and encouraging their purchase. A-187–88 (SAC ¶¶ 92–93); A-190–96 (SAC ¶¶ 97–100).

Binance directly solicited U.S. investors by, for example, targeting its marketing to U.S. users and providing customer support to U.S. users—indeed, it

publicly recognized that U.S. residents were accessing its platform. A-181–84 (SAC ¶¶ 76–81). Even when Binance cut off access for U.S. users to its platform in September 2019, it advised U.S.-based purchasers how to circumvent its own restrictions—after which several named Plaintiffs continued trading on Binance in the United States. A-183–84 (SAC ¶¶ 81–82).

Binance hosts its exchange on computer servers in the U.S. and stores its data in the U.S. A-170–71 (SAC ¶ 24). A number of its employees, including its Vice President of Global Operations, reside in the United States. A-171 (SAC ¶ 25). Binance hires in the United States, A-173–74 (SAC ¶ 37), has participated in conferences in the U.S., *id.*, and has pursued regulatory approval for its own stablecoin[4] in the United States, A-174 (SAC ¶ 39).

## IV. Procedural History

On April 3, 2020, the original Complaint in this action was filed in the U.S. District Court for the Southern District of New York. No. 1:20-cv-02803-ALC, ECF No. 1. On June 8, 2020, Plaintiffs moved for appointment as lead plaintiffs pursuant to the Private Securities Litigation Reform Act of 1995 and for selection of their counsel as co-lead counsel. No. 1:20-cv-02803-ALC, ECF Nos. 23–24. The district

---

[4] A stablecoin is a type of crypto-asset with a fixed value—typically pegged to a specific real currency, often the U.S. dollar—created to facilitate additional trading by investors on a crypto exchange.

court granted Plaintiffs' motion on August 26, 2020. No. 1:20-cv-02803-ALC, ECF No. 40.

On December 15, 2020, Plaintiffs filed the SAC on behalf of themselves and all others similarly situated. A-150. Plaintiffs allege that Binance was operating as an "online exchange without registering as an exchange or broker/dealer, and without a registration statement in effect for the securities it was selling, in violation of federal and state securities laws." A-162 (SAC ¶ 1). On February 16, 2021, Defendant filed a motion to dismiss or, in the alternative, compel arbitration. No. 1:20-cv-02803-ALC, ECF No. 58 ("Motion to Dismiss"). On March 31, 2022, the district court issued an Opinion and Order granting the Motion to Dismiss on two grounds. SPA-1 (the "Order"); *Anderson v. Binance*, 2022 WL 976824 (S.D.N.Y. Mar. 31, 2022). First, the district court found that Plaintiffs' claims under Section 12(a)(1) of the Securities Act and Section 29(b) of the Exchange Act were untimely. SPA-4–7. Second, the district court found that Plaintiffs' claims, including those brought under state "blue sky" securities laws, were impermissibly extraterritorial. SPA-7–10. Accordingly, on March 31, 2022 the district court entered a judgment granting the Motion to Dismiss and dismissing the SAC in its entirety. SPA-11.

Plaintiffs timely filed a notice of appeal on April 29, 2022. A-661.

## SUMMARY OF ARGUMENT

Plaintiffs more than adequately alleged that their purchases of Tokens from Binance were domestic transactions subject to federal and state securities laws. This Court, applying *Morrison v. National Australia Bank Ltd.*, 561 U.S. 254 (2010), has held that where an investor incurs irrevocable liability in the United States to purchase a security, the transaction is domestic. To be sure, mere placement of a purchase order in the United States for foreign shares that are processed, matched, and settled on a foreign exchange is insufficient to create a domestic transaction, because the investor does not incur irrevocable liability for the purchase in the United States. But under this Court's precedents, where a plaintiff alleges additional transactional steps that occurred in the United States and bound the plaintiffs to the transaction, she sufficiently pleads a domestic transaction. Such additional steps might include, for example, the matching of counterparties to a trade in the United States (even if the trade is subsequently cleared and settled abroad), the sending of offering materials and purchase confirmations to plaintiffs in the United States, and the plaintiff's sending payment for the security while in the United States.

That is exactly what Plaintiffs alleged here: that in addition to placing purchase orders in the United States, additional transactional steps occurred in the United States that irrevocably bound Plaintiffs to purchase the Tokens. Specifically, Plaintiffs alleged that while located in the United States they agreed to purchase the

Tokens pursuant to contracts with Binance, and submitted payment from their states of residence via Binance's crypto-asset exchange, which was hosted on U.S. computer infrastructure. Those purchases became final and binding when the trades were validated by computers servicing the Ethereum blockchain that were physically located in the United States. These allegations are more than sufficient to plausibly allege a domestic transaction under this Court's precedents, and the district court's contrary ruling should be reversed.

The district court's ruling that Plaintiffs' claims under the Exchange Act and Securities Act are untimely, even as to Token purchases within one year before filing, is irreconcilable with statutory language and this Court's precedents. Claims brought under Section 29(b) of the Exchange Act are subject to a one-year statute of limitations. As the district court recognized, Section 29(b) makes that period expressly subject to a discovery rule, pursuant to which the limitations period only begins to run upon the "discovery that [the] sale or purchase involves [a] violation." 15 U.S.C. § 78cc(b). The district court nonetheless dismissed all of Plaintiffs' Section 29(b) claims as untimely, including those arising from purchases within one year before this action was filed, on the ground that Plaintiffs knew the Binance exchange was not registered earlier than one year prior to filing.

This holding cannot be squared with the plain language of Section 29(b) providing that commencement of the statute of limitations is triggered by the

discovery of a sale or purchase involving a violation. *Id.* It is impossible for a sale or purchase to involve a violation when the sale or purchase has not yet occurred, as this Court and others have recognized when interpreting analogous limitations periods in the securities laws. The district court's holding—which relies on illegitimate fact-finding concerning Plaintiffs' pre-purchase knowledge—engrafts a knowledge defense where none exists in the statute or caselaw, and yields the illogical result that Section 29(b)'s discovery rule would shorten the one-year statute of limitations, rather than lengthen it.

In addition, the district court's ruling that Plaintiffs' Section 29(b) claims were untimely should be reversed because the court's factual finding regarding Plaintiffs' knowledge is contradicted by Plaintiffs' allegations that prior to April 3, 2019, investors would not reasonably have understood that the Tokens were securities.

As for Plaintiffs' claims under Section 12(a)(1) of the Securities Act, the district court recognized that such claims must be brought within one year after the violation upon which it is based pursuant to Section 13 of the statute, but found all of Plaintiffs' Section 12(a)(1) claims, including those arising from purchases within one year prior to the filing of suit, untimely because it concluded that Binance's latest act of solicitation occurred more than one year before filing. That was wrong for two reasons. *First*, this Court has squarely held that the one-year limitations period for a Section 12(a)(1) claim does not begin to run until *after* a plaintiff's

purchase of an unregistered security, because a contrary rule (like that employed by the district court) would mean that the statute of limitations could begin to run—or even expire—before the plaintiff could bring a claim. *Second*, even if the statute of limitations for Section 12(a)(1) claims based on Binance's solicitations did start to run at the time of the last solicitation (which it does not), Plaintiffs' Section 12(a)(1) claims arising from purchases within the year before filing would still be timely because each of those purchases coincided with Binance's continuous solicitation of the Tokens through its website's displaying of price and trading data that solicited, promoted, and enabled those purchases.

The district court also failed to address the limitations periods applicable to Plaintiffs' state law claims, and instead relied on the federal law limitations periods in dismissing all of Plaintiffs' claims as untimely. Even if this Court were to find Plaintiffs' claims under federal law untimely (which they are not), Plaintiffs have pled timely claims under state securities laws that set out lengthier limitations periods than the analogous federal statutes.

Finally, the district court dismissed on extraterritoriality grounds Plaintiffs' state law claims on behalf of absent class members on the grounds that the named Plaintiffs themselves did not trade from those jurisdictions. But this Court has held that as long as named plaintiffs have standing to sue the defendants—which Plaintiffs do here—any concern about whether it is proper for a class to include out-

of-state, nonparty class members with claims subject to other states' analogous statutes is a question of predominance for class certification, not grounds for dismissal.

Accordingly, the judgment of the district court should be reversed.

## **ARGUMENT**

### I. Plaintiffs' Claims Arise From Domestic Securities Transactions That Are Subject To Federal And State Securities Laws

A dismissal based on the extraterritorial applicability of a statute is treated as a dismissal pursuant to Rule 12(b)(6). *See Morrison*, 561 U.S. at 254. Accordingly, the Court reviews *de novo* the district court's ruling that Plaintiffs' claims are impermissibly extraterritorial, accepting all factual allegations in the SAC as true and drawing all reasonable inferences in Plaintiffs' favor. *See, e.g.*, *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 65 (2d Cir. 2012).

Pursuant to *Morrison*, the federal securities laws apply to "domestic transactions in … securities." 561 U.S. at 267. This Court has explained that "'domestic transactions[]' are those involving securities in which (1) irrevocable liability is incurred in the United States, or (2) title passes within the United States." *Giunta v. Dingman*, 893 F.3d 73, 79 (2d Cir. 2018) (quoting *Absolute Activist*, 677

F.3d at 62).[5]  A party to a transaction "incur[s] irrevocable liability in the United States" when it "becom[es] bound to effectuate the transaction" or "enter[s] into a binding contract to purchase or sell securities" in the United States.  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 265 (2d Cir. 2016) (quoting *Absolute Activist*, 677 F.3d at 67).  "In other words, territoriality under *Morrison* concerns where, physically, the purchaser or seller committed him or herself."  *United States v. Vilar*, 729 F.3d 62, 77 n.11 (2d Cir. 2013).  "At the pleading stage, it is sufficient for the plaintiff to 'allege facts leading to the plausible inference' of a domestic transaction."  *Giunta*, 893 F.3d at 79 (citing *Absolute Activist*, 677 F.3d at 68).

Allegations that a plaintiff placed purchase orders in the United States and that additional transactional steps binding the plaintiffs to the transaction took place in the United States suffice to plead a domestic transaction.  *See Myun-Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60, 66 (2d Cir. 2018).  Such additional steps might include, for example, the "matching" of counterparties to a trade in the United States (even if the trades are subsequently cleared and settled abroad), *id.* at 67; the sending of offering materials and purchase confirmations to plaintiffs who are located in the United States, *see FHFA*, 873 F.3d at 156–57; or the transmission of

---

[5] This Court has applied the same standard in deciding the territorial scope of state "blue sky" securities laws.  *See Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.* ("*FHFA*"), 873 F.3d 85, 156 (2d Cir. 2017).

payment for the security by a plaintiff who is located in the United States, *Giunta*, 893 F.3d at 80–81; *Vilar*, 729 F.3d at 78.  By contrast, as this Court held in *City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*, where a plaintiff merely alleges that she placed purchase orders in the United States, but those orders were processed, matched, and settled on a foreign exchange physically located in another country, such allegations are insufficient to allege domestic transactions. 752 F.3d 173, 181–82 (2d Cir. 2014).

The district court primarily relied on *City of Pontiac* to hold that Plaintiffs did not allege domestic transactions for purposes of *Morrison*, and therefore held that Plaintiffs' federal and state securities claims "fail due to extraterritoriality."  SPA-8–10.  But particularly when read alongside other precedent from this Court addressing the domesticity of securities transactions, *City of Pontiac* confirms the opposite of what the district court found: that Plaintiffs did, indeed, adequately allege domestic transactions subject to federal and state securities laws.

The key point is that the allegations here go beyond those in *City of Pontiac*. The plaintiffs there alleged that because they placed "a buy order in the United States for the purchase of foreign securities on a foreign exchange," they "incurred irrevocable liability in the United States, such that the U.S. securities laws govern the purchase of those securities." *City of Pontiac*, 752 F.3d at 181.  Here, by contrast, Plaintiffs allege much more: in addition to placing purchase orders in the United

States, other transactional steps occurred in the United States that irrevocably bound Plaintiffs to purchase the Tokens.

Specifically, Plaintiffs allege that while located in the United States they agreed to purchase the Tokens pursuant to contracts with Binance, and they submitted payment from their states of residence via Binance's crypto-asset exchange hosted on U.S. computer infrastructure. *See* A-168–70 (SAC ¶¶ 15–22); A-170–71 (SAC ¶ 24). Those purchases then became final and binding when the trades were validated by computers servicing the Ethereum blockchain that were physically located in the United States. *See* A-175 (SAC ¶ 44); A-176 (SAC ¶ 50); A-178 (SAC ¶¶ 56–59); A-254 (SAC ¶ 328).

As to the last point, as explained in the SAC, crypto-asset transactions utilizing blockchain technology, including all ERC-20 token transactions, must be "validated" by other participants in the blockchain network before they become final and binding, thus ensuring the accuracy and security of transactions recorded on the blockchain ledger. *E.g.*, A-175 (SAC ¶ 44); A-176 (SAC ¶ 50); A-178 (SAC ¶ 58). That validation process occurs across a network of "nodes"—individual computers that "verify the validity of the transaction," Alexis M. Tellerd, Comment, *Time to Validate Validators: Determining the Legal Duty of Cryptocurrency Validators*

*Under the Bank Secrecy Act*, 8 Nat'l Sec. L.J. 297, 304,[6] and the largest cluster of nodes validating transactions on the Ethereum blockchain is in the United States.[7] *See* A-170–71 (SAC ¶ 24); A-175 (SAC ¶ 44); A-176 (SAC ¶ 50); A-178 (SAC ¶¶ 56–59); A-254 (SAC ¶ 328).

Plaintiffs alleged that for the transactions at issue here, validation of Plaintiffs' Token purchases occurred on U.S.-based nodes servicing the Ethereum blockchain. *Id.* That allegation, as well as Plaintiffs' allegations that while located in the United States they agreed to purchase the Tokens pursuant to contracts with Binance and submitted payment from their states of residence via Binance's crypto-asset exchange hosted on U.S. computer infrastructure, *see* A-168–70 (SAC ¶¶ 15–22), A-170–71 (SAC ¶ 24), distinguish this case from *City of Pontiac*, in which the shares at issue could be acquired or traded only by placing orders on a Swiss exchange, such that the trades were processed, matched, and settled in Switzerland, even when "buy order[s]" for shares came from the United States. *See* 752 F.3d at 181.

---

[6] *See also* Shahar Somin et al., *ERC20 Transactions over Ethereum Blockchain: Network Analysis and Predictions*, 1–2 (Apr. 17, 2020), https://arxiv.org/abs/2004.08201; Vitalik Buterin, *Ethereum: A Next-Generation Smart Contract and Decentralized Application Platform*, 32–33 (2014), https://ethereum.org/669c9e2e2027310b6b3cdce6e1c52962/Ethereum_Whitepaper_-_Buterin_2014.pdf.

[7] *See Ethereum Mainnet Statistics*, ethernodes.org - The Ethereum Network & Node Explorer (last visited July 25, 2022), https://ethernodes.org/countries.

Other decisions of this Court confirm that Plaintiffs alleged domestic transactions under *Morrison*. *Myun-Uk Choi*, for example, recognized that as long at least one transactional step that binds the plaintiff to the transaction takes place in the United States, the transaction is domestic under *Morrison*. *See* 890 F.3d at 66–67. The Court held that even though the plaintiffs' trades were "cleared and settled" outside the United States, irrevocable liability was incurred in the United States because the trades were "matched" there, since matching "bind[s] the parties" and neither party can later "unilaterally revoke" the trade. *Id.* at 67. Here, Plaintiffs allege that their Token purchases became final and binding within the United States because they were validated on U.S.-based nodes servicing the Ethereum blockchain, and Plaintiffs were not "free to revoke" their "acceptance of [the] trade[s]" after validation. *Id.* at 68. Plaintiffs' allegations therefore "make it plausible" that they "incur[red] irrevocable liability in the United States," which is sufficient to allege domestic transactions at the pleading stage. *Id.* at 66.

Several other rulings of this Court confirm that the locations where an investor enters into relevant contracts and transmits funds for a purchase are critical in determining whether a transaction is domestic. In *Vilar*, the Court found dispositive "evidence demonstrating that [an investor] irrevocably committed herself to [the] investment while in New York," noting letters "demonstrat[ing] that [the investor] was in New York when she received and signed the commitment forms for her

23

[investment] and sent the money required for opening her account." 792 F.3d at 78. Such facts "'concerning the formation of the contracts' and 'the exchange of money'" indicated that the plaintiffs had become bound to the transaction in the United States, and thus the Court concluded that the plaintiffs had adequately alleged a domestic transaction. *Id.* Similarly, Plaintiffs here allege that they purchased the Tokens by entering into contracts with Binance to which they agreed while in their states of residence. *E.g.*, A-168 (SAC ¶ 15) (Plaintiff Anderson "purchased Tokens on Binance … pursuant to contracts with and solicitations from Binance, from Texas during the Class Period"); *see also* A-168–70 (SAC ¶¶ 15–22). That is indistinguishable from *Vilar*, and Plaintiffs allege that they became irrevocably bound to their purchases within the United States. *See Vilar*, 729 F.3d at 76–77, 98 (investors' transactions were domestic because the investors were in the United States when they agreed to purchase a security and sent payment); *Giunta*, 893 F.3d at 80–81 (same).

*FHFA* reached a similar conclusion. There, the Court found that because the investors' traders worked in the investors' principal places of business, and the defendants had emailed offering materials to those traders in those locations, irrevocable liability to purchase securities was incurred there. 873 F.3d at 156–58. Likewise, Plaintiffs here alleged that they traded securities from the United States, A-168–70 (SAC ¶¶ 15–22), and that Binance sent email communications to

investors in the United States to solicit purchases and enable U.S. investors to log into their accounts to trade Tokens, A-183 (SAC ¶¶ 79–80); A-196 (SAC ¶ 101). Under *FHFA*, these allegations are sufficient to show domesticity.

Applying this Court's decision in *Absolute Activist*, the U.S. District Court for the Northern District of California held that allegations very similar to those here established the domesticity of crypto-asset transactions. *In re Tezos Secs. Litig.*, 2018 WL 4293341, at *8 & n.12 (N.D. Cal. Aug. 7, 2018). The court noted the domestic "realities of the [alleged] transaction," including that the plaintiff "participated in the transaction from this country … by using an interactive website that was: (a) hosted on a server in Arizona and; (b) run primarily by [a defendant] in California." *Id.* at *8. In addition, the court observed, the plaintiff "presumably learned about the ICO and participated in response to marketing that almost exclusively targeted United States residents." *Id.* Crucially, the court recognized that the plaintiff's "contribution of Ethereum to the ICO became irrevocable only after it was validated by a network of global 'nodes' clustered more densely in the United States than in any other country." *Id.* The court found that those factors, taken together, "support an inference that [plaintiff's] alleged securities purchase occurred inside the United States." *Id.*

The same is true here. Plaintiffs were solicited to purchase the Tokens through marketing targeted at U.S. investors and purchased the Tokens using Binance's

crypto-asset exchange hosted on U.S. computer infrastructure. *See* A-181 (SAC ¶ 76); A-183 (SAC ¶ 79). Plaintiffs' trades became irrevocable upon being validated on U.S.-based nodes servicing the Ethereum blockchain. *See* A-170–71 (SAC ¶ 24); A-178 (SAC ¶¶ 56–59); A-254 (SAC ¶ 328). These allegations are more than sufficient to plausibly allege a domestic transaction.

Any other result would have perverse consequences. If Plaintiffs' transactions were beyond the reach of federal and state securities laws, then Binance would escape any liability for its operation of an unregistered exchange despite making every effort to target U.S. investors to purchase crypto-assets within the United States on its exchange. Binance marketed itself to U.S. users via email, allowed deposits from U.S.-based exchanges, and collected information including driver's license and passport information demonstrating that U.S. investors were purchasing crypto-assets on Binance. A-181–82 (SAC ¶¶ 76–77) A-183 (SAC ¶ 79). Allowing Binance to evade liability would incentivize all crypto-exchanges to set up shop outside the United States and flagrantly market unregistered securities to U.S. investors.

## II. Plaintiffs' Federal Claims Based On Purchases Within One Year Before Filing Suit Are Timely

A dismissal based on the timeliness of a claim is treated as a dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Accordingly, the Court reviews *de novo* the district court's ruling that Plaintiffs'

claims are untimely, accepting all factual allegations in the SAC as true and drawing all reasonable inferences in Plaintiffs' favor. *See Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 424 (2d Cir. 2008).

## A. Plaintiffs' Exchange Act Claims Based On Purchases Within One Year Before Filing Suit Are Timely

The district court dismissed as untimely Plaintiffs' claims under the Exchange Act, which alleged that Binance formed illegal contracts that are voidable under Section 29(b) by entering into transactions as an unregistered exchange and an unregistered broker/dealer. A-264–69 (SAC ¶¶ 370–90).[8] The district court held that "Section 29(b) has a one-year statute of limitations," as well as a "discovery rule" pursuant to which "the limitations period[] only begins to run within one year after the discovery that the sale or purchase involves a violation." SPA-6 (alterations and internal quotation marks omitted) (citing 15 U.S.C. § 78cc).[9] Plaintiffs asserted

---

[8] Binance asked the district court to dismiss Plaintiffs' Exchange Act claims on the additional ground that Binance is purportedly not a broker or dealer. No. 1:20-cv-02803-ALC, ECF No. 59 at 17–19; *cf.* No. 1:20-cv-02803-ALC, ECF No. 64 at 16–17 (explaining that Plaintiffs adequately allege Binance is a broker/dealer). The district court did not address this issue in its Order, and it is not ripe for review on appeal.

[9] Section 29(b) expressly provides a one-year limitations period and a three-year repose period only for actions based on *fraud* violations under Section 15(c)(1) and 15(c)(2) of the Exchange Act, which are not at issue in this case. 15 U.S.C. § 78cc(b)(B). The question of whether those periods also apply to non-fraud claims under Section 29(b) was not presented to nor decided by the district court. Resolution of that question is not necessary to decide this appeal, because even if

claims arising from purchases both within and outside of the one-year period before the filing of this action.[10]

The district court erroneously dismissed *all* of Plaintiffs' Section 29(b) claims—including those arising from purchases within one year prior to the filing of suit—as untimely, on the ground that "Plaintiffs knew of the violation, that the exchange was not registered, earlier than one year prior to filing." SPA-6. First, the district court's factual finding regarding Plaintiffs' knowledge is erroneous because it is contradicted by Plaintiffs' allegations and thus improper on a motion to dismiss. The district court claimed that "the complaint alleges that Plaintiffs knew that Binance was unregistered," but in support cited only a passage of the SAC stating that "[i]t is well known that VPNs are necessary for U.S. purchasers to access unregistered crypto-asset exchanges, like Binance." SPA-6 (quoting SAC ¶ 330). It simply does not follow from the quoted language that Plaintiffs knew Binance was an unlawfully unregistered exchange prior to the time of the relevant Token purchases, a determination that would require an assessment of Binance's legal

_____

the district court were correct that a one-year limitations period applies (which Plaintiffs assume for purposes of this appeal), Plaintiffs' claims are timely.

[10] Plaintiffs' claims based on purchases outside of one year before the filing of this action were premised on Plaintiffs' allegations that the accrual of such claims was delayed by the equitable doctrines of injury evading discovery and the fraud-based discovery rule. As noted above, Plaintiffs do not appeal the district court's determination that those equitable doctrines did not delay the accrual of Plaintiffs' claims.

status.  In addition, the relevant facts, even by the district court's understanding of the law, would necessarily require a plaintiff to understand that the underlying Tokens were securities.  But the SAC alleged precisely the opposite of what the district court claimed it did—specifically, the SAC alleged that prior to the guidance released by the SEC on April 3, 2019, investors would *not* reasonably have understood that the Tokens were securities and Plaintiffs therefore did *not* have knowledge that they had claims against Binance for the unlawful offer and sale of the Tokens.  *See, e.g.*, A-256 (SAC ¶ 336).  The district court's unsupported conclusion that Plaintiffs *did* have such knowledge—contrary to the well-pleaded allegations in the SAC—should therefore be reversed.

Second, the district court's holding is inconsistent with the language of the Exchange Act and decisions interpreting it, which make clear that a "violation" triggering the beginning of the limitations period cannot occur until a "sale or purchase" has occurred.  *See* 15 U.S.C. § 78cc(b).  The timeliness of a claim under Section 29(b) is determined by reference to "the discovery that *such sale or purchase* involves such *violation*."  15 U.S.C. § 78cc(b) (emphasis added).  It is impossible to discover that a sale or purchase "involves [a] violation," *id.*, when the sale or purchase has not yet occurred.  To hold otherwise would be inconsistent with the substantive prohibitions of Section 29(b), which renders contracts voidable "that are either illegal *when made* or … *performed*."  *Slomiak v. Bear Stearns & Co.*, 597 F.

Supp. 676 (S.D.N.Y. 1984) (emphasis added) (quoting *Reg'l Props., Inc. v. Fin. & Real Estate Consulting Co.*, 678 F.2d 552, 560 (5th Cir. 1982)); *accord EMA Fin., LLC v. NFusz, Inc.*, 509 F. Supp. 3d 18, 37 n.22 (S.D.N.Y. 2020). Accordingly, the one-year limitations period cannot begin to run until, at the very earliest, the time of the actual purchase. *See also Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 163 (2d Cir. 1989) (reversing dismissal on statute of limitations grounds and observing that "[t]he general rule in this circuit is that a cause of action accrues when the plaintiff could first have successfully maintained a suit based on that cause of action" (internal quotation marks omitted)). Thus, Plaintiffs' Exchange Act claims based on purchases made within one year of filing are timely on their face.

The district court's approach is in hopeless tension with the plain language of Section 29(b), 15 U.S.C. § 78cc(b), because it engrafts a knowledge defense where none exists in the statute. That omission is especially notable given that Congress knows how to create knowledge-based defenses to liability under the securities laws when it chooses to do so. *See, e.g.*, 15 U.S.C. § 77k; *id.* § 77*l*(a)(2). As the district court itself noted—despite failing to respect this caution—"[t]he Supreme Court has warned against … atextual judicial supplementation" when "Congress has shown that it knows how to adopt the omitted language or provision." SPA-4 (internal quotation marks and alterations omitted) (quoting *Rotkiske v. Klemm*, 140 S. Ct. 355, 361 (2019)).

Notably, the manner in which the district court applied Section 29(b)'s discovery rule would *shorten* the statute of limitations, rather than lengthen it. Neither Binance nor the district court cited any authority in support of this novel, and dubious, proposition. Its application would be particularly unjustifiable here, where Congress has already cabined the potential for open-ended liability by establishing a three-year repose period. By ignoring the accrual of Plaintiffs' claims (the date of purchase) and holding that the limitations period began to run *before* accrual, the district court treated the one-year statute of limitations as if it were a statute of repose, but statutes of limitations, unlike statutes of repose, begin to run only after accrual. *See, e.g.*, *City of Pontiac Policemen's & Firemen's Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 176 (2d Cir. 2011) ("Unlike a statute of repose, which begins to run from the defendant's violation, a statute of limitations cannot begin to run until the plaintiff's claim has accrued.").

In sum, neither the plain language of Section 29(b), nor caselaw concerning discovery rules more generally, supports a rule that could hold Section 29(b) claims untimely *ab initio* if a plaintiff learned of the fact that the exchange was unregistered before purchasing the security. Thus, even if this Court were to accept the district court's conclusion that the Plaintiffs were aware that Binance was an unregistered exchange prior to their purchases, Plaintiffs' claims based on purchases made on or after April 3, 2019 are necessarily timely because this action was filed on April 3,

2020. Plaintiffs Hardin, Muhammad, Thiagarajan, Token Fund I LLC, and Williams purchased the EOS and TRX tokens from Binance on or after April 3, 2019. *See* A-168 (SAC ¶ 16); A-169–70 (SAC ¶¶ 19–22); A-40–66 (Hardin Certification); A-84–122 (Muhammad Certification); A-123–25 (Thiagarajan Certification); A-126–31 (Williams Certification); A-132–49 (Token Fund I LLC Certification). Their Section 29(b) claims arising from those purchases are therefore timely as a matter of law, and the district court's dismissal of those claims as untimely was erroneous and should be reversed.

That result would be consistent with cases interpreting analogous limitations provisions, such as that of the Investment Advisers Act, as well as other securities laws, such as the Securities Act, which have consistently held that accrual occurs upon the sale of a security. *See, e.g.*, *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1040 (2d Cir. 1992) ("[T]he wrong occurs," for purposes of an Investment Advisers Act action for rescission, "when the plaintiff makes a completed sales transaction."); *Celsion Corp. v. Stearns Mgmt. Corp.*, 157 F. Supp. 2d 942, 949 (N.D. Ill. 2001) ("A cause of action under the [Securities] Act accrues and the statute of limitations begins to run 'on the date the sale of the instrument is

complete.'" (quoting *McCool v. Strata Oil Co.*, 972 F.2d 1452, 1460 (7th Cir. 1992))).[11]

## B. Plaintiffs' Securities Act Claims Based On Purchases Within One Year Before Filing Suit Are Timely

A claim under Section 12(a)(1) of the Securities Act must be brought "within one year after the violation upon which it is based." 15 U.S.C. § 77m. Plaintiffs alleged that Binance violated Section 12(a)(1) by promoting, soliciting, and selling unregistered securities to Plaintiffs and members of the proposed Class. *See* A-262–63 (SAC ¶¶ 363–69).

As with Plaintiffs' Exchange Act claims, the district court ruled that all of Plaintiffs' Section 12(a)(1) claims—including those arising from purchases within one year prior to the filing of suit—were untimely because "the violation alleged for the Section 12(a)(1) claim is solicitation," and the "latest act of solicitation" by Binance "occurred earlier than one year [before] filing." SPA-5.[12] This was

---

[11] *See also CTS Corp. v. Waldburger*, 573 U.S. 1, 7 (2014) ("In the ordinary course, a statute of limitations creates a time limit for suing in a civil case, based on the date when the claim accrued.") (internal quotation marks omitted); *cf. City of Pontiac*, 637 F.3d at 176 (because a "statute of limitations cannot begin to run until a claim has accrued, and a securities fraud claim does not accrue until the plaintiff has bought or sold the relevant security, then the statute of limitations cannot begin to run until after the plaintiff's transaction").

[12] The district court additionally ruled that the SAC insufficiently alleged that Binance violated Section 12(a)(1) by passing title of unregistered Tokens to Plaintiffs. SPA-5 n.2. Although Plaintiffs disagree with the district court's conclusion, in the event that this Court reverses the district court's dismissal of the

erroneous for two reasons.  *First*, this Court has expressly held that the statute of limitations for Section 12(a)(1) claims runs from a plaintiff's purchase, not the defendant's last solicitation, and therefore Plaintiffs' claims arising from purchases in the one year before filing are timely as a matter of law.  *Second*, even if the statute of limitations began to run upon Binance's last solicitation, Plaintiffs alleged that Binance continuously solicited purchases of the Tokens during the one year before filing, and Plaintiffs Hardin, Muhammad, Thiagarajan, Token Fund I LLC, and Williams's claims arising from purchases of the EOS and TRX tokens during that year are therefore timely.

### 1. The Limitations Period For Section 12(a)(1) Claims Runs From The Time Of Purchase

This Court has squarely held that the limitations period for a Section 12(a)(1) claim does not begin to run until the plaintiff's purchase of the unregistered security. In *Diskin v. Lomasney & Co*., this Court held that where a Section 12(a)(1) claim is predicated on the defendant's offer of unregistered securities, the limitations period begins to run only upon the plaintiff's purchase of the unregistered security.  452

_____

SAC for the reasons set forth herein and remands for further proceedings, Plaintiffs intend to seek the district court's leave to amend the SAC to further expand upon their allegations under Section 12(a)(1) regarding Binance's passing of title of unregistered tokens to Plaintiffs—in particular, that the structure of a centralized crypto-asset exchange such as Binance renders it in privity with its customers for each sale or purchase, and that title for securities transacted on Binance passes between Binance and the customer.

F.2d 871, 875–76 (2d Cir. 1971) (Friendly, J.). That is because "it would be unreasonable to read [the statute of limitations] as starting the short period for an action [under Section 12(a)(1)] at a date before the action could have been brought— a construction which might lead in some extreme cases to running the statute of limitations before the claim had ever arisen." *Id.* Other cases from this Court are in accord. *See Wigand v. Flo-Tek, Inc.*, 609 F.2d 1028, 1033 n.5 (2d Cir. 1979) (in Section 12(a)(2) action, citing *Diskin* for the proposition that "the limitations period here begins to run only after the sale, because it would be unreasonable to have the limitations period begin to run before the claim accrued, [*i.e.*], before the sale occurred"); *see also City of Pontiac*, 637 F.3d at 175 (in Section 10(b) action, observing that "[s]ince the purpose [of a statute of limitations] is to prevent stale claims, it would make no sense for a statute of limitations to begin to run before the plaintiff even has a claim").

*Diskin* is fully consistent with the Supreme Court's decision in *Pinter v. Dahl*, which holds that where Section 12(a)(1) liability is based on a defendant's solicitation of unregistered securities, "a prospective buyer has no recourse against a person who touts unregistered securities to him if he does not purchase the securities." 486 U.S. 622, 644 (1988). Because *Pinter* requires a *successful* solicitation in order for a plaintiff to bring a Section 12(a)(1) claim, the "violation" from which the limitations period begins to run can occur only upon the plaintiff's

purchase of the unregistered security.  Otherwise, the one-year limitations period could expire before a plaintiff could plead a violation of Section 12(a)(1), which is precisely the result this Court previously rejected in *Diskin*.  452 F.2d at 875–76.

Plaintiffs Hardin, Muhammad, Thiagarajan, Token Fund I LLC, and Williams purchased the EOS and TRX tokens from Binance within one year prior to the filing of this action.  *See* A-168 (SAC ¶ 16); A-169–70 (SAC ¶¶ 19–22); A-40–66 (Hardin Certification);  A-84–122  (Muhammad  Certification);  A-123–25  (Thiagarajan Certification);  A-126–31 (Williams Certification); A-132–49 (Token Fund I LLC Certification).  Because the limitations period for Plaintiffs' Section 12(a)(1) claims arising from those purchases runs from the time of purchase (*Diskin*, 452 F.2d at 875–76), those claims are timely as a matter of law, and the district court's dismissal of those claims as untimely was erroneous.

### 2. Plaintiffs' Token Purchases And Binance's Solicitations Occurred Within One Year Before Filing

Even  if  the  statute  of  limitations  for  Section  12(a)(1)  claims  based  on Binance's solicitations began to run at the time of the last solicitation (which, under *Diskin*, it does not), Plaintiffs' Section 12(a)(1) claims arising from their purchases within the year before filing would still be timely.

The district court found that "Defendants' latest act of solicitation with respect to these two tokens is Binance's republication of investor reports in November 2018 and February 2019, more than a year before Plaintiffs initiated this Action."  SPA-

5.  But the district court's description ignores Plaintiffs' allegation that "Binance's website served as a continuous form of solicitation, throughout the Class Period, that both promoted and enabled sales of the Tokens" by "displaying detailed price and trading data of the Tokens" that induced Plaintiffs to trade.  A-193–94 (SAC ¶ 99). The district court's determination that Defendants did not solicit sales within a year prior to suit thus contradicts the allegations in the SAC, namely, that Binance heavily promoted the Tokens *throughout* the Class Period, including immediately prior to each purchase and sale.  A-186 (SAC ¶¶ 87–89); A-187–93 (SAC ¶¶ 92–98).

As discussed above, Plaintiffs Hardin, Muhammad, Thiagarajan, Token Fund I LLC, and Williams each purchased the EOS and TRX tokens from Binance within one year prior to the filing of this action.  A-40–66 (Hardin Certification); A-84–122 (Muhammad Certification); A-123–25 (Thiagarajan Certification); A-126–31 (Williams Certification); A-132–49 (Token Fund I LLC Certification).  Each of those purchases was made through Binance's website, *see* A-168 (SAC ¶ 16); A-169–70 (SAC ¶¶ 19–22), and therefore each of those purchases coincided with Binance's continuous solicitation of the Tokens through its website's displaying of price and trading data that solicited, promoted, and enabled those purchases, A-193–94 (SAC ¶ 99).  Thus, even if the limitations period for Plaintiffs' Section 12(a)(1) claims were appropriately measured from Binance's last solicitation (which it is not), Plaintiffs' claims arising from those purchases are timely because Binance's

solicitations of Plaintiffs' purchases of the Tokens likewise occurred within the year prior to filing suit.

## III. Plaintiffs' State Securities Laws Claims Are Timely

The district court failed to address the limitations periods applicable to Plaintiffs' state law claims. Instead, it simply looked to the limitations periods applicable to Plaintiffs' federal law claims, and concluded that claims arising from "seven of the nine tokens at issue—QSP, KNC, FUN, ICX, OMG, LEND, and ELF" were untimely because those Tokens "were last purchased in 2018, more than a year before this action was brought," and "claims related to EOS and TRX are also untimely" for reasons discussed in Section II above. SPA-4–5. But even if this Court determines that Plaintiffs' claims under federal law are untimely—which they are not, for the reasons discussed above—Plaintiffs have pled timely claims under state securities laws.

Plaintiffs Anderson, Muhammad, and Williams bring claims arising from their purchases of the EOS, TRX, ELF, FUN, ICX, OMG, and QSP tokens under the Texas blue sky statute, which imposes what is effectively a three-year repose period after the sale of an unregistered security, with no statute of limitations, no notice provision, and no knowledge defense. Texas Civ. St. Art. 581-33H(1); *see also Rotstain v. Trustmark Nat'l Bank*, 2016 WL 8216509, at *3 n.3 (N.D. Tex. July 27, 2016) ("Courts have consistently characterized article 581-33H of the TSA as a

statute of repose, not a statute of limitations."). Because all of the Tokens Plaintiffs purchased were first issued after April 3, 2017 (*i.e.*, within three years before Plaintiffs commenced the action), A-213 (SAC ¶ 150); A-224 (SAC ¶ 195); A-228 (SAC ¶ 211); A-231 (SAC ¶ 226); A-234 (SAC ¶ 240); A-238 (SAC ¶ 255); A-241 (SAC ¶ 269); A-244 (SAC ¶ 283); A-247 (SAC ¶ 297), all of Plaintiffs Anderson, Muhammad, and Williams's claims under Texas's securities laws arising from their purchases of the EOS, TRX, ELF, FUN, ICX, OMG, and QSP tokens are necessarily timely. A15–39 (Anderson Certification); A-84–122 (Muhammad Certification); A-126–131 (Williams Certification).

Similarly, Plaintiff Token Fund I LLC brings claims arising from its purchases of the EOS token under Puerto Rico's blue sky laws, which are subject to a limitations period that runs for two years after the sale of an unregistered security. 10 L.P.R.A. § 890(e); *see also Fernandez v. UBS AG*, 222 F. Supp. 3d 358, 385 (S.D.N.Y. 2016) (noting that the limitations period stated in § 890(e) begins to run when "the sale contract has been executed"). Accordingly, Plaintiff Token Fund I LLC's claims under the Puerto Rico blue sky law based on purchases of the EOS token on or after April 3, 2018 are timely. A-132–49 (Token Fund I LLC Certification).

Plaintiff Hardin brings Nevada blue sky claims arising from his purchases of the TRX token. The Nevada statute sets the relevant timeliness period as "the

earliest of 2 years after the discovery of the violation" or "2 years after discovery should have been made by the exercise of reasonable care." Nev. Stat. § 90.670. "Th[at] limitations period accrues when the plaintiff discovered or should have learned of facts constituting *all of the elements of the* claim." *NNN Siena Off. Park I 2, LLC v. Wachovia Bank Nat. Ass'n*, 2014 WL 4417858, at *6 (D. Nev. Sept. 8, 2014) (emphasis added) (citing *Siragusa v. Brown*, 114 Nev. 1384 (1998)), *aff'd* 673 F. App'x 725 (9th Cir. 2016). Nevada's blue sky statute creates civil liability for "[a] person who *offers or sells a security* in violation of" those statutes to "the person *purchasing* the security." Nev. Stat. § 90.660(1) (emphasis added). Thus, a plaintiff bringing claims based on the sale of securities could not have discovered the facts "constituting all of the elements of th[at] claim," *NNN Siena*, 2014 WL 4417858, at *6, until, at the very earliest, the relevant sale took place. To hold otherwise would be "at odds with the statutory language," therefore "[t]he limitations period … runs from each violation, *i.e.*, each sale, and not from the plaintiff's discovery that the security was unregistered as a general matter." *Baroi v. Platinum Condo. Dev., LLC*, 2012 WL 4606720, at *8 (D. Nev. Oct. 1, 2012).

The district court addressed none of this. Because the limitations periods under the Nevada blue sky law did not begin to run until, at the earliest, the times of the relevant sales, Plaintiff Hardin's claims under Nevada law arising from his

purchases of the TRX token on or after April 3, 2018 are timely under the Nevada's securities laws.  A-40–66 (Hardin Certification).

## IV.    The District Court Improperly Dismissed State Claims On Behalf Of Absent Class Members

The district court dismissed on extraterritoriality grounds Plaintiffs' claims in the SAC that were asserted on behalf of absent class members under blue sky laws of jurisdictions in which putative class members, but not the named Plaintiffs, purchased Tokens, ruling that "there is an insufficient nexus between the allegations" concerning named Plaintiffs' purchases "and those jurisdictions."  SPA-9.  That was improper under this Court's precedent and even under the authority cited by the district court.

As Plaintiffs explained to the district court (No. 1:20-cv-02803-ALC, ECF No. 64 at 32–33), this Court has held that "as long as the named plaintiffs have standing to sue the named defendants, any concern about whether it is proper for a class to include out-of-state, nonparty class members with claims subject to different state laws is a question of predominance" under Rule 23, not a motion to dismiss.  *Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 93 (2d Cir. 2018); *accord In re Asacol Antitrust Litig.*, 907 F.3d 42, 47–51 (1st Cir. 2018) (reaching the same conclusion under state antitrust laws).  Because it is undisputed that Plaintiffs have standing under Article III to sue Defendants based on Plaintiffs' own

purchases of Tokens from Binance, it was improper for the district court to dismiss the blue sky claims on behalf of absent class members.  *Langan*, 897 F.3d at 93.

While the district court referenced *In re Bibox Group Holdings Ltd. Securities Litigation*, 534 F. Supp. 3d 326, 334 (S.D.N.Y. 2021), *reconsideration denied in part sub nom. In Re Bibox Grp. Holdings Ltd. Sec. Litig.*, 2021 WL 2188177 (S.D.N.Y. May 28, 2021), in dismissing the absent class members' state law claims, *Bibox* does not support the district court's ruling on these claims.  Quite the opposite: consistent with this Court's precedent, *Bibox* explained that district courts generally "do not address the standing and merits arguments with respect to the additional state law claims *unless and until the motion to dismiss is denied and a motion for class certification is granted pursuant to Rule 23*."  *Id.* (emphasis added).

## CONCLUSION

For the foregoing reasons, Plaintiffs have asserted timely claims under the Securities Act and the Exchange Act, and under the blue sky laws of Nevada, Puerto Rico, and Texas, arising from their domestic purchases of the EOS, TRX, ELF, FUN, ICX, OMG, and QSP tokens.  Plaintiffs therefore respectfully request that the Court reverse the judgment of the district court granting Binance's Motion to Dismiss, and remand for further proceedings.

Dated: July 28, 2022

Respectfully submitted,

*/s/ Caitlin J. Halligan*

CAITLIN J. HALLIGAN
JORDAN GOLDSTEIN
DAVID COON
SELENDY GAY ELSBERG PLLC
1290 Avenue of the Americas
New York, New York 10104
(212) 390-9000

*Attorneys for Plaintiffs-Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a)(5) of the Federal Rules of Appellate Procedure, the foregoing brief is in 14-Point Times New Roman proportional font and contains 10,186 words and thus is in compliance with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

Dated: July 28, 2022
        New York, New York

                                        */s/ Caitlin J. Halligan*
                                        CAITLIN J. HALLIGAN
                                        JORDAN GOLDSTEIN
                                        DAVID COON
                                        SELENDY GAY ELSBERG PLLC
                                        1290 Avenue of the Americas
                                        New York, New York 10104
                                        (212) 390-9000

                                        *Attorneys for Plaintiffs-Appellants*