# 22-972

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

CHASE WILLIAMS, *individually and on behalf of all others similarly situated,*

*Plaintiff-Appellant,*

JD ANDERSON, COREY HARDIN, ERIC LEE, *individually and on behalf of all others similarly situated,* BRETT MESSIEH, DAVID MUHAMMAD, RANJITH THIAGARAJAN, TOKEN FUND I LLC,

*Lead-Plaintiffs-Appellants,*

—against—

BINANCE, CHANGPENG ZHAO,

*Defendants-Appellees,*

YI HE, ROGER WANG,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLEES

JAMES P. ROUHANDEH
DANIEL J. SCHWARTZ
MARIE KILLMOND
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

*Attorneys for Defendants-Appellees*

## CORPORATE DISCLOSURE STATEMENT

In accordance with Rule 26.1 of the Federal Rules of Appellate Procedure, Binance hereby states that it has no parent corporation and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

P<span>AGE</span>

CORPORATE DISCLOSURE STATEMENT ..........................................................i

TABLE OF AUTHORITIES .....................................................................iv

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ......................1

STATEMENT OF THE CASE..................................................................2

FACTUAL BACKGROUND....................................................................8

PROCEDURAL HISTORY.....................................................................13

SUMMARY OF ARGUMENT ...............................................................16

LEGAL STANDARD..............................................................................20

ARGUMENT ..........................................................................................21

I.      The District Court Correctly Dismissed Plaintiffs' Claims Because Plaintiffs Do Not Allege That They Purchased the Tokens in Domestic Transactions.........................................................................21

      A. Plaintiffs Failed to Allege That They Incurred Irrevocable Liability for Their Transactions or That Title to the Tokens Passed in the United States.........................................................................23

      B. Plaintiffs' Purported "Purchase Order-Plus" Test Contravenes Controlling Authority .........................................................................27

      C. Plaintiffs' Novel Theory That Validation of ERC-20 Tokens "on the Blockchain" Confers Irrevocable Liability is Unalleged and Legally Unsupported .........................................................................34

ii

.

II.    Plaintiffs' Section 12(a)(1) Claims are Barred by Section 13's Applicable One-Year Statute of Limitations.............................................39

    A. The One-Year Statute of Limitations Runs From the "Violation," Irrespective of When a Sale Occurs ....................................................39

    B. Plaintiffs' Vague Allegations Do Not Plead "Continuous Solicitation"...........................................................................................45

III.   Plaintiffs' Claims Under Section 29(b) of the Exchange Act Are Barred by the One-Year Statute of Limitations ...................................................48

IV.   The District Court Properly Dismissed All the State Law Claims Asserted in the Complaint ........................................................................57

CONCLUSION ........................................................................................................60

CERTIFICATE OF COMPLIANCE.......................................................................61

# TABLE OF AUTHORITIES

## CASES

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
  677 F.3d 60 (2d Cir. 2012) ........................................................... *passim*

*Alpha Cap. Anstalt v. Oxysure Sys., Inc.*,
  216 F. Supp. 3d 403 (S.D.N.Y. 2016) ..............................19, 48, 54, 55

*Anilao v. Spota*,
  27 F.4th 855 (2d Cir. 2022) ................................................... 26

*In re Asacol Antitrust Litig.*,
  907 F.3d 42 (1st Cir. 2018) ................................................... 60

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................... 20

*Balintulo v. Ford Motor Co.*,
  796 F.3d 160 (2d Cir. 2015) ................................................. 21

*Banco Safra S.A.-Cayman Islands Branch v. Samarco Mineracrao, S.A.*,
  849 F. App'x 289 (2d Cir. 2021) ........................................... 28, 33

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................... 20, 27

*In re Bibox Group Holdings Ltd. Secs. Litig.*,
  534 F. Supp. 3d 326 (S.D.N.Y. 2021) ....................................... *passim*

*BP P.L.C. v. Mayor and City Council of Baltimore*,
  141 S. Ct. 1532 (2021) ....................................................... 43

*Capri v. Murphy*,
  856 F.2d 473 (2d Cir. 1988) ................................................. 46, 47

*Celsion Corp. v. Stearns Mgmt. Corp.*,
  157 F. Supp. 2d 942 (N.D. Ill. 2001) ....................................... 56

*Ceres Partners v. GEL Assocs.*,
918 F.2d 349 (2d Cir. 1990) ........................................................... 19, 48, 54, 55

*Choi v. Tower Research Capital LLC*,
890 F.3d 60 (2d Cir. 2018) ....................................................32, 33, 36, 37

*Citizens United v. Schneiderman*,
882 F.3d 374 (2d Cir. 2018) .................................................................. 29

*City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc.*,
637 F.3d 169 (2d Cir. 2011) ................................................................. 20

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014) ........................................................ 24, 25, 26, 29

*Craftmatic Secs. Litig. v. Kraftsow*,
890 F.2d 628 (3d Cir. 1989) .................................................45, 46, 47

*Cortec Indus., Inc. v. Sum Holding L.P.*,
949 F.2d 42 (2d Cir. 1991) ...................................................................... 9

*CTS Corp. v. Waldburger*,
573 U.S. 1 (2014) ............................................................................ 44, 45

*Dervan v. Gordian Grp. LLC*,
2017 WL 819494 (S.D.N.Y. Feb. 28, 2017) ...................................... 49

*Diskin v. Lomasney & Co.*,
452 F.2d 871 (2d Cir. 1971) .................................................... 41, 42, 43

*Edgar v. MITE Corp.*,
457 U.S. 624 (1982) ......................................................................... 23

*EMA Fin., LLC v. NFusz, Inc.*,
509 F. Supp. 3d 18 (S.D.N.Y. 2020) ................................................. 53

*EMA Fin., LLC v. Vystar Corp.*,
336 F.R.D. 75 (S.D.N.Y. 2020) .......................................................... 52

*Fed. Housing Fin. Agency v. Nomura Holding Am., Inc.*,
    873 F.3d 85 (2d Cir. 2017) ...................................................... 22, 23, 31, 32, 37

*Frank v. Gaos*,
    139 S. Ct. 1041 (2019) ......................................................................... 58

*Gamm v. Sanderson Farms, Inc.*,
    944 F.3d 455 (2d Cir. 2019) ................................................................... 9

*In re GE/CBPS Data Breach Litig.*,
    2021 WL 3406374 (S.D.N.Y. Aug. 4, 2021) ................................................ 58

*Giunta v. Dingman*,
    893 F.3d 73 (2d Cir. 2018) ............................................................... 23, 31

*Grace v. Rosenstock*,
    228 F.3d 40 (2d Cir. 2000) ................................................................... 21

*Holsworth v. BProtocol Found.*,
    2021 WL 706549 (S.D.N.Y. Feb. 22, 2021) ................................................ 14

*Kahn v. Kohlberg, Kravis, Roberts & Co.*,
    970 F.2d 1030 (2d Cir. 1992) ............................................ 18, 19, 48, 51, 55

*Kloeckner v. Solis*,
    568 U.S. 41 (2012) ........................................................................... 43

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*,
    501 U.S. 350 (1991) .......................................................... 19, 48, 54

*Langan v. Johnson & Johnson Consumer Cos., Inc.*,
    897 F.3d 88 (2d Cir. 2018) ............................................................. 59, 60

*Loginovskaya v. Batratchenko*,
    764 F.3d 266 (2d Cir. 2014) ..................................... 28, 29, 30, 37

*McMorris v. Carlos Lopez & Assocs., LLC*,
    995 F.3d 295 (2d Cir. 2021) ................................................................. 58

*Merck & Co. v. Reynolds*,
   559 U.S. 633 (2010) ........................................................... 48

*In re Morgan Stanley Info. Fund Secs. Litig.*,
   592 F.3d 347 (2d Cir. 2010) ............................................... 40

*Morrison v. Nat'l Austl. Bank Ltd.*,
   561 U.S. 247 (2010) ................................................... *passim*

*Muto v. CBS Corp.*,
   668 F.3d 53 (2d Cir. 2012) ................................................ 20

*Nat'l Credit Union Admin. Bd. v. Morgan Stanley & Co.*,
   2014 WL 241739 (S.D.N.Y. Jan. 22, 2014) ..................... 57

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
   693 F.3d 145 (2d Cir. 2012) ........................................ 19, 58

*Norton v. Sam's Club*,
   145 F.3d 114 (2d Cir. 1998) ............................................... 57

*Omega Overseas Partners, Ltd. v. Griffith*,
   No. 13-cv-4202, 2014 WL 3907082 (S.D.N.Y. Aug. 7, 2014) ......... 52

*In re OPUS360 Corp. Secs. Litig.*,
   2002 WL 31190157 (S.D.N.Y. Oct. 2, 2002) .................... 46

*Oxford Univ. Bank v. Lansuppe Feeder, LLC*,
   933 F.3d 99 (2d Cir. 2019) ................................................ 53

*Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*,
   712 F.3d 705 (2d Cir. 2013) .............................................. 27

*In re Petrobras Secs.*,
   862 F.3d 250 (2d Cir. 2017) ..................................... 22, 23, 24

*In re Petrobras Secs. Litig.*,
   150 F. Supp. 3d 337 (S.D.N.Y. 2015) .............................. 37

*Pinter v. Dahl,*
   486 U.S. 622 (1988) ........................................................ 39, 43, 44, 45

*R.R. Telegraphers v. Ry. Express Agency, Inc.*,
   321 U.S. 342 (1944) ...................................................................... 45

*Roman v. UBS Fin. Servs., Inc. of Puerto Rico*,
   2016 WL 9460664 (D.P.R. Sept. 30, 2016) ...................................... 57

*Rotkiske v. Klemm*,
   140 S. Ct. 355 (2019) .................................................................... 40

*SDM Holdings, Inc. v. UBS Fin. Servs., Inc. of Puerto Rico*,
   2016 WL 9461324 (D.P.R. Mar. 1, 2016) ........................................ 57

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946) ...................................................................... 12

*Seidl v. Am. Century Cos., Inc.*,
   427 F. App'x 35 (2d Cir. 2011) ...................................................... 35

*Shi v. Le,*
   2022 WL 896963 (E.D.N.Y. Mar. 28, 2022) .................................... 38

*Slomiak v. Bear Stearns & Co.,*
   597 F. Supp. 676 (S.D.N.Y. 1984) .................................................. 53

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*,
   277 F. Supp. 3d 521 (S.D.N.Y. 2017) ............................................. 30

*Subin v. Goldsmith*,
   224 F.2d 753 (2d Cir. 1955) .......................................................... 52

*Tanzanian Royalty Expl. Corp. v. Crede CG III, Ltd.,*
   2019 WL 1368570 (S.D.N.Y. Mar. 26, 2019) .................................. 52

*In re Tezos Secs. Litig.,*
   2018 WL 4293341 (N.D. Cal. Aug. 7, 2018) .................................... 38

*United States v. Vilar,*
   729 F.3d 62 (2d Cir. 2013) ...................................................... 30, 31

*Wal-Mart Stores, Inc. v. Visa USA, Inc.*,
    396 F.3d 96 (2d Cir. 2005) ................................................ 26

*Wigand v. Flo-Tek, Inc.*,
    609 F.2d 1028 (2d Cir. 1979) ........................................... 42

*Wilson v. Saintine Exploration & Drilling Corp.*,
    872 F.2d 1124 ......................................................... 46, 47

*Youngers v. Virtus Invs. Partners, Inc.*,
    195 F. Supp. 3d 499 (S.D.N.Y. 2016) ................................... 47

## STATUTES & RULES

15 U.S.C. § 77b ..................................................... 40, 44
15 U.S.C. § 77e ......................................................... 39
15 U.S.C. § 77l .................................................. 39, 43, 44
15 U.S.C. § 77m .............................................. 18, 39, 44
15 U.S.C. § 77v ......................................................... 1
15 U.S.C. § 78aa ........................................................ 1
15 U.S.C. § 78cc ............................................... 49, 52, 54
28 U.S.C. § 1291 ........................................................ 1
28 U.S.C. § 1331 ........................................................ 1
28 U.S.C. § 1332 ........................................................ 1
28 U.S.C. § 1367 ........................................................ 1
Cal. Corp. Code § 25110 ................................................ 22
Cal. Corp. Code § 25130 ................................................ 22
Nev. Rev. Stat. § 90.310 ............................................... 22
Nev. Rev. Stat. § 90.460 ............................................... 22
P.R. Laws Ann Tit. 10, § 861 .......................................... 22
P.R. Laws Ann Tit. 10, § 871 .......................................... 22
Tex. Govt. § 4001.056 ................................................. 22
Tex. Govt. § 4001.067 ................................................. 22
Tex. Govt. § 4004.051 ................................................. 22

.

## O<small>THER</small> A<small>UTHORITIES</small>

Alexis M. Tellerd, *Time to Validate Validators: Determining the Legal Duty of Cryptocurrency Validators Under the Bank Secrecy Act*, 8 Nat'l Sec. L.J. 297 (2021) ............................................................................................................. 37, 38

## JURISDICTIONAL STATEMENT

The District Court had original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 15 U.S.C. §§ 77v and 78aa(a) as to the claims that plaintiffs-appellants ("plaintiffs") asserted under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act"), and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 as to plaintiffs' state law claims. The District Court also had original jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d)(2) because plaintiffs filed this action as a class action and alleged that (i) the matter in controversy exceeded $5,000,000 and (ii) at least one putative class member is a citizen of a state different from at least one defendant. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 because it is an appeal from the District Court's final order and judgment.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether plaintiffs' purchases of cryptocurrency tokens were domestic transactions subject to the federal and state securities laws, when their complaint alleges that they transacted on a foreign exchange and fails to plead with facts that they incurred irrevocable liability to complete the transactions (or that title to the tokens passed) within the United States.

2. Whether the statute of limitations under Section 13 of the Securities Act, which requires a Section 12(a)(1) claim to be brought "within one year after

the violation on which it was based," bars plaintiffs' Section 12(a)(1) claims, where defendants' only alleged "violations" are purported acts of solicitation that occurred over a year before this lawsuit commenced.

3.      Whether the one-year statute of limitations applicable to claims under Section 29(b) of the Exchange Act, which begins to run when a plaintiff acting with reasonable diligence could have discovered the alleged violation, bars plaintiffs' Section 29(b) claims to void their contracts with Binance, where plaintiffs asserted their claims long after they allege that the facts that rendered those contracts voidable were "well known."

4.      Whether the District Court correctly held that the named plaintiffs could not prosecute state-law claims on behalf of absent putative class members after it determined that the named plaintiffs had no viable claims of their own.

## STATEMENT OF THE CASE

This securities action arises from plaintiffs' alleged purchases of cryptocurrency tokens from third parties on Binance, a foreign digital asset trading platform. In a belated attempt to rescind those purchases and recover the fees they paid Binance, plaintiffs seek to apply the securities laws extraterritorially to transactions that took place (and became binding) on an exchange located outside the United States.

2

Applying well-established legal principles, the United States District Court for the Southern District of New York (Hon. Andrew L. Carter Jr., J.) properly dismissed plaintiffs' Second Amended Class Action Complaint (the "complaint"). The federal and state securities laws apply to domestic transactions, not foreign ones like those at issue. This remains so even if the buyer is a U.S. resident or places its buy order from the United States. Under the federal securities laws, moreover, claims based on alleged violations that occurred or were reasonably discoverable more than a year before the filing of the complaint are untimely. The District Court faithfully followed these rules. Its dismissal order was fully consistent with the Supreme Court's ruling in *Morrison v. National Australia. Bank Ltd.* and this Court's opinion in *Absolute Activist Value Master Fund Ltd. v. Ficeto*, as well as this Court's other precedents and the reasoning of several Southern District of New York decisions dismissing materially identical claims. This Court should affirm.

As they did below, plaintiffs fail to identify any factual allegations in the complaint that, if credited, would establish that the token purchases at issue were domestic transactions subject to U.S. law. As this Court has held, the touchstone for determining whether a transaction is domestic is the location where irrevocable liability to complete the purchase or sale was incurred or where title was passed. The complaint is devoid of allegations to support the inference that either of these

events occurred within the United States for any of the alleged token purchases. Plaintiffs concede that Binance is not based in the United States, and they do not allege that Binance maintains any trading operations or facilities in this country. The "matching" of transactions—i.e., the pairing of an offer to buy with an offer to sell, forming a binding contract—occurs where an exchange is located, which, in Binance's case, is necessarily abroad. Plaintiffs do not allege otherwise, and documents incorporated in the complaint demonstrate that they could not.

Instead, plaintiffs advance baseless theories that have been rejected by the Supreme Court and this Court or are nowhere to be found in the complaint. Plaintiffs contend that residing in the United States while placing buy orders suffices for domesticity if at least one transactional step that binds the plaintiff to the transaction also occurs in the United States. But this "purchase-order plus" theory finds no support in Circuit precedent, and merely repackages the discredited "conduct and effects" test that the Supreme Court rejected in *Morrison*. In addition, the complaint nowhere alleges that plaintiffs' token purchases were even recorded on a third party's (Ethereum's) blockchain, much less that they became irrevocable only when "validated" on nodes of that blockchain. Plaintiffs cannot amend their complaint in their briefs to this Court. But even if they could, their theory would fail, both because transaction validation occurs *after* the trading counterparties have already incurred irrevocable liability and because, according to

4

the very source plaintiffs cite for their novel theory, validation could occur anywhere simultaneously.

Plaintiffs' federal claims fail for the additional, independent reason that they are untimely. Plaintiffs largely concede as much—they do not appeal the limitations-based dismissal of their claims as to most of the token purchases alleged in the complaint. And they cannot resurrect their time-barred claims as to the limited set of transactions on which they *do* appeal—alleged purchases of two tokens within the year before they sued. The statute of limitations governing plaintiffs' claims under Section 12(a)(1) of the Securities Act runs for one year "after the violation upon which it was based." Plaintiffs base their claims on allegations that offering and selling the tokens violated Section 5 of the Securities Act because they were unregistered securities. Plaintiffs, however, do not allege that Binance actually *sold* them any tokens, so the only "violation" upon which plaintiffs can sue Binance is for purportedly "*offering*" them tokens—i.e., soliciting their purchases. But the complaint does not allege that Binance engaged in any conduct that could even conceivably constitute solicitation after February 2019—more than a year before plaintiffs filed suit. Plaintiffs contend that every time they bought a token from some unidentified third party, the statute of limitations for their claims against Binance restarted, and that their Section 12

claims therefore are timely.  But this interpretation disregards the Securities Act's text, and, in any event, is illogical and unsupported.

Plaintiffs' attempt to reinstate their time-barred claims under Section 29(b) of the Exchange Act likewise fails.  Plaintiffs allege that their contracts with Binance violate the Exchange Act and therefore are voidable under Section 29(b) because Binance supposedly was required to register as a national securities exchange and broker-dealer but did not.  Under Circuit precedent, however, a contract is voidable under Section 29(b) only if it is illegal on its face and incapable of lawful performance when made.  Moreover, the statute of limitations for Section 29(b) claims runs for one year from constructive discovery of the facts constituting the violation.  As the District Court correctly determined, plaintiffs' own allegations demonstrate that the purported violation—Binance's alleged failure to register—was well known and readily discoverable through the exercise of reasonable diligence when each plaintiff entered into Binance's terms of use, which are the only contracts plaintiffs allegedly had with Binance.  Because plaintiffs entered these contracts well over one year before commencing this action, their Section 29(b) claims are untimely.

Plaintiffs attack the District Court for supposedly imputing a knowledge defense into Section 29(b), but their contention misconstrues the constructive knowledge standard applicable under the statute of limitations.  Similarly, their

assertion that their claims are timely under a different clause of Section 29(b), which contains a special statute of limitations for transactions induced by fraud is wrong. As plaintiffs concede, that statute of limitations is inapplicable because they have not alleged fraud.

The District Court also correctly held that where the named plaintiffs' claims were all subject to dismissal, the dozens of additional state-law claims that plaintiffs purport to assert on behalf of absent putative class members—but have no ability to assert on their own behalf—must also be dismissed.

Finally, the District Court properly dismissed the complaint with prejudice, as plaintiffs amended their complaint multiple times below and never sought leave to amend again or identified additional factual allegations that would allow them to plead plausible claims.

For all these reasons, this Court should affirm in its entirety the District Court's judgment dismissing the complaint.

## FACTUAL BACKGROUND

Plaintiffs' claims arise from their alleged purchases of digital, cryptocurrency "tokens." Plaintiffs allege that these tokens utilize nonparty Ethereum's blockchain and "ERC-20" protocol. (A-178–79, ¶¶56–59, 62.)[1]

Binance is a foreign cryptocurrency trading platform (A-170–72, ¶¶23, 26–28), and defendant Changpeng Zhao is Binance's Chief Executive Officer[2] (A-171, ¶26). According to plaintiffs, Binance is an "online exchange," and investors who wish to "purchase Bitcoin and other crypto-assets" may do so on "[o]nline crypto-asset exchanges" like Binance, which "are similar to traditional exchanges in that they provide a convenient marketplace to match buyers and sellers of virtual currencies." (A-162, 175, ¶¶1, 46; *see also* A-175, ¶45.) Binance allegedly lists digital tokens of third-party issuers for trading.[3] (A-162–63, 167, ¶¶1, 4, 12.)

Binance is not headquartered in the United State and does not have any operations here. (A-170–72, ¶¶24, 26–28.) Plaintiffs allege that Binance was headquartered at various times in China, Japan and Malta, but that its operations

---

[1] Citations in the form "A-__" are to the Joint Appendix. Citations in the form "SPA-__" are to the Special Appendix submitted with the opening Brief for Appellants ("App. Br.").

[2] Plaintiffs voluntarily dismissed their claims against two other individual defendants. (A-12, Dkt. 63.)

[3] Plaintiffs also allege that Binance issued its own token (A-170, ¶23), but it is not at issue here because plaintiffs do not allege they purchased it.

are decentralized. (*Id.*; A-253, ¶326.) Plaintiffs allege that Binance has certain limited ties to the United States, including that (1) some portion of Binance's fluctuating user base consists of U.S. residents (A-254, ¶329), and (2) Binance contracts with Amazon Web Services, a U.S. cloud computing company, to host its website, and some Amazon servers and data centers are in California (A-170–71, 253, ¶¶24, 327).

Plaintiffs are cryptocurrency traders located in Texas, Nevada, New York, Florida, California, and Puerto Rico. (A-168–70, ¶¶15–22.) All plaintiffs allege that they traded "pursuant to contracts with … Binance" (*id.*), and that they began transacting on Binance by May 8, 2018 (*see* A-15–149; A-522–24 (showing each plaintiff's first purchase of each token at issue)). In doing so, they entered into Binance's terms of use, the only contracts that plaintiffs allegedly had with Binance. (A-265, 268, ¶¶375, 386; *see also* A-498 (providing that transacting on Binance constitutes acceptance of terms of use), A-589 (same, in subsequent iteration of terms of use), A-597 (same).)[4]

---

[4] On an appeal from a Rule 12(b)(6) motion to dismiss, this Court may consider the terms of use as documents incorporated by reference in the complaint, integral to plaintiffs' claims, or otherwise judicially noticeable. *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019), *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47, 48 (2d Cir. 1991).

Plaintiffs allege that, "pursuant to and consistent with [Binance's] terms of use" (A-265, 268, ¶¶375, 386), they purchased certain tokens "*on*" Binance's platform while residing in the United States (A-168–170, ¶¶15–22 (emphasis added)).  Plaintiffs do not allege that they purchased these tokens—ELF, EOS, ICX, OMG, TRX, QSP, KNC, and LEND[5] (the "Tokens")—*from* Binance, or that Binance issued them.  Rather, the complaint identifies nonparty issuers for each Token, who allegedly published whitepapers and engaged in other activities to market their Tokens.  (*See, e.g.*, A-179, 198, 213–14, 225–26, 229, 231, 236, 238, 241, 245, 247 ¶¶66, 109 (TRX), 151–52 (EOS), 196–99 (QSP), 215–16 (KNC), 255–56 (ICX), 269–70 (OMG), 287 (LEND), 297–98 (ELF).)

By contrast, *Binance's* alleged conduct with respect to the Tokens is limited to (i) generally advertising its trading services; (ii) agreeing to list tokens; (iii) announcing listings via email and social media; (iv) re-publishing third-party research about Tokens on its website; and (v) providing trading services, including currency conversion and a FAQ page, on its website. (A-183, 187–89, 193–96, ¶¶79, 92–93, 95, 99–101.)  Plaintiffs do not allege that Binance urged plaintiffs to purchase particular Tokens or managed the flow of Token-related information to

---

[5] Plaintiffs dropped their claims concerning three other tokens (BNT, CVC, and SNT) after defendants argued that the complaint did not allege that any named plaintiff had purchased them.  (Dkt. 64, at 3 n.3.)

potential investors. Nor do they allege that they viewed Binance's listing announcements or the third-party research that Binance allegedly republished.

The complaint contains no non-conclusory allegations about *where* the Token purchases occurred. The complaint circularly alleges that because all plaintiffs resided in the United States when they bought the Tokens, the purchases were "effected in" each plaintiff's state of residence. (A-168–70, ¶¶15–22.) The complaint also alleges, on information and belief, that "title for the tokens … passed in whole or in part over servers located in California that host Binance's website." (*Id.*) The complaint does not, however, allege the factual basis or source for that belief. Nor does the complaint allege when or where plaintiffs' purchases became irrevocable. Binance's terms of use, which are incorporated by reference in the complaint, confirm that users can no longer "change, withdraw, or cancel" transactions after "matching" occurs—i.e., after one Binance user's "Order has been matched with an Order from another user." (*See* A-504; A-605.) Plaintiffs do not and cannot allege that matching occurred anywhere other than on Binance's platform.

For six of the eight Tokens (QSP, KNC, ICX, OMG, LEND, and ELF), plaintiffs' alleged purchases all occurred more than one year before they filed suit. (A-522–23; *see also* A-15–149.) Plaintiffs (besides Anderson, Lee and Messieh)

11

allege that they made certain purchases of the other two Tokens (TRX and EOS) within a year of commencing this action.  (*Id.*)

Plaintiffs assert that the Tokens are securities, and that selling them without first registering them violated federal and state securities laws.  (A-162, ¶1.)  The complaint includes hundreds of paragraphs asserting that investors did not understand the Tokens were securities until April 2019, when a unit of the U.S. Securities and Exchange Commission (the "SEC") released a "Framework for 'Investment Contract' Analysis of Digital Assets" (the "Framework"), which was informal, unofficial guidance[6] discussing when digital assets may qualify as securities under the 73-year-old investment contract test that the Supreme Court announced in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).  (*See* A-201–53, ¶¶120–325.)  Plaintiffs do not allege that the Framework provided any additional *facts* that led them or others to conclude that digital tokens in general or the Tokens in particular were securities—indeed, the Framework does not mention the Tokens at all.  Rather, plaintiffs allege that the Framework "clarified" a legal interpretation under which the Tokens could be deemed securities.  (A-201, ¶120.)  Well before April 2019, however, the SEC had already concluded—in formal reports,

---

[6] *See* Framework, A-537, 544 n.1.

enforcement actions and public statements, which the Framework itself cites[7]—that digital tokens similar to the Tokens were securities.

Plaintiffs also allege that Binance operated as an unregistered broker-dealer and/or unregistered national securities exchange (A-264, 266–67, ¶¶372–73, 382–85), but do not allege that they ever believed Binance was registered or that it ever concealed its lack of registration.  Indeed, they allege that Binance urged users to utilize virtual private networks to access its site from the United States, because it is "*well-known* that VPNs are necessary for U.S. purchasers to access *unregistered* crypto-asset exchanges, like Binance."  (A-254, ¶330 (emphasis added); *see also* A-184, ¶82.)  At all relevant times, moreover, Binance's lack of registration was readily discoverable by viewing the SEC's public website or data available there. (A-526–36.)

## PROCEDURAL HISTORY

Plaintiffs and their counsel filed the original complaint in this action, as well as eleven similar cryptocurrency cases, on April 3, 2020, and an amended

---

[7] Framework, A-544–46 nn.1, 8, 9, 16; *see also* A-547–582 (attaching referenced reports and public statements, among others).  Citing these materials, defendants argued below that any plaintiff exercising reasonable diligence would have discovered that the Tokens allegedly were securities more than a year before plaintiffs filed this lawsuit.  (Dkt. 59, at 22–25.)  The District Court did not reach this issue because it concluded that plaintiffs' Section 12 claims were not subject to tolling (SPA-4-5), and plaintiffs have abandoned any contrary argument on appeal (App. Br. 28 n.10).

complaint on September 11, 2020. (A-5, 10, Dkts. 1, 43.) Plaintiffs filed the third—and now operative—complaint on December 15, 2020, after receiving defendants' premotion conference letter, which laid out in detail the defects in the complaint and the bases for defendants' anticipated motion to dismiss. (A-10–11, Dkt. 50–55.) The complaint purports to assert 154 causes of action under the Securities Act, the Exchange Act and the Blue Sky statutes of 49 jurisdictions. (A-262–487.)

Defendants moved to dismiss the complaint. (A-11, Dkt. 58–60.)[8] On March 31, 2022, the District Court granted defendants' motion and entered judgment. (A-13, Dkt. 77–78; SPA-11.)

The District Court first determined that plaintiffs' federal claims were time-barred. (SPA-4–7.) The Securities Act Section 12(a)(1) claims were barred under the applicable one-year limitations period set out in Section 13, which is not subject to tolling,[9] because the complaint did not allege that any plaintiff had purchased most of the Tokens (QSP, KNC, FUN, ICX, OMG, LEND, and ELF)

---

[8] During the pendency of defendants' motion, two other Southern District of New York courts dismissed plaintiffs' virtually identical complaints on grounds also asserted in defendants' motion. *See In re Bibox Group Holdings Ltd. Securities Litigation*, 534 F. Supp. 3d 326 (S.D.N.Y. 2021) (Cote, J.); *Holsworth v. BProtocol Found.*, 2021 WL 706549 (S.D.N.Y. Feb. 22, 2021) (Hellerstein, J.).

[9] Plaintiffs have not appealed this portion of the District Court's order and have not renewed their tolling arguments on appeal. (App. Br. 28 n.10.)

within one year of filing suit. (SPA-4–5.)  Plaintiffs' claims as to the other Tokens

(EOS and TRX) were also time-barred because Binance's last alleged act of

solicitation occurred more than a year before plaintiffs filed suit.  (SPA-5.)

Plaintiffs' Exchange Act claims were likewise time-barred under that statute's one-

year limitations period, which begins running when a plaintiff exercising

reasonable diligence would have discovered the facts constituting the violation.

(SPA-5–7.)  A plaintiff exercising such diligence, the District Court held, would

have discovered the alleged underlying violations—i.e., Binance's lack of

registration—over one year before plaintiffs sued.  (*Id.*)

The District Court next held that all of plaintiffs' claims—federal *and*

state—failed because the relevant statutes do not apply extraterritorially, and

plaintiffs had not alleged that Binance was a domestic exchange or that they

purchased the Tokens in domestic transactions.  (SPA-7–10.)  Finally, in the

absence of viable claims that plaintiffs could pursue in their own right, the District

Court determined that it did not have to specifically address the claims they

asserted on behalf of absent putative class members under the Blue Sky laws of

states in which plaintiffs did not allege they transacted.  (SPA-8–10.)  Having

dismissed all of plaintiffs' claims on these bases, the District Court did not reach

defendants' other arguments for dismissal.

## SUMMARY OF ARGUMENT

This Court should affirm the District Court's order and judgment dismissing the complaint. All of plaintiffs' claims are based on Token purchases made on a foreign trading platform. Plaintiffs' federal securities claims also fail because plaintiffs waited too long to bring them: Their claims under Section 12(a)(1) of the Securities Act are premised exclusively on claimed acts of solicitation by Binance, but the complaint alleges no acts of solicitation within the one-year limitations period. Plaintiffs' claims under Section 29(b) of the Exchange Act are likewise untimely, because plaintiffs' allegations demonstrate that a reasonable person would have discovered the claimed violation—Binance's lack of registration— well over a year before plaintiffs sued.

*First*, the District Court correctly held that the federal and state securities laws do not apply to plaintiffs' claims because plaintiffs do not allege that their transactions on Binance were domestic. A transaction is "domestic" only if "irrevocable liability is incurred or title passes within the United States." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012). Plaintiffs' complaint contains no allegations regarding where they incurred "irrevocable liability" for their transactions, and only the most rote and conclusory allegation (which they do not even mention on appeal) that "title" to the Tokens they purchased "passed in whole or in part" in the United States. (A-168–70,

¶¶15–22.)  Plaintiffs' alternative proposed test for domesticity—allegations of U.S.

purchase orders plus some additional transactional step in the United States—

essentially repackages the now-defunct "conduct and effects" test and contravenes

Circuit precedent.

Plaintiffs cannot escape the conclusion that their claims are based on

extraterritorial transactions by arguing—for the first time on appeal—that they

incurred irrevocable liability when their transactions were "validated" on the

"nodes" of the Ethereum blockchain.  Plaintiffs have waived this argument, which

appears nowhere in their complaint.  But it has no merit in any event:  Plaintiffs'

allegations and Binance's terms of use confirm that irrevocable liability is incurred

when transactional counterparties are "matched" on Binance's platform, which, as

plaintiffs concede, is not in the United States.  Validation necessarily occurs *after*

irrevocable liability for the transaction is incurred, and thus cannot affect the

location of the Token purchases.  Moreover, the sources plaintiffs *themselves* cite

on appeal state that Ethereum "nodes" are located around the world and all of those

nodes "validate" transactions on the blockchain simultaneously.  Accordingly,

even on plaintiffs' theory, validation cannot render these transactions domestic.

*Second*, the District Court correctly determined that plaintiffs waited too

long to assert claims under Section 12(a)(1) of the Securities Act.  Section 12(a)(1)

provides a private right of action for a securities purchaser against "statutory

sellers" who offer or sell them unregistered securities in violation of Section 5 of the Securities Act.  The limitations period for Section 12(a)(1) claims, set out in Section 13, runs for one year "from the violation upon which [the claim] is based." 15 U.S.C. § 77m. Plaintiffs do not allege that Binance actually sold them securities, so only the "solicitation" prong could potentially apply to Binance. Under Section 13's plain language, the limitations period for plaintiffs' Section 12 claims therefore runs from Binance's last purported act of solicitation—which, for each Token, occurred over one year before plaintiffs brought this case.  (*See* A-195–96, ¶100(d), (l).)  Plaintiffs' contention that their subsequent purchases of Tokens from third parties restarts the statute of limitations for claims against Binance finds no support in the Securities Act's text or this Court's controlling decisions.  And plaintiffs' conclusory allegation that Binance engaged in "continuous solicitation" (A-193–94, ¶99) by announcing listings and posting Token pricing and trading data does not change that reality.

*Third*, plaintiffs' claims under section 29(b) of the Exchange Act were correctly dismissed as time-barred.  Because Section 29 does not contain an express statute of limitations applicable to non-fraud-based claims, under the law of this Circuit, the applicable limitations period runs for one year from when a plaintiff exercising *reasonable diligence* would have learned the facts underlying the violation.  *See Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1038–

39 (2d Cir. 1992); *Alpha Cap. Anstalt v. Oxysure Sys., Inc.*, 216 F. Supp. 3d 403, 408 (S.D.N.Y. 2016) (citing *Ceres Partners v. GEL Assocs.*, 918 F.2d 349, 358–59 (2d Cir. 1990)); *see also Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 362 (1991). Here, plaintiffs allege that their contracts with Binance are unlawful under the Exchange Act and voidable under Section 29(b) because Binance supposedly acted as an unregistered exchange and broker-dealer. But to be voidable, a contract must violate the Exchange Act on its face when made. Plaintiffs do not allege that they were unaware of Binance's registration status when they entered into the terms of use—the only contracts they allegedly had with Binance. Moreover, the complaint's allegations and the SEC's judicially noticeable website demonstrate that Binance's registration status was public and readily available through the exercise of "reasonable diligence" at all times.

*Fourth*, having dismissed all claims which the named plaintiffs individually had standing to assert, the District Court correctly dismissed the remaining state-law claims included in the complaint on behalf of unnamed members of the putative class. With no viable claims of their own, plaintiffs lacked standing to assert claims on behalf of absent class members. *See, e.g.*, *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012); *In re Bibox Group Holdings Ltd. Securities Litigation*, 534 F. Supp. 3d 326, 334

(S.D.N.Y. 2021). It was thus proper for the District Court to dismiss plaintiffs' entire complaint.

## LEGAL STANDARD

The Court of Appeals reviews a district court's grant of a motion to dismiss *de novo*. *See Muto v. CBS Corp.*, 668 F.3d 53, 56 (2d Cir. 2012); *City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 173 (2d Cir. 2011). This is true when the complaint is dismissed on the basis of extraterritoriality, *see Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 65–67 (2d Cir. 2012), or the statute of limitations, *see Muto*, 668 F.3d at 56; *City of Pontiac*, 637 F.3d at 173.

To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege facts plausibly suggesting the defendant's liability. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). In ruling on a Rule 12(b)(6) motion, the court accepts the plaintiff's factual allegations as true, but not "legal conclusion[s] couched as [] factual allegation[s]." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation and quotation marks omitted). To be plausible, a complaint must contain "enough factual matter" to "raise [the] right to relief above the speculative level." *Twombly*, 550 U.S. at 555-56.

.

## ARGUMENT

Plaintiffs' efforts to reinstate their claims are factually and legally unsupported. Their claims are based on foreign Token purchases that would impermissibly require the extraterritorial application of federal and state securities laws. Their Section 12(a)(1) claims under the Securities Act and Section 29(b) claim under the Exchange Act are time-barred. And without any viable claims of their own, plaintiffs cannot pursue state-law claims on behalf of absent class members. Under these circumstances—particularly given that plaintiffs had already amended their complaint twice—any attempt to replead would be futile, and the District Court's dismissal with prejudice was appropriate. *See, e.g., Balintulo v. Ford Motor Co.*, 796 F.3d 160, 171 (2d Cir. 2015) (affirming dismissal with prejudice based on extraterritoriality); *Grace v. Rosenstock*, 228 F.3d 40, 53 (2d Cir. 2000) (proposed amendment based on untimely claims was futile).

## I.  The District Court Correctly Dismissed Plaintiffs' Claims Because Plaintiffs Do Not Allege That They Purchased the Tokens in Domestic Transactions

The complaint does not allege that plaintiffs' Token purchases are domestic transactions that occurred within the United States, dooming *all* of their claims to dismissal.

The federal securities laws do not apply to extraterritorial conduct. *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 265, 267–68 (2010) (holding that

Exchange Act does not generally apply extraterritorially and noting "[t]he same focus on domestic transactions" under Securities Act). For securities that do not trade on national securities exchanges, the "exclusive focus" for determining whether the securities laws apply is whether the challenged transactions involved "*domestic* purchases and sales." *Id.* at 268; *see also In re Petrobras Secs.*, 862 F.3d 250, 259 (2d Cir. 2017) (where notes did "not trade on any U.S.-based exchange," plaintiffs were "only entitled to assert" federal securities claims "if they can show that they acquired their Notes in 'domestic transactions'").[10]

The Blue Sky laws under which plaintiffs sued also apply only domestically.[11] As this Court has held—and plaintiffs concede (App. Br. 19 n.5)— "'[B]lue Sky laws … only regulate[] transactions occurring within the regulating States,'" and do not reach non-domestic purchases. *Fed. Housing Fin. Agency v.*

---

[10] *Morrison* also holds that transactions in securities "listed on [] domestic exchange[s]" are "subject to the securities laws," 561 U.S. at 270, but plaintiffs do not appeal the District Court's ruling that they failed to allege that Binance was a domestic exchange (SPA-7–8).

[11] *See* Nev. Rev. Stat. §§ 90.310(1), 90.460 (prohibiting sales of unregistered securities and by unlicensed broker-dealers "*in this State*"); P.R. Laws Ann Tit. 10, §§ 861, 871 (same, "*in Puerto Rico*"); Cal. Corp. Code §§ 25110, 25130 (same, "*in this state*"); Tex. Govt. §§ 4001.056(a)(1), 4001.067(c), 4004.051, (defining "Dealer" and "Sell" based on conduct "*in this state*" and prohibiting unregistered dealers from selling "*in this state*") (emphases added). Plaintiffs have not appealed the dismissal of their Florida law claims.

*Nomura Holding Am., Inc.* ("*FHFA*"), 873 F.3d 85, 156 (2d Cir. 2017) (quoting

*Edgar v. MITE Corp.*, 457 U.S. 624, 641 (1982)).

Under this Court's precedents, a transaction is "domestic" if "irrevocable

liability is incurred or title passes within the United States." *Absolute Activist*, 677

F.3d at 67.  As the District Court correctly determined (SPA 8-9), plaintiffs fail to

allege a domestic transaction under either prong, and none of plaintiffs'

contentions on appeal changes that result.

### A.     Plaintiffs Failed to Allege That They Incurred Irrevocable Liability for Their Transactions or That Title to the Tokens Passed in the United States

To satisfy the first prong of the *Absolute Activist* inquiry, a plaintiff must

allege facts supporting "the plausible inference that … the purchaser incurred

irrevocable liability within the United States to take and pay for a security."

*Absolute Activist*, 677 F.3d at 68.  A purchaser incurs irrevocable liability when

and where the purchaser/investor "become[s] bound to effectuate the

transaction"—i.e., at the time and place "the parties obligated themselves to

perform what they had agreed to perform."  *Giunta v. Dingman*, 893 F.3d 73, 79

(2d Cir. 2018) (internal citation and quotation marks omitted).  Factual allegations

"concerning the formation of the contracts, the placement of purchase orders, the

passing of title, or the exchange of money" may be relevant but are not dispositive

to pleading where irrevocable liability was incurred. *In re Petrobras Secs.*, 862 F.3d at 272 (quoting *Absolute Activist*, 677 F.3d at 70).

As in *Absolute Activist* itself, the complaint here contains only conclusory allegations about where irrevocable liability for completing the Token purchases at issue was incurred. Plaintiffs allege only that they are "resident[s] of" certain U.S. states or territories; they "purchased Tokens on Binance, and pursuant to contracts with and solicitations from Binance," from those jurisdictions; and their transactions "were therefore effected in" such jurisdictions. (A-168–170, ¶¶15–23.) As the District Court properly determined, these allegations fall short. (SPA-8.) Unsupported by any underlying factual allegations, they amount to little more than the "mere assertion that the transactions 'took place in the United States,'" which is "insufficient to adequately plead the existence of domestic transactions." *Absolute Activist*, 677 F.3d at 70.

Plaintiffs' additional assertion that they resided in the United States when they made their purchases does not overcome this deficiency. As this Court has consistently held, "a purchaser's citizenship or residency does not affect where a transaction occurs." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 181 (2d Cir. 2014) (quoting *Absolute Activist*, 677 F.3d at 69). The complaint does not allege that plaintiffs placed purchase orders for the Tokens *from* their states or territories of alleged residence, but even if it did, this would be

24

insufficient. Allegations that a plaintiff "placed a buy order in the United States that was then executed on a foreign exchange, standing alone" are not sufficient to establish that plaintiff "incurred irrevocable liability in the United States." *City of Pontiac*, 752 F.3d at 181. Indeed, this Court has repeatedly recognized that the location from which purchase orders were placed will have particularly little significance in cases, like this one, that arise in the context of transactions in alleged securities "on a foreign [alleged] exchange." *Id.* at 181 n.33 (citing *Absolute Activist*, 677 F.3d at 62, 71). As plaintiffs themselves acknowledge, "mere placement of a buy order in the United States," without more, "is insufficient to create a domestic transaction." (App. Br. 14.)

Plaintiffs here do not allege anything more. The complaint does not allege the identity or location of any of the third parties from whom plaintiffs purchased their Tokens. It does not allege where the contracts to purchase the Tokens were formed, or how, where or when plaintiffs became obligated to the sellers to buy them. It does not allege where the money to buy the Tokens was paid, other than to say that Binance facilitated payment through "supported third-party services" and enabled investors to deposit assets "into the Binance exchange." (A-181, 196, ¶¶76, 101.) And it does not allege where plaintiffs took delivery of the Tokens, other than stating that Binance "maintains custody of the crypto-assets in each investor's wallets." (A-196, ¶101.) Nor does the complaint allege where the

purchase transactions were executed, other than "on the Binance exchange."  (A-162, 196, 259, ¶¶1, 102, 349.)  Plaintiffs, however, do not allege that "the Binance exchange" was in the United States.  To the contrary, they affirmatively allege that Binance is a decentralized, foreign trading platform that was nominally based abroad, with no "physical headquarters in any geographic jurisdiction"—including the United States.  (A-170–71, 253, ¶¶23, 26, 326.)

In short, plaintiffs simply do not allege any facts that might support an inference that irrevocable liability for their Token purchases was incurred in the United States, *see City of Pontiac*, 752 F.3d at 181, and all the allegations they *do* make indicate that their transactions were extraterritorial.

Plaintiffs likewise fail to allege that title to the Tokens passed within the United States under the second prong of the *Absolute Activist* test.  *See* 677 F.3d at 68.  Indeed, plaintiffs have waived any contrary argument because they did not assert that title passed within the United States before the District Court or in their opening brief here.  *See, e.g., Anilao v. Spota*, 27 F.4th 855, 873 (2d Cir. 2022); *Wal-Mart Stores, Inc. v. Visa USA, Inc.*, 396 F.3d 96, 124 n.29 (2d Cir. 2005).  Nor could they have.  The sole allegation in plaintiffs' 327-page complaint concerning the transfer of title to the Tokens is the bare assertion that, "upon information and belief, title for the Tokens at issue in those transactions passed in whole or in part over servers located in California that host Binance's website."  (A-168–170,

26

¶¶15–22.)  This purely conclusory assertion is entirely inadequate as a basis for

plaintiffs' claims.  *See, e.g.*, *Pension Ben. Guar. Corp. v. Morgan Stanley Inv.*

*Mgmt. Inc.*, 712 F.3d 705, 717 (2d Cir. 2013) (rejecting "naked assertion[s]" and

"legal conclusion[s] couched as a factual allegation" (quoting *Twombly*, 550 U.S.

at 555, 557)).

## B.    Plaintiffs' Purported "Purchase Order-Plus" Test Contravenes Controlling Authority

Unable to meet the *Absolute Activist* test, plaintiffs invent a purported test of

their own:  "[a]llegations that a plaintiff placed purchase orders in the United

States and that additional transactional steps binding the plaintiffs to the

transaction took place in the United States suffice to plead a domestic transaction."

(App. Br. 19.)  But this "purchase-order plus" test finds no legal support.  Indeed,

plaintiffs' focus on "additional transactional steps" that may have taken place in

the United States—regardless of whether irrevocable liability was incurred at any

of those steps—amounts to an attempt to revive the now-rejected "conduct and

effects" test, under which a transaction was domestic if "the wrongful conduct

occurred in the United States" or "the wrongful conduct had a substantial effect in

the United States."  *Morrison*, 561 U.S. at 255 (internal citation and quotations

omitted).

The additional allegations that plaintiffs purport to identify, moreover, have

either been explicitly rejected by this Court as an insufficient basis for pleading

domestic transactions or have nothing to do with where irrevocable liability was incurred. Plaintiffs assert that they "were solicited to purchase the Tokens through marketing targeted at U.S. investors" (App. Br. 25), but allegations that investments "were heavily marketed in the United States" fail to satisfy *Morrison*'s domestic transaction standard. *Absolute Activist*, 677 F.3d at 70.

Similarly, plaintiffs assert that "they submitted payment from their states of residence." (App. Br. 20–21.) But, an alleged "direction to transfer money using [U.S.] bank accounts to purchase" securities does *not* "suffice to demonstrate a domestic transaction." *Banco Safra S.A.-Cayman Islands Branch v. Samarco Mineracrao, S.A.*, 849 F. App'x 289, 294 (2d Cir. 2021) (summary order) (citing *Loginovskaya v. Batratchenko*, 764 F.3d 266, 275 (2d Cir. 2014)). As this Court explained in *Loginovskaya*, even a direction to deposit money *into* a U.S. bank account will not establish that a transaction is domestic, because while payments are "actions needed to carry out the transactions," they are "not the transactions themselves" and occur *after* the parties incurred irrevocable liability to complete the purchase and sale. *See Loginovskaya*, 764 F.3d at 275.

Nor does it suffice for plaintiffs to tack on an allegation that they made payments "via Binance's crypto-asset exchange hosted on U.S. computer infrastructure" and therefore "use[d]" that infrastructure to make their purchases. (App. Br. 21, 25–26.)

.

First, plaintiffs' allegations regarding where Binance's computer "infrastructure" is located are remarkably thin.  Plaintiffs allege only that, "upon information and belief," Binance utilized "computer servers" provided by third-party vendor Amazon Web Services, and that "several" of Amazon's "Availability Zones," "data centers" and support hardware are located in the United States, including "a significant portion" of those hosting Binance.  (A-170–71, ¶24.)  But these allegations, by their terms, necessarily admit that *some* Amazon servers are physically located *outside* the United States, and plaintiffs offer no support for their "belief" that Binance is hosted only on Amazon infrastructure within the United States.  Plaintiffs "cannot merely plop 'upon information and belief' in front of a conclusory allegation and thereby render it non-conclusory." *Citizens United v. Schneiderman*, 882 F.3d 374, 384-85 (2d Cir. 2018).

Second, plaintiffs' web server allegations are functionally no different from saying that plaintiffs routed their purchase orders and payments *through* the United States.  Such allegations fall short because they say nothing about how, when or where plaintiffs became irrevocably committed to completing the trades.  *See Loginovskaya*, 764 F.3d at 275, *City of Pontiac*, 752 F.3d at 181.  This is logical: when a foreign electronic trading platform contracts with a third-party cloud computing vendor, the vendor's decisions about where to place its physical infrastructure do not establish when or where buyers and sellers who use the

29

trading platform incur liability to each other. The transactions, and how they are physically implemented, are two different things, and a foreign transaction does not become domestic under *Morrison* merely because a third party's machinery in the United States may be "needed to carry out the transactions" or "implement[] an aspect of a transaction." *Loginovskaya*, 764 F.3d at 275; *see also Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 582 (S.D.N.Y. 2017) (holding allegation that "defendants carried out their manipulation from abroad through servers that happened to route their communications in the United States" insufficient under *Morrison*).

Plaintiffs cite no decision by this Court holding otherwise, much less supporting their "purchase-order plus" test. Most of the decisions on which plaintiffs rely are factually far afield—they involved face-to-face dealings between U.S.-based counterparties concerning non-exchange-listed investments, not anonymous trading over a platform such as Binance that indisputably is not based in this country. Moreover, these decisions offer no support for plaintiffs' position because they each focused on *where* the parties became irrevocably obligated to each other to complete the transaction at issue. For example, in *United States v. Vilar*, this Court upheld a jury's finding that the investments were domestic transactions because the evidence established that the victims met with the defendant to discuss the investments, and ultimately executed the relevant

commitment agreements, in the United States. 729 F.3d 62, 76–78 (2d Cir. 2013). Similarly, in *Giunta*, the transaction at issue—an investment in a Bahamian restaurant—was domestic because the parties allegedly entered into the relevant contract in New York, where the parties met in person to discuss the investment and where the plaintiff accepted the defendants' offer. 893 F.3d at 76–77.

Nothing in these cases supports plaintiffs' "purchase-order plus" theory. Rather, the cases stand for the uncontroversial proposition that when a complaint alleges (or a litigant proves) facts to establish that an "[a]greement was entered into in [a U.S. state] and irrevocable liability was incurred in the United States," the plaintiff will have "plausibly alleged a domestic transaction cognizable" under *Morrison*. *Giunta*, 893 F.3d at 81-82; *see also Vilar*, 729 F.3d at 79 ("on this record," jury could find that victim "incurred irrevocable liability to purchase [the] investment while in the United States"). These cases thus provide no assistance to plaintiffs here because plaintiffs do not allege any facts about where irrevocable liability for purchasing the Tokens was incurred, let alone that it was incurred in the United States.[12]

---

[12] *FHFA*, also cited by plaintiffs (App. Br. 24–25), is even more inapposite. Like *Vilar* and *Giunta*, that case does not address where or when irrevocable liability is incurred when trading with anonymous third parties on a foreign trading platform. Rather, it addressed which state's Blue Sky laws applied to individually negotiated, non-exchange-traded bond purchases. This Court, on clear error review, affirmed the district court's conclusion that each party's traders had been at their principal

(….continued)

The last decision plaintiffs rely on, *Choi v. Tower Research Capital LLC*, 890 F.3d 60 (2d Cir. 2018), is the only one involving exchange-traded investments, but *Choi* supports *defendants*' position on this appeal. It confirms that, when trading on an exchange, irrevocable liability attaches when buy and sell orders are "matched" on the exchange—i.e., when the parties become committed to each other to complete the transaction. *Id.* at 67–68. This irrevocable liability is not vitiated, even if additional actions implementing the trade later occur elsewhere. *Id.* In *Choi*, the parties agreed that matching occurred on CME Globex, an electronic exchange allegedly "located in" Illinois, and the trades *then* cleared and settled on the Korea Exchange (KRX). *Id.* at 63, 67. This Court held that irrevocable liability occurred upon matching on the Illinois exchange. *Id.* at 67–68. Neither KRX's rights to cancel a trade prior to settlement in the event of a mistake, nor its assumption of liability to the parties at clearing, could undo that result, as these subsequent events did not render the trades "'revocable' in any meaningful sense." *Id.* at 68.

---

places of business when they formed the relevant investment contracts. *FHFA*, 873 F.3d at 156–58. This Court did *not* determine, as plaintiffs contend, that the transactions had occurred at those offices "*because*" the traders worked there and the sellers sent offering materials there; it merely held that those were facts that the district court could consider, together with many other facts—including direct witness testimony—in forming its conclusion. *See id.* *FHFA* is entirely distinguishable from plaintiffs' claims here.

.

As *Choi* makes plain, plaintiffs cannot simply pick *any* "additional transactional step[]" (App. Br. 19) occurring in the United States and claim that, together with their purchase orders, it renders their transactions domestic. Instead, plaintiffs must identify the *specific* step at which irrevocable liability attaches.[13] *Choi* further confirms that, to establish where irrevocable liability was incurred in cases involving exchange-listed investments, like this one, a plaintiff must allege when and where "matching" occurred. As discussed below, the complaint's allegations and the documents it incorporates by reference establish that matching occurred on the Binance exchange, which concededly was not in the United States.

---

[13] This Court recently reaffirmed that the critical factor rendering the transactions domestic in *Choi* was the parties' incurrence of irrevocable liability on a domestic exchange in Illinois, not that additional transactional steps were taken here. *See Banco Safra S.A.-Cayman Islands Branch*, 849 F. App'x at 293 n.2 ("We note that a transaction is also domestic when the two sides of the transaction are 'matched'—thus forming a binding contract—on an electronic exchange system within the United States." (citing *Choi*, 890 F.3d at 63)).

C. **Plaintiffs' Novel Theory That Validation of ERC-20 Tokens "on the Blockchain" Confers Irrevocable Liability is Unalleged and Legally Unsupported**

Plaintiffs assert that their purchases of Tokens "became irrevocable upon being validated on U.S.-based nodes servicing the Ethereum blockchain." (App. Br. 26; *see also id.* at 21–23.) This novel claim has no legal support and appears *nowhere* in the complaint. It also affirmatively contradicts the complaint and the documents incorporated therein.

The allegations plaintiffs cite to support their validation theory actually say nothing about when plaintiffs' purchases became irrevocable and virtually nothing about validation. (App. Br. 22.) Instead, they make generic reference to Binance being hosted on Amazon's computer servers, some of which allegedly are in California (A-170–71, ¶24), and offer high-level discussions of "Proof of Work" problems for recording transactions on generic blockchains and "miners" who act as validators on the Ethereum network (A-175–76, ¶¶44, 50). They also assert that ERC-20 tokens are built and exchanged on the Ethereum blockchain (A-178, ¶¶56–59), and, in purely conclusory terms, that Binance allegedly somehow availed itself of "computers on the Ethereum blockchain network located in the United States" (A-254, ¶328).

There is *not one word* in these paragraphs about plaintiffs' alleged Token purchases or where those purchases became final and binding—much less about

34

those purchases being "validated" on any "nodes." Indeed, the complaint does not even *mention* the word "node." Plaintiffs, in fact, never even allege that their transactions on Binance were recorded on the Ethereum blockchain, as opposed to solely "off-chain" in Binance's records. A plaintiff cannot amend its complaint on appeal, and waives arguments like this one that were not presented below. *See Seidl v. Am. Century Cos., Inc.*, 427 F. App'x 35, 37 (2d Cir. 2011) (summary order).

Putting that aside, plaintiffs' contention is meritless. As described above, and as multiple courts have recognized, anonymous transactions occurring on an exchange or trading platform become irrevocable at the site of the exchange, at the time buy and sell orders are matched and the parties become obligated to each other to complete the trade. Here, the complaint *confirms* that matching and irrevocable liability occurred abroad on the Binance platform, and that Binance's platform is not in the United States. The complaint alleges that plaintiffs purchased their Tokens "on the Binance exchange" (A-162, ¶1), that Binance is a "cryptocurrency exchange" that "provid[es] a marketplace and facilities for bringing together buyers and sellers" (A-170, ¶23), and that "[o]nline crypto-asset exchanges" such as Binance "are similar to traditional exchanges in that they provide a convenient marketplace to match buyers and sellers of virtual currencies" (A-175, ¶46; *see also* A-175, ¶45 (investors "often accomplish[]" acquisition of

crypto-assets by obtaining them "from someone else … through an online 'crypto-asset exchange," like Binance)).  And the terms of use—which plaintiffs incorporated by reference in the complaint—make clear that following matching, users may not "change, withdraw or cancel" any purchase or sale order.  (A-504; *see also* A-605.)  Accordingly, individuals transacting on Binance incur irrevocable liability on the Binance platform at the time of matching—not in the United States, where plaintiffs acknowledge Binance has no operations (A-170–72, ¶¶23, 26–28 (alleging that Binance is not headquartered in and does not have operations in the United States); A-253–54, ¶¶326–27 (alleging that Binance's U.S. presence is limited to using vendor with some infrastructure and having some employees in United States)).  *See Choi*, 890 F.3d at 68.  Accepting these allegations, the relevant transactions executed on Binance occurred abroad and therefore are extraterritorial.

Plaintiffs' new assertions regarding validation on Ethereum nodes cannot change this conclusion.  Plaintiffs do not assert that they could alter or cancel their Token orders *after* matching but before validation.  None of the allegations in their complaint speaks to the relationship between validation and irrevocable liability (i.e., the obligation of purchasers and sellers on Binance to complete their transactions).  The complaint never even defines "validation," besides vaguely suggesting that it relates to "confirmation of transactions on the network" and "the

36

ongoing security of the network." (A-209, ¶142.) To the extent validation functions as an "after-sale [trade] confirmation," however, it "is not irrefutable evidence of where the antecedent sale occurred." *FHFA*, 873 F.3d at 157. And even if, as plaintiffs claim, validation is necessary to finalize transactions in the Tokens, it is conceptually no different from events such as clearing and settlement—none of which establishes where the parties earlier incurred irrevocable liability to each other. *Choi*, 890 F.3d at 68; *see also In re Petrobras Secs. Litig.*, 150 F. Supp. 3d 337, 342 (S.D.N.Y. 2015) (holding domestic DTC settlement of securities transactions and recording of beneficial ownership are "insufficient to satisfy *Morrison*" because they lack "substantive indicia of a contractual commitment"). In sum, while validation may be "needed to carry out" or "implement[] an aspect of" previously executed purchases, it does not alter where, when or how buyers and sellers became obligated to each other and thus does not bear on whether plaintiffs purchased Tokens in domestic transactions. *See Loginovskaya*, 764 F.3d at 275.

Finally, apart from being legally untenable, plaintiffs' argument regarding Ethereum nodes is factually unsupported. The *very article* on which plaintiffs base their validation argument states that any transaction processed and recorded on a blockchain is validated by every single "node" worldwide—i.e., any computer that has downloaded the software to connect to that particular blockchain. Alexis M.

Tellerd, *Time to Validate Validators: Determining the Legal Duty of Cryptocurrency Validators Under the Bank Secrecy Act*, 8 Nat'l Sec. L.J. 297, 304 & n. 35 (2021) ("Before a transaction is confirmed on the Blockchain, *all nodes* must verify the validity of the transaction." (emphasis added)); *see also Shi v. Le*, 2022 WL 896963, at *3 n.5 (E.D.N.Y. Mar. 28, 2022) (recognizing that the "Ethereum network" consists of a "decentralized ledger . . . hosted in a permissionless manner in 'nodes' all over the world."). Thus, even under plaintiffs' novel theory, it makes no difference whether—as they assert—the "largest cluster" of Ethereum nodes is in the United States (App. Br. 22); validation of a transaction on Ethereum cannot clarify "where" a blockchain transaction occurs because, according to plaintiffs' source, *every* node—dispersed throughout the world—simultaneously validates the transaction.[14]

---

[14] *In re Tezos Securities Litigation*, 2018 WL 4293341 (N.D. Cal. Aug. 7, 2018)—an out-of-circuit, district court decision cited by plaintiffs (App. Br. 25)—is factually and legally distinguishable. The plaintiff there purchased digital tokens while in the United States directly from the issuer off a website "run primarily" by a co-founder "in California." *Id.* at *8. Further, the plaintiff purchased the tokens by contributing Ethereum to the defendants' initial coin offering, and the complaint specifically alleged that such contribution became irrevocable only after validation. *Id.* Even if such allegations were relevant, the complaint here contains no similar allegations.

## II. Plaintiffs' Section 12(a)(1) Claims are Barred by Section 13's Applicable One-Year Statute of Limitations

Plaintiffs appropriately dropped their Section 12(a)(1) claims arising from purchases they allegedly made over one year before filing suit. Their remaining claims—relating to Tokens EOS and TRX—are also untimely under Section 13 of the Securities Act because, as the District Court correctly determined (SPA-5), plaintiffs did not bring suit "within one year of the violation[s] upon which [those claims are] based," 15 U.S.C. § 77m.

### A. The One-Year Statute of Limitations Runs From the "Violation," Irrespective of When a Sale Occurs

Because plaintiffs did not adequately allege below, and do not contend on appeal, that Binance passed them title to the Tokens (SPA-5 n.2, App. Br. 33 n.12), the only "violation" they can pursue against Binance under Section 12 is for allegedly soliciting their purchases of unregistered EOS and TRX Tokens. Section 12(a)(1) creates a private right of action against anyone who "offers or sells a security in violation of" Section 5 of the Securities Act, which prohibits sales of unregistered securities. 15 U.S.C. §§ 77l(a)(1), 77e(a). Section 12 claims, however, may be asserted only by the person "purchasing such security from" the defendant. 15 U.S.C. § 77l(a). In *Pinter v. Dahl*, the Supreme Court held that, because the term "offer" in Section 12(a)(1) includes the "solicitation of an offer to buy," liability under Section 12 extends not only to defendants who pass title, but

39

also to those who successfully solicit a purchase—both of whom are considered "statutory sellers."  486 U.S. 622, 642–45 (1988) (citing, *inter alia*, 15 U.S.C. § 77b(a)(3) (defining "offer")); *accord In re Morgan Stanley Info. Fund Secs. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010).

The only specific alleged conduct by Binance as to EOS and TRX Tokens is the republication of third-party research in November 2018 and February 2019 (A-195–96, ¶100(d), (l))—more than a year before plaintiffs brought this action.  Even assuming that those Tokens were unregistered securities and that this conduct constitutes "solicitation," plaintiffs did not bring their claims within one year of Binance's last alleged acts of solicitation.[15]  Thus, under the plain text of Section 13, plaintiffs' claims are untimely.  This should end the inquiry, as courts do not look beyond unambiguous statutory language when interpreting limitations provisions.  *See Rotkiske v. Klemm*, 140 S.Ct. 355, 360 (2019).

Without even attempting to square their interpretation with Section 13's plain meaning, plaintiffs assert that the limitations period should run from the date they allegedly purchased the Tokens from unnamed third parties, rather than from

---

[15] In the District Court, defendants contested that plaintiffs' allegations could amount to solicitation, particularly where plaintiffs do not allege these activities influenced their purchases.  (Dkt. 59 at 13–14.)  Defendants further assumed, solely for purposes of the motion to dismiss, that the Tokens are securities.  The District Court did not pass on either question, and defendants reserve all rights with respect to those arguments.

Binance's purported "violation."  (App. Br. 33–34.)  In essence, they argue that the statute of limitations for their claims against Binance restarted every time they bought a Token from someone else, no matter how temporally removed those purchases were from Binance's conduct.  But plaintiffs are legally incorrect.  The cases they cite do not remotely suggest that the limitations period for a solicitation claim against a defendant should run from a much later and unrelated sale by a different, unknown third party.

Plaintiffs lean heavily on *Diskin v. Lomasney & Co.*, 452 F.2d 871 (2d Cir. 1971), a case that preceded *Pinter* by 17 years.  *Diskin*, however, addressed a wholly different situation—an underwriter that both solicited and sold securities as part of a single transaction over the course of several months.  In September 1968, the underwriter offered—without an effective registration statement or prospectus—to sell the plaintiff shares of not-yet-issued Continental stock, if the plaintiff agreed to buy currently available stock in a different company, which it did.  *See id.* at 873.  In February 1969, the underwriter transferred the now-issued Continental shares to the plaintiff without further communication, but still without delivering a prospectus.  *See id.*  The plaintiff sued in January 1970—within one year of the sale but more than a year from the offer.  *Id.  Diskin* thus addressed a solicitation that could not be completed when made (as the shares did not yet exist), and simply holds that where an underwriter both solicits and subsequently

41

completes a stock sale as part of a single transaction that violated the securities laws, the limitations period runs from the later date. *See id.* at 875–76.

The complaint here does not allege anything comparable. Defendants purportedly offered to sell and solicited plaintiffs' purchases of EOS and TRX by republishing third-party research in November 2018 and February 2019 (A-195–96, ¶100(d), (l)), when those Tokens already existed and were available (A-213, ¶150; A-231, ¶226). Plaintiffs—who do not allege they even saw this research—then purchased the Tokens months, and in some cases, more than a year later from unidentified third parties. (A-523–24; *see also* A-15–149.) Unlike in *Diskin*, these alleged sales did not represent a necessary continuation of a prior solicitation. The alleged solicitation and the sale were separate acts by unconnected persons. Nothing in *Diskin* suggests that Binance can be sued under Section 12(a)(1) for purported solicitation more than a year before plaintiffs asserted their claims, based on the happenstance that some unrelated person subsequently completed a sale.[16]

Moreover, *Diskin*'s policy rationale does not support allowing plaintiffs to sue Binance over a year after the alleged violation on which their claims are based. The *Diskin* Court was concerned that a single defendant who both solicited the sale

---

[16] *Wigand v. Flo-Tek, Inc.*, also cited by plaintiffs, is likewise inapposite. Like *Diskin*, and unlike this case, it held that the limitations period for a solicitation and sale by the same seller as part of a single transaction would be measured from the sale date. *See* 609 F.2d 1028, 1030–32, 1033 n.5 (2d Cir. 1979).

of a security in violation of Section 5 at a time when it could not be sold, and subsequently completed the sale after it became available, might avoid liability if the limitations period was not measured from the sale date. Under those circumstances, "it would be unreasonable to read § 13 as starting the short period for an action at a date before the action could have been brought." *Diskin*, 452 F.2d at 875–76. Here, by contrast, the Tokens *were* available for sale at the time of Binance's alleged solicitation, but plaintiffs allegedly waited until later to purchase them from someone else. In any event, whatever its merits, this policy cannot trump Section 13's plain text, as "'even the most formidable' policy arguments cannot 'overcome' a clear statutory directive." *BP P.L.C. v. Mayor and City Council of Baltimore*, 141 S.Ct. 1532, 1542 (2021) (quoting *Kloeckner v. Solis*, 568 U.S. 41, 56 n.4 (2012)).

Plaintiffs, moreover, are wrong that their reading of *Diskin* comports with *Pinter*. Nothing in *Diskin* or *Pinter* suggests that the "violation" that triggers the statute of limitations under Section 13 depends on a sale. While *Pinter* held that unsuccessful solicitations are not subject to suit under Section 12, that is only because Section 12 contains a separate "purchase requirement" that "clearly confines § 12 liability to those situations in which a sale has taken place." *Pinter*, 486 U.S. at 644; 15 U.S.C. § 77l(a) (limiting defendant's liability to "the person purchasing such security from him"). But that additional requirement—which

governs who can be a Section 12 *plaintiff*—is independent from the "activities that may render a person liable when a sale has taken place." *Pinter*, 486 U.S. at 644. For Section 12(a)(1), there are two such activities: (i) offering or (ii) selling a security in violation of Section 5. 15 U.S.C. § 77l(a)(1). But solicitation—the conduct in which Binance allegedly engaged—is covered only by the first because it is only the statutory definition of "offer" that includes solicitation, not the definition of "sale." 15 U.S.C. § 77b(a)(3); *Pinter*, 486 U.S. at 643. Thus, neither a purchase nor a sale is required for the underlying "violation" upon which a Section 12 solicitation claim is based. And the statute of limitations runs for a year from the date of the "violation," irrespective of when the sale or purchase occurs. 15 U.S.C. § 77m. Where, as here, the only alleged violation is a solicitation allegedly constituting an "offer" to sell, nothing in *Pinter* supports rewriting Section 13 to run from the date of the sale.

To hold otherwise would permit plaintiffs to bring solicitation claims against defendants at any time—no matter how much time has passed since the alleged solicitation—as long as the plaintiff made the purchase, even if from a totally unknown third party, in the year preceding suit. This construction would not only violate the clear statutory language, but would also undermine the key purposes of statutes of limitations: "'preventing surprises'" by requiring plaintiffs to pursue known claims before "'evidence has been lost, memories have faded, and

44

witnesses have disappeared.'" *CTS Corp. v. Waldburger*, 573 U.S. 1, 10 (2014)

(citing *R.R. Telegraphers v. Ry. Express Agency, Inc.*, 321 U.S. 342, 348–49

(1944)).  Plaintiffs' interpretation should therefore be rejected.

### B.    Plaintiffs' Vague Allegations Do Not Plead "Continuous Solicitation"

As a fallback, plaintiffs attempt to identify conduct by Binance within one

year of when they sued.  They assert that Binance solicited their Token purchases

"continuous[ly]" via its website "by 'displaying detailed price and trading data of

the Tokens' that induced Plaintiffs to trade."  (App. Br. 37 (quoting A-193–94,

¶99).)  Announcing listings and displaying pricing and trading data, however, does

not constitute solicitation.  Were it otherwise, numerous websites and

publications—such as Yahoo! Finance, Bloomberg and the Wall Street Journal, as

well as every securities exchange—would constantly face Section 12 solicitation

liability.  That is not the law.

Solicitation occurs when a party "control[s] the flow of information to a

potential purchaser," "disseminate[s] material information to investors," and

"urge[s] the buyer to purchase."  *Pinter*, 486 U.S. at 644, 646.  But "the term

'solicitation' does not encompass all activities related to the purchase transaction."

*Craftmatic Secs. Litig. v. Kraftsow*, 890 F.2d 628, 636 (3d Cir. 1989).  Merely

distributing information about a potential investment does not suffice.  For

example, preparing and distributing offering documents at the request of another

"cannot under any view be considered the kind of solicitation necessary under" Section 12, *Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124, 1126 (2d Cir. 1989), and even "extensive correspondence" from a "major" backer of the investment will not, without more, constitute solicitation, *Capri v. Murphy*, 856 F.2d 473, 478–79 (2d Cir. 1988). Thus, a plaintiff cannot sustain a Section 12 solicitation claim by "generally alleg[ing] that the [defendants] solicited sales of the shares," where "there are no specific allegations" pertaining to the securities plaintiffs actually purchased. *In re OPUS360 Corp. Secs. Litig.*, 2002 WL 31190157, at *11 (S.D.N.Y. Oct. 2, 2002) (allegations "speak[ing] in general terms without reference to any specific acts" are insufficient). Rather, parties can be liable under Section 12 only if "they solicited *the sales in question* for a financial gain." *Wilson*, 872 F.2d at 1126 (emphasis added). To allege this, the plaintiff "must demonstrate [the defendant's] direct and active participation in the solicitation of the immediate sale." *Craftmatic Secs. Litig.*, 890 F.2d at 636. Ultimately, the plaintiff must "show that [the defendant] actually solicited their investment," *Capri*, 856 F.2d at 478–79, by "persuad[ing] [them] to make a particular investment," *Wilson*, 872 F.2d at 1127. Plaintiffs' "continuous" solicitation allegations here do not satisfy these standards.[17]

---

[17] For example, plaintiffs cite a 2018 interview that occurred more than a year *before* plaintiffs sued and contains only high-level observations about Binance's
(….continued)

.

Plaintiffs' allegations that Binance announced token listings and published pricing and trading data fall short because such allegations do nothing more than suggest that defendants "distributed . . . marketing materials through their website and other channels," which are insufficient under Section 12(a)(1). *Youngers v. Virtus Invs. Partners, Inc.*, 195 F. Supp. 3d 499, 522 (S.D.N.Y. 2016) (internal quotation marks omitted). Plaintiffs allege, at best, the "extensive correspondence" *Capri*, 856 F.2d at 478, and "ministerial act[s]" that this Court has previously held insufficient because they do not evince an attempt to "persuad[e]" plaintiffs to "to make a particular investment," *Wilson*, 872 F.2d at 1126–27. Unsurprisingly, plaintiffs cite no case holding an exchange or finance publication liable for solicitation based on the publication of price and trading data. Nor do they plead any facts showing defendants' "direct and active participation in the solicitation" of plaintiffs' EOS and TRX purchases—much less on a *continuous* basis. *See Craftmatic Secs. Litig.*, 890 F.2d at 636; *see also Capri*, 856 F.2d at 478–799.

_____

business model, without mentioning EOS, TRX or any other Token. (A-186, ¶¶87-89.) Plaintiffs similarly cite allegations that Binance announced via social media that Tokens were available for trading on its platform. Most of these paragraphs address Tokens *other than* EOS or TRX. (A-187–89, ¶¶92–94; A-192–93, ¶98.) And the statements regarding EOS and TRX (A-189–92, ¶¶95, 96, 97) almost all occurred well outside the limitations period (in 2017 and 2018) and do not demonstrate "continuous solicitation" in any event.

Absent such allegations, defendants cannot be "statutory sellers" subject to Section 12 liability.

## III. Plaintiffs' Claims Under Section 29(b) of the Exchange Act Are Barred by the One-Year Statute of Limitations

The District Court correctly determined that plaintiffs' Section 29 claims were untimely because plaintiffs could, with reasonable diligence, have discovered the facts underlying the violations on which they sued more than a year before April 2020. (SPA-6-7.) Plaintiffs argue that Section 29's one-year statute of limitations runs from the date of each purchase (App. Br. 29), but they are wrong.

The one-year statute of limitations for Section 29 claims—like other federal securities claims—runs from the date that a "reasonably diligent plaintiff would have discovered the facts constituting the [alleged] violation". *Merck & Co. v. Reynolds*, 559 U.S. 633, 637 (2010) (internal quotation marks omitted); *see also id.* at 646 (applying this rule to Exchange Act claims (citing *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 362 (1991)); *see also Alpha Cap. Anstalt v. Oxysure Sys., Inc.*, 216 F. Supp. 3d 403, 408 (S.D.N.Y. 2016) (applying this rule specifically to Section 29 claim (citing *Ceres Partners v. GEL Assocs.*, 918 F.2d 349, 358–59 (2d Cir. 1990))); *accord Kahn v. Kohlberg, Kravis, Roberts & Co. ("KKR")*, 970 F.2d 1030, 1038–39, 1042 (2d Cir. 1992) (indicating that one-year statute of limitations running from "discovery of the claim" "applicable to

.

various provisions of the 1933 and 1934 Acts" impliedly applies to non-fraud rescission claims under Section 29).

Section 29 renders certain *contracts*—not necessarily transactions—voidable if they violate the Exchange Act.  15 U.S.C. § 78cc(b); *see also Dervan v. Gordian Grp. LLC*, 2017 WL 819494, at *8 (S.D.N.Y. Feb. 28, 2017).  Plaintiffs allege that their contracts with Binance were illegal because Binance operated as an unregistered exchange and broker-dealer; thus, the relevant question is when they could—with reasonable diligence—have discovered these purported violations.

As demonstrated below and not contested on appeal, the *only* contracts plaintiffs allege they had with Binance are the terms of use.  (A-265, 268, ¶¶375, 386.)  Because every plaintiff alleges that it began transacting on Binance "pursuant to and consistent with its Terms of Use" more than one year before filing the complaint,[18] plaintiffs necessarily had already *entered* into those terms with Binance by that time.  Thus, to survive Section 29's one-year statute of limitations, plaintiffs must allege that a reasonably diligent plaintiff would have been unaware that Binance was not a registered exchange or broker-dealer until months after agreeing to Binance's terms of use.

---

[18] A-265, ¶375; A-15–149; A-523–24 (showing that each plaintiff's first transaction on Binance occurred no later than May 2018).

The District Court correctly determined that the complaint alleges no facts that could support such a claim.  (SPA-6–7.)  Binance's lack of registration with the SEC was at all relevant times discoverable by searching the SEC website.  (*See* A-525–536 (lists of national securities exchanges and active broker-dealers on SEC's website).)  Reasonably diligent plaintiffs would have discovered publicly available information on a government website.  Notably, plaintiffs do not allege that they were ever *un*aware of Binance's registration status, and do not point to a single allegation that this information was unknown or unavailable to them.  Nor do they argue that Binance or anyone else misrepresented Binance's registration status—and, by admitting that their claims are not based on fraud (App. Br. 27 n.9), plaintiffs have waived any such argument.  Most critically, plaintiffs allege that Binance advised its customers to access its website using VPNs because it was "*well known* that VPNs are necessary for U.S. purchasers to access *unregistered* crypto asset-exchanges, like Binance."  (A-254, ¶330 (emphasis added); *see also* A-184, ¶82.)  Common knowledge, by definition, is discoverable through reasonable diligence.  Plaintiffs argue that it does not follow from this allegation that they actually knew that Binance was unregistered (Pls. Br. at 28–29), but what plaintiffs *actually* knew is irrelevant.[19]  What *is* relevant is the information they

_____

[19] Plaintiffs point to their allegation that investors would not have known the Tokens were securities "prior to the guidance released by the SEC on April 3,

(....continued)

50

could have discovered with reasonable diligence, and plaintiffs' allegation that it was "widely known" (A-184, ¶82) that VPNs were necessary for accessing unregistered crypto exchanges establishes that a person exercising "reasonable diligence" would have been able to determine that Binance was unregistered from the date of entry into Binance's terms of use, if not sooner. *See, e.g. KKR*, 970 F.2d at 1042 (claim under analogous provision of Investment Advisers Act was time-barred because defendant's lack of registration was "a matter of public record").

Doomed by these admissions, plaintiffs attempt to move the goalposts. They claim that the one-year limitations period for Section 29(b) claims should *not* run from the execution of the purportedly violative contract—even if a reasonably diligent plaintiff would have been aware of the alleged illegality when the contract was executed. Instead, plaintiffs argue, the limitations period should *restart* on the date of each transaction entered into pursuant to the contract. This makes no sense.

_____

2019," claiming that this allegation is somehow relevant to the timeliness of their rescission claim. (App. Br. 29.) It is not. The District Court determined that the Framework did not provide a basis for tolling because it "did not reveal new facts." SPA-7; *see also In re Bibox Group Holdings Ltd. Securities Litigation*, 534 F. Supp. 3d 326, 339 (S.D.N.Y. 2021) (reaching the same holding). Plaintiffs do not appeal that ruling. (App. Br. 2 n.2) Since, as is uncontested, the Framework revealed no new facts about whether the Tokens are securities, its release can have no bearing on when a reasonably diligent plaintiff would have discovered the facts underlying the claim.

Whether a contract is voidable under Section 29 does not depend on whether any particular securities transaction made pursuant to that contract violates the Exchange Act.  What matters is whether the contract is "*made* in violation of" the Exchange Act and the Rules thereunder.  15 USC § 78cc(b) (emphasis added).  When the contract is "*made*" is dispositive:  If, *at the time it is made*, the contract is capable of being performed in a manner that does *not* violate the Exchange Act, it is not actionable.  *See EMA Fin., LLC v. Vystar Corp.*, 336 F.R.D. 75, 82 (S.D.N.Y. 2020) (party could "rescind the contracts [under Section 29(b)] only if they were illegal *at the time they were made*, not because [counterparty] *later* engaged in an illegal transaction" (emphasis added)).  How the contract is later performed is irrelevant, if it does not require an illegal act "on its face."  *See, e.g., Subin v. Goldsmith*, 224 F.2d 753, 762 (2d Cir. 1955) (because section 29(b) "relates solely to a contract made in violation of 'any provision' of the Act or of 'any rule or regulation thereunder,'" claim failed where "*the contract itself* was not thus violative . . . even if the allegations stated a violation" (emphasis added)); *Tanzanian Royalty Expl. Corp. v. Crede CG III, Ltd.*, 2019 WL 1368570, at *13 (S.D.N.Y. Mar. 26, 2019) (contract not voidable because it did not "'on its face' require[] the performance of an illegal act"); *Omega Overseas Partners, Ltd. v. Griffith*, 2014 WL 3907082, at *4 (S.D.N.Y. Aug. 7, 2014) (Sullivan, J.) (recognizing that Section 29(b) reaches only contracts that facially violate

52

Exchange Act or cannot be performed without violation); *cf. Oxford Univ. Bank v. Lansuppe Feeder, LLC*, 933 F.3d 99, 109 (2d Cir. 2019) (affirming dismissal of analogous Investment Company Act claim for failure to "identif[y] any provision of the [contract] whose performance would violate the ICA").

Plaintiffs' contrary arguments (App. Br. 29–30) misconstrue the cases they cite, which actually support the District Court's conclusion that contracts are not voidable under Section 29 unless they violate the Exchange Act when made. For example, in *Slomiak v. Bear Stearns & Co.*, the plaintiff sought rescission of customer agreements under Section 29(b) based on the defendant's failure to provide certain disclosures, but the court held that rescission was unavailable because the contract was not illegal on its face and did not require the performance of an illegal act. 597 F. Supp. 676, 681–83 (S.D.N.Y. 1984) (distinguishing case where "there could be no performance under the contract without violating the Act"). Similarly, in *EMA Fin., LLC v. NFusz, Inc.*, the court expressed doubt that a Section 29(b) claim would have any merit where the complaining party could not "identif[y] any provision" of the contract sought to be rescinded "that requires [unregistered individual] to register as a broker." 509 F. Supp. 3d 18, 37 n.22 (S.D.N.Y. 2020). "In this District," the *EMA* court affirmed, "such a link is essential." *Id.* Under these cases, Section 29(b) claims turn on the validity of the allegedly illegal contract. To seek rescission, a plaintiff need not wait until an

illegal transaction has occurred pursuant to the illegal contract, because any such subsequent transactions are irrelevant to the claim. A Section 29(b) claim therefore accrues—and the one-year limitations period begins to run—when the allegedly illegal contract is signed.

Plaintiffs also attempt to find support for their argument in Section 29(b)'s special statute of limitations for fraud-induced transactions, which runs from the occurrence of a "sale or purchase." (App. Br. 29 (discussing 15 U.S.C. § 78cc(b)).) In discussing this provision, plaintiffs completely fail to clarify that it applies *only* to claims seeking rescission based on a "violation of any rule or regulation prescribed pursuant to paragraph (1) or (2) of subsection (c) of section 78o of this title," 15 U.S.C. § 78cc(b)—i.e., claims seeking rescission based on fraud, manipulation and deception, *see* 15 U.S.C. § 78o(c)(1)–(2). As plaintiffs concede, however, the complaint does not allege any transactions induced by fraud. (App. Br. 27–28 n.9.) Therefore, the one-year statute of limitations for plaintiffs' claims is *not* Section 29(b)'s express statute of limitations for fraud-based transactions. Rather, it is the borrowed one-year statute of limitations drawn from express causes of action under the Securities Act and Exchange Act. *See Lampf*, 501 U.S. at 362 (holding that "1-year period after discovery" found in Exchange Act applies to causes of action elsewhere in Exchange Act absent express limitations period); *Ceres Partners*, 918 F.2d at 363 (same); *Alpha Cap.*

*Anstalt*, 216 F. Supp. 3d at 408 ("There is a one-year statute of limitations for any implied cause of action under Section 29(b) of the Exchange Act." (citing *Ceres*, 918 F.2d at 358–59)).

Plaintiffs next attempt to analogize to the limitations period for rescission actions under the Investment Advisers Act. (App. Br. at 32.) In doing so, they misread *KKR*, where this Court rejected the plaintiffs' argument that the limitations period for their rescission claim had not yet started because the defendant's conduct constituted a "continuing wrong." 970 F.2d at 1039. Drawing from the "sales transaction theory," under which "the wrong occurs when the plaintiff makes a completed sales transaction," such that "subsequent payments on [that] transaction[] affect the amount of damages but do not constitute separate wrongs" for statute of limitations purposes, this Court reasoned that where a plaintiff seeks to void a contract on the basis that it mandates illegal actions, it is *entry into* the contract that constitutes the wrong, not the subsequent illegal actions. *Id*. at 1041–42. Applying that core principle, this Court concluded that "on the claim for rescission of the 1987 Agreement, … the wrong occurred *in 1987*" and the claim was therefore time-barred. *Id*. at 1042 (emphasis added). The logic of *KKR* thus *confirms* that the limitations period applicable to plaintiffs' Section 29(b) claims runs from their entry into Binance's terms of use, and mandates rejection of their

argument that the limitations period restarts with each transaction pursuant to the contract.[20]

Plaintiffs assert that commencing the limitations period upon their entry into Binance's terms of use is in "hopeless tension" with the language of Section 29 (App. Br. 30), but it is plaintiffs' approach that cannot be squared with Section 29. As demonstrated above, a Section 29 claim accrues upon discovery of the facts constituting the violation, which, here, is the same time as plaintiffs' entry into the allegedly violative contracts. Contrary to plaintiffs' suggestion, this rule does not engraft a "knowledge defense" onto Section 29, nor does it "shorten" the limitations period. Rather, it faithfully applies the one-year constructive knowledge standard applicable to Section 29 and the other express federal securities claims in the Exchange Act, which turns on what a person exercising reasonable diligence would have discovered. Because that statute of limitations bars any claims that were not asserted within one year of their discovery, and because it is apparent from the face of the complaint and the documents

---

[20] *Celsion Corp. v. Stearns Mgmt. Corp.*, 157 F. Supp. 2d 942 (N.D. Ill. 2001), cited by plaintiffs (App. Br. 32), likewise rejects their position. There, the court held that even assuming the plaintiff had alleged a "continuing violation" that was not barred by the three-year statute of repose, its Section 29(b) claim was still untimely under the statute of limitations, because the plaintiff filed suit more than a year after it was aware that the defendant was not a registered broker-dealer, and "it is the discovery of the *facts constituting the violation* that starts the one-year period of limitations." *Id.* at 948 (citations and internal quotations omitted).

incorporated by reference and subject to judicial notice that plaintiffs could have discovered their claims at the time they entered into the contracts, their Section 29 claims are untimely and the District Court properly dismissed them.

## IV. The District Court Properly Dismissed All the State Law Claims Asserted in the Complaint

In a final attempt to save their case from complete dismissal, plaintiffs argue that the District Court improperly dismissed certain of their state-law claims[21] and the state-law claims of absent class members. (App. Br. 38–42.) As a threshold matter, as discussed above, the state laws under which plaintiffs purport to assert claims, like the federal securities laws on which they are modeled,[22] do not apply

---

[21] Specifically, plaintiffs continue to assert that they have cognizable claims under the Blue Sky laws of Texas, Puerto Rico, and Nevada. (App. Br. 38–41.) They do not defend the dismissal of their Florida and California state-law claims on appeal and have therefore abandoned them. *See, e.g.*, *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) (issues not briefed are waived).

[22] *See, e.g.*, *Nat'l Credit Union Admin. Bd. v. Morgan Stanley & Co.*, 2014 WL 241739, at *12–13 (S.D.N.Y. Jan. 22, 2014) ("Texas courts have generally adopted federal securities law when analyzing" Texas Securities Act, which was modeled after federal Securities Act); *SDM Holdings, Inc. v. UBS Fin. Servs., Inc. of Puerto Rico*, 2016 WL 9461324, at *6 (D.P.R. Mar. 1, 2016) (Puerto Rico Uniform Securities Act claims are "for all practical purposes a verbatim repetition of [Exchange Act] claim[s]"), *report and recommendation adopted sub nom. Roman v. UBS Fin. Servs., Inc. of Puerto Rico*, 2016 WL 940664 (D.P.R. Sept. 30, 2016).

extraterritorially, and plaintiffs' claims under those laws were properly dismissed. (*See supra* Point I.)

Having properly dismissed *all* claims that plaintiffs assert in their own names, the District Court rightly dismissed the state-law claims they purportedly brought on behalf of absent putative class members. "In a class action, 'federal courts lack jurisdiction if no named plaintiff has standing'" *McMorris v. Carlos Lopez & Assocs., LLC*, 995 F.3d 295, 299 (2d Cir. 2021) (quoting *Frank v. Gaos*, 139 S. Ct. 1041, 1046 (2019)); *see also In re GE/CBPS Data Breach Litig*, 2021 WL 3406374, at *13 (S.D.N.Y. Aug. 4, 2021) (dismissing claim where plaintiff "has not adequately pleaded facts showing cognizable deceptive conduct," and declining to address absent class members' claims). Under the law of this Circuit, a named plaintiff has "class standing" to assert absent class members' claims only where the named plaintiff itself "personally suffered injury as a result of" the defendants' alleged conduct *and* "such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012) (internal quotations omitted). A plaintiff's claim will implicate the "same set of concerns" as the claims of absent class members where the claims all turn on the same proof. *See id.* at 163. But when a plaintiff has no viable claims of its own, there can be no common proof and

the claims of absent class members necessarily will not involve the same set of concerns. The Southern District of New York recently applied these principles in dismissing state law claims in one of plaintiffs' other, nearly identical cryptocurrency cases, holding that "*courts typically address only the state law claims of the named plaintiff at the motion to dismiss stage* and do not address the standing and merits arguments with respect to the additional state law claims unless and until the motion to dismiss is denied and a motion for class certification is granted." *Bibox*, 534 F. Supp. 3d at 334 (emphasis added).

The same rule applies here. Plaintiffs concede that they cannot assert claims under the laws of states in which they do not allege they transacted. They simply contest that it was proper to dismiss claims purportedly belonging to unnamed class members, even where all the named plaintiffs' claims have been dismissed. As in *Bibox*, plaintiffs cannot purport to represent the claims of unnamed class members when they have failed to raise any actionable claim on their own behalf. Complete dismissal of a class action complaint is unquestionably appropriate when, as here, all named plaintiffs fail to assert an actionable claim. *Bibox*, 534 F. Supp. 3d at 338–41.

The cases upon which plaintiffs rely are inapposite. Each case, unlike this one, involved named plaintiffs who had at least one viable claim to assert in their own right. *See Langan v. Johnson & Johnson Consumer Cos., Inc.*, 897 F.3d 88,

93 (2d Cir. 2018); *In re Asacol Antitrust Litig.*, 907 F.3d 42, 48–49 (1st Cir. 2018).

Here, the only issue the Court need decide is whether lead plaintiffs with no

actionable claims of their own may continue representing the claims of unnamed

class members.  Logic and precedent dictate that the answer is no.

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgment below.


Dated:  October 27, 2022
        New York, New York

                        DAVIS POLK & WARDWELL LLP

                        By:  */s/ James P. Rouhandeh*
                             James P. Rouhandeh

                        James P. Rouhandeh
                        Daniel J. Schwartz
                        Marie Killmond
                        Davis Polk & Wardwell LLP
                        450 Lexington Avenue
                        New York, New York  10017
                        Telephone: (212) 450-4000
                        Facsimile: (212) 701-5835
                        rouhandeh@davispolk.com
                        daniel.schwartz@davispolk.com
                        marie.killmond@davispolk.com

                        *Counsel for defendants Binance and*
                        *Changpeng Zhao*

.

# CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of Local Rule 32.1(a)(4)(A) because this brief contains 13,974 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

Dated:  October 27, 2022
       New York, New York

DAVIS POLK & WARDWELL LLP

By:  */s/ James P. Rouhandeh*
James P. Rouhandeh
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York  10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5835
rouhandeh@davispolk.com