# 22-0972-cv

## United States Court of Appeals

*for the*

## Second Circuit

CHASE WILLIAMS, individually and on behalf
of all others similarly situated,

*Plaintiff-Appellant,*

JD ANDERSON, COREY HARDIN, ERIC LEE, individually
and on behalf of all others similarly situated, BRETT MESSIEH, DAVID
MUHAMMAD, RANJITH THIAGARAJAN, TOKEN FUND I LLC,

*Lead-Plaintiffs-Appellants,*

– v. –

BINANCE, CHANGPENG ZHAO,

*Defendants-Appellees,*

YI HE, ROGER WANG,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

CAITLIN J. HALLIGAN
JORDAN GOLDSTEIN
DAVID COON
SELENDY GAY ELSBERG PLLC
*Attorneys for Plaintiffs-Appellants*
1290 Avenue of the Americas
New York, New York 10104
(212) 390-9000

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................... ii

PRELIMINARY STATEMENT ............................................................. 1

ARGUMENT ............................................................................................ 4

    I.     Plaintiffs Allege Domestic Securities Transactions Because They Incurred Irrevocable Liability To Purchase Tokens In The United States And Title Was Transferred Within The United States ................................................................................. 4

    II.    Plaintiffs' Securities Act Claims Based On Purchases Within One Year Before Filing Are Timely ................................. 12

        A.    The Limitations Period For Section 12(a)(1) Claims Runs From The Date Of Purchase ............................................. 12

        B.    Binance Continuously Solicited the Purchase of Tokens Within One Year Before Filing .................................... 17

    III.    Plaintiffs' Exchange Act Claims Based On Purchases Within One Year Before Filing Suit Are Timely ........................................... 20

    IV.    The District Court Improperly Dismissed State Law Claims On Behalf Of Absent Class Members ................................. 27

CONCLUSION ......................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
  677 F.3d 60 (2d Cir. 2012) ................................................................. 4, 10, 11

*Alpha Cap. Anstalt v. Intellipharmaceutics Int'l Inc.*,
  2020 WL 3318029 (S.D.N.Y. June 18, 2020) ............................................18

*Alpha Cap. Anstalt v. Oxysure Sys., Inc.*,
  216 F. Supp. 3d 403 (S.D.N.Y. 2016) .........................................................20

*Banco Safra S.A.-Cayman Islands Branch v. Samarco Mineracao S.A.*,
  849 F. App'x 289 (2d Cir. 2021) ..............................................................5, 7

*Capri v. Murphy*,
  856 F.2d 473 (2d Cir. 1988) ........................................................................18

*Celsion Corp. v. Stearns Mgmt. Corp.*,
  157 F. Supp. 2d 942 (N.D. Ill. 2001)..........................................................25

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. MBIA, Inc.*,
  637 F.3d 169 (2d Cir. 2011) ..................................................... 13, 14, 16, 23

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014) ..........................................................................5

*Craftmatic Secs. Litig. v. Kraftsow*,
  890 F.2d 628 (3d Cir. 1989) .........................................................................19

*Direction Assocs., Inc. v. Programming & Sys., Inc.*,
  412 F. Supp. 714 (S.D.N.Y. 1976) ..............................................................16

*Diskin v. Lomasney & Co.*,
  452 F.2d 871 (2d Cir. 1971) ........................................................... 12, 13, 16

*Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v.
  Nomura Holding Am., Inc.*,
  873 F.3d 85 (2d Cir. 2017) .............................................................................6

*Giunta v. Dingman*,
  893 F.3d 73 (2d Cir. 2018) ................................................................. 10, 11

*In re OPUS360 Corp. Secs. Litig.*,
  2002 WL 31190157 (S.D.N.Y. Oct. 2, 2002)..............................................19

*In re Tezos Securities Litigation*,
    2018 WL 4293341 (N.D. Cal. Aug. 7, 2018) ............................................. 8-9

*Kahn v. Kohlberg, Kravis, Roberts & Co.*,
    970 F.2d 1030 (2d Cir. 1992) ........................................................................25

*Langan v. Johnson & Johnson Consumer Cos.*,
    897 F.3d 88 (2d Cir. 2018) ...........................................................................28

*Morrison v. National Australia Bank Ltd.*,
    561 U.S. 247 (2010)........................................................................................2

*Myun-Uk Choi v. Tower Rsch. Cap. LLC*,
    890 F.3d 60 (2d Cir. 2018) ................................................................... 5, 6, 7

*Pinter v. Dahl*,
    486 U.S. 622 (1988)................................................................................ 13, 14

*Slomiak v. Bear Stearns & Co.*,
    597 F. Supp. 676 (S.D.N.Y. 1984) ..............................................................22

*United States v. Vilar*,
    729 F.3d 62 (2d Cir. 2013) ..................................................................... 10-11

*Wigand v. Flo-Tek, Inc.*,
    609 F.2d 1028 (2d Cir. 1979) ................................................................ 13, 16

*Wilson v. Saintine Expl. & Drilling Corp.*,
    872 F.2d 1124 (2d Cir. 1989) .......................................................................18

*Youngers v. Virtus Inv. Partners Inc.*,
    195 F. Supp. 3d 499 (S.D.N.Y. 2016) .................................................... 17-18


**Statutes & Other Authorities:**

15 U.S.C. § 77m.................................................................................... 12, 15

15 U.S.C. § 78cc ......................................................................................20

Alexis M. Tellerd, Comment, *Time to Validate Validators: Determining
    the Legal Duty of Cryptocurrency Validators Under the Bank
    Secrecy Act*, 8 Nat'l Sec. L.J. 297 ..............................................................9

David Yaffe-Ballany, *Embattled Crypto Exchange FTX Files for
    Bankruptcy*, N.Y. Times (Nov. 11, 2022) ......................................................1

## **PRELIMINARY STATEMENT**

This case presents novel questions about the extent to which U.S. securities laws protect U.S. consumers from crypto-asset exchanges that promote, offer, and sell highly-risky unregistered crypto-assets—an issue with tremendous consequences, as recent turmoil in the crypto markets underscores.[1]  As alleged in the complaint, Binance heavily promoted, offered, and sold speculative crypto-assets that utilize blockchain technology[2] ("ERC-20 Tokens"[3]) to Plaintiffs and the proposed class via Binance's online crypto-asset exchange.  The Tokens are unregistered securities and Binance was operating as an unregistered exchange, in violation of federal and state securities laws.  Even though Binance relied heavily on U.S. computer infrastructure to make these sales, Binance insists that its conduct is extraterritorial and thus outside the reach of U.S. law simply because it does not maintain formal headquarters in the United States.  If Binance can insulate itself from liability in this way, so too could every crypto-asset exchange.  That would be a terrible result for consumers, and it is not the law.

---

[1] David Yaffe-Ballany, *Embattled Crypto Exchange FTX Files for Bankruptcy*, N.Y. Times (Nov. 11, 2022), https://www.nytimes.com/2022/11/11/business/ftx-bankruptcy.html.

[2] A "blockchain" is a digital ledger that records the ownership and transfers of a specific crypto-asset.  *See* Plaintiffs-Appellants' Opening Brief at 8.

[3] Capitalized terms not defined herein have the same meaning as in Plaintiffs-Appellants' Opening Brief.

The district court improperly dismissed on extraterritoriality and timeliness grounds Plaintiffs' claims seeking redress for this conduct, and Plaintiffs explained in their opening brief why the relevant statutes and this Court's controlling precedents compel reversal. Binance primarily claims dismissal was warranted for reasons that the district court did not even address. Not only do those arguments come too late in the day, they ignore or contradict Plaintiffs' well-pleaded allegations and cannot be squared with this Court's precedents.

Plaintiffs more than adequately alleged that their purchases of Tokens on the Binance exchange were domestic transactions subject to federal and state securities laws under *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). On appeal, Binance argues that the *sine qua non* of the extraterritoriality analysis is the location where Plaintiffs' transactions were "matched." Relying on factual assertions outside of Plaintiffs' complaint, Binance contends that such matching occurred, and Plaintiffs' transactions were recorded, solely "off-chain" (*i.e.*, off the blockchain) in Binance's records. Even if Binance were right—and it is not— Plaintiffs adequately pleaded the domestic nature of the transactions by alleging that Binance's data is stored, and the servers hosting Binance's online exchange are located, on computers physically located in the United States. If instead, as alleged in Plaintiffs' complaint, the transactions were recorded on the blockchain through a process known as "validation" (and not solely "off-chain," as Binance now asserts

on appeal), Plaintiffs' transactions were domestic because that process was completed on computer infrastructure physically located in the United States. Plaintiffs also alleged further steps that occurred in the United States, including their agreement to purchase the Tokens by entering into contracts with Binance and their submission of payment for these purchases from within the United States, and this Court has found such actions to be indicia of domesticity in other cases. In addition, Plaintiffs' purchases were domestic under this Court's precedents for the independent reason that title for the Tokens passed in whole or in part over internet servers located in California that host Binance's website.

As to timeliness, while Binance claims that the applicable limitations periods began to run *before* Plaintiffs had even purchased the securities at issue—and therefore before Plaintiffs could have pleaded claims seeking rescission of those purchases—the text of the Securities Act and the Exchange Act and this Court's precedents defeat that contention. So, too, does the well-established principle that limitations periods (unlike repose periods) do not begin to run until a claim has accrued. Even if Binance's view of statutes of limitations were correct, Plaintiffs' claims would be timely because they alleged violations of the Securities Act and Exchange Act within one year before filing their complaint.

For the reasons detailed below and in Plaintiffs-Appellants' opening brief, the judgment of the district court should be reversed.

## ARGUMENT

**I.  Plaintiffs Allege Domestic Securities Transactions Because They Incurred Irrevocable Liability To Purchase Tokens In The United States And Title Was Transferred Within The United States**

Plaintiffs' complaint sufficiently alleges that their purchases of Tokens on the Binance exchange were domestic securities transactions subject to federal and state securities laws. This Court's decision in *Absolute Activist Value Master Fund Ltd. v. Ficeto* lays out various indicia that a court can use to determine that "irrevocable liability was incurred or title was transferred within the United States" in a securities transaction, and therefore that the transaction was "domestic" and subject to federal securities laws under *Morrison*. 677 F.3d 60, 68, 70 (2d Cir. 2012). Allegations which may suffice to show that the transaction was domestic "includ[e], but [are] not limited to, facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money." *Id.* at 70.

Binance cannot defend the cramped legal standard for domesticity that it asks this Court to adopt. In assessing whether a transaction is domestic or extraterritorial, the Court has not given specific instructions about how much weight to give the relevant factors in each case; instead, *Absolute Activist* and its progeny engage in a case-specific holistic analysis of the various components of each transaction at issue to determine whether a complaint adequately alleges that irrevocable liability was incurred or title was transferred within the United States. For example, this Court

4

has explained that "[d]etailed factual allegations describing contract formation in the United States will typically satisfy the domestic transaction test." *Banco Safra S.A.- Cayman Islands Branch v. Samarco Mineracao S.A.*, 849 F. App'x 289, 293 (2d Cir. 2021) (summary order). "[A] transaction is also domestic when the two sides of the transaction are 'matched'—thus forming a binding contract—on an electronic exchange system within the United States." *Id.* at 293 n.2. Thus, in the context of exchange-traded securities, this Court has found that where trades were matched on an electronic platform located in Illinois, and the alleged "mechanics of the transaction support[ed]" that "the buyer and seller enter[ed] a binding irrevocable agreement through matching" on the electronic platform, the plaintiffs sufficiently alleged domestic transactions. *Myun-Uk Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60, 63, 68 (2d Cir. 2018). On the other hand, this Court has ruled that "the mere placement of a buy order in the United States for [a] purchase of foreign securities" that was "then executed on a foreign exchange," without other transactional steps in the United States that bound the purchaser to the transaction, is insufficient to allege a domestic securities transaction. *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 181 (2d Cir. 2014).

Binance takes an unduly narrow view of the *Absolute Activist* standard, arguing (at 32–33) that for exchange-traded securities, irrevocable liability can attach *only* at the moment "when buy and sell orders are 'matched' on the exchange."

But *Choi*, on which Binance relies, does not set forth an exclusive test for ascertaining the location of transactions in exchanged-traded securities. Instead, *Choi* demonstrates that matching is *not* the only transactional step that can cause irrevocable liability to attach to such transactions; depending on the structure and mechanics of the transaction, a purchaser can incur irrevocable liability at more than one transactional step, in more than one location. *See* 890 F.3d at 68; *accord Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 156 (2d Cir. 2017).

Even if this Court departed from its own precedents to agree with Binance that the place of "matching" was the sole factor in determining where Plaintiffs incurred irrevocable liability for their Token purchases, Plaintiffs' transactions would still be domestic. Binance argues (at 35), without evidentiary support and improperly on a motion to dismiss, that Plaintiffs' transactions occurred "solely 'off-chain' in Binance's records." Even if that were true, it would mean only that Plaintiffs' trades occurred on Binance's servers, which are alleged to be in the United States. A-170–71 (Second Amended Complaint ("SAC") ¶ 24); A-253 (SAC ¶ 327). Plaintiffs allege that although Binance does not have a physical "headquarters," it hosts its

exchange on computer servers in the U.S. and stores its data in the U.S. *Id.*[4] Accordingly, even if Binance were correct that the place where Plaintiffs' purchases are matched on Binance's electronic system is determinative of where Plaintiffs incurred irrevocable liability for their Token purchases, that matching took place in the United States, and Plaintiffs' transactions were therefore domestic. *See Banco Safra*, 849 F. App'x at 293 n.2; *Choi*, 890 F.3d at 63, 68.

Binance's repeated contrary assertions (*e.g.*, at 4, 16, 26, 35) that transactions on the Binance exchange "occurred abroad" on a "foreign trading platform" cannot help Binance. Indeed, they directly contradict the well-pleaded allegations of the SAC and Defendants' own statements. What the SAC actually alleges is that "Binance has rejected the concept of having physical headquarters in any geographic jurisdiction and describes its operations as decentralized"—in other words, Binance takes the untenable position that because it has no headquarters and its exchange is internet-based, Binance has no physical "location" at all, and therefore answers to no one. *See* A-253 (SAC ¶ 326); A-171–72 (SAC ¶ 28) (quoting Defendant Zhao). As discussed above, Plaintiffs allege that even though Binance lacks a physical headquarters, it hosts its exchange on computer servers in the U.S. and stores its data

---

[4] The complaint flatly contradicts Binance's claim (at 36) that Plaintiffs "acknowledge Binance has no operations" in the United States. *See* A-170–71 (SAC ¶ 24); A-253 (SAC ¶ 327).

on computer infrastructure in the U.S. (A-170–71 (SAC ¶ 24); A-253 (SAC ¶ 327)). Plaintiffs' purchases were therefore domestic even accepting, *arguendo*, Binance's claim that irrevocable liability was incurred in the location where Plaintiffs' purchases were matched on Binance's (U.S.-located) electronic systems.

But Binance's myopic focus on matching is misplaced because it ignores Plaintiffs' numerous other allegations which confirm that irrevocable liability was incurred in the U.S. For one thing, as explained in the SAC and Plaintiffs' opening brief (at 21–22, 25) crypto-asset transactions using blockchain technology, such as the Token purchases, become final and binding only once they are "validated" by other participants in the blockchain network. *E.g.*, A-175 (SAC ¶ 44); A-176 (SAC ¶ 50); A-178 (SAC ¶ 58). That validation process occurs across a network of "nodes" (individual computers that "verify the validity of the transaction"), and the largest cluster of nodes validating transactions on the Ethereum blockchain is located in the United States. Opening Br. at 21–22 & nn.6–7, 25; A-170–71 (SAC ¶ 24); A-175 (SAC ¶ 44); A-176 (SAC ¶ 50); A-178 (SAC ¶¶ 56–59); A-254 (SAC ¶ 328).

Because validation makes crypto-asset transactions—including Plaintiffs' Token purchases—final and binding, the place of validation represents a critical factor that can demonstrate where irrevocable liability for a crypto-asset transaction was incurred. Other courts have recognized as much: for example, the district court in *In re Tezos Securities Litigation* applied *Absolute Activist* to find that the

plaintiff's crypto-asset transaction "became irrevocable only after it was validated by a network of global 'nodes' clustered more densely in the United States than in any other country." 2018 WL 4293341, at *8 & n.12 (N.D. Cal. Aug. 7, 2018). Here, Plaintiffs' Token purchases became final and binding—and Plaintiffs incurred irrevocable liability—when the trades were validated by computers servicing the Ethereum blockchain that were physically located in the United States. *See* A-175 (SAC ¶ 44); A-176 (SAC ¶ 50); A-178 (SAC ¶¶ 56–59); A-254 (SAC ¶ 328).[5]

Binance wrongly claims (at 17, 36) that Plaintiffs' allegations do not "speak[] to the relationship between validation and irrevocable liability." But Plaintiffs' allegations directly address the mechanics by which transactions in crypto-assets (including the ERC-20 tokens Plaintiffs purchased) are recorded and validated, including, for example, that ERC-20 tokens "exist on the Ethereum blockchain," and transactions on the Ethereum blockchain are "validat[ed]" by network users who thus ensure that the blockchain is "accurate and secure." *See, e.g.*, A-162 (SAC ¶ 2);

---

[5] Binance's claim (at 37–38) that "any transaction processed and recorded on a blockchain is validated by every single 'node' worldwide" is inconsistent with Plaintiffs' allegations that their Token purchases were validated by computer infrastructure physically located in the United States, and is therefore improper on a motion to dismiss. Moreover, as the cited source and articles referenced therein explain, "[o]nly one validator may successfully confirm a particular transaction, even if multiple validators attempt [to do so]." Alexis M. Tellerd, Comment, *Time to Validate Validators: Determining the Legal Duty of Cryptocurrency Validators Under the Bank Secrecy Act*, 8 Nat'l Sec. L.J. 297, 304–06 & n.35.

A-175 (SAC ¶ 44); A-176 (SAC ¶ 50); A-178 (SAC ¶¶ 56–59). Plaintiffs thus "allege[d] facts suggesting that irrevocable liability was incurred … within the United States." *Absolute Activist*, 677 F.3d at 68.

Beyond this, the complaint alleges additional transactional steps in the United States that bound Plaintiffs to the transactions. Plaintiffs purchased the Tokens while located in their domestic states or territories of residence, pursuant to contracts with Binance that they entered into from their domestic states or territories of residence. A-168–70 (SAC ¶¶ 15–22). (By comparison, the cases on which Binance relies (at 28) involve purchasers who were located abroad.) Plaintiffs also submitted payment for their purchases from their domestic states or territories of residence via Binance's crypto-asset exchange, which is hosted on U.S. computer infrastructure. *See id.*; A-170–71 (SAC ¶ 24).

This Court has found similar allegations regarding where contracts are formed and payments transmitted sufficient to "'lead[] to the plausible inference' of a domestic transaction," which is all that is required at the pleading stage. *Giunta v. Dingman*, 893 F.3d 73, 79 (2d Cir. 2018) (citing *Absolute Activist*, 677 F.3d at 68). For example, a transaction was domestic where an investor "was in New York when she received and signed the commitment forms for her [investment] and sent the money required for opening her account," and thus "irrevocably committed herself to [the] investment while in New York." *United States v. Vilar*, 729 F.3d 62, 78 (2d

10

Cir. 2013). Similarly, this Court found a domestic transaction alleged where a plaintiff agreed to purchase securities while physically located in New York and sent payment for the securities from New York. *Giunta*, 893 F.3d at 82. Plaintiffs' allegations concerning the locations from which they traded Tokens, their formation of contracts with Binance, and their transmission of payment for Tokens, *see* A-168–70 (SAC ¶¶ 15–22); A-170–71 (SAC ¶ 24), likewise suffice to allege domestic securities transactions.

Finally, even if Plaintiffs had not adequately alleged that irrevocable liability was incurred in the United States—which they did—their Token purchases were domestic for the independent reason that "title was transferred within the United States." *Absolute Activist*, 677 F.3d at 69. Although Binance asserts otherwise (at 26), Plaintiffs alleged that "title for the Tokens at issue in those transactions passed in whole or in part over servers located in California that host Binance's website," A-168–170 (SAC ¶¶ 15–22), and Plaintiffs raised that point in briefing to the district court and their opening brief to this Court, No. 1:20-cv-02803-ALC, ECF No. 64 at 9; Opening Br. at 33–34 n.12.[6]

---

[6] As explained in Plaintiffs' opening brief (at 33–34 n.12), Plaintiffs disagree with the district court's ruling that the SAC insufficiently alleged that Binance violated Section 12(a)(1) by passing title of unregistered Tokens to Plaintiffs, and if this case is remanded, Plaintiffs intend to seek the district court's leave to amend the SAC to further expand upon those allegations. With respect to the extraterritoriality analysis, as discussed above, Plaintiffs' allegations that "title for the Tokens at issue

## II. Plaintiffs' Securities Act Claims Based On Purchases Within One Year Before Filing Are Timely

### A. The Limitations Period For Section 12(a)(1) Claims Runs From The Date Of Purchase

A Section 12(a)(1) claim must be brought "within one year after the violation upon which it is based." 15 U.S.C. § 77m ("Section 13"). The district court wrongly held that all of Plaintiffs' Section 12(a)(1) claims—including those arising from purchases made <u>within</u> one year prior to filing suit—are untimely because "the violation alleged for the Section 12(a)(1) claim is solicitation," and the "latest act of solicitation" by Binance "occurred earlier than one year [before] filing." SPA-5. But that view (which Binance seeks to defend) runs directly counter to controlling precedent. It would also yield an untenable result: Section 13's limitations period would begin to run—and maybe even expire—before a plaintiff could assert a cause of action for a violation of Section 12(a)(1).

As explained in Plaintiffs' opening brief (at 33–36), this Court has squarely held that where a plaintiff brings a Section 12(a)(1) claim based on the alleged unlawful offer of unregistered securities, the limitations period runs from the date of the plaintiff's purchase, not the date of the defendant's last solicitation of such purchase. *Diskin v. Lomasney & Co.*, 452 F.2d 871, 875–76 (2d Cir. 1971)

---

in those transactions passed in whole or in part over servers located in California that host Binance's website," A-168–170 (SAC ¶¶ 15–22), are independently sufficient to establish domestic transactions under *Absolute Activist*.

(Friendly, J.); *see also Wigand v. Flo-Tek, Inc.*, 609 F.2d 1028, 1033 n.5 (2d Cir. 1979) (same, in Section 12(a)(2) action); *City of Pontiac Policemen's & Firemen's Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011) (same, in Section 10(b) action). Accordingly, Plaintiffs' Section 12(a)(1) claims based on Token purchases occurring on or after April 3, 2019 (*i.e.*, one year before filing) are timely under Section 13's one-year statute of limitations.

Binance's observation (at 41) that *Diskin* predated the Supreme Court's decision in *Pinter v. Dahl*, 486 U.S. 622 (1988), is irrelevant. As Plaintiffs explained in their opening brief (at 35–36), *Pinter*'s reasoning reaffirms *Diskin*'s conclusion that the limitations period for a Section 12(a)(1) claim based on unlawful offering of unregistered securities cannot begin to run until the plaintiff has purchased the securities. As *Pinter* explained, a plaintiff may not bring a claim under Section 12(a)(1) based on the solicitation of unregistered securities unless and until the solicitation is successful (*i.e.*, the plaintiff purchases the unregistered security). 486 U.S. at 644. The statute of limitations for a Section 12(a)(1) claim therefore must be understood to commence upon the plaintiff's purchase, to avoid an "unreasonable" statutory reading that would allow the limitations period to begin running "before the action could have been brought—a construction which might lead in some extreme cases to a running of the statute of limitations before the claim had even arisen." *Diskin*, 452 F.2d at 875–76.

*Pinter* held that Section 12(a)(1) "clearly confines … liability to those situations in which a sale has taken place." 486 U.S. at 644. That holding forecloses Binance's argument (at 43–44) that neither a purchase nor sale is necessary for the defendant's "violation" of Section 12(a)(1) because *Pinter*'s "purchase requirement" is distinct from the category of "activities that may render a person liable when a sale has taken place." *Pinter* makes clear that there can be no violation of Section 12(a)(1) for the solicitation of unregistered securities until a sale has occurred. Thus, under Section 13's plain language, Plaintiffs' claims arising from purchases within one year of filing are timely.

Binance's strained interpretation of *Pinter* would fly in the face of this Circuit's well-established principles concerning statutes of limitations. As this Court has explained, "[u]nlike a statute of repose, which begins to run from the defendant's violation, a statute of limitations cannot begin to run until the plaintiff's claim has accrued." *City of Pontiac*, 637 F.3d at 176. Because statutes of limitation are designed "to prevent stale claims, it would make no sense for a statute of limitations to begin to run before the plaintiff even has a claim." *Id.* at 175.

Binance is wrong to suggest (at 44) that commencing the Section 12(a)(1) limitations upon the plaintiff's purchase would "permit plaintiffs to bring solicitation claims against defendants at any time—no matter how much time has passed since the alleged solicitation." Section 12(a)(1) claims are governed by a statute of repose

that ensures potential defendants are not subject to open-ended liability for stale claims by barring any actions brought "more than three years after the security was bona fide offered to the public." 15 U.S.C. § 77m.

Finally, Binance's attempts to distinguish *Diskin* from this case are unsupported by *Diskin* itself. Binance argues (at 41–42) that *Diskin* stands only for the proposition that Section 13's limitations period does not begin to run until the time of purchase "where an underwriter both solicits" stocks not currently in existence "and subsequently completes a stock sale as part of a single transaction that violated the securities laws." *Diskin* has no such limitation, and its broad holding cannot be reconciled with Binance's attempt to artificially cabin it to its facts. Likewise, Binance's attempt (at 42–43) to constrain "*Diskin*'s policy rationale" to situations where a "single defendant" both solicited the sale of a then-non-existent security and "subsequently completed the sale after it became available" lacks any basis in the decision or its reasoning. Moreover, Binance's insistence (at 42) that it would be unreasonable to condition the commencement of the limitations period on "separate acts by unconnected persons" cannot be squared with Section 12(a)(1)'s imposition of liability for the "offer" of unregistered securities. That point also ignores that Binance is no stranger to the purchases that it successfully solicited, which were completed via Binance's exchange and based upon which Binance collected a fee.

Contrary to Binance's arguments, *Diskin*'s interpretation of "the one-year period of limitation" applicable under Section 13 was not limited to any particular factual application, and this Court held that the limitations period could not reasonably be read to begin running "at a date before the action could have been brought." 452 F.2d at 875–76. Binance tellingly does not cite a single case that applies Section 13 in the manner it urges upon this Court. Plaintiffs, however, have cited multiple cases that apply *Diskin* or its reasoning outside of the narrow context to which Binance would confine it, which Binance fails to address in its brief. *See* Opening Br. at 35 (citing *Wigand*, 609 F.2d at 1033 n.5; *City of Pontiac*, 637 F.3d at 175); *see also Direction Assocs., Inc. v. Programming & Sys., Inc.*, 412 F. Supp. 714, 717 (S.D.N.Y. 1976) ("[*Diskin*] simply held that the one-year provision in section 77m does not commence to run on an illegal offer until the plaintiff acquires the shares.").

For the reasons explained in Plaintiffs' opening brief and above, the limitations period for Plaintiffs' Securities Act claims began to run upon the date they purchased the Tokens pursuant to Binance's solicitations, and their claims based on such purchases within one year of filing are therefore timely.[7]

---

[7] Binance's knowledge-based arguments discussed in Section III, *infra*, are made only with respect to Plaintiffs' Exchange Act claims and do not apply to Plaintiffs' Securities Act claims.

### B. Binance Continuously Solicited the Purchase of Tokens Within One Year Before Filing

Even if Binance were right—which it is not—that the statute of limitations runs only from the time of the last solicitation, Plaintiffs' Section 12(a)(1) claims are based on solicitations made within one year of suit, and therefore are timely. Plaintiffs allege that Binance, via its website, engaged in continuous solicitation during the year before filing of the two Tokens that Plaintiffs purchased during that year (the EOS and TRX Tokens), including by "displaying detailed price and trading data of the Tokens" that induced Plaintiffs to trade. Opening Br. at 36–37 (citing A-186 (SAC ¶¶ 87–89); A-187–94 (SAC ¶¶ 92–99)).[8] Binance asserts that such allegations do not constitute continuous solicitation, but the cases on which it relies demonstrate otherwise.

Relying on out-of-circuit caselaw, Binance asserts (at 45–47) that Plaintiffs must allege "direct and active participation in the solicitation" of the relevant purchases to allege a violation of Section 12(a)(1). But this Court has never adopted such a standard, and courts in this Circuit—including in a decision Binance itself cites—have concluded that even indirect solicitation can suffice to state a claim under Section 12(a)(2). *Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499,

---

[8] Binance does not contest that in mistakenly concluding the last acts of solicitation were in November 2018 and February 2019, the district court wholly failed to address these allegations.

523 (S.D.N.Y. 2016); *see also Alpha Cap. Anstalt v. Intellipharmaceutics Int'l Inc.*, 2020 WL 3318029, at *4 (S.D.N.Y. June 18, 2020) (explaining that the Second Circuit has not identified what makes a solicitation successful for the purposes of Section 12 liability).

In any event, the cases on which Binance relies (at 45–46) are readily distinguishable on the facts and do nothing to undermine Plaintiffs' allegations of solicitation liability under Section 12(a)(1). Binance did not simply inform investors that it was disseminating information on behalf of another party, or engage in a purely "ministerial" or administrative task with no attempt to "persuad[e]" plaintiffs to invest. *Wilson v. Saintine Expl. & Drilling Corp.*, 872 F.2d 1124, 1126–27 (2d Cir. 1989). Nor do Plaintiffs allege that Binance merely aided in "setting up" the venture, *Capri v. Murphy*, 856 F.2d 473, 478–79 (2d Cir. 1988), or that they simply supervised the marketing process without actively engaging in it, *see Youngers*, 195 F. Supp. 3d at 523.

Instead, Plaintiffs alleged that throughout the class period—and throughout the year prior to filing the complaint—Binance continuously solicited the sale of the Tokens to investors by, for example, inviting them to "[b]uy & sell Crypto in minutes," and enabled them to do so by displaying the necessary price and trade data for the Tokens on its website exchange platform to facilitate and effectuate that sale. *See, e.g.*, A-193–94 (SAC ¶ 99). Binance's website further incentivized investors

by promoting various "Weekly Bonus[es]," "Trading Competition[s]" and other programs affiliated with specific tokens. *See id.* Critically, Plaintiffs allege that Binance "profited handsomely" from engaging in this conduct by "receiving fees for each transaction performed on its exchange" and "receiv[ing] large cash payments from Issuers seeking to have their tokens listed." A-196 (SAC ¶ 102).

That alleged conduct suffices to establish that, even under the standard Binance proffers, Binance engaged in active solicitation for the purpose of persuading investors to purchase tokens on its platform, including the Tokens at issue here, in order to profit Binance as a broker-dealer. *See, e.g.*, *Craftmatic Secs. Litig. v. Kraftsow*, 890 F.2d 628, 636–37 (3d Cir. 1989) (allegations that defendants "solicited plaintiffs … and in so acting were motivated by a desire to serve their own financial interests," and assisted in the preparation of promotional materials, were sufficient at the motion to dismiss stage); *In re OPUS360 Corp. Secs. Litig.*, 2002 WL 31190157, at *10 (S.D.N.Y. Oct. 2, 2002) (assisting in preparing promotional materials and engaging in promotion of investments "while motivated by the prospect for financial gain … constitute[s] the active solicitation of securities").

Accordingly, even if the statute of limitations for Plaintiffs' Securities Act claims ran from the time of the last solicitation (rather than from the date of purchase), Plaintiffs' claims based on purchases made within the year before filing

are timely as a result of Binance's continuous solicitation during the year before filing.

## III. Plaintiffs' Exchange Act Claims Based On Purchases Within One Year Before Filing Suit Are Timely

Plaintiffs' Exchange Act claims arising from purchases on or after April 3, 2019 are timely because Section 29(b)'s one-year limitations period could not have started to run until those purchases occurred. In ruling otherwise, the district court held that "Section 29(b) has a one-year statute of limitations" with "a discovery rule by which the limitations periods only begins to run within one year after the 'discovery that [the] sale or purchase involves [a] violation.'" SPA-6 (citing 15 U.S.C. § 78cc; *Alpha Cap. Anstalt v. Oxysure Sys., Inc.*, 216 F. Supp. 3d 403, 408 (S.D.N.Y. 2016)). As Plaintiffs explained in their opening brief (at 28–33), the district court ruling suffered from several fatal flaws: it rested on factual conclusions about Plaintiffs' purported knowledge of Binance's unregistered status that are unsupported by Plaintiffs' allegations; it cannot be squared with the text of the express Section 29(b) limitations period that it applied, and it improperly engrafts a knowledge defense onto Section 29(b) where none exists. Binance does not defend the district court's reasoning, and now argues that Plaintiffs' claims are untimely under a *different* limitations period. But Plaintiffs' Section 29(b) claims for purchases made within one year of suit are necessarily timely under both the limitations period applied by the district court and the limitations period on which

Binance now relies because neither one began to run until the date of Plaintiffs' purchases.

Without acknowledging that the district court explicitly relied on Section 29(b)'s express limitations period that applies only to fraud claims (and not the strict liability claims at issue here), Binance faults Plaintiffs (at 54) for focusing their opening brief's arguments on that fraud-based limitations period. But Plaintiffs' opening brief (at 27 n.9) specifically highlighted that Section 29(b) provides an express limitations period only for fraud violations and explained that the question of whether that limitations period applies to non-fraud claims such as those here was neither presented to nor expressly decided by the district court.

Notably, Binance does not even attempt to argue that Plaintiffs' Section 29(b) claims for purchases made within one year of suit are untimely under the limitations period applied by the district court. Nor could it; as explained in Plaintiffs' opening brief (at 28–33), those claims are necessarily timely under the plain language of that limitations period. Instead, Binance claims (at 48) that the appropriate limitations period for non-fraud Section 29(b) claims "runs from the date that a 'reasonably diligent plaintiff would have discovered the facts constituting the [alleged] violation.'" Even under that limitations period, Plaintiffs' Section 29(b) claims are timely.

In arguing otherwise, Binance asserts (at 49, 52) that the date of the "violation" for the purposes of its discovery rule and limitations period is the date on which the contract was "made." Based on that logic, Binance claims that Plaintiffs' claims are untimely because, according to Binance, Plaintiffs knew that Binance was an unregistered exchange when they agreed to their contracts with Binance, and those contracts were entered into more than one year prior to filing. Binance is wrong for several reasons.

*First*, as Plaintiffs explained in the district court, the relevant contracts between Plaintiffs and Binance that Plaintiffs seek to rescind are the purchase contracts that Plaintiffs impliedly entered into with Binance upon executing each Token purchase at issue. No. 1:20-cv-02803-ALC, ECF No. 64 at 4, 14–15 (citing SAC ¶¶ 15–22, 58, 375, 386). Each time the Plaintiffs transacted in the Tokens, they paid Binance a 0.1% fee associated with the transaction and, in doing so, entered into a purchase contract with Binance that necessarily, and "'as in fact performed' involved effecting securities transactions on an unregistered exchange." *Id.* at 14 (quoting *Slomiak v. Bear Stearns & Co.*, 597 F. Supp. 676, 682 (S.D.N.Y. 1984)). Binance's assertion (at 49) that "the only contracts plaintiffs allege they had with Binance are the terms of use" is therefore wrong and inconsistent with Plaintiffs' allegations. Because Plaintiffs' purchase contracts for Token purchases within the year before filing were formed within the year before filing, Plaintiffs' Section 29(b)

claims based on those purchases are timely even if Binance were right (which it is not, as explained below) that the limitations period necessarily begins to run at the time of contract formation.

As explained in Plaintiffs' opening brief (at 28–29) Plaintiffs' allegations do not support an inference that Plaintiffs knew Binance was an unlawfully unregistered exchange prior to the time of the relevant Token purchases, as Binance contends (at 51–52) and the district court improperly found. But even if Plaintiffs did have such knowledge, it would have no bearing on the timeliness of their claims. Binance's arguments (and the district court's holding) that the limitations period began to run *before* Plaintiffs entered the relevant purchase contracts—and therefore before Plaintiffs' claims to rescind those contracts accrued—would improperly create a knowledge defense where none exists in the statute. Statutes of limitations, unlike statutes of repose, begin to run only after accrual. *See, e.g.*, *City of Pontiac*, 637 F.3d at 176. As Plaintiffs explained in their opening brief (at 30–33), neither the plain language of Section 29(b), nor caselaw concerning discovery rules more generally, support a reading of Section 29(b) under which claims would be untimely *ab initio* if a plaintiff learned of the fact that the exchange was unregistered before entering into the purchase contract the plaintiff seeks to rescind. Thus, for the reasons explained in Plaintiffs' opening brief and above, Plaintiffs' claims based on

purchases made on or after April 3, 2019 are timely under the one-year statute of limitations applicable to Section 29(b) claims.

*Second*, Plaintiffs' claims are timely even if Binance were correct that Binance's terms of use are the only contracts between Plaintiffs and Binance (which they are not), because the limitations period to rescind those contracts with respect to Plaintiffs' purchases within the year before filing did not begin to run until the date of the relevant purchases. Binance observes that contracts are not voidable under Section 29(b) unless they are facially unlawful under the terms of the Exchange Act, and asserts that the limitations period therefore necessarily runs from the time of contract formation. But not one of the cases Binance cites (at 49, 52–53) holds that the limitations period necessarily begins to run on the date the allegedly unlawful contract is formed. Moreover, Binance does not identify—and Plaintiffs have not found—any cases holding that, as Binance argues (at 52–53), Section 29(b) claims accrue when the contract is signed, such that plaintiffs may bring such claims before any illegal transaction has occurred and even if no party ever performs under the contract. Presumably if Plaintiffs had brought suit against Binance upon agreeing to the underlying terms but before making a purchase, Binance would have sought dismissal for lack of standing under Article III.

Cases interpreting analogous limitations provisions for rescission actions demonstrate that the limitations period begins to run at the time of Plaintiffs'

purchases for which they seek to rescind the contract (*i.e.*, purchases within the year before filing).  As Plaintiffs explained in their opening brief, those cases conclude that where, as here, the contract does not require performance by either party, accrual of the rescission claim occurs on the date of sale of a security (which in this case occurred within a year of suit), not the prior date on which the contract was entered into.  Opening Br. at 32–33 (citing *Kahn v. Kohlberg, Kravis, Roberts & Co.* ("*KKR*"), 970 F.2d 1030, 1040 (2d Cir. 1992); *Celsion Corp. v. Stearns Mgmt. Corp.*, 157 F. Supp. 2d 942, 949 (N.D. Ill. 2001)).

Binance's attempts to distinguish those cases are flawed.  Although this Court in *KKR* determined that the limitations period ran from the time of contract formation, that conclusion was based on the parties' "commit[ment] to pay" the amount under the specific contract at issue.  970 F.2d at 1040–41.  The Court made clear that where, as here, a plaintiff seeks to rescind a contract that contemplates but does not require subsequent payments, the statute of limitations for a rescission claim *does not* begin to run at the time of contract formation.  *Id.* at 1039–41.  As for *Celsion*, the passage Binance cites in attempting to distinguish the decision did not address whether claims can accrue before the date of sale.  Indeed, the court held that the accrual date was the date of sale, which was the same as the date of formation because the parties were "obligated" to carry out the sale under the contract.  157 F. Supp. 2d at 949.  Here, by contrast, the Plaintiffs were not obligated to carry out any

transaction once they had created their accounts, and thus the "sale" for purposes of *Celsion*'s analysis could not have occurred at any point prior to Plaintiffs' purchase of the Tokens.

*Finally*, even if Binance were right that its terms of use are the only relevant contracts between Plaintiffs and Binance, and even if Binance were right that the limitations period runs from the date of formation of the contract, Plaintiffs' claims for purchases within the year before filing are timely. Binance issued a revised terms of use agreement on February 20, 2019, which governed any purchases made thereafter. A-489–511. Pursuant to its terms, each Plaintiff agreed to the revised terms of use agreement as of the date they first transacted on Binance *after* issuance of those new terms of use. A-498. But none of the Plaintiffs transacted on the date the revised terms of use agreement was issued, nor on any other date until *after* April 3, 2019. *See* A-129 (Williams Certification) (transacted on May 8, 2019); A-143 (Token Fund I LLC Certification) (transacted on May 19, 2019); A-87 (Muhammad Certification) (transacted on June 27, 2019); A-58 (Hardin Certification) (transacted on July 8, 2019); A-125 (Thiagarajan Certification) (transacted on March 19, 2020). Plaintiffs therefore did not enter into the revised terms of use until after April 3, 2019, which was within one year before filing the complaint. Plaintiffs' Section 29(b) claims based on purchases within the year prior to suit are therefore timely

even under Binance's incorrect arguments since Plaintiffs agreed to the underlying terms of use governing those purchases within one year of suit.

## IV. The District Court Improperly Dismissed State Law Claims On Behalf Of Absent Class Members

Plaintiffs assert several claims on behalf of absent class members under Blue Sky laws of jurisdictions in which putative class members, but not the named Plaintiffs, purchased Tokens. As explained in Plaintiffs' opening brief (at 38–41), Plaintiffs Anderson, Muhammad, Williams, Hardin, and Token Fund I LLC brought timely state law claims arising from their individual Token purchases under the Blue Sky laws of their respective states or territories of residence (Texas, Nevada, and Puerto Rico), which the district court wrongly dismissed as untimely. Although Binance argues in passing (at 57–58) that these claims should be dismissed because they are impermissibly extraterritorial, Binance does not dispute, and therefore concedes, that these claims are <u>timely</u> under the applicable two- and three-year state limitations periods.

Instead, Binance argues (at 58) that "[h]aving properly dismissed all claims that plaintiffs assert in their own names, the District Court rightly dismissed the state-law claims they purportedly brought on behalf of absent putative class members." Binance *does not* argue that if Plaintiffs' claims survive dismissal, it would still be appropriate to dismiss claims asserted on behalf of absent class members on the ground relied upon by the district court (*i.e.*, that "there is an

27

insufficient nexus between the allegations" concerning named Plaintiffs' purchases "and those jurisdictions"). SPA-9. For good reason: as Plaintiffs explained in their opening brief (at 41–42), Plaintiffs plainly have Article III standing to sue Defendants based on Plaintiffs' own purchases, and the question of whether they may *additionally* bring claims on behalf of out-of-state, absent class members whose claims arise under materially identical states' laws is a predominance question reserved for the class certification stage. *Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 93 (2d Cir. 2018).

## <u>CONCLUSION</u>

For the foregoing reasons and the reasons set forth in Plaintiffs-Appellants' opening brief, Plaintiffs-Appellants respectfully request that the Court reverse the judgment of the district court and remand for further proceedings.

Dated: November 17, 2022
   New York, New York

 

                                    */s/ Caitlin J. Halligan*
                                    CAITLIN J. HALLIGAN
                                    JORDAN GOLDSTEIN
                                    DAVID COON
                                    SELENDY GAY ELSBERG PLLC
                                    1290 Avenue of the Americas
                                    New York, New York 10104
                                    (212) 390-9000

                                    *Attorneys for Plaintiffs-Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a)(5) of the Federal Rules of Appellate Procedure, the foregoing brief is in 14-Point Times New Roman proportional font and contains 6,724 words and thus is in compliance with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

Dated: November 17, 2022
      New York, New York

*/s/ Caitlin J. Halligan*

CAITLIN J. HALLIGAN
JORDAN GOLDSTEIN
DAVID COON
SELENDY GAY ELSBERG PLLC
1290 Avenue of the Americas
New York, New York 10104
(212) 390-9000

*Attorneys for Plaintiffs-Appellants*